1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,    )
                                  )    Case No. 2:16-cr-00046-GMN-PAL
4              Plaintiff,         )
                                  )    Las Vegas, Nevada
5         vs.                     )    February 14, 2017
                                  )    3:32 p.m.
6    ERIC J. PARKER (11), O.      )
     SCOTT DREXLER(12), RICHARD   )
7    LOVELIEN (13), STEVEN A.     )
     STEWART (14), TODD C. ENGEL  )
8    (15), and GREGORY P.         )
     BURLESON (16),               )
9                                 )    Testimony of Michael Johnson
               Defendants.        )
10   _____ )

11                   PARTIAL TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE GLORIA M. NAVARRO
12          UNITED STATES DISTRICT COURT CHIEF JUDGE, AND A JURY

13

14   APPEARANCES:

15   For the Government:

16             STEVEN W. MYHRE, AUSA
               ERIN M. CREEGAN, SAUSA
17             NADIA JANJUA AHMED, AUSA
               NICHOLAS D. DICKINSON, AUSA
18             United States Attorney's Office
               District of Nevada
19             501 Las Vegas Boulevard South, Suite 1100
               Las Vegas, Nevada 89101
20

21   Appearances continued on next page.

22

23   Court Reporter:  Katherine Eismann, CSR, CRR, RDR
                       (702)431-1919 ke@nvd.uscourts.gov
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.

1    APPEARANCES CONTINUED:

2   For the Defendant Eric J. Parker (11):

3            JESS R. MARCHESE, ESQ.
             Law Office of Jess R. Marchese
4            601 South Las Vegas Boulevard
             Las Vegas, NV 89101
5            marcheselaw@msn.com

6   For the Defendant O. SCOTT DREXLER (12):

7            TODD M. LEVENTHAL, ESQ.
             Leventhal and Associates
8            626 South Third Street
             Las Vegas, NV 89101
9            leventhalandassociatescmecf@gmail.com

10  For the Defendant Richard Lovelien (13):

11           SHAWN R. PEREZ, ESQ.
             Law Office of Shawn R. Perez
12           626 South Third Street
             Las Vegas, NV 89101
13           shawn711@msn.com

14  For the Defendant Steven A. Stewart (14):

15           RICHARD E. TANASI, ESQ.
             601 South Seventh Street, 2nd Floor
16           Las Vegas, NV 89101
             rtanasi@tanasilaw.com

17
    For the Defendant Todd C. Engel (15):
18
             TODD C. ENGEL, PRO SE
19           18427-023
             Nevada Southern Detention Center
20           2190 Ease Mesquite Avenue
             Pahrump, NV 89060
21
             JOHN G. GEORGE, ESQ. (Standby Counsel)
22           600 South 8th Street
             Las Vegas, NV 89101
23           johngeorgejr@fastmail.fm

24

25

1    APPEARANCES CONTINUED:

2    For the Defendant Gregory P. Burleson (16):

3              TERRENCE M. JACKSON, ESQ.
               Law Office of Terrence M. Jackson
4              624 South Ninth Street
               Las Vegas, NV 89101
5              Terry.Jackson.Esq@gmail.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Tuesday, February 14, 2017, 3:32 p.m.)

2                         --oOo--

3                  P R O C E E D I N G S

4        (Jury in.)

5            MR. DICKINSON:  The government calls Special Agent

6    Michael Johnson.

7            THE COURT:  Good afternoon, Mr. Johnson, Special

8    Agent Johnson.  Come on up here.  You are going to be taking

9    the seat to my right.  Be careful with -- actually, we have all

10   the wires out of the way, but be careful with the steps.

11                     MICHAEL JOHNSON,

12   having been duly sworn, was examined and testified as follows:

13           COURTROOM ADMINISTRATOR:  State your full name and

14   spell it for the record.

15           THE WITNESS:  Michael Johnson, M-I-C-H-A-E-L

16   J-O-H-N-S-O-N.

17                   DIRECT EXAMINATION

18   BY MR. DICKINSON:

19   Q.   Good afternoon, Special Agent Johnson.

20   A.   Good afternoon.

21   Q.   Can you tell the ladies and gentlemen of the jury where

22   you work?

23   A.   I am a special agent -- the Assistant Special Agent In

24   Charge for BLM law enforcement in Utah.

25   Q.   And how long have you been the Assistant Special Agent in

Michael Johnson - Direct

1   Charge in Utah?

2   A.   Almost one year.

3   Q.   And before that, were you just a special agent?

4   A.   Yes, sir.  I was.

5   Q.   And were you a special agent in April 2014?

6   A.   Yes, sir.  I was.

7   Q.   And were you -- did you have any involvement, as a special

8   agent, in the impoundment operation regarding Cliven Bundy's

9   cattle?

10  A.   Yes, I did.

11  Q.   And prior to the impoundment operation starting, did you

12  have some involvement in attempting to reach out to the Bundy

13  family?

14  A.   Yes, I did.

15  Q.   All right.  Sort of the two main things I want to talk

16  about, but your background a little bit.

17          When did you start with the BLM?

18  A.   In October of 2012.

19  Q.   Before October of 2012, did you have any prior law

20  enforcement experience?

21  A.   Yes, I did.  I was a uniformed division Secret Service

22  officer starting in 2001 and became a special agent with the US

23  Secret Service in 2004.

24  Q.   And just briefly, what's the difference between a

25  uniformed secret service officer and a non-uniformed Secret

Michael Johnson - Direct

1  Service officer?

2  A.   As a uniformed Secret Service officer, I was primarily

3  responsible for physical security of the vice president's

4  residence, the White House, and various foreign missions

5  located in the Washington, DC, area.

6         As a special agent with the Secret Service, I was

7  responsible for investigating counterfeit currency, financial

8  crimes, threats against persons that we protect and so forth.

9  Q.   And were you in DC the whole time or elsewhere?

10 A.   I was in Washington, DC, until early 2004.  And then I

11 transferred to Houston, Texas.

12 Q.   And what is your educational background?

13 A.   I have a bachelor's degree in business administration.

14 Q.   And why the move from the Secret Service to the BLM?

15 A.   The BLM is actually the agency that I wanted to work for

16 from the time I was a teenager.  I had hopes of working for

17 them from that time.

18        But due to the limited positions available, and once

19 the positions are full, the difficulty in getting those

20 positions, I needed to go get some experience with another

21 agency so that I would be qualified to work for the BLM.  And

22 so it was kind of a life's goal, really, which became true for

23 me in 2012.

24 Q.   And did you end up in Utah?

25 A.   I did.

1   Q.   So did the move also get you back home?

2   A.   It did.  I applied with the BLM all over the country, and

3   lucked out, and I got my hometown.

4   Q.   And did you do your initial law enforcement training with

5   the Secret Service?

6   A.   I did.

7   Q.   And did that involve some Time at what the jury has now

8   heard of as FLETC?

9   A.   Okay.  Yes, I did two different tours at the Federal Law

10  Enforcement Training Center in Glencoe, Georgia.

11          First was for the uniformed division Secret Service,

12  and second as a special agent with the Secret Service.  Also

13  attended the Secret Services's respective academies in

14  Beltsville, Maryland, for each of those.

15  Q.   And was there any specific training when you started BLM,

16  or was it on-the-job training or --

17  A.   It was on-the-job training.

18  Q.   All right.  Now, in your role as a special agent, how did

19  you became involved -- special agent in Utah, how did you

20  become involved in the impoundment operation in 2014 here in

21  Nevada?

22  A.   My supervisors, which supervised Utah and Nevada, were in

23  charge of planning the -- the cattle gather.  And, therefore,

24  as I worked for them, I became involved with parts of it.

25  Q.   And the supervisors were?

Michael Johnson - Direct

1  A.   Rand Stover and Dan Love.

2  Q.   And before the operation started, in April of 2014, were

3  you tasked with trying to contact the Bundy family?

4  A.   Yes, I was.

5  Q.   And were you the sole agent with that task or was there

6  another agent?

7  A.   Myself and Special Agent Shilaikis from Colorado.

8  Q.   And who tasked you to do that?

9  A.   The Special Agent in Charge Dan Love.

10 Q.   And what was the purpose of trying to reach out to the

11 Bundy family?

12 A.   The purpose of the -- of our trip down to Nevada was to

13 attempt to reach out for the Bundy family -- members of the

14 Bundy family, including Cliven Bundy, Dave Bundy, Ryan Bundy,

15 and discuss with them our intentions to fulfill the Court

16 orders to remove the cattle from the Gold Butte area, and to

17 see if there was anything that we could do, as BLM law

18 enforcement, to mediate any potential problems.

19 Q.   And you mentioned Dave and Ryan Bundy.  To your

20 understanding, what was their relationship with Cliven Bundy?

21 A.   It was my understanding that they were his sons.

22 Q.   And was part of trying to contact the Bundys -- was it to

23 assess any potential threats there might be?

24 A.   Absolutely.  Given the history that I was made aware of

25 from previous attempts to gather the cows there, it was my

Michael Johnson - Direct

1   understanding that there was difficulties there.  And that my

2   role would be to go down and -- and try to talk with them

3   one-on-one, if they would meet with us, and see if there was

4   anything we could do to -- to keep any problems from occurring.

5   Q.   And as the primary day that this occurred, was that

6   March 17, 2014?

7   A.   Yes, it was.

8   Q.   All right.  I want to talk a few minutes and just walk you

9   through that day and the attempts you made to speak with Cliven

10  Bundy, Dave Bundy, and then Ryan Bundy.

11           So where did you start that the day?

12  A.   We started that day in Bunkerville, Nevada, attempting to

13  contact Cliven Bundy at his residence.

14  Q.   And how did you go about that?

15  A.   Myself and Special Agent Shilaikis drove to his home, and

16  knocked on his door, and attempted to talk to him.  And he was

17  not home.

18  Q.   And how were you dressed that day?

19  A.   I was dressed in plain clothes, jeans, cowboy boots, a

20  button-up shirt, cowboy hat.

21  Q.   So made no contact at the residence in Bunkerville?

22  A.   No, sir.

23  Q.   And what did you do next?

24  A.   Next we attempted to call what we believed to be his

25  cellular telephone number.  He did not answer.  I left a voice

Michael Johnson - Direct

1    mail with my name and cellular phone number asking him if he

2    would call me back.

3    Q.   Did you ever get a call back?

4    A.   I never did.

5    Q.   And in total, a call back period?

6    A.   No.

7    Q.   So after that, where did you go?

8    A.   After that, we were already in contact with a BLM

9    uniformed ranger that resided in the area.  And she -- her name

10   was Ranger Sullivan.  She recommended that we go to some areas

11   that were nearby on BLM land that she had recently seen members

12   of the Bundy family gathering cattle.  And that we could

13   potentially run into them and talk to them.

14   Q.   And did you do that?

15   A.   We did.

16   Q.   And what happened?

17   A.   While we were driving out to the area where she believed

18   they could be, we saw a pickup truck coming towards us on the

19   dirt road that we were on.  So we pulled completely off the

20   road, and got out of our -- our truck, and attempted to make

21   contact with them.

22        We didn't impede their progress in any way.  We

23   didn't verbally ask them to stop.  But it's pretty customary,

24   when you are out in the back country in the desert, that if

25   somebody is stopped, that you would talk, stop, and say hello.

Michael Johnson - Direct

1    And so they -- they stopped to talk to us.

2    Q.   Were you in a marked BLM vehicle or --

3    A.   No, it was unmarked.  It was a Ford F150 unmarked truck.

4    Q.   And who did you come in contact with?

5    A.   We came in contact with two individuals, one who

6    identified himself as Duke Clancy Cox.  He goes by Clancy.  And

7    another individual who identified himself as an associative

8    grandson of Cliven Bundy.  Clancy Cox is the son-in-law of

9    Cliven Bundy.

10   Q.   And how long did you talk to those two individuals?

11   A.   It was just a few minutes.  We immediately identified

12   ourselves as BLM law enforcement and told them of our

13   intentions.  That we were attempting to make contact with

14   members of the Bundy family that day to discuss the upcoming

15   cattle gather.  And they knew about it.

16         And we asked if -- we asked Clancy if he would, in

17   fact, attempt to contact Cliven Bundy for us to see if he would

18   meet with us.  And he did.  He did so.  He called Cliven Bundy

19   on his cellular telephone.

20         Mr. Bundy declined to meet with us at that time.  We

21   then asked Clancy if we could have Cliven Bundy's cell phone

22   number.  He did give it to us.  And we asked for Clancy's cell

23   phone number, so that we could contact him back if it was

24   needed, and he did provide it to us as well.

25   Q.   Did you ever call the number that was given to you that

Michael Johnson - Direct

1    you were told was Cliven Bundy's cell phone number?

2    A.   We did.  At the end of the contact, when Clancy was on his

3    way, we got to an area where we had cell phone reception, and

4    we attempted to call Cliven Bundy on the new number that Clancy

5    had given us, and he did not answer.

6          We provided him with our -- I then provided him with

7    my name and cellular phone number to return our call should he

8    choose.

9    Q.   Did you ever receive a call from Cliven Bundy?

10   A.   I did not.

11   Q.   After that, what did you do?

12   A.   After that, we proceeded to go to Mesquite, Nevada, not

13   far away, to attempt to talk to Dave Bundy, one of Cliven

14   Bundy's sons, at an address that we had that we believed to be

15   a potential work address.

16         We arrived at the location and contacted an unknown

17   person there who told us that Dave Bundy had not worked there

18   in several years.

19   Q.   Did you have another lead of where to possibly find Dave

20   Bundy after that?

21   A.   After that, we drove to St. George, Utah, to attempt to

22   contact him at what we believed to be a potential residence for

23   him.  When we arrived at the place, it ended up being a mail

24   parcel store that had, like, P.O. boxes.

25         And we talked to the employee there and asked if we

Michael Johnson - Direct

1    could have the information that belonged to the number, which

2    we originally thought was potentially an apartment number and

3    ended up being a box number.  The employee did provide us with

4    the information on the box number.  It was registered to Dave

5    Bundy, and it was registered to a different address there in

6    St. George, Utah.

7    Q.   And did you go to that address?

8    A.   We did go to that address.

9    Q.   And were you able to make contact with Dave Bundy at that

10   address?

11   A.   Dave Bundy was not at that address.  A person who we later

12   identified as Dave Bundy's wife's sister resided at that

13   address.  Her name was Lora Lee.  When we opened the door, we

14   identified ourselves and asked if she knew if Dave Bundy was at

15   home.

16          And she said, "I -- I don't know anybody named Dave,

17   and I don't know any Bundys," and she shut the door on us.

18   Q.   After that, did you go try and make contact with Ryan

19   Bundy?

20   A.   We did.  We drove from St. George, Utah, to Cedar City,

21   Utah, still again with my partner Agent Shilaikis.  And we

22   drove by the address that we believed to be Ryan Bundy's

23   address.

24          When we drove by his house, we observed there to be

25   several people out in front of the house, several people in the

Michael Johnson - Direct

1    house, several vehicles in the driveway, several vehicles in

2    the street.  And we decided, at that time, that we would not --

3    just the two of us -- attempt to knock on the door and make

4    contact with Ryan Bundy.

5    Q.   So what did you do?

6    A.   So we went to the Cedar City Police Department, and we

7    spoke with an Officer Smith there who was the afternoon

8    supervisor, and identified ourselves as BLM law enforcement and

9    discussed with him the possibility of having his assistance --

10            MR. LEVENTHAL:  Your Honor, I am going to object.

11   There's somewhat of a narrative here, and it's allowing some

12   hearsay statements in.

13            MR. JACKSON:  I will join in that objection.

14            THE COURT:  Mr. Dickinson?

15            MR. DICKINSON:  I will rephrase the question, Your

16   Honor.

17            THE COURT:  All right.  Go ahead.

18   BY MR. DICKINSON:

19   Q.   You made contact with a law enforcement officer.  After

20   having some discussions with -- you say Officer Smith?

21   A.   Yes, sir.

22   Q.   What did you do?

23   A.   We -- after Officer Smith had also run Ryan Bundy's --

24   Q.   Let me just ask you.  What did you do?  Whether you or

25   Officer Smith, did anybody make contact with Ryan Bundy?

Michael Johnson - Direct

1    A.    Yes.   Officer Smith made telephonic contact with Ryan

2    Bundy in our presence.

3    Q.    And what did he tell him?

4    A.    He told them that we --

5            MR. LEVENTHAL:   Objection.   Hearsay.

6            THE COURT:   Mr. Dickinson?

7            MR. DICKINSON:   It's not for the truth of the matter,

8    Your Honor.   It's just for the fact that this officer told Ryan

9    Bundy that the BLM wanted to talk with him and eventually gave

10   them his phone number, and then Ryan Bundy contacts them.

11           THE COURT:   All right.   I will allow it.

12   BY MR. DICKINSON:

13   Q.    What did the officer state in your presence?

14   A.    He stated, in our presence, and we could hear Ryan Bundy's

15   voice on the speaker phone, that there were two BLM law

16   enforcement agents here that would like to meet him to discuss

17   the cattle gather at a neutral location.

18   Q.    And what did Mr. Bundy say?

19   A.    Ryan Bundy responded by saying --

20           MR. LEVENTHAL:   Objection.   Hearsay.

21           MR. JACKSON:   I'd object on the same grounds and

22   confrontation grounds for --

23           THE COURT:   Mr. Dickinson?

24           MR. JACKSON:   -- Mr. Burleson.

25           MR. DICKINSON:   This would be in furtherance of the

1   conspiracy, Your Honor.  This is where Mr. Bundy starts saying

2   it's family, and he will not cooperate in the cattle gathering.

3   And then bring it down to where he calls the agent, and I'm

4   sure we'll get the same objection.  And I can --

5          THE COURT:  All right.  So it's offered as a

6   coconspirator statement?

7          MR. DICKINSON:  Yes, Your Honor.

8          THE COURT:  All right.  Go ahead.

9          MR. DICKINSON:  And there's no confrontation -- just

10  for the record, Your Honor, there's no confrontation issue

11  because, A, it's being offered for -- as the statement of a

12  coconspirator; and, B, it's not testimonial.

13  Q.   Go ahead.  What did Mr. Bundy say?

14  A.   Mr. Bundy stated that we should not show up to the cattle

15  gather, and that when the officer attempted to have Ryan Bundy

16  speak with us, Ryan Bundy terminated that phone call.

17  Q.   And what did you do then?

18  A.   We then spoke with the officer, and the officer told us

19  that if he could make contact with Ryan later in the evening,

20  he would see if Ryan would call us.  And after that, we

21  returned to our hotel for the evening.

22  Q.   And what happened when you returned to your hotel?

23  A.   After we returned to the hotel, I received a phone call on

24  my cellular telephone, of which I recognized the number to be

25  Ryan Bundy's cellular -- cellular phone number.

Michael Johnson – Direct

1  Q.   And did you answer the call?

2  A.   Yes, I did.

3  Q.   And did the person on the other line identify himself?

4  A.   Yes, he did.  He identified himself as Ryan Bundy.

5  Q.   And did you recognize the voice from the police station

6  phone call?

7  A.   I did recognize his voice.

8  Q.   And what did you do then?

9  A.   The phone call lasted approximately 46 minutes, and we

10 spoke on many, many issues.

11 Q.   Let me stop you there.  Did you record the phone call?

12 A.   Yes, I did.

13 Q.   And describe how that happened.  You get the phone call.

14 It's Ryan Bundy.  What do you do?

15 A.   We ran from the hotel room.  The audio recorder that we

16 possessed was out in our vehicle.  So we ran out to the vehicle

17 and turned on the recorder.  The recording began a couple of

18 minutes after the conversation was initiated.

19 Q.   And you say "we."  Was that still Special Agent Shilaikis

20 with you?

21 A.   Yes, sir.  He was with me.

22 Q.   And in general, what was your purpose during the 46-minute

23 telephone call with Ryan Bundy?

24 A.   My purpose circled back to the reason in which I was asked

25 to go down there initially by my Special Agent in Charge, and

Michael Johnson - Direct

1  that was to ascertain the reason or the -- to ascertain what

2  the Bundy family and their associates may do to impede this

3  cattle gather.  And to offer up the -- myself as a contact for

4  them.  That if they had any questions, they should contact me,

5  and we should try and work it out ahead of time.

6  Q.   And next to you is a binder.  One of the binders starts

7  with 1.  I want you to look at Exhibit 13.  It may be on the

8  front is where they are numbered.  I apologize.

9          May I approach, Your Honor?

10          THE COURT:  Yes, you may.  It think it's the front

11  cover of the binder not on the spine.

12  BY MR. DICKINSON:

13  Q.   Government Exhibit 13, that is a disk with an audio file;

14  correct?

15  A.   Yes, sir.

16  Q.   And prior to coming to court, did you have an opportunity

17  to review that audio file, Exhibit 13?

18  A.   Yes, sir.  I have.

19  Q.   And was that the phone call between you and Dave Bundy

20  [sic] on the 17th of March?

21  A.   Yes, it is.

22  Q.   And there are six clips cut down from the 46 minutes;

23  correct?

24  A.   Yes, sir.

25  Q.   And do those six clips accurately reflect the phone

Michael Johnson - Direct

1   conversation you had with Dave Bundy on the 17th?

2   A.   Yes, they do.

3            MR. DICKINSON:  Your Honor, I would offer Government

4   Exhibit 13 into evidence.

5            THE COURT:  Any objection to Exhibit 13?

6            MR. MARCHESE:  No objection Parker.

7            MR. TANASI:  No objection Stewart, Your Honor.

8            MR. ENGEL:  None from Engel.

9            MR. LEVENTHAL:  No objection on behalf of

10  Mr. Drexler.

11           MR. PEREZ:  None for Lovelien.

12           MR. JACKSON:  Just the objection of relevance as to

13  my client.

14           THE COURT:  All right.

15           MR. JACKSON:  Greg Burleson.

16           THE COURT:  So Exhibit 13 will be admitted.  Did you

17  want to publish it?

18           MR. DICKINSON:  Yes, Your Honor.

19       (Exhibit 13 admitted.)

20  BY MR. DICKINSON:

21  Q.   And just starting -- clip one starts at the beginning of

22  your telephone call; correct?

23  A.   Yes, it does.

24  Q.   Strike that.  Clip one starts the beginning of your

25  recording; correct?

Michael Johnson - Direct

1   A.   Yes, sir.

2   Q.   But that was not the beginning of the telephone call?

3   A.   No, sir.

4   Q.   And again, why was that?

5   A.   We were inside the hotel room -- inside the hotel, and the

6   audio recorder was located in our vehicle.  When the call

7   began, we moved from the hotel out to our vehicle to begin the

8   recording.

9           MR. DICKINSON:  We can publish clip A.

10          (Exhibit 13 being played.)

11   BY MR. DICKINSON:

12   Q.   And you pretty much just came straight out and said what

13   your purpose was at the beginning of the clip; correct?

14   A.   Yes, I did.  I wanted to be upfront with Ryan Bundy and

15   tell him what our intentions were.

16          MR. DICKINSON:  If we could play clip B.

17          (Exhibit 13 being played.)

18          MR. DICKINSON:  For the record, Your Honor, the first

19   clip was starting at the beginning of the telephone call to

20   approximately one minute and 15 seconds.  Clip B was on 15

21   minutes and 35 seconds to 17 minutes and 15 seconds in the

22   call.

23   Q.   In the second clip, it appears you weren't getting a

24   direct answer about any potential threats or impedement [sic]

25   one way or the other?

Michael Johnson - Direct

1  A.   No.  I -- throughout the phone call, I was going upon my

2  knowledge, training, and experience as a special agent in

3  having interviewed hundreds, if not a thousand over the years.

4  It's been my experience to let people talk as much as they want

5  to talk.  And then when the opportunity presents itself, to

6  help them circle back to what I was trying to understand from

7  him.

8        MR. DICKINSON:  If we could play clip C, which is at

9  approximately 18 minutes and 10 seconds to 20 minutes and 20

10 seconds.

11     (Exhibit 13 being played.)

12 Q.   If we could go to clip -- publish clip D, which is 21

13 minutes and 35 seconds into the call, to 28 minutes and 35

14 seconds approximately.

15     (Exhibit 13 being played.)

16 Q.   I am going to publish clip E, which is approximately 38

17 minutes to 41 minutes and 10 seconds.

18     (Exhibit 13 being played.)

19 Q.   Let's go over the last clip.  There's been a few

20 references to "our ranch" and "our home," and "if somebody

21 comes to our home."

22        At any time in this conversation, in the 46 minutes,

23 the full version, did you reference the BLM coming to any

24 Bundys home or any -- doing anything at Mr. Bundy's ranch or

25 any private property?

Michael Johnson - Direct

1    A.    No, sir.

2    Q.    All right.  And finally clip F, which is approximately at

3    42 minutes 40 seconds to the end at 46 minutes.

4          (Exhibit 13 being played.)

5    Q.    So, Special Agent Johnson, based on your telephone call

6    with Mr. Bundy, did you feel like you had any answers to the

7    questions you were seeking out that day?

8    A.    Yes, I did.

9    Q.    And what was that?

10   A.    As he stated on multiple occasions, that he and hundreds

11   of others would do whatever it took to stop the gather.

12   Q.    And the phone call speaks for itself, but I have just a

13   couple questions.

14          You asked him several times regarding violence.  And

15   did you ever get a straight answer?

16   A.    No, I did not.

17   Q.    And did you ever hear -- did you ever speak with Mr. Bundy

18   again?

19   A.    No, I did not.  Oh, yes, I did.  Yes, I did.

20   Q.    Did you ever speak -- I am not doing a good job.  Did you

21   ever speak with Ryan Bundy again?

22   A.    Yes, I spoke with him again the next morning.

23   Q.    And was that call recorded?

24   A.    No, it was not.

25   Q.    And about how long, if you recall, was the conversation?

1   A.   It was approximately seven minutes.

2   Q.   And what was the -- what was the nature of that

3   conversation with Ryan Bundy?

4   A.   It was a follow-up conversation which he initiated.  He

5   called me back again.  We were at the same hotel in the

6   morning.  And he wanted to reiterate his points that we should

7   not show up.  That he would do whatever it took to stop the

8   gather.

9        Additionally, he made some rather slanderous comments

10  about other BLM officers who had been in a shooting.  I asked

11  him to seriously consider his role --

12       MR. LEVENTHAL:  Judge, I am going to object again.

13  This is getting into a narrative.

14       THE COURT:  Mr. Dickinson?

15       MR. DICKINSON:  I just asked him to briefly summarize

16  the conversation, Your Honor.

17       THE COURT:  Yeah, it's a seven-minute conversation,

18  so go ahead.

19       THE WITNESS:  My last comment was that I asked him to

20  seriously consider his role in the gather as a husband and as a

21  father, and he terminated the phone call at that time.

22  BY MR. DICKINSON:

23  Q.   Did you ever have any further contact with Ryan Bundy?

24  A.   No, I did not.

25  Q.   Did you ever have any further contact on the 18th with any

Michael Johnson - Direct

1  other members of the Bundy family?

2  A.   Yes, sir.  On the next day, we -- we being myself,

3  Shilaikis -- Agent Shilaikis and Rand Stover, made a telephonic

4  phone call to Duke Clancy Cox who we had previously contacted

5  the day before.

6  Q.   And what was the purpose of that phone call?

7  A.   The purpose of the phone call was to further try to gain

8  any cooperation we could from any of the Bundy family members

9  and try to keep an open dialogue, if there was one to be, to

10  see if we could reach any further resolutions.

11  Q.   And about how long was that phone call?

12  A.   It was just a few minutes.

13  Q.   And at some point, did you give Mr. Cox your phone number?

14  A.   After the phone call was over, I text him my contact

15  number.

16  Q.   You said the next day, was that the 18th, the same morning

17  that you talked to Ryan Bundy the second time?

18  A.   Yes, it is.

19  Q.   Okay.  And did you ever hear from Mr. Cox?

20  A.   Never again.

21  Q.   Did anybody -- whether it be David Bundy, Ryan Bundy,

22  Cliven Bundy, did anybody else ever contact you on the numbers

23  you had given out on the 17th and 18th of March?

24  A.   They never contacted me again.

25  Q.   Was the information that you -- specifically the phone

1   call with Ryan Bundy, was that information conveyed back to

2   your superiors?

3   A.   Yes, sir, it was.

4   Q.   That would Special Agent Stover -- or Assistant Special

5   Agent in Charge Stover at the time and Special Agent in Charge

6   Love?

7   A.   Yes, sir.

8   Q.   Now, did you -- were you working full-time on the

9   impound -- on the cattle impoundment starting then, or was that

10  just a side duty of yours on the 17th and 18th of March?

11  A.   That was a side duty.

12  Q.   When did you become involved full-time in the impoundment?

13  A.   It was approximately the 3rd or 4th of April, a couple

14  weeks after the phone calls.

15  Q.   And the impoundment started -- the actual gathering of the

16  cattle started on the 5th of April; correct?

17  A.   As I recall, yes.

18  Q.   And did you have -- before the impoundment started, when

19  you came to Nevada, did you have a specific role that you were

20  going to be fulfilling in the impoundment?

21  A.   I was assigned to be the investigation's team leader for

22  the duration of cattle impoundment.

23  Q.   And what was your understanding, before the impoundment

24  started, of what the investigation's team leader -- of what

25  your duties were going to be?

Michael Johnson - Direct

1    A.    My primary roles would be to provide countersurveillance

2    for the cattle convoys that would be going to and from the

3    public lands areas where the cows would be gathered, looking

4    for potential threats.  Also to provide protection for those

5    convoys coming in and out of the public lands.

6            And if there were to be any -- any investigations

7    that occurred during the cattle, I would assign team members

8    who were working under me to investigate those things.

9    Q.    Typically, were you on every day from, let's say, the 5th

10   of April to -- we'll go to the 11th of April?

11   A.    Yes, I worked every day.

12   Q.    And what was your shift generally?

13   A.    Generally, we worked approximately 16-hour shifts starting

14   at various times in the morning, depending on when the gather

15   was starting for the day until -- until late evening.

16   Q.    And during that time from the 5th through the 11th, what

17   did you end up doing the most of personally?

18   A.    Personally, myself and my team members were providing

19   countersurveillance for the -- for the convoys of contractors,

20   BLM employees, cowboys that were gathering the cows, and

21   security for their convoys, transporting them back to our

22   incident command post.  That was the majority.

23   Q.    Security for the convoys, just driving along with the

24   convoys?

25   A.    Yes, sir.  There were multiple attempts on multiple days

Michael Johnson - Direct

1    from persons, unknown persons and -- that were attempting to

2    get in between our vehicles, that were attempting to block our

3    vehicles from getting from the public lands onto the highways.

4    Q.   And typically how were the -- were you familiar with how

5    those roads were with the convoys coming off the public lands?

6    I mean, were they improved roads, unimproved roads?

7    A.   They were coming from unimproved dirt roads to improved

8    paved roads.

9    Q.   And did that pose any sort of safety issues?

10   A.   Yes, it did.  The convoys could be very long in nature.

11   They consist of several cars, several trucks, several livestock

12   trailers, which require long distances to stop and start.

13          They were traveling over uneven terrain to even

14   terrain, and, therefore, needed to be able to pass from the one

15   area to the next without being impeded.

16   Q.   And you briefly mentioned that you were engaged in

17   countersurveillance.  Can you just briefly explain to the jury

18   what you mean by that?

19   A.   Countersurveillance is in a -- in a covert role, watching

20   for persons and vehicles that are attempting to disrupt the

21   gather operations.  Identifying that information and then

22   relaying that to the -- those that were involved in the gather

23   to be prepared for that and to come up with ways to mitigate

24   that.

25   Q.   And when you say "covert," do you mean driving around in

Michael Johnson - Direct

1    unmarked cars or --

2    A.   Yes.  Yes, we were in unmarked trucks and SUVs.  And we

3    were operating in plain clothes, like I had said before, jeans,

4    and T-shirts, and ball caps.

5    Q.   You stated you were supervising investigations.  Did you

6    actually conduct any investigations?

7    A.   There were -- there were not many investigations.  There

8    were a couple that I recall, one in which where a threat was

9    made to one of the head contractors.  I attempted to call the

10   person who made the threat back, posing as the contractor, to

11   ascertain as to whether or not the threat was viable.  We

12   had -- that was my main recollection.

13   Q.   When you were out there, were you familiar with -- did you

14   become aware that Dave Bundy was arrested on April 6th?

15   A.   I was aware of that.

16   Q.   And did you have any role in investigating that incident?

17   A.   No, I didn't.

18   Q.   And were you aware of the convoy being blocked on

19   April 10th, where there was a use of force taser deployment to

20   Ammon Bundy?

21   A.   I was aware of that.

22   Q.   Were you aware of that?  Sorry.  I didn't mean to speak

23   over you.

24   A.   I was aware of that but did not investigate that.

25   Q.   So your role wasn't to investigate -- your role didn't

Michael Johnson - Direct

1  include investigating those two incidents?

2  A.   No.  We -- two of my investigative team members did

3  transport Dave Bundy from the ICP to the jail in Las Vegas, but

4  we did not investigate him.

5  Q.   You had no personal involvement?

6  A.   No.  No, sir.

7  Q.   Did you -- but as far as investigations go, did you

8  oversee an undercover operation?

9  A.   Yes, I did.

10  Q.   And in your role, were you acting as an undercover agent?

11  A.   No, I was not.

12  Q.   Did you go observe anything or interact with anybody in an

13  undercover role personally?

14  A.   No, I did not.

15  Q.   Just from your supervisory role, can you just explain what

16  the undercover operation was?

17  A.   The Special Agent in Charge Dan Love, who is also the

18  incident commander, came to me and asked me to pick four team

19  members -- four investigative team members to assume an

20  undercover role to start attending events at the Bundy rally

21  site, a few miles from our incident command post, and to

22  attempt to determine what type of threats, if any, what the

23  temperament was from those that were beginning to gather in the

24  area.

25  Q.   And did, in fact -- did you go through with that?  Did you

Michael Johnson - Direct

1    recruit or assigned four people to do that?

2    A.   Yes, we did.  I assigned two teams of two agents that

3    rented rental cars that became undercover cars.  They purchased

4    undercover clothing from thrift stores to, you know, further

5    help with their -- their covert mission.  And they did attend

6    various rally events and report back to us with their findings.

7    Q.   And how many days, if you recall, did they go up to the

8    rally site?

9    A.   I recall it was two different days.

10   Q.   Do you remember what days?

11   A.   What?

12   Q.   Do you recall which days?

13   A.   I don't recall the days exactly.  I do recall that the

14   second day was the 11th, April 11th .

15   Q.   And when the agents were -- were -- who assumed undercover

16   roles, when they were done for the day, were you the person

17   they came back and reported back to?

18   A.   They did report back to me, and then I reported what they

19   told me to my supervisors.

20   Q.   And that would have been?

21   A.   It was Rand Stover and Dan Love.

22   Q.   So that's how the information flowed that was learned from

23   those undercovers?

24   A.   Yes, sir.

25   Q.   Okay.  Now, you said the last day or the -- you remember

Michael Johnson - Direct

1   the second day, which was the last day you -- the undercovers

2   were operating was April 11th.

3            At some point, when they were operating, were you out

4   in the field with them?

5   A.   Yes, we were.  The remainder of our team was staged as

6   close as we could be to the rally site.  I would approximate

7   that we were approximately a mile away from the rally site.

8            And we -- the only contact that we had with them was

9   via cell phone, and they would periodically check in with us to

10  make sure they were safe.

11  Q.   At some point, did you go back to the ICP on the 11th?

12  A.   I did.  It was much later in the evening.

13  Q.   And were you -- was that the normal time you were going

14  back, or were you summonsed to come back early?

15  A.   We were summoned to come back early.  We had -- the

16  undercover agents had finished their work, and we had escorted

17  them back to where they were staying in St. George, Utah.  And

18  it was at that time that we were informed that the gather had

19  been canceled, and that we were to return to the ICP.

20  Q.   And who was with you, or how many -- whether it be rangers

21  or special agents -- were with you outside of the undercovers

22  that you took back to St. George?

23  A.   The undercovers came back with us as well shortly --

24  shortly after us.  I believe there was 9 or 10 of us.

25  Q.   Including the undercovers?

Michael Johnson - Direct

1    A.    Including the undercovers shortly after us.

2    Q.    So everyone was called back to the ICP?

3    A.    They were.

4    Q.    And what happened when you got back to the ICP?

5    Approximately what time did you get back to the ICP?

6    A.    I don't recall an exact time.  It was in the evening time.

7    It was after dinnertime.  We had eaten dinner in St. George and

8    returned after we ate dinner.

9    Q.    And when you got to the ICP, did you learn why you were

10   called back?

11   A.    We spoke with Rand Stover and with Dan Love, the

12   supervisors for the operation.  They told us that the gather

13   was being suspended at this time, and that there was a

14   potential for persons to come to the ICP to try to do -- that

15   could potentially do us harm, and that were going to

16   potentially try to take the cattle that we were holding there

17   back.  And that our assignment for the evening was to provide

18   very close cover for the ICP, close protection.

19   Q.    Now we're saying "ICP," when you say -- what was your role

20   then?  What did you do after that briefing?

21   A.    After that briefing, I briefed my investigative team on

22   our assignment for the evening, and we assumed positions

23   immediately outside of the ICP in our vehicles and around our

24   vehicles.  And we stayed there for the duration of the night.

25   Q.    And the term ICP has been used here in court throughout

Michael Johnson - Direct

1    the last couple of days.  When you say you were close to the
2    ICP, what specific -- it's sort of been referred to as the
3    whole sort of complex when you go on off the 15 down to where
4    the cattle pens were and the trailers.  Where specifically were
5    you that night?
6    A.   Specifically what I'm referring to in the ICP is the
7    trailers and -- and Conex boxes that were being used to house
8    and -- and provide the office space for gathered personnel.
9         It was the area in the -- in the very center of the
10   ICP and where the most persons -- personnel were gathered.  And
11   so, therefore, we were at that immediate area.
12   Q.   And were there still civilian, non-law enforcement
13   employees on-site throughout the evening of the 11th?
14   A.   Yes, there was.
15   Q.   And the morning of the 12th?
16   A.   Yes, there was.
17   Q.   And any incidents around the ICP, were you aware, on the
18   evening into the morning?  Going through the night of the
19   11th into the morning of the 12th?
20   A.   No, there was not.
21   Q.   And did you get much sleep?
22   A.   Not much.
23   Q.   What -- what did you do on the morning of April 12th?
24   What -- say early morning, 8:00, 9:00 a.m.
25   A.   We awoke and began discussing amongst ourselves what the

Michael Johnson - Direct

1    day's -- the day was going bring.  I checked in with the

2    command staff, and we were just holding until they made

3    decisions on what was going to occur that day.

4    Q.   What were you told was going to -- did you have an

5    assignment?  Were you still just --

6    A.   We were still just providing security at that time.

7              THE COURT:  Mr. Dickinson, is this a good time to

8    stop?  It's 4:30.

9              MR. DICKINSON:  It's actually a perfect time to stop,

10   Your Honor.

11             THE COURT:  All right.  Let's go ahead and let the

12   jury take their overnight break, and we'll ask them to please

13   return at 8:00 a.m. tomorrow morning.

14             Please remember, ladies and gentlemen, that during

15   this break you are not to discuss this case with anyone nor

16   allow anyone to discuss it with you.  You are not to listen to

17   or read to -- read or review anything that touches upon this

18   case in any way.

19             If any friends, relatives, colleagues at work try to

20   talk to you about this case, please tell them "The Judge has

21   told me I cannot talk about this case.  When it's all over,

22   maybe we can talk about it then.  But not while -- not until

23   there's a decision."

24             So please do not talk about the case.  Obviously you

25   can tell your employer, yes, you are still in trial, but you

1    will be off on Friday.

2              Please do not perform any research or make any

3    independent investigation about the case and do not form any

4    opinion until after you have heard all the evidence, closing

5    arguments, been provided with the written jury instructions of

6    law, and then -- then released to begin your deliberation

7    process.  At that time, you can talk to each other about the

8    case, but not until then.

9              So we'll go ahead and stand for the jury.  And then

10   after they've departed, then Special Agent Johnson, you may

11   also take your overnight break.  And we would ask that you be

12   back at 8:00 a.m. tomorrow morning as well.

13             THE WITNESS:  Yes, Your Honor.

14        (Jury out.)

15             THE COURT:  The jury has left the courtroom.

16   Anything that we need to meet about and talk about tomorrow

17   morning or --

18             MR. LEVENTHAL:  No, Your Honor.

19             MR. MARCHESE:  No, Your Honor.

20             THE COURT:  Nothing anticipated?  All right.  We will

21   see you back here at 8:00 a.m. tomorrow morning.

22        (Recess, 4:53 p.m.)

23

24

25

Vol. 1 - 36

1                          INDEX OF EXAMINATIONS

2     For the Plaintiff:

3     Witness Name              Direct  Cross    RD    RX    Voir Dire

4          Michael Johnson          4

5

6                         PLAINTIFF'S EXHIBIT INDEX

7     Exhibit No.                                Marked    Admitted

8     13                                                     19

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                      --oOo--

2                          COURT REPORTER'S CERTIFICATE

3

4         I, KATHERINE EISMANN, Official Court Reporter, United

5    States District Court, District of Nevada, Las Vegas, Nevada,

6    certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-entitled matter.

8

9    Date:  March 29, 2017.

10                                   /s/ *Katherine Eismann*

11                                  Katherine Eismann, CSR CRR RDR

12

13

14

15

16

17

18

19

20

21

22

23

24

25