Vol. 5 - 1

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,    )
                                  )   Case No. 2:16-cr-00046-GMN-PAL
4               Plaintiff,        )
                                  )   Las Vegas, Nevada
5         vs.                     )   February 14, 2017
                                  )   8:10 a.m.
6    ERIC J. PARKER (11), O.      )
     SCOTT DREXLER(12), RICHARD   )
7    LOVELIEN (13), STEVEN A.     )
     STEWART (14), TODD C. ENGEL  )
8    (15), and GREGORY P.         )
     BURLESON (16),               )
9                                 )   Day 5
                Defendants.       )
10   _____)

11                      TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE GLORIA M. NAVARRO
12        UNITED STATES DISTRICT COURT CHIEF JUDGE, AND A JURY

13

14   APPEARANCES:

15   For the Government:

16           STEVEN W. MYHRE, AUSA
             ERIN M. CREEGAN, SAUSA
17           NADIA JANJUA AHMED, AUSA
             NICHOLAS D. DICKINSON, AUSA
18           United States Attorney's Office
             District of Nevada
19           501 Las Vegas Boulevard South, Suite 1100
             Las Vegas, Nevada 89101
20

21   Appearances continued on next page.

22

23   Court Reporter:  Katherine Eismann, CSR, CRR, RDR
                      (702)431-1919 ke@nvd.uscourts.gov
24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

 1   APPEARANCES CONTINUED:

 2   For the Defendant Eric J. Parker (11):

 3           JESS R. MARCHESE, ESQ.
             Law Office of Jess R. Marchese
 4           601 South Las Vegas Boulevard
             Las Vegas, NV 89101
 5           marcheselaw@msn.com

 6   For the Defendant O. SCOTT DREXLER (12):

 7           TODD M. LEVENTHAL, ESQ.
             Leventhal and Associates
 8           626 South Third Street
             Las Vegas, NV 89101
 9           leventhalandassociatescmecf@gmail.com

10   For the Defendant Richard Lovelien (13):

11           SHAWN R. PEREZ, ESQ.
             Law Office of Shawn R. Perez
12           626 South Third Street
             Las Vegas, NV 89101
13           shawn711@msn.com

14   For the Defendant Steven A. Stewart (14):

15           RICHARD E. TANASI, ESQ.
             601 South Seventh Street, 2nd Floor
16           Las Vegas, NV 89101
             rtanasi@tanasilaw.com

17
     For the Defendant Todd C. Engel (15):
18
             TODD C. ENGEL, PRO SE
19           18427-023
             Nevada Southern Detention Center
20           2190 Ease Mesquite Avenue
             Pahrump, NV 89060
21
             JOHN G. GEORGE, ESQ. (Standby Counsel)
22           600 South 8th Street
             Las Vegas, NV 89101
23           johngeorgejr@fastmail.fm

24

25

1    APPEARANCES CONTINUED:

2    For the Defendant Gregory P. Burleson (16):

3              TERRENCE M. JACKSON, ESQ.
               Law Office of Terrence M. Jackson
4              624 South Ninth Street
               Las Vegas, NV 89101
5              Terry.Jackson.Esq@gmail.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Tuesday, February 14, 2017, 8:10 a.m.)

 2                            --oOo--

 3                   P R O C E E D I N G S

 4              THE COURT:  Thank you.  You may be seated.

 5              COURTROOM ADMINISTRATOR:  This is the time set for

 6   the jury trial, Day 5, in Case No. 2:16-cr-046-GMN-PAL, United

 7   States of America versus Eric Parker, O. Scott Drexler, Ricky

 8   Lovelien, Steven Stewart, Todd Engel and Gregory Burleson.

 9              Counsel, please make your appearances for the record.

10              MR. MYHRE:  Good morning, Your Honor.  Steven Myhre,

11   Erin Creegan, and Nick Dickinson on behalf of the United

12   States.

13              THE COURT:  Good morning.

14              MR. TANASI:  Good morning, Your Honor.  Rich Tanasi

15   for Steven Stewart who is present.  Also is our group paralegal

16   Gwen Wilson in the back.

17              THE COURT:  Good morning.

18              MR. MARCHESE:  Good morning.  Jess Marchese on behalf

19   of Eric Parker.

20              THE COURT:  Good morning.

21              MR. LEVENTHAL:  Good morning, Your Honor.  Todd

22   Leventhal on behalf of Mr. Drexler.  He's present.

23              THE COURT:  Good morning.

24              MR. ENGEL:  Good morning, Your Honor.  Todd Engel for

25   We the People.
```

1              THE COURT:  Good morning.

2              MR. PEREZ:  Good morning, Your Honor.  Shawn Perez on

3    behalf of Rick Lovelien who is present.

4              THE COURT:  Good morning.

5              MR. JACKSON:  Good morning, Your Honor.  Terrence

6    Jackson for Gregory Burleson.

7              THE COURT:  Good morning.  Well, thank you for your

8    patience this morning.  The jury was here on time, but they had

9    to fill out some paperwork so that they can get their first

10   payment checks.  So that's what we were just waiting on, to

11   make sure they had time to fill that out correctly and if they

12   had any questions, because it's the first time they are filling

13   it out.

14             So, before we bring them in, I do want to make some

15   preliminary remarks just to remind everyone how court will be

16   conducted.  Remember, this is not a sporting event.  This is a

17   courtroom.  So it's never appropriate for people to make any

18   expression of their opinions, either verbally or through body

19   language, whether you approve or disapprove of what's being

20   said.

21             People may not speak out of turn.  The defendants are

22   represented by attorneys and they may speak only through their

23   attorney.  Mr. Engel is representing himself.  And likewise, he

24   also needs to be held to the same rules as the other attorneys

25   and defendants.

1          Any distracting language or inappropriate body

2   language or any other kind of inappropriate displays will

3   result in the defendant being returned to the holding cell to

4   listen to the remainder of the day through the audio speaker in

5   the holding cell.

6          And I also ask everyone to please make sure that you

7   have no cell phones or any other electronic devices, whether or

8   not they are on or turned off.  Regardless, there are no cell

9   phones or electronic devices permitted in the courtroom.

10          I have instructed the marshals to remove anyone that

11   has a cell phone whether or not it's in use.  So please check

12   now to make sure that you left it outside.

13          This applies to the lawyers as well.  They are never

14   to record with their electronic devices, as recording is not

15   allowed in federal court, neither audio nor visual.  They can,

16   of course, use their electronic devices to present evidence

17   here during the trial.

18          And as you can see, the tables are all provided --

19   all have microphones, so you are welcome to stay at your desk

20   if you would like to, since you have a lot of notes and

21   computers and things.  On the other hand, we do have the podium

22   that's available for everyone as well.  So, if you prefer to

23   use the podium, you are welcome to do that.  It's up to you

24   which of the two you would like to use.

25          So we are going to go ahead and stand now for the

Rand Stover - Direct

1   jury to come in.  We always stand for the jury, because they

2   are the judge of the facts.

3        (Jury in.)

4             THE COURT:  All right.  Everyone may be seated.  We

5   are joined by the jury, all 16 members returning after the

6   overnight break.

7             And we do have Special Agent Stover with us again

8   today sitting in the witness chair.  I do remind you,

9   Mr. Stover, that you are still under oath to tell the truth.

10            THE WITNESS:  Yes, Your Honor.

11            THE COURT:  And Mr. Myhre, you may continue with your

12   direct examination when you are ready.

13            MR. MYHRE:  Thank you, Your Honor.

14                          RAND STOVER,

15   having been previously sworn, was examined and testified as

16   follows:

17                        DIRECT EXAMINATION

18   BY MR. MYHRE:

19   Q.   Good morning, Agent Stover.

20   A.   Good morning.

21   Q.   When we broke -- we recessed last evening, we had just

22   finished talking about the arrest of Dave Bundy on April the

23   6th, 2014, and your knowledge of that event.

24            Now, did there come a time after the David Bundy

25   arrest that you met with members of the Bundy family concerning

Rand Stover - Direct

1   effects that belonged to Mr. Bundy?

2   A.   Yes.

3   Q.   When did that meeting occur?

4   A.   That was the morning of April 9th at approximately 11:15

5   in the morning.

6   Q.   Where did this meeting occur?

7   A.   It occurred at a small gravel turnout at the junction of

8   Highway 170 and Gold Butte Road.

9   Q.   Did you travel there?

10  A.   I did.

11  Q.   How did you get there?

12  A.   I drove there.

13  Q.   Were you with anybody?

14  A.   I was.

15  Q.   Who were you with?

16  A.   With Dan Love the special agent in charge.

17  Q.   And Dan Love you mention was the special agent in charge.

18  You mean the special agent in charge of what?

19  A.   He was the -- his official title was the Regional Special

20  Agent in Charge over Utah and Nevada for BLM law enforcement.

21  But during this particular operation, he was part of the

22  unified command, so he was one of the law enforcement incident

23  commanders.

24  Q.   So was he someone you reported to during the impoundment

25  operation?

Rand Stover - Direct

1   A.   Yes.

2   Q.   So he was your boss.

3   A.   He was my boss during the impound.

4   Q.   And in terms of the overall impoundment operation itself,

5   what were Special Agent -- SAC Love's responsibilities and

6   duties?

7   A.   He was -- he was part of the unified command, so he and

8   the other top law enforcement officers would coordinate all the

9   major decisions that had to do with day-to-day operations, and

10  they had final decision authority over how the operation would

11  be conducted.

12  Q.   Was he on-site or off-site during the impoundment

13  operations?

14  A.   He was on-site.

15  Q.   So this meeting, was this a prearranged or preplanned

16  meeting that you had?

17  A.   It was.

18  Q.   Now, on your way to that meeting, you drove down State

19  Route 170; is that correct?

20  A.   Correct.  We left the incident command post, drove on

21  southbound Interstate 15, and got off at Exit 112.  Drove down

22  Highway 170 to that location I was just describing.

23          MR. MYHRE:  If I may, Your Honor, may I bring up

24  Exhibit 330?

25          THE COURT:  Yes.

Rand Stover - Direct

1    BY MR. MYHRE:

2    Q.   Can you see 330 in front of you?  That's a map we went

3    over yesterday.  Would you just mind circling where this

4    meeting took place?

5    A.   Sure.

6    Q.   Okay.  The witness has indicated on the map about

7    two-thirds of the way down the center of the map.  Is that

8    north or south of the Virgin River bridge?

9    A.   It's just south of the Virgin River bridge.

10   Q.   Now, before you got to that area, did you notice any

11   changes in that area in around -- in and around State Route

12   170?

13   A.   Well, just north of the Virgin River bridge, the Bundy

14   family and some of their supporters had set up a small area

15   where they could -- they set up a stage and an area where they

16   could gather.

17   Q.   And if you wouldn't mind grabbing the exhibit book there

18   for a moment at Exhibit 332.

19   A.   Okay.

20   Q.   Do you have that in front of you?

21   A.   I do.

22   Q.   Okay.  And what is that?

23   A.   That's an overview photo of the bridge -- the Highway 170

24   bridge that crosses the Virgin River.

25   Q.   And does that map depict the location of the stage that

Rand Stover - Direct

1    you just described?

2    A.    Yes, the area is on that -- on this particular map.

3    Q.    And does this map fairly and accurately depict that area

4    as it existed on April 12th, 2014?

5    A.    Yes, it doesn't show the stage.  But, yes, it shows the --

6    Q.    It shows the area?

7    A.    -- geographical area, yes.

8              MR. MYHRE:  Thank you.  Your Honor, we offer 332.

9              MR. MARCHESE:  No objection Parker.

10             MR. TANASI:  No objection Stewart, Your Honor.

11             MR. LEVENTHAL:   No objection, Judge.

12             MR. ENGEL:  None from Engel.

13             THE COURT:  Mr. Perez?

14             MR. PEREZ:  No objection Lovelien.

15             MR. JACKSON:  No objection Burleson.

16             THE COURT:  All right.  So Exhibit 332 will be

17   admitted.  Did you wish to publish it?

18             MR. MYHRE:  Yes, Your Honor.

19             THE COURT:  Go ahead.

20        (Exhibit 332 admitted.)

21             MR. MYHRE:  Thank you.

22   Q.    If you could clear your screen.

23   A.    Yes.

24   Q.    Thank you.  Okay.  If you would -- now, with Exhibit 332

25   in front of you, if you could just circle the area where you

Rand Stover - Direct

1  observed the staging this day.

2  A.   The area I'm talking about was generally in this area

3  here.

4  Q.   And you've drawn an oblong circle just next to the State

5  Route 170 toward the north portion as depicted on this map.

6       Now, did you, before moving down to this area on

7  April 9th, had you heard about this stage from different

8  sources that you had available to you?

9  A.   Yes.

10  Q.   And based on the information that you had received, what

11  was your understanding of what this stage was for?

12  A.   My understanding was it was an area for -- that the Bundy

13  family and their supporters were going to gather.  They were

14  going to have lawful protest activities.  They were giving

15  speeches.  They had meetings at that location.

16  Q.   So, was this area in an area of private property or public

17  lands?

18  A.   That's -- the area closest to the highway is a highway

19  right-of-way, but just adjacent there was some private

20  property.

21  Q.   So we talked yesterday a little bit about closure orders

22  and so forth.  You mentioned this was not subject to the

23  closure orders; is that correct?

24  A.   Correct.  That area was not subject to the closure order.

25  Q.   And the reason for that was what?

Rand Stover - Direct

1  A.   Well, it was a highway right-of-way, and it was also

2  private property.

3         MR. MYHRE:  If I may, Your Honor, may I pull up

4  Exhibit 132?

5         THE COURT:  Yes.

6  BY MR. MYHRE:

7  Q.   And if I could go to 18:18.  Just the first segment.  And

8  if you could stop it there.  Thank you.  Oops.  And stop right

9  there, please.  Oops.  Back just a little bit.

10        Okay.  We have stopped 132 at 18:18:03.  And do you

11  see that in front of you, Agent Stover?

12  A.   I do.

13  Q.   And what do you see in this frame?

14  A.   This is a frame showing that area I was just describing

15  that had an area where the Bundy family and their supporters

16  were gathering.  It had a small stage set up, and this is

17  typical of --

18  Q.   All right.  I'm circling, on your screen, an area in the

19  lower right-hand corner.  And do you recognize what that is?

20  A.   Yes, that looks like the -- the stage area and two

21  vertical posts that were set up to -- to hold a banner.

22  Q.   Okay.  Thank you.  So, if I could have 330 again, please.

23        So just going back to Exhibit 330, Agent, could you

24  circle again on there where your meeting occurred on April 9th?

25  A.   Yes.

1    Q.   And the witness is -- has again indicated with a circle

2    the location of the meeting.

3              When you got to that area, was anybody present there?

4    A.   Yes.

5    Q.   Who was present?

6    A.   There was a vehicle, and David Bundy was in the driver's

7    seat of the vehicle.  Mel Bundy was there.  There was an ATV

8    there.  Ammon Bundy was on the ATV.  David Bundy's wife was

9    present.  There was also another individual that I don't know

10   who he was.

11   Q.   You mentioned Ammon Bundy.  Was Ammon Bundy known to you?

12   A.   Yes.

13   Q.   And what did you -- what was his relationship to Cliven

14   Bundy?

15   A.   He is a son of Cliven Bundy.

16   Q.   Before this meeting on April 9th, had you ever met with

17   Ammon Bundy?

18   A.   Not in person.

19   Q.   With respect to Dave Bundy as well, had you ever met with

20   him before this meeting on April 9th?

21   A.   I wouldn't say I had met him.  I saw him in person briefly

22   at the incident command post after he was arrested.

23   Q.   But you didn't introduce yourself or anything of that

24   nature?

25   A.   No, sir.

Rand Stover - Direct

1   Q.   So once you got there and you saw everybody there, did --

2   was there a conversation between you and the Bundys at all?

3   A.   There was a conversation.  Well, an attempted conversation

4   I would call it.

5   Q.   What was your attempt at a conversation?

6   A.   Well, I was driving in the vehicle.  Dan Love was a

7   passenger in my vehicle.  Dan Love got out first, and he was

8   the first one to introduce himself to the group that was there.

9        When I got out, I attempted to introduce myself to

10  Ammon Bundy and shake his hand.  He refused to do so.

11  Q.   You mentioned Mel Bundy as well, and I didn't cover this.

12  Was Mel Bundy known to you as well?

13  A.   He was.

14  Q.   And what was his relationship to Cliven Bundy?

15  A.   Also a son of Cliven Bundy.

16  Q.   Did you attempt to shake hands with either Mel or Dave?

17  A.   I did shake hands with Dave Bundy at one point.  I

18  introduced myself to Mel.

19  Q.   And from your understanding, the object of this meeting or

20  the purpose of this meeting was what?

21  A.   It was to return some property that belonged to Dave Bundy

22  that was held after his arrest.

23  Q.   And did you -- was the object of the meeting accomplished?

24  A.   Eventually, it was, yes.

25  Q.   When you say "eventually," was there any conversation that

Rand Stover - Direct

1  you overheard between Special Agent Love and any family

2  members?

3        MR. LEVENTHAL:  Objection as to relevance to all

4  this.

5        MR. MYHRE:  Your Honor, we intend to introduce a

6  statement from Ammon Bundy about this war beginning now, or

7  this war will be won, or we'll win this thing, something to

8  that effect.  So it's a statement in furtherance of the

9  conspiracy itself.

10        THE COURT:  For Count One.

11        MR. MYHRE:  In Count One, yes, Your Honor.

12        THE COURT:  Okay.  I will allow it then.  It is

13  relevant.

14  BY MR. MYHRE:

15  Q.  So, did you overhear any discussion or conversation

16  between SAC Love and any members of the Bundy family?

17  A.  Yes.

18  Q.  And what, generally, was the gist of the conversation?

19  A.  In general, it as was a very heated, confrontational

20  conversation I would describe it.  Both Dan Love and Ammon

21  Bundy were talking over each other.

22        Ammon Bundy was yelling at his brother Dave and also

23  at Dan Love.  They were -- Dan Love was trying to establish

24  some communication with Ammon Bundy and with other family

25  members, but it was -- it was -- it was not a cordial

Rand Stover - Direct

1  conversation.

2           MR. LEVENTHAL:  Objection as to speculation.

3           MR. MYHRE:  It's his impression, Your Honor.

4           THE COURT:  His impression.  He was there.

5           MR. LEVENTHAL:  It is.  He indicated he's never met

6  these people before though, Your Honor.  He doesn't know how

7  they speak.

8           THE COURT:  Overruled.  You may continue.

9  BY MR. MYHRE:

10 Q.   And did you hear any words uttered by Ammon Bundy as you

11 were departing the area or getting ready to leave?

12 A.   I did.

13 Q.   And what were those words?

14 A.   He -- he said, "You know what you can do?  You can get the

15 hell off our land.  You can leave them cows right where they

16 are and get the hell out."

17           And then he said, "We're going to win this thing.

18 We're going to win this war today, guaranteed."

19 Q.   Did -- and when you -- when you heard this or these words

20 uttered by Mr. Bundy, where was he located?

21 A.   He was sitting on the ATV that he was riding.

22 Q.   Did you notice anything conspicuous about the ATV?

23 A.   He had one of the closure signs that the BLM had posted

24 zip tied to the front of his ATV.

25 Q.   When you say "closure sign," could you describe for us

Rand Stover - Direct

1    what that is?

2    A.   Sure.  The BLM had posted many signs in the area

3    indicating the area was closed or temporarily closed.  It had

4    language on there.  It was a white sign with black and red

5    writing indicating the area was closed and that entering that

6    area could subject a person to a federal violation.

7    Q.   And those aren't normally posted on an ATV; is that

8    correct?

9    A.   Not that I'm aware of.

10   Q.   Is that how the meeting ended?

11   A.   That was -- the meeting concluded by Ammon Bundy telling

12   his brother Dave, "Come on Davie.  Let's go.  Let's get out of

13   here."  And then Ammon Bundy instructed Dave Bundy's wife to

14   get on the ATV with him and then they left the area.

15   Q.   What did you and SAC Love do after that?

16   A.   We let them depart the area, and then we got back in my

17   government vehicle, and we drove back to the incident command

18   post.

19   Q.   Now, in terms of your assessment of the threat level for

20   the impoundment operation, did this affect your -- your

21   assessment of the threat?

22   A.   It did.

23   Q.   In what way?

24   A.   Well, it just further indicated to me that the Bundy

25   family was going to do whatever they could to --

Rand Stover - Direct

1          MR. JACKSON:  I'm going to object to his conclusion

2    as to what the Bundy family may or may not have done.  He can

3    state that they had a certain threat assessment, but his

4    conclusion as to what the Bundy family may have done is mere

5    speculation.  And it's irrelevant as to our clients, I believe,

6    in this matter.

7          THE COURT:  Mr. Myhre.

8          MR. MYHRE:  Thank you, Your Honor.  It's directly

9    relevant to the charge, not only the assault on a federal

10   officer, but to the conspiracy as well.

11         But this agent's state of mind is relevant not only

12   as to how the BLM ultimately was postured on April 12th, which

13   has been at issue in this case, but also what the agent

14   perceived in the wash during the assault on April 12th.

15         His state of mind, all -- every piece of information

16   that informs his judgment and his assessment is directly

17   relevant for this jury to assess whether the agent reasonably

18   perceived a threat of imminent bodily harm or injury.  And, so,

19   therefore, we are advancing proof of his state of mind.

20         THE COURT:  All right.  I will allow it for the

21   evidence of his state of mind and the steps that he took to

22   protect the contractors who were there to execute the order of

23   the Court.  You may proceed.

24         MR. MYHRE:  Thank you, Your Honor.

25   Q.   Now, on -- later, during the 9th of April, did you also

Rand Stover - Direct

1  have contact with Mr. Robbins in Utah?

2  A.   I did.

3  Q.   And just to remind the jury again, Mr. Robbins is who?

4  A.   Mr. Robbins is the owner of the -- the livestock auction

5  in Utah that was contracted by the government.  And I need to

6  clarify something I said yesterday.  I inadvertently --

7             MR. MARCHESE:  Objection.  Nonresponsive.

8  BY MR. MYHRE:

9  Q.   Just don't worry about that part.  Just --

10 A.   Okay.

11 Q.   Okay?  We'll seek to clarify --

12 A.   Okay.

13 Q.   -- in a moment.  So, Mr. Robbins, is that 'R' Livestock?

14 A.   Correct.  He's the owner of 'R' Livestock.

15 Q.   Now, with regard to your discussion with him, did he call

16 you?  Did he meet you in person?

17 A.   He called me on the telephone.  On my cell phone.

18 Q.   Sure.  And where were you located?

19 A.   I was at the incident command post.

20 Q.   And what was his purpose in calling you?

21 A.   He called me to let me know --

22            MR. MARCHESE:  Objection.  Speculation.

23 BY MR. MYHRE:

24 Q.   What did you perceive his purpose to be in calling you?

25 A.   His purpose was to inform me that --

Rand Stover - Direct

1          MR. MARCHESE:  Objection.  Hearsay and relevance.  I

2    mean --

3          THE COURT:  It's relevant, but it is hearsay.  Just

4    ask him what steps he took after the call.

5          MR. MARCHESE:  Well, Your Honor, I want to make a

6    record as to relevance.  We keep saying that this is about

7    conspiracies and that this is somehow relevant to these

8    gentlemen here.  We have not had one witness --

9          THE COURT:  All right.  We don't need to have the

10   theatrics.  You have made your point.  You know that your

11   clients are charged with aiding and abetting in every single

12   count except the one where they are charged with conspiracy.

13         So the government has the right to lay down the

14   conspiracy that these people allegedly joined.

15         MR. MARCHESE:  But --

16         THE COURT:  Or the other acts that they allegedly

17   aided and abetted in.  So the government has the right to

18   introduce that information first.  And that's what they are

19   doing now.  You know that.  So enough with theatrics.  Let's

20   move on.

21         MR. MARCHESE:  I know that, Your Honor, but the

22   issue --

23         THE COURT:  You are right it is hearsay, and I am

24   instructing the government to stay away from the hearsay and to

25   instruct the witness to stay away from the hearsay.

Rand Stover - Direct

1              MR. MARCHESE:  Okay.  Can I make a record or no?

2              THE COURT:  At the break you may.

3    BY MR. MYHRE:

4    Q.   Agent, without going into specifically what he told you,

5    how did what he told you affect your assessments in terms of

6    the threat of interference and the threat of violence in

7    connection with the impoundment operation?

8    A.   It -- it increased my knowledge and impression that

9    interference of our operation would continue to occur, not just

10   in the local area, but in the various areas outside of the

11   immediate location such as where the cattle were supposed to be

12   transported to.

13   Q.   Now, before we move off of the topic of the 'R' Livestock,

14   you indicated you wanted to clarify something.  Did you want to

15   clarify with respect to the name of the organization or the

16   name of the --

17             MR. MARCHESE:  Objection.  Leading.

18             THE COURT:  Overruled.  Go ahead.

19             THE WITNESS:  Yes.  Correct.  Yesterday I

20   inadvertently said the business was called 'R' Livestock

21   Exchange.  It's 'R' Livestock Connection.  I said Exchange

22   instead of Connection.  My apologies.

23   BY MR. MYHRE:

24   Q.   Moving on further into April 9th, did you also learn that

25   day of an incident involving the tasing of Ammon Bundy?

Rand Stover - Direct

1   A.   Yes.

2   Q.   And was that reported to you in the normal course of your

3   duties as the Operations Section Chief?

4   A.   Yes.

5   Q.   And did that information as well inform your judgment

6   about the nature of the threat?

7   A.   It did.

8   Q.   Now, following the events of April 9th, did you receive

9   information from your intelligence sources about what was being

10  said just generally in social media?

11  A.   I did.

12  Q.   And were there things that were being said, were they said

13  about the BLM's operation in conducting the impoundment?

14  A.   Yes.

15  Q.   Now, just what type -- we talked yesterday briefly about

16  the intelligence information, but you had someone at the site

17  who was actually gathering this information?

18  A.   That's correct.

19  Q.   And they were gathering it from what types of sources?

20  A.   They were gathering it from mainstream media, from

21  newspapers, from open source Internet, from social media

22  sources.

23  Q.   And was it your impression, from what you were being

24  briefed, as to whether the amount of information was

25  increasing, decreasing, or the same?

Rand Stover - Direct

1   A.   It was significantly increasing by this time.

2   Q.   And what was your impression in terms of just the level of

3   rhetoric?  Was it critical, noncritical, or neutral?

4   A.   There was a narrative being created, especially on social

5   media, that was critical to our operation and the threat to our

6   operation.

7   Q.   And just generally speaking, what was the nature or the

8   substance of the narrative that you were hearing from your

9   intelligence folks?

10  A.   The general narrative was that the BLM was stealing Cliven

11  Bundy's cattle, that they were acting illegally, that they were

12  violating Mr. Bundy's rights, and that the BLM was attempting

13  to lock people out of public land.

14  Q.   Now, moving on to just the overall impoundment operation,

15  while these events are going on, is the -- are the contractors

16  still collecting or gathering cattle?

17  A.   Yes.

18  Q.   And where are those cattle being held?

19  A.   They are being held at the incident command post.

20  Q.   Had you moved any cattle from the incident command post to

21  Utah?

22  A.   No.

23  Q.   Do you have an understanding as to why that is?

24  A.   I was instructed and told by our senior level BLM

25  management that the cows were not going to be moved at -- up to

Rand Stover - Direct

1    April 9th as of that day.

2    Q.   As of April 9th, they were not going to be moved to Utah?

3    A.   Correct.

4    Q.   Were you later instructed to find an alternative site to

5    move the cattle?

6    A.   Not me personally, but the BLM employees that were working

7    directly with the contractors, they were making efforts to try

8    and find a different location to move the cattle as an

9    alternate plan.

10   Q.   Did you ever -- in connection with that, did you ever get

11   involved in terms of trying to find an alternative location?

12   A.   Yes.

13   Q.   And what was your involvement with that?

14   A.   My -- specifically, there was -- there was a location in

15   Arizona that quickly fell through.  There was another location

16   in Twin Falls, Idaho, that fell through.  And there was also a

17   location in Euclid, California.

18   Q.   Now, when you say fell through, what generally do you mean

19   by that?

20   A.   Meaning it was -- the BLM made initial attempts to try and

21   use those locations to take the cattle to, but the plans did

22   not go very far.  The implementation of those plans didn't go

23   very far.

24   Q.   When it came to Euclid, did you reach out to any of your

25   contacts -- you are talking about Euclid, California; correct?

Rand Stover - Direct

1    A.    Correct.

2    Q.    Did you reach out to any of your contacts in order to

3    establish a relationship with Euclid?

4    A.    I did.

5    Q.    And what was the nature of those contacts?

6    A.    I spoke with the local BLM ranger that's familiar with

7    that area, and I also -- and he directed me to a sheriff's

8    department sergeant that worked in that area.

9    Q.    And was there -- what type of facility was in Euclid?  Was

10   it another sale barn?

11   A.    It was another livestock auction barn or livestock auction

12   facility.

13   Q.    Now, based on those conversations, without going into the

14   conversations, did you have an understanding as to whether this

15   would be a potential place to move the cattle to?

16   A.    Yes, it -- it appeared to be -- at that time, it appeared

17   to be a viable place to take the cattle.

18   Q.    And did that change?

19   A.    It did.

20   Q.    When did that change?

21   A.    It was -- it changed within -- I don't remember the exact

22   time, but it -- it wasn't long after, a few hours to half of a

23   day.

24   Q.    Within a couple hours or half a day of when you had the

25   understanding that this was going to be a viable alternative?

Rand Stover - Direct

1   A.   Once we -- once we got far enough down the road of

2   actually planning and believing that this could be a potential

3   option, and we started putting reasonable plans in place to do

4   so, within a half a day of that, it was no longer -- it became

5   no longer an option.

6   Q.   If you could look at Exhibit 11 in your book, please.  And

7   do you recognize that?

8   A.   Yes, I do.

9   Q.   And what is it?

10   A.   It's a copy of a Facebook posting indicating that --

11   Q.   Without reading what it says, just generally, it's a

12   Facebook posting.  And what is the sponsor of the Facebook?

13   A.   It's from the "We support Cliven Bundy."

14   Q.   And the date of it is April 11th?

15   A.   April 11th, 2014.

16   Q.   And how are you familiar with this document?

17   A.   It was provided to me by one of our special agents.

18   Q.   And does this address the Euclid Stockyard?

19   A.   Yes, it does.

20            MR. MYHRE:  Your Honor, we offer Government

21   Exhibit 11.

22            THE COURT:  Any objection?

23            MR. MARCHESE:  Objection.  Authentication.

24            MR. TANASI:  And Your Honor, objection.  Hearsay.

25            MR. JACKSON:  I'd object on relevance.

1          MR. LEVENTHAL:  I will object on all three.

2          MR. PEREZ:  I'll join.

3          MR. ENGEL:  I'll join.

4          THE COURT:  All right.  Mr. Myhre.

5          MR. MYHRE:  Yes, Your Honor.  This is offered as a

6   801(d)(2)(e) statement in furtherance of the conspiracy.

7          The authentication is that this agent recognizes it.

8   It was provided to him from another agent.  It's -- from the

9   face of the document itself, it's clear that it's from a Cliven

10  Bundy supporter, and it addresses relevant information directly

11  on point with respect to Euclid Stockyard.

12         So, therefore, we believe that it's both authentic as

13  well as relevant under 801(d)(2)(E).

14         THE COURT:  All right.  I will admit it.

15         MR. MYHRE:  Thank you, Your Honor.  May we publish?

16         THE COURT:  Yes, you may.

17     (Exhibit 11 admitted.)

18  BY MR. MYHRE:

19  Q.   And Agent Stover, if you could just -- it's a relatively

20  short message.  Would you mind reading that for us, please?

21  A.   Sure.  It says: "Attention.  I just got some information

22  in.  The cattle are going to be transported to the Euclid

23  Stockyard in California.  Scheduled for Monday.  Could be

24  sooner than that.  They are going to the auctioned Wednesday."

25         "Folks, I ask that you spread this to the four

Rand Stover - Direct

1    corners of the Internet.  If you are in California, you will be

2    a great asset on this one.  Euclid Stockyard information is as

3    follows."

4    Q.   That's fine right there.  And at the bottom, there appears

5    to be some information with hashtags there; is that correct?

6    A.   That's correct.

7    Q.   Are you familiar with hashtags?

8    A.   No.

9    Q.   So, now, the information contained in this document, was

10   that information generally available to the public?

11   A.   No, it was not.

12   Q.   How -- did you -- in terms of your contacts for the Euclid

13   Stockyard, were -- did you ask that information be shared with

14   others?

15   A.   No, I specifically asked that it be kept as confidential

16   as possible.

17   Q.   If you could turn to Exhibit 10, please.  Do you recognize

18   this document?

19   A.   Yes.

20   Q.   And what is this?

21   A.   This is another copy of a Facebook posting.

22   Q.   And is it from the "We the Cliven Bundy" Facebook page?

23   A.   Yes.

24   Q.   And the date thereof is what?

25   A.   April 9th, 2014.

Rand Stover - Direct

1  Q.   And just without going into detail, what does this

2  generally address?

3  A.   It generally addresses a -- I don't know how to describe

4  it without reading it -- a method of operation or a method of

5  rule of engagement.

6  Q.   Thank you.

7          Your Honor, we offer Exhibit 10.

8          THE COURT:  Any objection to Exhibit 10?

9          MR. MARCHESE:  As to Mr. Parker, it's hearsay, lack

10 of authentication, lack of personal knowledge and relevance.

11         MR. TANASI:  Join as to Mr. Stewart.

12         MR. LEVENTHAL:  Join for Mr. Drexler.

13         MR. ENGEL:  Join from Engel.

14         MR. PEREZ:  Join for Lovelien.

15         MR. JACKSON:  I join in those objections as well for

16 Mr. Burleson.

17         THE COURT:  Thank you.

18         MR. MYHRE:  Your Honor, the same bases as before,

19 801(d)(2)(E).  This agent has identified this document as

20 something he had seen in the normal course that was provided to

21 him.  He's familiar with it, and it directly goes to the

22 conspiracy in this matter.

23         It is, in essence, a call to arms, which we will be

24 presenting a great deal of evidence on.

25         THE COURT:  And what is the method of the Exhibit 10?

Rand Stover - Direct

1  Is it also Facebook?

2          MR. MYHRE:  Exhibit 10 is Facebook as well, Your

3  Honor, from the "We the Cliven" -- "We Support Cliven Bundy."

4  So the document itself --

5          THE COURT:  Purports to be from --

6          MR. MYHRE:  Right.  Purports to be from the Bundy

7  supporter.

8          THE COURT:  I will admit it.

9          MR. MYHRE:  Thank you, Your Honor.  May we publish?

10          THE COURT:  Yes.

11      (Exhibit 10 admitted.)

12  BY MR. MYHRE:

13  Q.   And Agent Stover, as before, would you mind reading into

14  the record just the brief statement here?

15  A.   Yes, it says:  "Stand your ground.  Do not fire unless

16  fired upon.  But if they mean to have a war, let it begin

17  here."

18  Q.   And there's a photograph associated with this as well?

19  A.   There is.

20  Q.   And essentially, there's -- that photo depicts those words

21  on some sort of monument?

22  A.   Yes.  The quote I just read is listed in the photograph.

23  Q.   Now, the message that you see here, was this consistent or

24  inconsistent with what you were hearing from your intelligence

25  officer and what your -- the intelligence information was that

Rand Stover - Direct

1   you were receiving?

2   A.   It was consistent with that narrative I spoke of earlier.

3   Q.   Now, I want to move to April 11th further.

4           During the course of that day, did -- was there a

5   determination made as to whether you are going to continue

6   operations through the rest of that weekend?

7   A.   On April 11th?

8   Q.   Yes.

9   A.   Yes, there was.

10  Q.   Okay.  And just for the record, April the 11th was a

11  Friday; is that correct?

12  A.   That's correct.

13  Q.   What was the initial determination as to how you were

14  going to conduct operations going forward?

15  A.   Initially, we were going to not conduct any operations

16  over the weekend, because the contractors were going to go --

17  not all, but a majority of contractors were going to go back to

18  Utah to attend a funeral for a mutual friend.

19  Q.   Now, was this determination made in the morning or the

20  afternoon?  When did it occur?

21  A.   It was -- it was -- that determination was made -- I -- I

22  believe it was the evening of the 10th or the morning of the

23  11th.

24  Q.   Now, at the time that it was decided that we are not going

25  to continue through the weekend, were you receiving any

Rand Stover - Direct

1    information from your intelligence sources as to whether there

2    were people in the area moving into the area to support

3    Mr. Bundy?

4    A.   Yes.

5    Q.   What -- generally speaking, what type of information were

6    you receiving?

7    A.   Generally I was receiving a significant amount of

8    information from one of our special agents that individuals

9    calling themselves "militia members" were coming to the area.

10   Q.   Did you have a sense -- I'm focusing now on the morning of

11   April the 11th.  Did you have a sense of the numbers?

12   A.   One report I saw said 150.

13            MR. JACKSON:  I'm going to object to what --

14            THE WITNESS:  But the numbers varied.

15            MR. JACKSON:  -- the report said on the grounds that

16   they are hearsay, on grounds that we don't have any foundation

17   for reports.  We don't know who made them.  And unless we can

18   confront and cross-examine the authors of the report, I object

19   to the content of these reports.

20            THE COURT:  Any joinder?

21            MR. TANASI:  Stewart joins.

22            MR. MARCHESE:  Parker joins.

23            MR. LEVENTHAL:  Drexler joins.

24            MR. ENGEL:  Engel joins.

25            MR. PEREZ:  Lovelien joins.

1           THE COURT:  Mr. Myhre, your response?

2           MR. MYHRE:  As before, Your Honor, this is directly

3    relevant to his state of mind, his understanding of what the

4    threat was in the area and informs his decisions through the

5    11th and the 12th in the wash.

6           THE COURT:  All right.

7           MR. JACKSON:  Your Honor, I'll stipulate to his state

8    of mind as long as they don't bring in evidence that's hearsay,

9    and I can't confront or cross-examine.

10          I will stipulate that he had a state of mind that he

11   was in fear or his officers were in fear.  If he wants to draw

12   up a stipulation that he had -- he had information that caused

13   him to be anxious.  He said they had moderate threat level.

14          We'll accept that.  We'll stipulate to that.  But as

15   far as these reports that we don't know who wrote them, or we

16   can't confront and cross-examine the basis of their facts, we

17   would object to that, because we think it violates the

18   constitutional right to confront and cross-examine witnesses.

19          MR. LEVENTHAL:  On behalf of Mr. Drexler, I do not

20   join in that.

21          MR. TANASI:  Your Honor, same thing for Mr. Stewart.

22          MR. MARCHESE:  Parker as well.

23          MR. ENGEL:  Engel as well.

24          MR. PEREZ:  Lovelien as well.

25          THE COURT:  Mr. Myhre?

Rand Stover - Direct

1          MR. MYHRE:  Yes, Your Honor.  The witness is

2    available for cross-examination.  All -- what Mr. Jackson is

3    objecting to merely goes to the weight of the evidence, not to

4    admissibility.

5          He certainly is free to cross-examine Agent Stover

6    all day long as to his source of information; the reliability

7    of it.  But the government is entitled to prove that Agent

8    Stover acted reasonably.  And in order to do that, we need to

9    advance proof of the information he was working on and where he

10   derived it from.

11         THE COURT:  All right.  That's sufficient.  I will

12   allow it.  Overruled.

13   BY MR. MYHRE:

14   Q.   So, Agent Stover, you said you understood, again, with

15   respect to the numbers in the area?

16   A.   Yes.  That was one of the reports I received, yes.

17   Q.   Now, in terms of how that affected your operation going

18   forward, did it have any effect on it at that point, just

19   having this information?

20   A.   Again, it increased my belief that interference was likely

21   and people were -- more people than I expected were coming to

22   the area.

23   Q.   Did you believe, however, at least on that information,

24   that you would be able to conduct operations without serious

25   risk of violence?

Rand Stover - Direct

1  A.    I believed at that -- on the morning of the 11th, because

2  so much information was coming in, that we were going to -- I

3  was going to continue with my plan of conducting operations

4  when we picked back up on Monday.

5  Q.    At this point in time, midmorning or late morning of

6  April 11th, approximately how many cattle had been gathered?

7  A.    We were at approximately -- after the morning of the 11th,

8  we were at approximately 377 cows.

9  Q.    And those were corralled in the ICP?

10  A.    They were.

11  Q.    Now, did the plan to, you know, take off the weekend and

12  begin the operations later, did that change later on the 11th?

13  A.    Yes, it did.

14  Q.    And what occurred to change that plan?

15  A.    There was a conference call that I participated in at

16  approximately -- I don't remember if it was 4:00 or 6:00 that

17  evening.

18  Q.    It was in the evening of April 11th?

19  A.    Yes.

20  Q.    And where did this call take place?

21  A.    It occurred at the incident command post in the command

22  trailer.

23  Q.    Who was present for this conversation?

24  A.    There were -- well, there were multiple people on the

25  phone including upper-level Department of the Interior

Rand Stover - Direct

1  management.  There were upper level National Park Service

2  management.

3           There was a deputy assistant director from the FBI on

4  the call.  And there present in -- at the -- inside the

5  trailer, our director of BLM law enforcement, the unified

6  command staff that was working on the operation, myself.

7  Q.  That would have included SAC Love in that party?

8  A.  Yes.

9  Q.  Now, the people on the other end of the phone, they were

10  in Washington?

11  A.  Yes, some were in Washington, DC.  Some were in other

12  locations.

13  Q.  What was the general gist of this or the general purpose

14  of this call?

15  A.  The general purpose was to try and evaluate the current

16  threat level to the operation and to try and get a handle on

17  the many groups that had come in -- the many groups calling

18  themselves militia members or militia groups that had come into

19  the area or were reported to still be in transition to the

20  area.

21  Q.  Who was leading the call?

22  A.  It was Dan Love, our director of law enforcement, and then

23  the upper level management from Washington, DC.  I wouldn't say

24  there was one particular leader of the call.

25  Q.  Who was doing most of the talking?

Rand Stover - Direct

1    A.    Most of the talking was done by the deputy assistant

2    director from the FBI.

3    Q.    And was he conveying information to you?

4    A.    Yes.

5    Q.    And what was the nature of that information?

6    A.    In general, he said that at that particular time --

7              MR. LEVENTHAL:  I object.

8              MR. JACKSON:  I object to hearsay, what he heard from

9    the deputy.

10             THE COURT:  Sustained.

11             MR. MYHRE:  Your Honor, again, this goes to his state

12   of mind.  The information that he's receiving informs his

13   actions in the wash on both the 11th and the 12th.  So it's the

14   same bases that we offered the previous information that he

15   received.

16             MR. JACKSON:  Object on confrontation grounds as

17   well.  I would just like to be able to cross-examine this

18   deputy district director, and I don't know if he's listed on

19   their witness list.

20             MR. MYHRE:  It's not --

21             THE COURT:  Once again, the jury is instructed.  This

22   is one of those times when you are only to accept the

23   information for a limited purpose.  Not for the truth of what's

24   being said, but for the effect that it had on the listener in

25   this case, Agent Stover.

Rand Stover - Direct

1          You may continue.

2          MR. MYHRE:  Thank you, Your Honor.

3   Q.   So what was the general -- again, during this

4   conversation, what was the information that was conveyed to

5   you?

6   A.   The deputy assistant director said at that particular

7   time, the FBI had never seen that number of purported militia

8   groups and organizations coming together in cooperation to one

9   area to support one common cause.

10          He recommended to the BLM that we conclude and end

11  operations, and he listed a number of what he termed "flash

12  points" to support that conclusion.

13  Q.   And what were the flash points?

14  A.   He -- he said if the BLM continued to gather cattle, it

15  would be a flash point.  If the BLM attempted to transport the

16  cattle, it would be a flash point.  If the BLM confronted the

17  Bundy family, it would be a flash point.  Or if the BLM left

18  the area en masse, it would be a flash point.

19  Q.   Now, based on that information, did that affect your

20  continuing operations?

21  A.   Yes.

22  Q.   And how did it affect it?

23  A.   It greatly affected our operations that I felt he said no

24  matter what we do at that point, there was a flash point,

25  meaning a significant risk of violent encounter.

Rand Stover - Direct

1    Q.    Did the -- how did the call end?

2    A.    The call ended with our director and our special agent in

3    charge thanking the deputy assistant director for his time and

4    saying thank you for his analysis and conclusions.

5    Q.    Did Special Agent Love or the director of the BLM then

6    make any decisions with respect to the continuation of the

7    operations?

8    A.    They did.  At the end of the call, they determined that we

9    were going to conclude operations and stop gathering cattle.

10   Q.    Were there any decisions made with respect to the

11   disposition of the cattle?

12   A.    At that point, at that particular moment in time, no.

13   They said the top priority was to ensure the safety of the

14   civilians and the contractors working and to develop a plan to

15   get the -- to move the cattle out of the area.

16   Q.    Now, did you and the rest of the staff at the incident

17   command post take steps then to add security or enhance

18   security at the command post?

19   A.    Yes.

20   Q.    And what -- what were those steps?

21   A.    In general, I doubled the security positions around the

22   incident command post.  We called the officers that were

23   currently working in the incident command post to give them a

24   general briefing that we were going to stop operations.

25              I made attempts to increase the security perimeter of

Rand Stover - Direct

1    our incident command post and increase the number of roving

2    patrols in the area to try and gauge if any violent encounters

3    were imminent.

4              MR. MYHRE:  Your Honor, may I recall Exhibit 329,

5    please?

6              THE COURT:  Yes.

7    BY MR. MYHRE:

8    Q.   Agent Stover, this is the map we used yesterday, Exhibit

9    329.

10             Would you just, if you could, draw on this map for us

11   some of the steps that you took to increase the security around

12   the command post.

13   A.   Sure.  So, as we discussed, the main entrance to the

14   incident command post was there through that fence line and

15   down into the incident command post.

16   Q.   Okay.  You have drawn a line near that median strip on the

17   15 north and southbound lanes just north of that; correct?

18   A.   Correct.

19   Q.   And that was again referred to as what?

20   A.   It was referred to as the "post one" by our officers.

21   Q.   Okay.

22   A.   I -- so I increased the number of officers in that

23   location.  I also increased the number of officers down here in

24   the area.

25   Q.   And you've circled -- drawn a circle on the map just north

Rand Stover - Direct

1    of that southbound lane of the 15.  And that's referred to as

2    what?

3    A.    That was referred to by our officers as "post two."

4    Q.    Now, why did you put officers at post two?

5    A.    That was -- that was a potential -- not the main, but a

6    potential ingress/egress area and a definite security concern.

7    Q.    And did you enhance security elsewhere at the ICP?

8    A.    I did.

9    Q.    And where else did you place?

10   A.    I positioned officers -- this isn't representative of how

11   many, but along this general line up in here.  I increased --

12   Q.    Would you mind making that a solid line?

13   A.    Sure.  Sure.  You bet.  In the area up in here, I

14   increased the number of officers and there were also some

15   roving patrols in that area.

16   Q.    And were these officers instructed in any way as to what

17   they were going to be doing there or why they were there?

18   A.    They were.  They were there to maintain the security

19   perimeter of the incident command post and to be vigilant for

20   any potential individuals trying to -- or unauthorized

21   individuals trying to get in to the incident command post.

22   Q.    Did you enhance security elsewhere?

23   A.    Yes.

24   Q.    And where else did you do so?

25   A.    This is -- they were a little bit further back, but back

Rand Stover - Direct

1   here in this area to the north of the incident command post.

2   Q.   And why did you place someone at that position?

3   A.   Well, there -- from the -- from the north there and down

4   the wash, there is a -- the possibility that someone could come

5   into the incident command post from the north down the wash.

6   Q.   So, and I meant to ask this question when we were -- you

7   drew that line.  That line was drawn to the west of the main

8   ICP; is that correct?

9   A.   That's correct.

10  Q.   And your purpose in placing security there was what?

11  A.   That was to prevent or deter any unauthorized people from

12  getting into the incident command post and to maintain the

13  security perimeter around our incident command post.

14  Q.   So any -- did you do anything with respect to the east

15  portion of the ICP?

16  A.   Yes, there were officers in a -- in a roving patrol

17  fashion to the east.

18  Q.   Now, we discussed yesterday a little bit about the number

19  of officers you had, and you also had two shifts.  Did you take

20  steps to extend the shifts of any of the officers?

21  A.   Yes.

22  Q.   And what were those steps?

23  A.   The officers on that day on the 11th that had worked

24  during the day on the 11th, they were instructed to stay and

25  work a double shift over the night of the 11th into the morning

Rand Stover – Direct

1    of the 12th.

2              And the officers that were –– that had come on to

3    work the night shift of the 11th were also stationed at the

4    incident command post.

5    Q.   So you had essentially two shifts working?

6    A.   Essentially, yes.

7    Q.   Now, were these officers allowed to –– to rest that

8    evening, or were they to maintain security?  What were their

9    instructions in that regard?

10   A.   They were instructed to maintain the security of the

11   incident command post.  And if they happened to be in a

12   position where there were multiple officers, to switch off and

13   get some rest or grab a snack out of their vehicle, if they

14   could, and get a little bit of downtime.  And then switch

15   assignments and let somebody else stand the post while they

16   took a little bit of a rest.

17   Q.   And just in terms of approximation, how many officers were

18   involved in this security that evening?  That night?

19   A.   I –– I don't remember the exact number.

20   Q.   But it involved both day and night shift?

21   A.   Yes.  Or for the most part.  There were some officers that

22   that still had other assignments in –– around the hotels where

23   some employees were staying.  But the majority of the officers

24   were stationed at the incident command post that evening.

25   Q.   Now, with respect to the civilian employees who worked

Rand Stover - Direct

1    there, were any steps taken to provide extra security for them?

2    A.   Yes.

3    Q.   And what were those steps?

4    A.   Some of those officers or those employees were escorted

5    out by some officers.  And there were a few of the employees

6    that were required to stay there, such as people working in our

7    radio dispatch trailer.  Some of the employees that were there

8    to make sure the cattle were fed and watered, they stayed.

9         But some of the employees were allowed to leave.

10   They were escorted out by law enforcement and allowed to leave

11   to a safe location.

12   Q.   I would like to just address briefly with you how these

13   officers were equipped, not only for the evening of the

14   11th and then the following day.

15        Were the officers who were involved in the

16   impoundment operation -- were they issued any special equipment

17   or any sort of special gear to conduct this security for the

18   operation?

19   A.   In general, no.

20   Q.   Generally speaking, how -- what is the normal issue of

21   equipment for a law enforcement officer?  Let's begin with

22   the -- with the BLM ranger, for example.

23   A.   Sure.  A BLM ranger has a standard uniform.  He has a

24   badge, a set of credentials, police markings and patches on his

25   uniform shirt or jacket --

Rand Stover - Direct

1    Q.   Do they have --

2    A.   -- his or her.

3    Q.   -- firearms?  I'm sorry.

4    A.   His or her.

5    Q.   And are they issued firearms?

6    A.   Yes.

7    Q.   What is the standard issue for a BLM officer?

8    A.   In general, a BLM officer is issued a primary

9    semi-automatic handgun or pistol.  They have the option to

10   choose a backup pistol if they would like.  They also are

11   issued a Remington 870 shotgun and a Colt AR15 rifle.

12   Q.   Is that true for agents as well?

13   A.   Yes.

14   Q.   For personal protection, what is the -- what is an officer

15   issued?

16   A.   An officer is -- has soft body armor we call it, which is

17   a -- it's just a cloth multiple body armor that they can wear.

18   Q.   And do they also have additional plating that they could

19   use?

20   A.   If their supervisor approved it, they did have the ability

21   to purchase a hard or a ballistic-type of rifle plate, but that

22   was with supervisor approval.

23   Q.   So, with respect to the soft armor, what is that designed

24   for?

25   A.   It's designed for a ballistic protection for a handgun

Rand Stover - Direct

1   round up to a certain caliber.

2   Q.   Is it designed to withstand impact from a -- from a rifle?

3   A.   It would not withstand an impact from a high-powered

4   rifle, no.

5   Q.   Is that the purpose behind the hard plates?

6   A.   Yes.

7   Q.   Now, during the conduct of the -- strike that question.

8        Does a BLM ranger law enforcement officer -- are they

9   also issued a vehicle to use?

10  A.   Yes.

11  Q.   What type of vehicles?

12  A.   A ranger is issued a marked patrol vehicle, and it's

13  usually an SUV or a pickup truck type of vehicle.  Some kind of

14  four-wheel drive vehicle.  We do have a few rangers at that

15  time that had Jeeps as well.

16  Q.   And with respect to special agents, are they issued

17  vehicles as well?

18  A.   Yes, they are.

19  Q.   And what type of vehicles are they issued?

20  A.   Special agents are generally issued unmarked vehicles, so

21  they don't have police markings on the -- overt police markings

22  on the outside.

23        And again, those are typically, but not always, but

24  typically a four-wheel drive SUV or a pickup truck of some make

25  or model.

Rand Stover - Direct

1   Q.   I meant to ask this question yesterday.  But for record

2   purposes, the BLM is an agency of the US Department of

3   Interior; is that correct?

4   A.   Correct.

5   Q.   As well as the Park Service?

6   A.   Correct.

7   Q.   And the US Department of the Interior is an agency of the

8   United States; is that correct?

9   A.   That's correct.

10  Q.   Now, just in general for this operation, you mentioned

11  there was no special equipment.  So, the equipment that was

12  there, was it pre-staged or did -- was it delivered or how did

13  the equipment get there in terms of the firearms and the body

14  armor, body protection and so forth?

15  A.   That type of equipment was -- was brought to the operation

16  by the individual officer that it was issued to.

17  Q.   So moving forward now through the night of April 11th, any

18  incidents reported to you?  Any confrontations or conflicts?

19  A.   There were -- there were no incidents at the incident

20  command post.  There was some reporting of surveillance-type

21  activity at the hotels.

22  Q.   But aside from that, no -- no reports around the ICP?

23  A.   No, that's correct.

24  Q.   Now, on the morning of April 12th, were any decisions made

25  with respect to the continuing of the operation or was it the

Rand Stover - Direct

1   same?

2   A.   Well, it was essentially the same as far as the operation

3   goes and the gathering of cattle.  We had received information

4   that there was going to be a -- what was termed a rally at

5   9:00 that morning at that staging area off of Highway 170 that

6   I indicated on the map earlier.

7   Q.   And would -- in response to that information, did you do

8   anything differently or remain the same?

9   A.   We -- we maintained our security perimeter at the incident

10  command post and were waiting to get further information on how

11  that rally transpired and what happened at that rally.

12  Q.   And did you later receive information about the rally?

13  A.   Yes.

14  Q.   And who delivered that information?

15  A.   Sheriff Gillespie.

16  Q.   And your understanding of who Sheriff Gillespie is?

17  A.   At the time, he was the sheriff of Clark County Nevada.

18  Q.   And did you meet with Sheriff Gillespie then?

19  A.   I was in a meeting with him, he and others for a few

20  minutes that morning of the 12th.

21  Q.   And where did this meeting occur?

22  A.   At the -- inside the command trailer at the incident

23  command post.

24  Q.   And aside from you and Sheriff Gillespie, who else was

25  present?

Rand Stover - Direct

1    A.   Our law enforcement director was there.  Dan Love was

2    there.  Some other members of the unified command staff were

3    there.  So -- law enforcement officers from the Park Service.

4    Q.   And what was your understanding of the object of that

5    meeting?

6    A.   That Sheriff Gillespie was going to tell Dan Love and our

7    director of law enforcement what happened at the rally while he

8    was there.

9    Q.   And did you hear what he had to say about that?

10   A.   He -- I heard him say that Cliven Bundy had instructed him

11   to go to the incident command post and disarm the BLM.

12   Q.   What did that term mean to you, "disarm"?

13   A.   To --

14           MR. LEVENTHAL:  Objection, Judge.  Calls for

15   speculation.

16           MR. MYHRE:  I'm asking what he believed, Your Honor.

17   How he interpreted that.

18           MR. LEVENTHAL:  That's what --

19           THE COURT:  All right.  Again, limited only --

20   admitted limited only to the effect that it had on Mr. Stover.

21           THE WITNESS:  I took that to mean that Mr. Bundy had

22   instructed Sheriff Gillespie to come to the incident command

23   post and take the BLM's firearms away from them and disarm

24   them.

25

Rand Stover - Direct

1   BY MR. MYHRE:

2   Q.   And did that happen?

3   A.   No.

4   Q.   No.  Was that -- did -- what was said about the -- just

5   the general nature of what had occurred at that rally aside

6   from the disarming?

7           MR. LEVENTHAL:  Again, objection.  Hearsay.

8           MR. MYHRE:  Effect on the listener, Your Honor.

9           MR. LEVENTHAL:  Yeah, but is it the effect on the

10  listener?  Prior it was to build up and to increase or have an

11  understanding of the threat level.  So at this point, what --

12  what exactly is the state of mind?  So, again, I go back to

13  hearsay.

14          MR. MYHRE:  Again, Your Honor, it informs the

15  decisions of Agent Stover in the events following that meeting

16  down in the wash.

17          THE COURT:  I'll allow it for that purpose.  You may

18  continue.

19  BY MR. MYHRE:

20  Q.   So aside -- you talked about the disarming of the agents.

21  Do you recall anything else that the sheriff said with regard

22  to that meeting?

23          Just to be more specific, do you recall whether or

24  not anything was said about the cattle in your presence?

25  A.   No.  I don't recall anything in my presence while I was in

Rand Stover - Direct

1   the meeting.

2   Q.   Did you leave the meeting after hearing about the

3   disarming?

4   A.   Yes.  I left the meeting a short time after.

5   Q.   Did you see whether the sheriff left or not?

6   A.   Yes.

7   Q.   After the sheriff left, did you then have any further

8   information or was any information provided to you with regard

9   to the status of the rally?

10  A.   Yes.

11  Q.   And what was that information?

12  A.   I was standing outside the incident command post, and our

13  Special Agent in Charge Dan Love came out, and he pointed at

14  me.  And he said -- he said, "They're coming.  Get everyone to

15  the front gate."

16  Q.   When you -- when he said "they're coming," what did you

17  understand that to mean?

18  A.   I understood that to mean that people from that rally site

19  were coming to the incident command post.

20  Q.   And in terms of the relationship time-wise of that meeting

21  that took place in the trailer and Special Agent Love saying

22  "Get ready.  They're coming," how much time had lapsed?

23  A.   Well, when he told me that, it was approximately 11:15 in

24  the morning.

25  Q.   Do you recall approximately when that meeting occurred?

Rand Stover - Direct

1    A.   I believe it was -- I -- I don't recall specifically.  It
2    was -- I believe it was -- no.  I don't recall.
3    Q.   So what did you do in response to that?  To Agent Love's
4    information passing to you?
5    A.   Well, the way our command post was set up, the command
6    trailer was very close to the radio communications building.
7    So I walked across the courtyard, if you could call it a
8    courtyard, to the radio communications building and told the
9    dispatchers working at that time Dan Love's instructions.  And
10   they -- they said that over the radio to the officers.
11   Q.   I'm sorry.  The last part again?
12   A.   The radio dispatchers announced that over our police
13   radios.
14   Q.   If we could just touch on that a moment.  So, how would
15   the officers communicate within the incident command post?
16   A.   We -- three primary methods; verbally, or cell phone, if
17   they had a cell phone connection, or via police radio.
18   Q.   And would the radio be heard within the vehicle or through
19   earpiece, or how would that be accomplished?
20   A.   Most of -- the majority of the officers had vehicle-based
21   radios and handheld radios.
22              MR. MYHRE:  Your Honor, may we call up Exhibit 347,
23   please.
24              THE COURT:  Yes, you may.
25

Rand Stover - Direct

1    BY MR. MYHRE:

2    Q.   It should be on your monitor, Agent Stover.

3    A.   I see it.

4    Q.   So the initial response was -- this is a picture of what?

5    A.   This is a picture of Interstate 15 northbound and

6    southbound and the post one area or main entrance into the

7    Toquop Wash.

8    Q.   So, the time stamp on this is approximately 11:30.  But

9    where -- you said you initially moved resources to post one; is

10   that correct?

11   A.   Correct.

12   Q.   Okay.  And in the photograph here, just generally

13   speaking, where were your resources initially deployed?

14   A.   Well, these -- in general, this area here is post one.

15   Q.   Now, we see a number of -- you have drawn a circle around

16   a number of vehicles at post one.  Are those BLM vehicles at

17   this point?

18   A.   I can't identify each and every vehicle, but I know some

19   of those vehicles are BLM vehicles, yes.

20   Q.   Now, if you look -- if we look toward the immediate front

21   entrance there, we see a number of vehicles.  Were vehicles

22   moved up into that area to reinforce that security?

23   A.   Yes.

24   Q.   And what was the purpose in putting vehicles there?

25   A.   There was a -- there were vehicles positioned there to

Rand Stover - Direct

1  prevent anyone with ill intent from just driving straight

2  through that post, going through the gate and down into the

3  incident command post.  So, as a deterrent for vehicle traffic.

4  Q.   And generally speaking, where were you located while all

5  of this was going on?

6  A.   At -- at this particular time, around 11:30, I was back by

7  the cattle corrals towards the post three area.

8  Q.   Now, are you -- from that area, are you able to see what's

9  going on with respect to people arriving at post one or near

10 post one?

11 A.   I -- from that position, I could not see all the post one.

12 Q.   What were you -- were you able to hear on the traffic what

13 was going on?

14 A.   I could hear over the radio that I was carrying.  I could

15 hear some of the radio traffic, yes.

16 Q.   And just generally, what was it that you were hearing from

17 the radio traffic?

18 A.   That they were seeing slowing traffic on the interstate.

19 A significant amount of slowing.  They were seeing people

20 parking and getting out of their vehicles and moving on to the

21 interstate or moving across the interstate towards the incident

22 command post.

23 Q.   Were you also able to hear what was going on at post two?

24 A.   Yes.

25 Q.   And what were you hearing on the radio traffic there?

Rand Stover - Direct

1    A.   That they were seeing multiple individuals above them, on

2    the high ground above them on the interstate.  That they were

3    seeing people down in the wash underneath the overpasses.

4    Q.   And did you hear anything about guns?

5    A.   Yes.

6    Q.   And what were you hearing with respect to guns?

7    A.   I was hearing that our officers were identifying multiple

8    individuals that were carrying firearms.  I also -- I was able

9    to hear that they were trying to keep track of the number and

10   the location of those individuals.

11   Q.   Now, did you have what's called an LPOP for the incident

12   command post?

13   A.   Yes.

14   Q.   What is an LPOP?

15   A.   In general, it's an elevated lookout post or an

16   observation post, usually at a high-ground position that would

17   have a wide field of view.

18   Q.   And what's the purpose of an LPOP?

19   A.   The purpose of our LPOP was to, as I said, have a wide

20   field of view to be able to see over top of the command post

21   and the area beyond to be able to determine if unauthorized

22   individuals were trying to encroach into the closed area or

23   come to the ICP without authorization.

24   Q.   And the individuals at the LPOP, did they have -- or at

25   least the one that was set up for this, did they have any

Rand Stover - Direct

1  devices that they used to make their observations?

2  A.   I believe they had binoculars, and they may have had a

3  spotting scope.  I don't remember if that particular crew that

4  was up there had a spotting scope at that time.  They had some

5  optical enhancement devices like binoculars.

6  Q.   And where was this LPOP located with respect to the ICP?

7  A.   It was on a mesa that was just to the -- just slightly

8  north but mostly to the east of the incident command post.

9        MR. MYHRE:  Your Honor, may I call up Exhibit 346?

10       THE COURT:  Yes.

11  BY MR. MYHRE:

12  Q.   Do you see 364, Agent Stover?

13  A.   Yes, I do.

14  Q.   And what is depicted there?

15  A.   That's a representation of our lookout post or observation

16  post that was on top of that mesa I was just describing.

17  Q.   Now, did the -- how were these individuals communicating

18  with the people down in the ICP?

19  A.   They also had vehicle-based radios and handheld radios.

20  Q.   And do you recall the names of the individuals who were up

21  there that day?

22  A.   One -- one name I specifically remember is Wes Jensen.

23  Q.   Now, do you remember hearing any reports from -- is he a

24  ranger or agent?

25  A.   At the time, he was a ranger.

Rand Stover - Direct

1   Q.   Do you remember hearing any reports from Ranger Jensen

2   from the LPOP about guns?

3   A.   Yes.

4   Q.   What did you hear?

5   A.   He was attempting to identify people from his position

6   that were carrying firearms.

7            MR. MARCHESE:  Objection.  Hearsay.

8   BY MR. MYHRE:

9   Q.   What was your understanding from what he was saying what

10  he was doing?

11  A.   I heard him say that he was watching individuals that had

12  firearms.

13  Q.   And did he make a report as to what he was visualizing?

14  A.   Yes.  He -- he was --

15           THE COURT:  Okay.  Wait.  We are just not going to do

16  this anymore.

17           Please don't tell us what anyone else is saying.  You

18  can summarize generally what you are -- what information you

19  are receiving, but don't tell me what he said or what you heard

20  him specifically say.

21           THE WITNESS:  Yes, Your Honor.

22           THE COURT:  If you know that his duty is to attempt

23  to ID people, that's fine.  That's not hearsay.  If you tell me

24  what he actually says, then that is hearsay.

25           MR. MYHRE:  But, Your Honor, again, we go to --

Rand Stover - Direct

1          THE COURT:  I know, but it's cumulative at this

2    point.  It's gone on for too long.  I have given you some

3    leeway, but it's getting out of hand every time he says "I

4    heard someone say.  I heard someone say."

5          Sometimes it's necessary.  I understand it's

6    impossible to not say sometimes.

7          MR. MYHRE:  Right.  May I inquire --

8          THE COURT:  But it's getting out of hand.

9          MR. MYHRE:  -- Your Honor, just in terms of

10   specifically with respect to guns, because that's going to

11   inform his perceptions down in the wash if he just heard a

12   report of numbers of guns.

13         THE COURT:  All right.

14   BY MR. MYHRE:

15   Q.   And, Agent Stover, just with respect to report of numbers

16   of guns, do you recall Agent Jensen making that report?

17   A.   Yes.

18   Q.   And what did he say?

19   A.   That there were more guns and individuals than he could

20   count and keep track of.

21   Q.   Now, in response to that, what did you do?

22   A.   Well, at that time, I had -- I was transitioning between

23   my location at post three up to post two.

24   Q.   And what drew you to post two?

25   A.   There was a call on the radio that more officers were

Rand Stover - Direct

1    needed and backup was needed at that location.

2    Q.   Did you go with anybody down to post two?

3    A.   I did.

4    Q.   And who did you go down -- go with?

5    A.   I went with Nevada State Chief Ranger Eric Boik.  I'm

6    sorry.  At that time, he was still the Utah State Chief Ranger.

7    He's now the Nevada State Chief Ranger.  My apologies.

8    Q.   Now, your purpose in going to post two, you said you

9    responded to the call.  But what was your purpose in going

10   there?  What were you going to do?

11   A.   My initial purpose was responding to the request for

12   assistance or backup by the officers that were on scene at post

13   two.

14   Q.   Now, when you got down there, did you assess the

15   situation?

16   A.   I did.

17   Q.   I direct your attention, if you could, in the book to

18   Exhibit 258, please.  And do you recognize Exhibit 258?

19   A.   Yes.

20   Q.   What is depicted there, just generally speaking?

21   A.   It shows some BLM -- a number of BLM officers and myself.

22   Q.   And are you included in that photo as well?

23   A.   Yes.

24   Q.   And is this a fair and accurate depiction of the events of

25   April 12th, 2014?

Rand Stover - Direct

1    A.    Yes.

2                MR. MYHRE:  Your Honor, we offer Exhibit 258.

3                THE COURT:  Any --

4                MR. MARCHESE:  No, objection Parker.

5                THE COURT:  -- objection to 258?

6                MR. TANASI:  No objection Stewart.

7                MR. LEVENTHAL:  No objection, Your Honor.  Thank you.

8                MR. ENGEL:  No objection Engel.

9                MR. PEREZ:  No objection Lovelien.

10               MR. JACKSON:  No objection Burleson.

11               THE COURT: All right.  Exhibit 258 will be admitted.

12   Did you wish to publish?

13               MR. MYHRE:  Yes, Your Honor.

14               THE COURT:  You may.

15   BY MR. MYHRE:

16   Q.    Okay.  Agent Stover, this is now displayed.  Can you

17   describe for us what we're observing in this particular shot

18   here?

19   A.    Yes.  This picture was as I was arriving at the post two

20   location, and I walked up to those officers that were already

21   there.  And they were telling me what they were seeing on the

22   over -- the Interstate 15 overpass and --

23   Q.    Just stop there for just a second.  And were they telling

24   you these things as they were observing them?

25   A.    Yes.

Rand Stover - Direct

1          MR. MYHRE:  Your Honor, we are going to offer what

2    they were saying as a present sense impression.

3          THE COURT:  But it's not this witness's present sense

4    impression.  It's these other folks' present sense impression.

5          MR. MYHRE:  Yes, Your Honor, which would be an

6    exception to the hearsay rule, because he's going to be hearing

7    what they are saying.  It's going to inform his actions, but

8    it's also specific exclusion to the -- exception, excuse me --

9    to the hearsay rule.

10          MR. TANASI:  And, Your Honor, I would object from

11   Stewart.  And I'd say that maybe the exception would apply to

12   the first level of hearsay but not necessarily the second.

13          MR. MARCHESE:  And we would join.  We would ask for

14   some foundation.  I realize that different people are going to

15   be saying things at different times, so -- at least Mr. Parker

16   will taking it on a case-by-case basis.

17          THE COURT:  All right.  So why don't you lay a better

18   foundation for what's going on in the photo before we get into

19   what was said.

20          MR. MYHRE:  Thank you, Your Honor.

21   Q.   So you described that this is -- was this essentially your

22   first stop down into the wash?

23   A.   Yes.

24   Q.   Okay.  And it appears from this photo that -- are you

25   speaking with somebody?

Rand Stover - Direct

1   A.    Yes.

2   Q.    And who are you speaking with?

3   A.    His name is Shane Naylon.

4   Q.    And what does Mr. Naylon appear to be doing?

5   A.    He is telling me what he's observed.

6   Q.    What does he appear to be doing with his hands?  Can you

7   tell?

8   A.    Pointing.

9   Q.    And what does it appear that you were doing?

10  A.    Listening to what he's telling me.

11  Q.    And in which direction are you looking?

12  A.    I'm looking south towards the Interstate 15 overpass.

13  Q.    So you are looking at the -- which overpass, the

14  northbound or the southbound?

15  A.    You could see -- I could see both from that position.

16  Q.    And what was it that he was explaining to you?

17  A.    He was explaining to me what he and the other officers

18  that were there before I arrived --

19              MR. MARCHESE:  Objection.  Hearsay.

20              MR. MYHRE:  He's just describing what he -- just

21  generally what he heard, I believe.  Not exactly --

22              MR. MARCHESE:  Well, the government -- the government

23  has proffered that they will lay the foundation for a present

24  sense impression.  Not what they had seen.

25              The witness was talking in the past tense, thus he

Rand Stover - Direct

1  has not laid the proper foundation for a present sense

2  impression.

3           MR. TANASI:  And, Your Honor, I'd object for Stewart

4  that it's also -- there's a relevance objection here, because

5  the thrust of the case is that these agents perceived fear.

6  And what they were -- what was in their head and what fear they

7  perceived, not necessarily what Agent Stover learned of that

8  fear.  Kind of secondhand removed, so it's not relevant as it

9  comes in through Agent Stover.

10          MR. JACKSON:  I would just interpose an objection on

11 confrontation clause grounds under the Sixth Amendment.  If

12 they want to come in and testify what they were thinking or

13 feeling or what they saw, then they can come in and testify and

14 we can cross-examine them.  That's all.

15          This witness doesn't have to testify what the other

16 officers were thinking and feeling or seeing.

17          THE COURT:  Mr. Myhre, what's your response?

18          MR. MYHRE:  Your Honor, again, we are offering this

19 not only as an exception to hearsay, but to inform Agent

20 Stover's decision.

21          But I can -- we are calling these witnesses, so -- or

22 witnesses at this event, so I can move on from here just to

23 save time for everybody.

24          THE COURT:  All right.  Why don't you move on.

25

Rand Stover - Direct

1   BY MR. MYHRE:

2   Q.   So after speaking with these officers, what did you do

3   next?

4   A.   Next I tried to determine the overall threat at that

5   particular moment in time.

6   Q.   Okay.  And what was your determination of the overall

7   threat?

8   A.   That there was a significant threat of violence.

9   Q.   Did you move further down the wash from here?

10  A.   Yes.  At one point, I did.

11        MR. MYHRE:  Your Honor, may I call up Exhibit 132,

12  please.

13        THE COURT:  Yes.

14  BY MR. MYHRE:

15  Q.   And that would be the third clip at 19:18.  And it's

16  playing at 19:18:10.  I'll just allow it to move forward a

17  little bit.

18       (Exhibit 132 being played.)

19  Q.   And if we could stop there, please.  We've stopped at

20  19:18:25.  Do you see at the top of that screen, Agent Stover?

21  A.   Yes.

22  Q.   Okay.  Are you -- now, this is approximately 11:18 --

23  excuse me -- 12:18 in the afternoon on April 12th.  Are you --

24  can you identify generally where you were in the wash at that

25  time?

Rand Stover - Direct

1    A.    Yes.

2    Q.    And where was that?

3    A.    I was -- I was up by these vehicles here.

4    Q.    Was that the forward-most position?

5    A.    Those were the forward vehicles, yes.

6    Q.    Now, when you -- you indicated that when you first got

7    there, you assessed that there was a threat of violence.

8    A.    Yes.

9    Q.    Now, we talked about earlier your training and experience,

10   which included time as a Secret Service agent; is that correct?

11   A.    Correct.

12   Q.    Have you received a significant amount of training, in the

13   course of your career, with respect to identifying potentials

14   for threats of violence?

15   A.    Yes.

16   Q.    And what -- just generally, what type of training would

17   you receive on that?

18   A.    In general, I -- I received extensive training in

19   observation of crowds, observation of individuals in crowds,

20   looking for behavior out of the norm, based on location,

21   whether -- particular facts surrounding the event.  Looking for

22   potential threats of some sort, whether those be overt threats,

23   veiled threats.

24   Q.    And is there something known as the "threat indicators"?

25   A.    Yes.

Rand Stover - Direct

1    Q.   And just generally speaking, what are threat indicators?

2    A.   In general, threat indicators is a term that the law

3    enforcement community uses often to categorize certain

4    behaviors that would be indicators that a threat of violence,

5    assault, physical confrontation are imminent or maybe going to

6    happen in the near future.

7    Q.   Now, in this clip that we just saw, in the 10 seconds or

8    so, where does the crowd of people appear to be with respect to

9    your position as you've indicated on Exhibit 132?

10   A.   In this photo, there were -- a large number of the crowd

11   is underneath that interstate overpass.

12   Q.   When you first got down to the wash, was the crowd in this

13   position or was it in a different position?

14   A.   No, it was in a different position.

15   Q.   Okay.

16   A.   The -- the crowd -- I should say the crowd on the ground

17   at ground level was in a different position.

18   Q.   And where was that -- when you first got to the wash, what

19   did you observe the crowd at ground level?

20   A.   They were further to the south generally in between the

21   two interstate overpasses.

22   Q.   Did they appear to be in any particular formation?

23   A.   At what -- at what time?

24   Q.   When you first got down to the wash.

25   A.   They were -- they were formed up in a -- in a loose crowd,

Rand Stover - Direct

1    and then at one point a line of horses formed.

2    Q.    Now, at this point in time, at 12:18, do you recall

3    Special Agent Love coming down to the wash?

4    A.    Yes.  At this point, he -- he had --

5    Q.    Well, just do you recall him coming down there?

6    A.    Yes, he came down to the wash.

7    Q.    How did he arrive?

8    A.    He arrived on foot.

9    Q.    Was he with anybody?

10   A.    When I first saw him, no.  He was by himself.

11   Q.    And where was he headed when you first saw him?

12   A.    He was walking towards that area underneath the overpass

13   towards the temporary fence that was there underneath the

14   southbound freeway.

15   Q.    When you -- when you observed Agent Love walking toward

16   that fence area, did you have an understanding of what he was

17   doing?  What his purpose was?

18   A.    I did not.

19   Q.    In terms of your own assessment of the situation, did this

20   create a greater sense of a threat or less sense of a threat?

21   A.    For me, it created a greater sense of threat.

22   Q.    Do you observe how the group of people in the wash reacted

23   when you saw Agent Love move to the gate?

24   A.    Yes.

25   Q.    And what was their reaction?

Rand Stover - Direct

1  A.   They moved forward towards the gate, meaning they moved

2  towards the north to meet him in an attempt to meet him at

3  the -- it looked like they were going to meet him at the gate,

4  at the fence.

5  Q.   Now, during the time that you were at the wash observing

6  this, what were -- I know you already talked about you were

7  assessing the situation.  Were you also directing anybody or

8  speaking with anybody?

9  A.   I was speaking with the officers that were there next to

10  me.

11  Q.   Okay.  And just generally, what were you telling them?

12  A.   At this particular moment, I was telling them to watch

13  Dan, watch the crowd around him, and to try and -- if possible,

14  try and provide some sort of cover for him.

15  Q.   Now, did you -- while you were down in the wash, did you

16  hear any commands for the crowd to disburse?

17  A.   Yes.

18  Q.   And what commands did you hear?

19  A.   One of our rangers was giving regular commands to the

20  crowd over his vehicle-based PA system.

21  Q.   Okay.  And generally speaking, was -- what was he saying?

22  A.   He was telling the crowd to -- they were in a closed area.

23  To disburse.  That if they failed to disburse, they could be

24  subjected to violations of federal law.

25  Q.   How often was the repeated?

Rand Stover - Direct

1    A.    It was repeated a number -- numerous times.

2    Q.    And while -- during this time that you're in this position

3    by these vehicles, could you hear officers calling out guns or

4    positions of guns?

5    A.    Yes.

6    Q.    Okay.  Generally speaking, what -- what was the purpose of

7    that?

8    A.    An attempt to -- by the officers to keep track of where

9    the individuals they were seeing with firearms were located at

10   one particular moment in time.

11   Q.    I'd ask you to turn to Exhibit 349 in your book, please.

12   A.    349?

13   Q.    349, yes.

14   A.    Okay.

15   Q.    And what is 349?

16   A.    That's a photo of myself and some other officers down at

17   the post two position.

18   Q.    And the direction from which this photo is taken?

19   A.    It's looking from north to south underneath the interstate

20   overpasses.

21   Q.    And is this a fair and accurate depiction of the events

22   you were involved with on April 12th, 2014?

23   A.    Yes.

24              MR. MYHRE:  Your Honor, we offer Exhibit 349.

25              THE COURT:  Any objection to 349?

Rand Stover - Direct

1          MR. MARCHESE:  None from Parker.

2          MR. TANASI:  None from Stewart.

3          MR. LEVENTHAL:  None from Drexler.

4          MR. ENGEL:  None from Engel.

5          MR. PEREZ:  None from Lovelien.

6          MR. JACKSON:  No objection from Burleson.

7          THE COURT:  All right.  Exhibit 349 will be admitted.

8   Did you wish to publish it now?

9          MR. MYHRE:  Not at this moment, Your Honor.  I'd like

10  to move to another exhibit if I may.

11         THE COURT:  Okay.

12       (Exhibit 349 admitted.)

13  BY MR. MYHRE:

14  Q.   And if you could turn to Exhibit 358, please.  And what is

15  Exhibit 358?

16  A.   That's a picture of several BLM and Park Service law

17  enforcement officers at the post two position.

18  Q.   And is this also taken from the south looking north?  Or

19  from -- yes, if the north looking south.  Excuse me.

20  A.   That's correct.

21         MR. MYHRE:  Your Honor, we offer exhibit --

22  Q.   And is this a fair and accurate depiction of the events on

23  April 12th, 2014?

24  A.   Yes.

25         MR. MYHRE:  We offer Exhibit 358.

Rand Stover - Direct

1          THE COURT:  Any objection to 358?

2          MR. MARCHESE:  None from Parker.

3          MR. TANASI:  None from Stewart.

4          MR. LEVENTHAL:  None from Drexler.

5          MR. ENGEL:  None from Engel.

6          MR. PEREZ:  None from Lovelien.

7          MR. JACKSON:  No objection, Your Honor.

8          THE COURT:  All right.  So, Exhibit 358 will be

9    admitted.

10         (Exhibit 358 admitted.)

11   BY MR. MYHRE:

12   Q.   And lastly, Agent Stover, if you would look at

13   Exhibit 359.

14   A.   Okay.

15   Q.   And as before, is Exhibit 359 a fair and accurate

16   depiction of the events as they occurred on April 12, 2014?

17   A.   Yes.

18   Q.   And is this also a photo taken from ground level looking

19   from the north to the south?

20   A.   Yes.

21         MR. MYHRE:  And we offer 359, Your Honor.

22         THE COURT:  Any objection to 359?

23         MR. MARCHESE:  None from Parker.

24         MR. TANASI:  None from Stewart, Your Honor.

25         MR. LEVENTHAL:  No, Your Honor.

Rand Stover - Direct

1            MR. ENGEL:   None from Engel.

2            MR. PEREZ:  None from Lovelien.

3            MR. JACKSON:  None from Burleson.

4            THE COURT:  All right.  So Exhibit 359 may be

5     admitted.

6         (Exhibit 359 admitted.)

7            MR. MYHRE:  Thank you, Your Honor.  Now may we

8     publish 349?

9            THE COURT:  Yes.

10    BY MR. MYHRE:

11    Q.   Agent Stover, you discussed briefly this photograph.  So,

12    in terms of this image, what are we observing in this

13    photograph?  And let's begin with the structure that's furthest

14    away from you.

15    A.   That --

16    Q.   The bridge area.

17    A.   The concrete bridge area furthest away in the picture is

18    the northbound Interstate 15 freeway overpass.

19    Q.   We see some columns over to the right.  What are those?

20    A.   Those columns in the foreground, the three concrete

21    columns are the support -- part of the support structure for

22    the southbound interstate freeway overpass.

23    Q.   And the southbound overpass, in relation to where you are,

24    we saw in the previous photo.  So you are a few feet back from

25    that; is that correct?

Rand Stover - Direct

1  A.   Correct.

2  Q.   Do you have an approximation of the distance that you are

3  from this location to that gate?

4  A.   Well, the -- that truck in the center there with ME4

5  written on the back, I would estimate that truck was 40 to

6  50 feet from the gate -- from the fence.

7  Q.   All right.  And the fence that we see is -- if you could

8  just draw a little circle or an arrow pointing to that.

9  A.   To the fence?

10 Q.   Yes.  And the witness has indicated with a circle where

11 the fence area is.  You can clear that.

12        So at this point in time, where is the crowd in

13 relationship to that fence?

14 A.   A large number of people in the crowd are right up against

15 the -- that fence.

16 Q.   Now, during the course of this event, you talked about the

17 horses and the people in the middle of the wash.  And you

18 talked about the gate.

19        At the point where the crowd reaches the gate, did

20 you form -- did you or did you not form an assessment of the

21 potential for violence at that point?

22 A.   I did.

23 Q.   And on a scale of 1 to 10, with 10 being the greatest risk

24 of potential for violence, what was your assessment?

25 A.   At that moment in time, it was at a 10.

Rand Stover - Direct

1  Q.   And did your assessment of the potential for violence

2  cause you or not cause you to fear for the safety of yourself

3  or the safety of your other officers?

4  A.   It did cause me to fear for the safety of especially my

5  fellow officers, but also myself.

6  Q.   Now, in making your assessment, did you consider a number

7  of factors from what you were observing in the scene before

8  you?

9  A.   Yes.

10  Q.   And in terms of your assessment, were you able to -- well,

11  let me ask you this.

12       At the time of this photograph here, was BLM

13  conducting or not conducting impoundment operations?

14  A.   We were not conducting impoundment operations.

15  Q.   Was that significant or not a significant factor in your

16  assessment?

17  A.   It was a -- it was a significant factor.

18  Q.   And why is that?

19  A.   Because we did not have any personnel in the field.

20  Q.   Had there been any announcements made, to your knowledge

21  that -- publicly that BLM was no longer conducting operations?

22  A.   There was a -- there was a press release that went out.

23  Q.   Now, we talked earlier about closure orders.  This area

24  where this crowd had formed in the wash area between these two

25  bridges, was that area closed or not closed?

Rand Stover - Direct

1   A.   It was closed.

2   Q.   And was that a significant factor?

3   A.   Yes.

4   Q.   And why?

5   A.   It showed that we were not conducting impoundment

6   operations.  This area was a closed area.  The people in this

7   crowd had sought out the BLM.  They had come to our incident

8   command post.  They had come into a closed area to confront the

9   BLM.

10  Q.   And was your assessment whether that was lawful or

11  unlawful activity?

12          MR. LEVENTHAL:  Objection.

13          MR. MARCHESE:  Objection.

14          MR. LEVENTHAL:  Objection, Judge.

15          MR. MYHRE:  It's his assessment, Judge.  He's a law

16  enforcement officer.

17          MR. LEVENTHAL:  Speculation.

18          THE COURT:  No, sustained.

19  BY MR. MYHRE:

20  Q.   In terms of your assessment of the risk, was it

21  significant as to whether there were commands given for the

22  crowd to disburse?

23  A.   Yes.

24  Q.   Okay.  And what -- what was the significance of that?

25  A.   That continual commands via --

Rand Stover - Direct

1          MR. LEVENTHAL:  Objection.  Asked and answered.

2          MR. MYHRE:  No, it hasn't been, Your Honor.

3          THE COURT:  No, it hasn't.  He may answer it.

4          THE WITNESS:  Multiple and continuous commands were

5    given via a vehicle-based PA system for the crowd to --

6    notifying the crowd that they were in a closed area.  Ordering

7    the crowd to leave the area and disburse.  And they did not do

8    so.

9    BY MR. MYHRE:

10   Q.   In your training and experience, when a law enforcement

11   officer gives a command for someone to move or to leave an

12   area, that command is not followed, does that present a risk

13   factor for you for threat of violence?

14   A.   Yes.

15   Q.   Now, we see the northbound bridge in the photograph.  And

16   did you observe people there?

17   A.   I did.

18   Q.   And did you observe what the people were doing?

19   A.   In general, yes.

20   Q.   And what were you observing?

21   A.   I observed people standing and watching.  I observed

22   people moving around.  I observed people ducking down behind

23   the concrete barrier of the freeway.  I observed people that

24   would go to the other side of the freeway or where I could not

25   see them and then come back to a different location.

Rand Stover - Direct

1   Q.   Now, did -- what you observed with respect to the movement

2   of the people on the bridge, was that a significant factor in

3   your assessment of the risk?

4   A.   Yes.

5   Q.   And why was that?

6   A.   Well, those people on the bridge were, number one,

7   impeding traffic on an interstate.  They were also moving

8   about, and a few of the people I observed were ducking behind

9   physical obstacles, such as the Jersey barriers on the edge of

10  the freeway.

11  Q.   Did you feel there was any risk of harm coming from those

12  bridges?

13  A.   I did, based on information I had received from other

14  officers previously.

15  Q.   Now, moving down into the wash, did you observe any people

16  with guns moving in the wash?

17  A.   Yes.

18  Q.   What did you observe?

19  A.   I observed people moving in and out amongst unarmed people

20  in the crowd.  I observed people moving to positions of

21  concealment behind those concrete pillars.  I observed people

22  moving up along the slanted freeway support graded area and

23  concreted area to different positions.

24  Q.   And had you heard officers calling out guns?

25  A.   Yes.

Rand Stover - Direct

1   Q.   And did this confirm or not confirm for you the presence

2   of guns?

3   A.   It confirmed.

4   Q.   In terms of your observations of people moving with guns,

5   what -- did you see any of them raised to you or pointed at

6   you?

7   A.   At me personally, no.  I did not.

8   Q.   Did you see them pointed at anybody else?

9   A.   No.

10  Q.   Now, does a gun have to be pointed in order for it to

11  present a risk to a law enforcement officer?

12  A.   No.

13          MR. JACKSON:  Objection.  Calls for a conclusion.

14          THE COURT:  Sustained.

15  BY MR. MYHRE:

16  Q.   Does -- from your observation, down in the wash, did a gun

17  have to be raised at you for you to assess the risk that there

18  was a threat of violence?

19  A.   No.

20  Q.   And why is that?

21  A.   Because -- several factors.  The number of individuals

22  that were carrying guns, the movement of the individuals, the

23  potential areas of concealment where they could hide themselves

24  and could no longer be seen by me.

25          The -- the elevated positions that some of those

Rand Stover - Direct

1   individuals took above our positions, so they had the high

2   ground, so to speak.

3   Q.   And in terms of the numbers of people just in general,

4   were you -- did the crowd present more numbers than you had of

5   officers?

6   A.   Yes.

7   Q.   Now, were the presence of the horses a significant factor

8   for you?

9   A.   Yes.

10  Q.   And why is that?

11  A.   They -- the horses -- in that terrain, the horses could

12  have easily come through that fence or around that fence into

13  the secure -- the secure command post area.  They were already

14  in a closed area, but they could have easily come into the

15  command post.

16  Q.   We haven't talked much about that fence, but was that

17  fence a permanent structure?

18  A.   No, it was not.

19  Q.   Why was it put there?

20  A.   It was -- it was put there as a physical barrier and a

21  deterrent.

22  Q.   And was there any signage on that fence?

23  A.   At one point during the operation, there was signage on

24  that fence.

25  Q.   And how was that fence stabilized?

Rand Stover - Direct

1    A.    Temporarily tied together.   The panels were temporarily

2    tied or lashed together.

3    Q.    Now, directing your attention to the southbound bridge,

4    which is not pictured here, but it -- that is again above you;

5    is that correct?

6    A.    Correct.

7    Q.    Did you observe people up there?

8    A.    I did.

9    Q.    And what did you observe about those people?

10   A.    Those people were moving about, some of them.   Some of

11   them were stationary.   Some of them were hanging over the

12   concrete barrier looking down on our location.

13   Q.    And did they present a significant factor of risk?

14   A.    They did.

15   Q.    And why is that?

16   A.    They were not immediately above us, but in very close

17   proximity above us.   Their movement and the number of them,

18   they could have easily dropped an item on us or thrown an item

19   on the officers at that location to cause harm.

20   Q.    And could you hear what the crowd was saying, if anything?

21   A.    Yes.   I heard many statements.

22   Q.    And what type of statements did you hear?

23   A.    I heard statements of "Go home.   F you.   You have no

24   authority.   Give us back the cattle.   You are -- you're cattle

25   thieves.   This is our land."   Many statements of that nature.

Rand Stover - Direct

1   Q.   And what was the general tenor in which they are were --
2   were they yelled or not yelled?
3   A.   They were -- they were yelled.
4   Q.   And what was your assessment?  Was that a significant
5   factor in your assessment?
6   A.   Yes.
7   Q.   And why is that?
8   A.   They were -- obviously, their emotions were -- in my
9   opinion, their emotions with high, and they were using strong
10  language to challenge our authority and reason for being there.
11  Q.   And did you observe any people in that area with gas
12  masks?
13  A.   I did.
14  Q.   And what did you observe?
15  A.   I saw one individual with a gas mask attached to his belt
16  on his hip.
17  Q.   And was that a factor in your assessment of the risk?
18  A.   Yes.
19  Q.   And why is that?
20  A.   In my training and experience, a person does not normally
21  engage in what would be a lawful demonstration with a gas mask
22  attached to their hip.
23         MR. TANASI:  Objection, Your Honor.  Move to strike.
24  Calls for a legal conclusion.
25         MR. MYHRE:  It's his assessment, Your Honor, of the

Rand Stover - Direct

1    risk.

2             THE COURT:  His assessment.  I'll allow it.

3    BY MR. MYHRE:

4    Q.   With respect to the gas mask, were there riot control

5    agents available to your officers to deal with the crowd?

6    A.   What do you mean by riot control measures?

7    Q.   Specifically, are you familiar with the term "pepper

8    ball"?

9    A.   Yes.

10   Q.   What is a pepper ball?

11   A.   A pepper ball is a tool that some law enforcement officers

12   can use, our agency included, to bear less than lethal means of

13   force to disburse a crowd or to break up an illegal activity.

14   Q.   And how is a pepper ball deployed?

15   A.   It's usually deployed by a compressed air-powered device,

16   a gun of some sort.  A compressed air gun.

17   Q.   Now, is it designed to injure someone or physically injure

18   them?

19   A.   Not the ones that we have in our agency.

20   Q.   Now, was pepper ball available in the wash?

21   A.   Yes.

22   Q.   Was there ever an announcement made that pepper ball could

23   be deployed?

24   A.   Yes.

25   Q.   And how was that announcement made?

Rand Stover - Direct

1    A.    It was made via that same vehicle-based PA system.

2    Q.    Was there any -- was it significant to you as to whether

3    or not there would be a potential for violence if pepper ball

4    were deployed?

5    A.    Yes, it was --

6    Q.    In what way?

7    A.    That was a possibility.  Because of the number of

8    individuals there, the number of firearms there, it could --

9    the firing of a pepper ball gun could be perceived as the

10   firing of a firearm.

11   Q.    And did you anticipate or did you assess that perhaps that

12   might provoke a response?

13   A.    Yes.

14   Q.    Now, in terms of the level of intensity of this, with

15   respect to your assessment of the situation, if -- if a

16   firearm, for example, had been accidentally discharged, would

17   that have created a potential for firearm or for gun fire?

18            MR. MARCHESE:  Objection.  Calls for speculation.

19            MR. MYHRE:  Just in his assessment, Your Honor.

20            MR. LEVENTHAL:  Well, I understand it's his

21   assessment.  It's still speculating.  Whether it's his

22   assessment, Your Honor, he's still speculating on it.

23            MR. MYHRE:  I'm not asking him to look in hindsight,

24   Your Honor, to speculate.  I'm asking him if that thought

25   crossed his mind while he was in the wash observing these

Rand Stover - Direct

1    events.

2              THE COURT:  All right.  I'll allow it.  It's

3    overruled.

4              THE WITNESS:  Yes, it did.

5    BY MR. MYHRE:

6    Q.   Okay.  And what was your concern or your assessment?

7    A.   My concern is that if an accidental discharge of a firearm

8    were to happen, that a gunfight would ensue.

9    Q.   Now, looking at 349 and your position here, where exactly

10   are you located?

11   A.   Just right here.

12   Q.   So, you are circling on the exhibit, but you have a white

13   T-shirt that you are wearing?

14   A.   That's correct.

15   Q.   And what is -- there appears to be something over your

16   white T-shirt.  What is that?

17   A.   Yes, I had -- I had on my soft body armor that was

18   enclosed in an external soft body armor carrier.

19   Q.   Now, do you have -- aside from your soft body armor, what

20   other types of personal -- personal protection do you have?

21   A.   At that -- at that time, I had my agency-issued pistol and

22   my agency-issued rifle.

23   Q.   And do you have any sort of other ability for cover and

24   concealment there?

25   A.   The vehicles in front of me as I'm walking forward.

Rand Stover - Direct

1          MR. MYHRE:  May I have just a moment, Your Honor?

2          THE COURT:  Yes.

3      (Pause in the proceedings.)

4          MR. MYHRE:  Your Honor, I'm having a little

5  difficulty locating one exhibit I wanted to go through with the

6  witness.  Court's indulgence.

7      (Pause in the proceedings.)

8          MR. MYHRE:  Your Honor, if the Court's planning to

9  take a break, rather than wasting the Court time now, I can

10  handle this at the break.  It shouldn't take me very long.

11          THE COURT:  All right.  I was going to take a break

12  at 10:15, but we can go ahead and do so.

13          I do remind the jury during this time, please do not

14  discuss this case with anyone or permit anyone to discuss it

15  with you.  Do not read or listen to or view anything that

16  touches upon this case in any way.

17          Do not attempt to perform any research or any

18  independent investigation, and do not form an opinion about the

19  issues in this case.

20          It's 10:04, so we will go ahead and take a break

21  until about 10:20.  Let's go ahead and stand for the jury.  And

22  after they've exited, then, Special Agent Stover, you may take

23  your break as well and take a stretch.  Use the restroom if you

24  need to.

25      (Jury out.)

Rand Stover - Direct

1            THE COURT:  All right.  So the jury has left, and the

2      door is closed.  The defense want to go ahead and put your

3      further objection or proffer on the record?

4            MR. MARCHESE:  Yes, Your Honor.  There was a --

5      there's been a lot of objections in reference to hearsay and

6      the state of mind in reference to Agent Stover.

7            Our issue with it was that it was irrelevant,

8      particularly given the time frame of a lot of these statements.

9      Many of the statements were made well in advance of when these

10     individuals, particularly Mr. Parker, came into this supposed

11     conspiracy.

12            It's our position that the government, when they do

13     bring some of these statements in or show some actions by our

14     clients, although we admit nothing, the evidence that they

15     would show would not be until much later, so around, I would

16     say, April 11th.

17            So anything prior to April 11th being brought in is

18     hearsay, first of all.  It would not be the statement of a

19     coconspirator, because there was no conspiracy at the time.

20            Further, because they had not, for lack of a better

21     term, injected themselves into the conspiracy at that point,

22     there would be limited relevance if any.

23            So these statements coming in are more prejudicial

24     than probative.  There are several statements and incidents

25     from the Bundys.  And once again, these gentlemen have nothing

1    to do with it.  So the fact that this was elicited to the jury

2    is more prejudicial than prohibitive, it's irrelevant, and it's

3    hearsay.

4            THE COURT:  So is it your argument that the elements

5    are turned around?  That there should be evidence first that he

6    joined the conspiracy before there's evidence that a conspiracy

7    existed?  Because the elements are that there was an agreement

8    between two or more people, and then that the defendant joined

9    that conspiracy knowing of the object.

10           MR. MARCHESE:  Well --

11           THE COURT:  Generally you lay out the conspiracy

12   first and then the joinder.  But is your objection that his

13   joinder needs to be introduced before evidence of conspiracy

14   can be brought?

15           MR. MARCHESE:  Well, we're saying it's irrelevant,

16   because they had not brought themselves into the conspiracy.  I

17   mean, the argument could be that this conspiracy started years

18   and years ago with Mr. Bundy, when these gentlemen had never

19   even heard of Mr. Bundy.

20           So to bring that evidence before the jury is

21   irrelevant.

22           THE COURT:  All right.  Mr. Myhre.

23           MR. MYHRE:  Your Honor, under 801(d)(2)(E), the

24   timing of joining the conspiracy doesn't dictate whether it's a

25   statement in furtherance of the conspiracy.  It's whether the

Rand Stover - Direct

1  statement itself furthers the conspiracy between two or more

2  people.

3           When the defendants joined, irrespective in continuum

4  of time when they joined, they are equally liable for all of

5  those statements as well, because they are joining an existing

6  conspiracy.

7           So the government is entitled to show how that

8  conspiracy was advanced.  When they enter it does not dictate

9  whether it's the statement in furtherance.

10          THE COURT:  All right.  Any other objection?  I think

11  that -- Mr. Leventhal, did you also want to make an objection

12  for the record?

13          MR. LEVENTHAL:  On something separate, Your Honor,

14  yes.  But not this.  I join in Mr. Marchese's.

15          THE COURT:  Mr. Jackson?

16          MR. JACKSON:  I just join in the objections of other

17  counsel and simply ask that if the government doesn't

18  adequately, at the end of the case, link my client to the

19  larger conspiracy, that the Court instruct the jury they should

20  disregard all of the evidence that came in regarding the

21  conspiracy.

22          And, you know, I know the Court will give the proper

23  instruction on that.  That's all.  And that's why I make

24  continuing objections to those things.  I don't want to be a

25  pest and whatever.  I just want the record to be clear that our

Rand Stover - Direct

1  position is that Mr. Burleson has never been a part of a

2  conspiracy either beginning or end.  So, that's our position.

3           THE COURT:  All right.  Thank you.

4           MR. ENGEL:  Engel joins Parker's objection.

5           THE COURT:  Thank you, Mr. Engel.

6           All right.  Well, as I said, the government has the

7  right to introduce evidence of the conspiracy that existed

8  prior to the defendants allegedly joining it.  And as defense

9  points out, if there's no evidence that the defendants joined

10  it, no evidence that a reasonable jury could find and make that

11  determination that there was a joinder, then, of course, I

12  would entertain a dismissal and a 29(a) motion at the

13  conclusion of the government's case.

14           MR. MARCHESE:  Thank you, Your Honor.

15           MR. TANASI:  Thank you.

16           MR. LEVENTHAL:  Your Honor, at this time, I'd like to

17  on behalf of Mr. Drexler file a motion or a motion to sever or

18  at least a limiting instruction.  And I love Mr. Jackson

19  dearly.  However, there's been some things said.

20           For example, in opening, he indicated that BLM are

21  not real officers.  That does not apply to Mr. Drexler.  As

22  well here, he stipulated or he agreed to stipulate that the

23  witness was in fear; thereby, I guess, in some way admitting

24  that his client assaulted that officer by admitting or agreeing

25  or stipulating to that.

Rand Stover - Direct

1           We don't hold that same position as well.  So, with

2    that, I would ask for a motion to sever out from Mr. Jackson's

3    client or at least a limiting instruction notifying the jury

4    that each of these individuals are here for their own and --

5    you know, purpose and their own defense and not always does one

6    leak over to the other one.

7           THE COURT:  All right.  Well, I am happy to provide

8    that limiting instruction.

9           MR. JACKSON:  May I respond?

10          THE COURT:  Of course.

11          MR. JACKSON:  I didn't say that my client or his

12   clients put the witness in fear.  I just said the witness can

13   say that he felt subjective fear, which is what he kept trying

14   to say over and offer again.

15          And I just didn't want him to keep bringing in

16   hearsay evidence of what -- that I could not confront and

17   cross-examine.  You know, he kept saying he was in fear or the

18   other agents were in fear.  That's going to be for the jury to

19   decide.

20          I did not stipulate that my client or anyone else put

21   him in fear.  His subjective feelings of fear -- you know, he

22   kept saying that.  I'm not -- I'm not disputing that.  I can't

23   get in his head and read what's in his mind.

24          If he wants to say he was in fear, he can say that

25   4,000 times, and I will argue to the jury that's what he said.

Rand Stover - Direct

1    Whether the jury believes the fear was reasonable or whether

2    the fear was precipitated by any actions of my client or

3    anybody else in this courtroom is for the jury to decide.

4            I'm not stipulating that my client created that fear

5    by any actions of my client or that any of the other

6    codefendants created that fear reasonably.

7            That's not the -- I think co-counsel either

8    misunderstood, and I hope the jury didn't understand that I was

9    saying my client created fear.  He didn't do anything of the

10   sort.  What -- and, you know, I -- I have always wanted a

11   severance in this case.  I filed a motion for severance,

12   because my client, I think, was least involved of any of these

13   people.

14           Now, I'm not trying to try the case for anyone else,

15   or defend them, or damage them, or anything else.  But I'm

16   happy to try the case separately.  We can send everybody else

17   home, and I will finish up right now.

18           But, I -- you know, counsel doesn't like the way I

19   handle the case, that's -- you know, he will have to get over

20   it.

21           THE COURT:  All right.

22           MR. TANASI:  Your Honor, with all due respect to

23   Mr. Jackson, I would join in Mr. Leventhal and Mr. Drexler's

24   objection.

25           MR. MARCHESE:  And I join as well.  I apologize if I

Rand Stover - Direct

1    misheard Mr. Jackson, but that -- it was my understanding of

2    what he had said in court as well.

3            THE COURT:  Well, my recollection was -- and I

4    apologize if I'm wrong -- was that he said he was willing to

5    stipulate that the assessment for the security level was

6    moderate, and that we should move along and not continue.

7            So I didn't hear him say that he stipulated that

8    there was fear expressed or felt by the witness.  But in any

9    case, I'm not going to be severing the defendants.  I'm not

10   persuaded that that's sufficient reason.

11           However, I am willing to instruct the jury -- if you

12   want to draft an instruction over the break, I'm willing to go

13   ahead and instruct them that each defendant is going to be

14   cross-examining or making arguments for themselves that are to

15   be considered individually and separate, and not to overspill

16   what one attorney or defendant says when considering the guilt

17   or innocence of another defendant.

18           MR. LEVENTHAL:  Thank you, Your Honor.

19           THE COURT:  If you want to draft something like that,

20   I'm happy to --

21           MR. LEVENTHAL:  I will.  Thank you.

22           MR. TANASI:  Thank you, Your Honor.

23           MR. LEVENTHAL:  I just have one other item.  The

24   Court knows about this item, and we were going to speak about

25   it last night.  I am not sure the government and I came to an

Rand Stover - Direct

1  agreement on this.  However, this is in regards -- and it goes

2  exactly towards Rand Stover, Michael Johnson, Logan Briscoe.

3          MR. MYHRE:  We would object to the names, Your Honor.

4  Those names are all -- if it's in connection with what I think

5  it is, it's all subject to a protective order at this point.

6          THE COURT:  So do we need to have sealed proceeding

7  then?  Do you want to do that so we can actually get it on the

8  record?

9          MR. MYHRE:  Yes, Your Honor.

10          THE COURT:  All right.  So let's go ahead and take

11  our bathroom break, and that way everybody can have a chance to

12  stretch.  And we will ask the attorneys to come back in and

13  have everyone else wait outside while we put this on the

14  record, and then we will open it back up again when we are

15  done, so that everyone else can come back in.

16          COURTROOM ADMINISTRATOR:  Off record.

17      (Recess, 10:15 a.m.  Sealed hearing held.)

18      (Resumed 10:59 a.m.  Jury in.)

19          THE COURT:  All right.  Everyone may be seated.  We

20  are joined by the jury, and we have Special Agent Stover back

21  on the witness stand.

22          Mr. Myhre, you may continue with your direct.

23          MR. MYHRE:  Thank you, Your Honor.  May we publish

24  now what has been previously admitted as 358?  Government

25  Exhibit 358?

Rand Stover - Direct

1          THE COURT:  Yes.

2          COURTROOM ADMINISTRATOR:  You said previously

3     admitted?  Was that today?  Okay.

4     BY MR. MYHRE:

5     Q.   And do you see on the monitor before you, Agent Stover,

6     358?  And again, this appears to be an image of what?

7     A.   That is an image of the events on April 12th, 2014.

8          (Juror reported their screen was not working.)

9          THE COURT:  That screen is not working?  Thank you

10    for letting us know.

11         All right.  All the screens working now?  Great.

12    Okay.

13         Sorry for the interruption, Mr. Myhre.  Go ahead.

14         MR. MYHRE:  Thank you, Your Honor.

15    Q.   Agent Stover, I'm circling here just these officers toward

16    the lower left-hand corner of the image.  And we talked a

17    little bit before about how the officers are equipped and

18    dressed.  And if you could, the officers that are on either

19    side -- I am drawing a line toward -- across those officers.

20    Are those BLM officers or Park Service officers?

21    A.   Those are BLM officers.

22    Q.   We see what they are wearing there.  Is this what you

23    described earlier as sort of the standard issue?

24    A.   For this operation, yes.  That was the standard issue

25    uniform.

Rand Stover - Direct

1    Q.   And when these officers were deployed in the field during

2    the impoundment operation, would they be dressed similarly to

3    this?

4    A.   Similar to that fashion, yes.

5    Q.   Was that different for the inner ring of security that you

6    described?

7    A.   It was.

8    Q.   And how is it different?

9    A.   Those officers wore -- at the most inner ring of security,

10   they wore camouflage clothing with subdued police markings.

11   Q.   And what was the reason for the camouflage uniform?

12   A.   That was in an effort to -- as the cattle were coming in

13   to the trapping area, to not provide or to limit any type of

14   visual distraction to the cattle.

15   Q.   Now, looking at the officers sandwiched in between these

16   two officers here, are they Park Service or BLM officers?

17   A.   The officers are in the -- the olive-green-type uniforms

18   are Park Service officers.

19   Q.   Now, I would ask you to look at, if you would,

20   Exhibit 257, please.

21   A.   Okay.

22   Q.   Do you have 257?  Do you recognize this?

23   A.   Yes.

24   Q.   And what is this?

25   A.   That's a photograph of, in the foreground, four Park

Rand Stover - Direct

1   Service officers.

2   Q.   And is this a fair and accurate depiction of how these

3   officers appeared on April 12, 2014?

4   A.   Yes.

5   Q.   Did you observe these officers in the wash while you were

6   there?

7   A.   Yes.

8   Q.   Did you observe these officers in this particular

9   configuration?

10  A.   Yes.  At one point, I did.

11            MR. MYHRE:  Your Honor, we offer 257.

12            THE COURT:  Any objection to 257?

13            MR. MARCHESE:  None from Parker.

14            MR. TANASI:  None from Stewart, Your Honor.

15            MR. LEVENTHAL:  None from Mr. Drexler.

16            MR. ENGEL:  None from Engel.

17            MR. PEREZ:  None from Lovelien.

18            MR. JACKSON:  None from Mr. Burleson.

19            THE COURT:  All right.  Exhibit 257 will be admitted.

20            Did you want to publish Exhibit 257?

21        (Exhibit 257 admitted.)

22  BY MR. MYHRE:

23  Q.   Now, these officers are with the Park Service; correct?

24  A.   Correct.

25  Q.   Are they with any particular unit of the Park Service?

Rand Stover - Direct

1   A.   They were part of what's called the Pacific West Region

2   Special Event Tactical Team or SET Team.

3   Q.   And are you familiar with what their responsibilities and

4   duties were in connection with the impoundment operation?

5   A.   Yes.

6   Q.   And what were those duties and responsibilities?

7   A.   Their general assigned duties before this day when we were

8   conducting impoundment operations was to -- for a couple

9   different things.  To provide security for the convoys moving

10  in and out of areas that could be considered more contentious

11  than others.

12          They were to provide roving patrols, and they were --

13  some of them were also assigned as a -- in general terms, a

14  quick reaction force or a responding force in the event of a

15  critical incident or situation.

16  Q.   And in this particular instance, did you have any control

17  or authority over their deployment in the wash at the time?

18  A.   They were -- they -- they had a SET Team supervisor that

19  was there with them, and he was -- they were responding to his

20  direction.

21  Q.   So they reported to someone other than you?

22  A.   On this particular day --

23  Q.   At this particular time on the 12th of April.

24  A.   Yes.

25  Q.   Now, are you familiar with -- with this particular

Rand Stover - Direct

1   formation that we see here?

2   A.   In general, yes.

3   Q.   In general, what is this referred to?

4   A.   In law enforcement, agencies sometimes refer to this or

5   often refer to this as a stack formation.

6   Q.   And what is the purpose of a stack formation?

7   A.   A stack formation is used for officers to complete certain

8   missions, such as the execution of a search warrant, or maybe

9   going into a high threat area, or potentially an arrest

10  warrant.

11  Q.   Now, with respect to the armaments that these individuals

12  have, are you familiar with what they are carrying there?

13  A.   In general, yes.

14  Q.   And with respect to the person that is aiming there, are

15  you familiar with what he is aiming?

16  A.   That is a pepper ball gun.

17  Q.   That's what you referred to earlier as pepper ball?

18  A.   Correct.

19  Q.   Now, in terms of the -- that -- do you know where that

20  weapon is aimed at this point?  Not weapon.  Excuse me.  That

21  device.

22  A.   I don't -- I can't tell from this photo exactly where it's

23  aimed, no.

24  Q.   Now, during your time in the wash, did you observe any of

25  your officers raising weapons at the individuals in the wash?

Rand Stover - Direct

1    A.   At ground level?

2    Q.   At -- okay.  Let's take it at ground level.

3    A.   No, I don't recall at ground level.

4    Q.   And we saw the earlier photograph where weapons were

5    raised; correct?

6    A.   Correct.

7    Q.   And they were not raised -- to your understanding, they

8    were not raised at the ground level?

9    A.   Correct.  In the previous exhibit, correct.

10           MR. MYHRE:  And if I could have published what's been

11   previously admitted as 359, Your Honor.

12           THE COURT:  Yes, you may.

13   BY MR. MYHRE:

14   Q.   And Agent Stover, looking at Exhibit 359, is -- I'm

15   circling an individual.  Is that you there?

16   A.   Yes, it is.

17   Q.   And the individual that I'm drawing an arrow to, who is

18   that?

19   A.   That's a BLM Ranger Greg Smith -- or sorry.  Greg Johnson.

20   Excuse me.

21   Q.   Greg Johnson.  And do you -- do you recall what BLM Ranger

22   Greg Johnson was doing during the course of this photograph?

23   A.   A majority of that time, he was the officer that was

24   making the announcements over the vehicle-based PA system.

25   Q.   And the three vehicles we see depicted here were also

Rand Stover - Direct

1    depicted in that aerial shot that we looked at in 132?

2    A.    Correct.

3    Q.    So, at some point then, do you observe Agent -- Special

4    Agent in Charge Love leave the gate area?

5    A.    Yes.

6    Q.    And is he by himself?

7    A.    No.

8    Q.    Do you know who -- did you recognize who he was with?

9    A.    He was accompanied by Dave Bundy and a -- what appeared to

10   be a film crew or a media crew.

11   Q.    And could you determine where they were headed?

12   A.    From my position, it appeared they were walking back

13   towards -- walking to the north back towards the incident

14   command post.

15   Q.    Now did you -- as they were walking back toward the

16   incident command post, did you discern any change in the mood

17   of the crowd or the configuration of the crowd?

18   A.    The crowd in general stayed up towards the fence line.

19   But the -- their language, they got a little bit more quiet,

20   and it appeared they were waiting to see what would happen.

21   Q.    Had you observed two Metro officers walk toward the gate?

22   A.    Yes.

23   Q.    Was that before or after Love had gone to the gate?

24   A.    My recollection -- my recollection is it was after.

25   Q.    And after Love left the gate, do you recall whether the

Rand Stover - Direct

1    Metro officers stayed at the gate or not?

2    A.    They did.

3    Q.    And do you know who those officers were?

4    A.    I recognized one as -- his name is Tom Roberts.

5    Q.    Did -- and was he -- was he a deputy?

6    A.    I believe that his -- at that time, his title was patrol

7    commander, but I'm not certain.

8    Q.    And did Officer Roberts speak with you while you were in

9    the wash?

10   A.    Yes.

11   Q.    And what was that conversation?

12   A.    At one point, he left the fence line.  And he came up to

13   where I was positioned, and he said, "You guys are good.  You

14   can move back."

15   Q.    And did you respond at all to that?

16   A.    Not immediately.

17   Q.    Well, what did you do, if anything, in response to that?

18   A.    I -- I determined I was going to wait and get direction

19   from my own agency supervisors.  And I was trying to figure out

20   exactly what he meant by that statement.

21   Q.    Did you observe how the crowd -- from your vantage point,

22   did you observe how the crowd reacted to Officer Roberts and

23   the other officer with him?

24   A.    Yes.

25   Q.    And what were your observations?

Rand Stover - Direct

1   A.   They -- they didn't appear to be agitated or angry at

2   those officers.

3   Q.   When Officer Roberts said, "Okay, we've got it."  Why

4   didn't you all just leave when he said that?

5   A.   We were -- I was waiting for confirmation from our special

6   agent in charge and/or someone from the unified command staff

7   that was working at the operation.

8   Q.   Now, even before Officer Roberts arrived there, after

9   assessing the situation and, as you've testified, assessing the

10  risk of the threat of potential for violence, why didn't you

11  just back -- back away at that point in time?

12  A.   Well, I am and those other officers there were sworn law

13  enforcement officers.  We still had a duty to do our job.  We

14  still had an area to secure.  We still had government

15  employees, civilian employees that were behind us at the

16  command post that we were responsible for protecting.  We still

17  had government equipment that we were responsible for

18  protecting.

19       There were still cattle there that had been titled

20  over to the United States Government that we were responsible

21  for their care and well-being.  So, at that time, I -- I was

22  not inclined to move back away from that position.

23  Q.   Now, did you ultimately receive confirmation from your

24  unified command structure to back out?

25  A.   Yes.

Rand Stover - Direct

1  Q.  As you were -- if you could just generally describe how

2  did you make that movement?  How -- did you just turn around

3  and turn your back to the crowd, or did you do something else?

4  A.   No, we -- as safely as we could, we tried to back from the

5  area.  There were many vehicles parked in different directions,

6  so it took a few minutes for the various officers there to get

7  vehicles turned around, to make sure they had all their

8  equipment, and to move back towards the -- to the north towards

9  the incident command post.

10 Q.  As you were backing up, could you assess again the -- the

11 mood of the crowd or the -- the level of anger in the crowd?

12 A.   It appeared to have calmed down at that point.  There were

13 many people still right up against the fence line.  I still

14 could see people with firearms, but it appeared that they were

15 not making -- at that time, not making any aggressive movements

16 towards the fence line.

17 Q.  Did you feel that in terms of the overall risk then,

18 you -- once you backed up a certain distance, did you then turn

19 to leave the area?  Turn vehicles?

20 A.   Yeah.  Eventually, I got to a point where I felt

21 comfortable getting into a vehicle and driving back to the --

22 as a passenger riding back to the incident command post.

23 Q.  When you got back to the incident command post, what were

24 you told with respect to your next -- next movement?

25 A.   We were -- I was informed that we had one hour to gather

Rand Stover - Direct

1    up all necessary equipment and be ready to depart the incident

2    command post and head back towards Mesquite, Nevada.

3    Q.   Do you have an understanding of -- did anybody explain to

4    you why that was?

5    A.   That we were officially going to conclude the operation,

6    we were going to leave the area, and we were going to be

7    escorted by Las Vegas Metro and/or the Nevada Highway Patrol

8    back to the Holiday Inn in Mesquite.

9    Q.   And when -- when you say pack up necessary equipment, what

10   do you mean by that?

11   A.   Any sensitive equipment.  There were multiple BLM trailers

12   and ATVs there, computers.  There was portable radio equipment.

13   Those types of items that could be readily loaded into a

14   vehicle or a trailer or secured onto the back of a vehicle to

15   be pulled out of the incident command post.

16   Q.   And were you successful in getting all your equipment, or

17   did you leave equipment behind?

18   A.   The agency left equipment behind, yes.

19   Q.   What type of equipment did you leave behind?

20   A.   I don't -- I don't know.

21   Q.   The trailers, for example?

22   A.   There were some trailers that were left there.

23   Q.   Now, what about the cattle?

24   A.   The cattle were left there.

25   Q.   And were the -- was the contract with the auction barn in

Rand Stover - Direct

1  Utah, "'R' Livestock, was that contract ever fulfilled?

2  A.   What do you mean by "fulfilled"?

3  Q.   Did they ever receive cattle from your impoundment

4  operation?

5  A.   No.

6  Q.   Wasn't that -- was that part of the contract that they

7  would receive the cattle?

8  A.   That was part of the contract.

9  Q.   As part of the contract, would they receive proceeds from

10 the sale of the cattle?

11         MR. LEVENTHAL:  Objection.  Leading.

12         THE COURT:  Sustained.

13 BY MR. MYHRE:

14 Q.   What was your understanding in terms of how they would

15 make money from the contract?

16 A.   That the cattle would be transported to the auction

17 facility in Utah.  They would auction those cattle off, and

18 they would receive the proceeds from that auction where

19 applicable.

20 Q.   And did that occur?

21 A.   No.

22 Q.   With respect to the contract with the civilian cowboys,

23 what happened to that -- excuse me.  Were those contractors

24 allowed to complete their contract?

25 A.   No.

Rand Stover - Direct

1   Q.   You talked briefly about being escorted back to Mesquite.

2   As you were being escorted, were you able to observe the crowd

3   as you were leaving the impoundment site?

4   A.   Yes.

5   Q.   What was the mood of the crowd, in your assessment, as you

6   were leaving?

7   A.   They -- I would categorize it as -- it was a mix between

8   still -- still a mix between hostile, but yet excited that we

9   were leaving.  That's how I would categorize it.

10  Q.   Did you hear any -- did you hear what words they were

11  saying to you, if any?

12  A.    No.  My vehicle windows were rolled up.

13          MR. MYHRE:  Court's indulgence.

14          THE COURT:  Yes.

15      (Pause in the proceedings.)

16          MR. MYHRE:  No further questions, Your Honor.

17          Thank you, Agent Stover.

18          THE COURT:  All right.  Mr. Tanasi,

19  cross-examination.

20          While he's getting ready, let me just take a moment

21  to instruct the jury and remind you that each one of the

22  defendants is to be regarded separately.  And that no --

23  nothing that one attorney says about the case should be held to

24  apply to any of the other defendants unless their attorneys or

25  the defendant agrees and says that they adopted or joined in --

Rand Stover - Cross

1    in that.  So please try to keep those separated.

2              MR. TANASI:  Thank you, Your Honor.

3              THE COURT:  Go ahead, Mr. Tanasi.

4              MR. TANASI:  Thank you.

5                       CROSS-EXAMINATION

6    BY MR. TANASI:

7    Q.   Good morning, Agent Stover.  I'm Rich Tanasi.

8    A.   Good morning, sir.

9    Q.   I represent Steven Stewart.  I've got a few questions for

10   you on cross-examination.

11             Just to make sure I understand, you're the Operations

12   Section Chief on this; correct?

13   A.   For this incident, yes.

14   Q.   Okay.  And again, we're talking about the protests on

15   April 12th, 2014; correct?

16   A.   During April 12th, I was -- my title was Operations

17   Section Chief.

18   Q.   Understood.  And as I understand from yesterday's

19   testimony and a little bit today, you developed a threat level

20   for the operation; correct?

21   A.   Yes.  Correct.

22   Q.   And so you had relied on some different items, some

23   different pieces of information in order to develop that threat

24   level; correct?

25   A.   Yes.

Rand Stover - Cross

1    Q.   You actually saw some videos as well.  We saw one
2    yesterday.  The video of the cowboys with the music behind it.
3    We saw that yesterday.  That was part of your threat level; is
4    that fair?
5    A.   Yes.
6    Q.   Okay.  Did you also see -- and you mentioned it a little
7    bit yesterday -- recall seeing an incident with David Bundy
8    where he was arrested?  Were you aware of that incident?
9    A.   I am.
10   Q.   Okay.  You are aware of that taking place on April 6,
11   2014; correct?
12   A.   Yes.  Correct.
13   Q.   Okay.  I'm going to show you what's been premarked for
14   identification purposes as Defense Exhibit 5008-F.  Okay?
15   A.   Okay.
16   Q.   It's going to come up on your screen.
17             THE COURT:  Is this just for the witness or for
18   everyone?
19             MR. TANASI:  This is just for the witness for --
20             MR. MYHRE:  Objection, Your Honor.  It's being
21   published.  It's not been admitted.
22             COURTROOM ADMINISTRATOR:  Your Honor, the jury can't
23   see it.
24             THE COURT:  But it's up there on the screen.
25             COURTROOM ADMINISTRATOR:  No, that's the projector

Rand Stover - Cross

1    turning off.

2              THE COURT:  Okay.  Make sure.

3    BY MR. TANASI:

4    Q.   Thank you.  So, if you could just -- I'm going to have

5    this video play for you, and I would like you to watch it and

6    identify it or let me know when you recognize what it is.

7    Okay?

8    A.   Okay.

9         (Exhibit 5008-F being played.)

10   Q.   Is this fairly and accurately depicting Dave Bundy's

11   arrest on April 6, 2014?

12   A.   I was not there.

13   Q.   Understood.  But did you see this video prior to

14   developing your risk assessment in this case?

15   A.   No.

16   Q.   So you were just aware of the arrest, but you didn't

17   actually see the dash cam video?

18   A.   To my knowledge, I have not seen all of the footage that's

19   out there that exists for this arrest.

20   Q.   Did you see any portion of this arrest, sir?

21   A.   Yes.

22   Q.   Okay.  So why don't we keep watching it until we can

23   identify what portion of this arrest you saw.  Fair?

24        (Exhibit 5008-F being played.)

25   Q.   Agent, is it playing on your screen or is it paused?

Rand Stover - Cross

1    A.   Yes, it's playing.

2    Q.   Okay.

3              MR. TANASI:  Turn the volume off, too.

4              MR. MYHRE:  I'm not sure, counsel, that screen

5    there --

6              COURTROOM ADMINISTRATOR:  Turn it this way.

7              MR. TANASI:  Thank you, sir.

8    Q.   Okay.  Agent Stover, as you watch this video, could you

9    just identify which portion you actually saw prior to

10   developing your April 12 threat assessment?

11   A.   Okay.

12             (Exhibit 5008-F being played.)

13   Q.   As you watch this video, can you identify anybody who's in

14   it?

15   A.   Beginning at this portion about here is the -- the part of

16   the video that I saw.

17   Q.   Okay.  And if we could stop that for a second.

18             For the record, that is three minutes and 55 seconds

19   into the video?

20   A.   A few seconds back I would -- I would say.

21   Q.   Understood.  Okay.  So, again, who do you see in this

22   video right now?

23   A.   I see two vehicles and four BLM law enforcement officers.

24   Q.   Okay.  Do you also see Dave Bundy or did you prior to what

25   you see now?

Rand Stover - Cross

1  A.   I learned later that that was Dave Bundy.

2  Q.   Okay.  Go ahead and play it.

3       (Exhibit 5008-F being played.)

4  Q.   And so is it fair to say that you saw this video from

5  where what you started here at roughly the 3:55 mark through

6  the end of it?  Through the actual arrest itself?

7  A.   I'll have to see it all the way through the end, but --

8  Q.   Fair enough.

9  A.   -- starting at the time you indicated, yes.

10 Q.   Okay.

11      (Exhibit 5008-F being played.)

12      MR. MYHRE:  May we get some foundation, Your Honor,

13 as to when he saw that?

14      MR. TANASI:  Your Honor, I think he's already

15 testified he saw it prior to his April 12, 2014, threat

16 assessment.

17      (Exhibit 5008-F being played.)

18 Q.   And if you would, Agent, just let me know when the video

19 comes to its conclusion from what you saw prior to April 12th,

20 2014.

21 A.   Okay.

22      (Exhibit 5008-F being played.)

23 A.   That's the conclusion of the video.

24 Q.   Thank you, sir.

25      MR. TANASI:  Your Honor, we move to admit Defense

Rand Stover - Cross

1   Exhibit 5008-F, just the portion that Agent Stover indicated

2   that he saw prior to April 12th, 2014, which led to his threat

3   assessment.

4           THE COURT:  Was it Exhibit 8 or 8F?

5           MR. TANASI:  8F, Your Honor.

6           THE COURT:  F.  All right.

7           Any objection to Exhibit 8F, starting at three

8   minutes and five seconds to its conclusion?

9           MR. MYHRE:  Yes, Your Honor.  We object.  We ask for

10  further foundation as to what he viewed in terms of his threat

11  assessment, which I believe was the question.  I didn't get the

12  answer to that.

13          MR. TANASI:  Your Honor, he has indicated --

14          THE COURT:  Do you want to lay a better foundation,

15  Mr. Tanasi?

16          MR. TANASI:  Understood.

17  Q.   Agent Stover, the portion of the video we just watched

18  from Exhibit 5008-F, from 3 -- the 3:50 mark to the end, did

19  you watch that video, from what I understand, prior to

20  April 12, 2014, in coming to your threat assessment in this

21  case?

22  A.   Yes.

23  Q.   Okay.  And how did it affect your threat assessment in

24  this case?

25  A.   It -- based on the information from the officers' reports,

Rand Stover - Cross

1    it affected my threat assessments by leading me to believe that

2    there was going to be and had been interference with the

3    movement of the convoy and failure to follow lawful commands

4    from a BLM officer.

5    Q.   Okay.  And so you saw this video, and it affected your

6    threat assessment in this case; is that fair?

7    A.   It was one of the factors, yes.

8            MR. TANASI:  Your Honor, I move to admit Defense

9    Exhibit 5008-F, just that portion.

10           THE COURT:  Any other objection?

11           MR. MYHRE:  No objection, Your Honor.

12           THE COURT:  All right.  So Exhibit 8F starting at

13   3:55 to its conclusion will be admitted.

14       (Exhibit 5008-F admitted.)

15           MR. TANASI:  And Your Honor, I move to publish that

16   portion as well.

17           THE COURT:  Yes, you may.

18           MR. TANASI:  Thank you.

19           THE COURT:  Publish from 3:55.

20       (Exhibit 5008-F being played.)

21   BY MR. TANASI:

22   Q.   In watching this individual, can you identify where Dave

23   Bundy is, please?

24   A.   He's standing in front of the sedan.

25   Q.   Okay.  And if you could also identify, if you know, who is

Rand Stover - Cross

1  in the van?

2  A.   I don't have positive -- I was told it was Ryan Bundy.

3  Q.   Understood.  Thank you.  And keep playing that.

4       (Exhibit 5008-F being played.)

5  BY MR. TANASI:

6  Q.   Stop right there.  In watching this video, what do you

7  observe the agents over with David Bundy to be doing?

8  A.   The rangers with David Bundy appear to be attempting to

9  take him into -- or detain him, I should say.

10  Q.   Do you see anything in his hand?

11  A.   From this angle, I do not.

12  Q.   If we backed it up, did you -- why don't we back it up.

13       Brian, if you can, back it up just a few seconds.

14       (Exhibit 5008-F being played.)

15  Q.   Do you see anything in his hand there, or did you later

16  come to learn he was handling anything in this particular

17  incident?

18  A.   I came to learn -- I can't see anything in this particular

19  frame, but I came to learn he was holding a iPad.

20  Q.   Okay.  Go ahead.

21       (Exhibit 5008-F being played.)

22  Q.   Agent, if you could identify who that is speaking.

23  A.   That's a BLM Ranger Jason Cox.

24  Q.   Thank you.

25       (Exhibit 5008-F being played.)

Rand Stover - Cross

1   Q.   Okay.  Agent, I'm going to also show you another video
2   that we have premarked for identification, premarked for
3   identification Defense Exhibit 5007-D.
4   A.   Okay.
5   Q.   Okay.  Before I do, I have a few questions.
6   A.   Okay.
7   Q.   Again, in leading to this April 12th threat assessment,
8   you have indicated that you had reviewed several different
9   videos; correct?
10  A.   Yes.
11  Q.   Okay.  We just went through the arrest of Dave Bundy, and
12  prior to that we went through yesterday the cowboy video;
13  correct?
14  A.   Yes.
15  Q.   Okay.  Did you also have an opportunity to review a video
16  that went viral, went public of Margaret Houston, a lady who
17  was actually taken down by BLM agents?
18  A.   During that -- during the incident, I did not view that
19  video.
20  Q.   Understood.  You didn't review it, or you didn't see it
21  during that incident, but have you had an opportunity to see
22  that video?
23  A.   Yes, after -- after the event was concluded.
24  Q.   So, it's your testimony you didn't see the Margaret
25  Houston-related video until after you developed your threat

Rand Stover - Cross

1   assessment?

2   A.   No, until after the entire event was concluded.

3   Q.   But did you review that video prior to developing your

4   threat assessment in this case?

5   A.   No.

6   Q.   Okay.  Did you have an opportunity to review a video

7   related to Ammon Bundy, an incident that occurred on April 9,

8   2014?

9   A.   Yes.

10   Q.   Okay.  And in that video, did you have an opportunity to

11   see Ammon Bundy being tased?

12   A.   Yes.

13   Q.   Okay.  I'm going to show you now what's been premarked for

14   identification as Defendant's Exhibit 5006-E.  Same idea.  Take

15   a look at it and let me know when you recognize it.

16   A.   Okay.

17            THE COURT:  Was that "E" as in elephant?

18            MR. TANASI:  "E" as in elephant.

19            THE COURT:  Okay.  Thank you.

20        (Exhibit 5006-E being played.)

21            THE WITNESS:  From that point there.

22   BY MR. TANASI:

23   Q.   Okay.  You can stop it, Brian.

24            That's at the 57 second mark.  You said from that

25   point there.  Why don't you tell us what you see in that video?

1   A.   I see several vehicles, a dump truck, several members of

2   the public on Highway 170.  It appears to be Highway 170, and I

3   can see four BLM officers.

4   Q.   Can you identify the officers?

5   A.   I can identify one of the officers right there in the

6   center from this frame.

7   Q.   Can you also see Ammon Bundy?

8   A.   Not from this frame.

9   Q.   Okay.  Can you identify who the person in the plaid shirt

10  is?

11  A.   Not from this frame.

12  Q.   Okay.  Go ahead and keep playing it.

13       (Exhibit 5006-E being played.)

14  Q.   Stop it there.  Agent Stover, as you look at that video,

15  at that portion and this far, can you identify Ammon Bundy?

16  A.   At the point previously in the video, I could.

17  Q.   Okay.  And what you've looked at so far, is this a fair

18  and accurate depiction of what happened on April 9th, as far as

19  you saw it and knew it, before April 12th when you developed

20  your threat assessment?

21  A.   From this particular video, yes.

22            MR. TANASI:  Okay.  Your Honor, I would move to admit

23  Defense Exhibit 5006-E.

24            THE COURT:  Starting at --

25            MR. TANASI:  The 55 second mark.

Rand Stover - Cross

1          THE COURT:  55 seconds.  Any objection?

2          MR. MYHRE:  Your Honor, I may have missed it.  I just

3   needed the foundation with respect to when he saw it.

4          MR. TANASI:  Your Honor, he's indicated he saw it

5   prior to April 12, 2014.

6          MR. MYHRE:  That was not --

7          THE COURT:  He said he was familiar with the event.

8   I'm not sure that he said that he saw the video.  Let's ask

9   again just to be sure.

10  BY MR. TANASI:

11  Q.   Sure.  Fair enough.  Did you see this video prior to

12  April 12, 2014, in developing your threat assessment?

13  A.   Starting from the time stamp that I indicated.  Yes, I saw

14  it prior to April 12th.

15         MR. TANASI:  Thank you, sir.

16         MR. MYHRE:  Thank you, Your Honor.  No objection.

17         THE COURT:  All right.  Exhibit 5 --

18         MR. TANASI:  5006.

19         THE COURT:  5006-E will be admitted.

20     (Exhibit 5006-E admitted.)

21         MR. TANASI:  Thank you.  May we publish?

22         THE COURT:  Yes.

23         MR. TANASI:  From the 55 second mark.

24     (Exhibit 5006-E being played.)

25  Q.   Thank you.  Okay, sir.  I have a few other questions for

Rand Stover - Cross

1    you.  Prior to today's testimony, did you have an opportunity

2    to meet with Agent -- FBI agent Andrew Gruniger?  Do you

3    recall?

4    A.    I don't recall.

5    Q.    Okay.  Do you recall meeting with FBI agents prior to

6    today's testimony?

7    A.    Yes.

8    Q.    Okay.  Would seeing a copy of a report from an interview

9    with Agent Gruniger refresh your recollection as to whether or

10   not you met with him?

11   A.    Sure.

12   Q.    Okay.  Agent Stover, do you see that report in front of

13   you dated May 23, 2014?

14   A.    I do.

15   Q.    Okay.  And do you see that it starts off with your name

16   there on the top?

17   A.    Yes.

18   Q.    Okay.  And then do you see on the bottom, the report's

19   prepared by Andrew Gruniger?

20   A.    Yes.

21   Q.    Okay.  And do you see that this is just one page of that

22   report on the top.  It says page 1 of 2?

23   A.    Yes.

24   Q.    Okay.  And do you see that -- I'm showing you now the

25   second page of that report, page 2 of 2.

Rand Stover - Cross

1    A.    Yes.

2    Q.    Okay.  And does seeing that report that I have just shown

3    you, does that refresh your recollection as to whether or not

4    you met with Agent Gruniger prior to your testimony here today?

5    A.    Yes.

6    Q.    Okay.  You testified earlier, you know, that you, in fact,

7    were not -- you know, you, in fact, were scared; is that fair?

8    A.    Yes.

9    Q.    Okay.  Again, do you recall telling Agent Gruniger, in

10   that report, that despite these circumstances, Agent Stover did

11   not feel personally threatened while he was in the wash.  Do

12   you recall that?

13            MR. MYHRE:  Objection, Your Honor.  Foundation.  I

14   believe he's trying to attempt to impeach.  This witness has

15   not adopted this statement.

16            THE COURT:  Sustained.  You need to ask him whether

17   he remembers giving a different statement to the officer.

18   BY MR. TANASI:

19   Q.    Okay.  Do you recall telling FBI Agent Gruniger that

20   despite the circumstances, you didn't feel personally

21   threatened while you were in the wash that day?

22   A.    I recall feeling -- I recalling telling Agent Gruniger

23   that I did not feel personally threatened by a firearm in the

24   wash that day, by a firearm pointed at me.

25   Q.    And do you recall also meeting with FBI Agent Joel Willis

Rand Stover - Cross

1    on or about January 8, 2015, prior to today's testimony?

2    A.   I recall meeting with Special Agent Willis.  I don't

3    remember the exact date.

4    Q.   Okay.  And at that meeting, US Attorney Myhre --

5    Mr. Myhre, he was there?

6    A.   I don't -- I don't know.

7    Q.   So is it your testimony you don't recall who was at that

8    meeting on -- on or about January 8, 2015?

9    A.   I don't recall exactly who was there, no.  If you would

10   refresh my memory, that --

11   Q.   Sure.  Fair enough.  I'm showing you a report from your

12   meeting on -- on or about -- it's actually February 24, 2015,

13   that the report was entered, but the date of the report seems

14   to reflect January 8, 2015.

15            Do you see that there in front of you?

16   A.   Yes.

17   Q.   Okay.  Does it refresh your recollection as to who was at

18   the meeting that day?

19   A.   Yes, it lists the people that were there.

20   Q.   Okay.  Was Assistant US Attorney Steve Myhre at that

21   hearing or at that meeting?

22   A.   Yes, his name was listed on that report.

23   Q.   Was Dan Sheetz, another US Assistant Attorney, at that

24   meeting?

25   A.   Yes.

Rand Stover - Cross

1    Q.   Was Nadia Ahmed also at that hearing or that meeting

2    rather?

3    A.   Yes.

4    Q.   And was US Attorney Roger Yang also --

5          MR. MYHRE:  Objection to the relevance of this, Your

6    Honor.  I understand he's reading from the document, but I'm

7    not sure what the relevance is.

8          MR. TANASI:  Your Honor, the relevance goes to his

9    preparation leading to his testimony here today.

10         THE COURT:  So you are asking him if he met with them

11   prior to testifying today?

12         MR. TANASI:  Absolutely.  Goes to credibility.

13         THE COURT:  All right.  I will allow it.

14   BY MR. TANASI:

15   Q.   So again, as a recap, did you meet with all those US

16   Attorneys prior to coming and testifying here today?

17   A.   Yes.  The report says, yes, I did.

18   Q.   Okay.  The report's not inaccurate though; fair?

19   A.   No, it's not inaccurate.

20   Q.   Okay.

21   A.   As far as the people that are -- that I met with on that

22   day.

23   Q.   And in addition to that time frame, January 8, 2015, have

24   you had an opportunity to meet with any of the US Attorneys in

25   this case prior to testimony here today?

Rand Stover - Cross

1    A.    Yes.

2    Q.    How many times?

3    A.    I -- I don't know how many times.  Numerous times.

4    Q.    Okay.  More than 5?

5    A.    Yes.

6    Q.    More than 10?

7    A.    I -- I would say between 5 and 10 probably would be --

8    would be an estimate.

9    Q.    Thank you, sir.  Now, let's talk about reports.  Fair to

10   say that it's important to prepare reports in your line of

11   work?

12   A.    Yes.

13   Q.    Correct?  You want to prepare reports, because you want to

14   make sure you capture the events as part of your investigation;

15   get them down on paper; have a place to look to and remember;

16   correct?

17   A.    Correct.

18   Q.    Want to help you, as we just did, refreshing your own

19   recollection or, potentially, it's important for other members

20   of law enforcement to review and rely on your reports; correct?

21   A.    Correct.

22   Q.    I mean, reports, you would say, are an important function

23   in law enforcement; correct?

24   A.    Yes.

25   Q.    And it's also important to try to prepare those reports as

Rand Stover – Cross

1   close in time to the events themselves; right?

2   A.   In general, yes.

3   Q.   Okay.  Just easy, fair enough to say, that you remember

4   things better closer to the actual time of the event; right?

5   A.   Yes.

6   Q.   Okay.  And in this case, you prepared a report on

7   March 28th, 2014, called the "Memorandum of Activity."  And

8   that was regarding events that occurred on March 28th, 2014;

9   correct?

10  A.   Correct.

11  Q.   Okay.  You also prepared another report on that same day,

12  a second report, on March 28, 2014, for events that took place

13  regarding Cliven Bundy occurring on March 28th, 2014, that same

14  day; correct?

15  A.   Correct.

16  Q.   All right.  You prepared another report, a third report on

17  April 12th, 2014, for events regarding or occurring on

18  April 12th, 2014; correct?

19  A.   Correct.

20  Q.   Okay.  You then prepared another report on April 9th,

21  2014, for events regarding David Bundy, which occurred on

22  April 9th, 2014; correct?  Do you recall?

23  A.   April 9th for Dave Bundy?

24  Q.   Yes.

25  A.   Yes.

Rand Stover - Cross

1    Q.   Okay.

2    A.   Yes.

3    Q.   All right.

4            THE COURT:  Can you tell me the year?  I think I

5    might have --

6            MR. TANASI:  I'm sorry, Your Honor.  2000 --

7            THE COURT:  March 28, 2013, April 12, 2014, April 9,

8    2014?

9            MR. TANASI:  If I said 2013, I misspoke.  They are

10   all 2014.

11           THE COURT:  Okay.  Thank you.

12   BY MR. TANASI:

13   Q.   And in this case, did you also prepare a report on

14   April 14, 2014?

15   A.   Yes.

16   Q.   Okay.  And those were for events, though, that occurred on

17   April 12th, 2014, two days earlier; correct?

18   A.   I believe that's correct.  Yes.

19   Q.   Okay.  That report you waited two days to prepare; fair?

20   A.   Yes.

21   Q.   We've talked a little about this already, but let's talk a

22   little more about the operation.  Again, you're assistant

23   special agent in charge, ASAC; correct?

24   A.   At that time, I was, yes.

25   Q.   Okay.  And you categorized or called taking Mr. Bundy's

Rand Stover - Cross

1   cattle was an impound operation; fair?

2   A.   Yes.

3   Q.   Okay.  You consulted with state agencies; correct?

4   A.   Yes.

5   Q.   You consulted with NHP; correct?

6   A.   Yes, Nevada Highway Patrol, yes.

7   Q.   Consulted with Metro, Las Vegas Metropolitan Police

8   Department?

9   A.   Yes.

10  Q.   Consulted with Utah Highway Patrol?

11  A.   Yes.

12  Q.   Consulted with Mesquite Police Department?

13  A.   Yes.  Myself, I don't -- I don't believe that I directly

14  coordinated with Mesquite, but one of our -- the other people

15  working on the operation did.

16  Q.   Okay.  And again, we've talked about it already, but

17  leading up until the April 12th date, there was a potential for

18  violence as you categorized it; right?

19  A.   Yes.

20  Q.   A potential; right?

21  A.   Correct.

22  Q.   Moderate threat level is the threat level you assigned it;

23  correct?

24  A.   The original threat assessment that was completed before

25  the operation started was listed at a moderate threat level.

Rand Stover - Cross

1    Q.   Okay.  Not hard and fast violence, I think were your

2    words.

3    A.   Correct.

4    Q.   Okay.  83 BLM officers were assigned to this operation?

5    A.   Approximately.

6    Q.   You worked with the US Park Police; correct?

7    A.   Some of the -- some of the National Park Service officers

8    were members of the US Park Police.

9    Q.   And Agent Stover, these guys, they had specialized skill;

10   right?  The US Park Police?

11   A.   Yes, they are trained in certain areas.

12   Q.   All right.  They were called, I think, the -- if I have

13   got it right -- the Special Event Tactical Team, SET; correct?

14   A.   Yes, Pacific West Region Special Event Tactical Team.

15   Q.   Okay.  You had a Quick Reaction Force, too; right?

16   A.   Yes.

17   Q.   There were helicopters in the sky?

18   A.   At certain times, the -- by the contractors.

19   Q.   Drones in the sky?

20   A.   No.

21   Q.   No drones in the sky?

22   A.   No, not to my knowledge.

23   Q.   There were FBI air assets though; correct?

24        MR. MYHRE:  Objection, Your Honor.  May we have

25   foundation as to time period we are talking about?

1        MR. TANASI:  Sure.  April 12, 2014, Your Honor.

2        THE COURT:  Thank you.

3        THE WITNESS:  Yes, there was.

4   BY MR. TANASI:

5   Q.   In fact, you had a small security force near a hotel

6   nearby in Mesquite protecting the hotel and the agents there;

7   right?

8   A.   Yes, during the operation.

9   Q.   During the operation.  You had rings of security; right?

10  A.   Yes.

11  Q.   Okay.  There was an inner ring of security as well I think

12  was the word you used yesterday?

13  A.   That is how I would describe it, yes.

14  Q.   Okay.  This was just like a military operation for you;

15  wasn't it?

16  A.   I have never been in the military, sir.

17  Q.   Okay.  And anybody that you consulted with, were they in

18  the military?

19  A.   I'm sure some people were.  I can't recall.

20  Q.   Was Agent Love in the military?

21  A.   Not to my knowledge.

22  Q.   Okay.  So nobody that you consulted with had a military

23  background.  That's your testimony?

24  A.   No, I'm not saying that nobody did.  I'm just saying I

25  can't -- off the top of my head, I don't remember of all the

Rand Stover - Cross

1    officers that were there, I can't tell you who has prior

2    military experience and who doesn't.

3    Q.   Okay.  Let's talk about Scott Robbins.

4    A.   Okay.

5    Q.   Remember him?

6    A.   Yes.

7    Q.   Okay.  You called him yesterday as a man of his word;

8    right?

9    A.   Those were his words.

10   Q.   He was the impound contractor in this case?

11   A.   He owned the livestock auction business in Utah.

12   Q.   Okay.  And his job was to basically gather the cattle;

13   fair?

14   A.   No.

15   Q.   No?  What was his job?

16   A.   His job was to -- his business was going to receive the

17   cattle that had been gathered and then auction them off.

18   Q.   Okay.  And he was to receive compensation for his

19   services?

20   A.   I believe that's -- that was part of the contract, yes.

21   Q.   And part of his compensation was $48,000; is that fair?

22   A.   Yes.

23   Q.   Okay.  And basically, he -- who ultimately would sell the

24   cattle?

25   A.   Mr. Robbins would sell the cattle at his regularly

Rand Stover - Cross

1  scheduled auctions.

2  Q.   And he would receive all the proceeds; is that your

3  testimony?

4  A.   I -- I can't answer that.  I don't know.  I would have to

5  refresh my memory with the contract.  I don't know how the

6  proceeds were broken out if at all.

7  Q.   Okay.  Would he split the proceeds, if you know, with the

8  government?

9  A.   Again, I'd have to refresh my memory with the contract.  I

10  don't know the -- I don't recall the exact stipulations in the

11  contract.

12  Q.   All right.  Okay.  Let's talk a little bit, and we've

13  talked about it a little bit already, about the First Amendment

14  Zone in this case.  Okay?

15         Are you familiar with there being a First Amendment

16  Zone in place on April 12, 2014?

17  A.   On the April 12th, they were no longer there.

18  Q.   Okay.  Was he -- the First Amendment Zone in place on

19  April 13th or April 11th rather?

20  A.   I don't recall.

21  Q.   Do you know what date the First Amendment Zone was in

22  place?

23  A.   They were in place when the closure order went into

24  effect.

25  Q.   Okay.

Rand Stover - Cross

1   A.   As far as I know.

2   Q.   Okay.  Sir, I'm showing you Government's Exhibit 330.  Do

3   you remember that?

4   A.   Yes.

5   Q.   All right.  And in looking at this, can you circle for us

6   where the First Amendment Zone was prior to April 12, 2014?

7   A.   My understanding was it was right in that area.

8   Q.   Okay.  Do you know more specifically?  I'm sorry.  I think

9   we have technical difficulties.

10          THE COURT:  Aaron, this one is admitted, No. 330.

11          COURTROOM ADMINISTRATOR:  330?

12          THE COURT:  Yes.

13          COURTROOM ADMINISTRATOR:  Are we switching to that

14   computer now?

15          MR. TANASI:  That's coming from the Elmo.

16          COURTROOM ADMINISTRATOR:  Okay.

17          MR. TANASI:  Actually, coming from the Elmo.

18          COURTROOM ADMINISTRATOR:  Oh, sorry.

19          MR. TANASI:  That's okay.

20   Q.   Okay.  So if you could, one more time, just circle for us

21   where the First Amendment Zone was in this case?

22   A.   Yes.  My understanding was it was in this area here.

23   Q.   Okay.  All right.  Now, I'm going to show you what's been

24   premarked -- hasn't been admitted yet -- as Defense

25   Exhibit 5000-A.

Rand Stover - Cross

1          Okay?  Sir, do you see Defense Exhibit 5000-A in

2    front of you?

3    A.   Yes.

4    Q.   Okay.  What does it appear to be?

5    A.   It appears to be one of the two First Amendment Zones.

6    Q.   Okay.  Is that the First Amendment Zone that you just

7    circled?

8    A.   No.

9    Q.   Okay.  So let's go back then.  Hold on.  Why don't we do

10   this.

11          I would move to admit Defense Exhibit 5000-A.

12          THE COURT:  Any objection to 5000-A?

13          MR. MYHRE:  Your Honor, there appear to be markings

14   on there.  We would ask the witness to lay further foundation

15   or ask counsel with the witness to lay further foundation.

16          THE COURT:  Do you want to ask him if that accurately

17   depicts what the First Amendment Zone looked like?  It looks

18   like there might be some modification.

19   BY MR. TANASI:

20   Q.   Does this picture accurately depict what the First

21   Amendment Zone looked like?

22   A.   I can't answer that, because personally I never saw

23   this -- the second of the two First Amendment Zones.

24   Q.   Okay.  So, you never saw the second of the two First

25   Amendment Zones?

Rand Stover - Cross

1    A.    No.

2    Q.    But you saw the first; fair?

3    A.    I saw the one that I indicated on the previous exhibit.

4    Q.    Okay.  Do you know the location of the second Amendment

5    Zone then?

6    A.    It was supposed to be at the intersection of highway --

7    this one that we are talking about here?

8    Q.    Why don't we do this.  We'll go back to Government's

9    Exhibit 330, which has already been admitted.

10   A.    Okay.

11   Q.    Okay.  You indicated that there were two First Amendment

12   Zones.  Can you circle both of them on this exhibit?

13   A.    I can circle the area of one.  I can't circle the area of

14   the other one.  I don't believe it's shown on this map.

15   Q.    All right.  All right.  I will show you now what's been

16   premarked for identification as Defendant's Exhibit 500-B.

17          Take a look at that and let me know when you are

18   done.

19   A.    Okay.

20   Q.    All right.  Do you recognize that picture?

21   A.    Yes.

22   Q.    What is that picture, sir?

23   A.    That is a picture of one of the First Amendment Zones that

24   I -- I can recognize.

25   Q.    I'm sorry.  I didn't hear the last part.

Rand Stover - Cross

1   A.   That I can recognize.  That's one of the First Amendment

2   Zones -- one of the two First Amendment Zones that I personally

3   saw.

4   Q.   Okay.  Is that a picture of the First Amendment Zone that

5   you circled in our previous Exhibit Government's 300?

6   A.   Yes.

7   Q.   Okay.  All right.  Who's in the picture, sir?

8   A.   I believe that to be Cliven Bundy.

9        MR. TANASI:  Okay.  Your Honor, I move to admit

10  Defendant's Exhibit 500-B.

11       THE COURT:  Any objection?

12       MR. MYHRE:  None, Your Honor.

13       THE COURT:  All right.  Exhibit 500-B will be

14  admitted.  Would you like to publish it now?

15       MR. TANASI:  I would, Your Honor.

16    (Exhibit 500-B admitted.)

17       THE COURT:  Go ahead and publish it for the jury.

18  BY MR. TANASI:

19  Q.   Okay.  Agent Stover, we just talked about it.  If you

20  could describe for the jury what you see in this picture,

21  please.

22  A.   Sure.  I see a picture of one of the two First Amendment

23  Zones that were designated before the operation commenced after

24  the closure order went into place and an individual who I

25  believe to be Cliven Bundy.

Rand Stover – Cross

1    Q.   Can you estimate the size of that First Amendment Zone?

2    A.   No, sir.

3    Q.   So let's go back to your operation in this case.  The

4    operation or the goal was to transport cattle; fair?

5    A.   Part of the operation included the transport of cattle,

6    yes.

7    Q.   Okay.  And in this case, in fact, the cattle wasn't

8    ultimately transported; correct?

9    A.   Not from the incident command post.

10   Q.   Okay.  And one of the reasons that it wasn't actually

11   transported was because of political pressure; correct?

12   A.   That's my understanding, that there was some political

13   pressure.

14   Q.   I mean, you knew that there was political pressure;

15   correct?

16   A.   Yes.  Yes.

17   Q.   So, I mean, it's not just your understanding.  It's

18   something you had first-hand knowledge of; fair?

19   A.   To some extent, yes.  That's fair.

20   Q.   Okay.  And, I mean, in fact there was a lot of political

21   pressure; right?

22   A.   To characterize a lot, I would say there was definitely

23   political pressure.

24   Q.   Okay.  A lot of political pressure?

25           MR. MYHRE:  Objection, Your Honor.  Asked and

Rand Stover - Cross

1   answered.

2           THE COURT:  Sustained.

3   BY MR. TANASI:

4   Q.   There was political pressure from local -- local

5   representatives that you knew of?

6   A.   Yes.

7   Q.   County commissioners?

8   A.   I know of one county commissioner in Utah, yes.

9   Q.   Sheriff's department political pressure?

10  A.   I can't answer if they were receiving political pressure.

11  Which sheriff's department?  Perhaps you could clarify.

12  Q.   Sheriff's department in general.  You had pressure from a

13  sheriff's department?

14          MR. MYHRE:  I am going to object on relevance

15  grounds, Your Honor, since we've gone this far, but what's the

16  relevance of this?

17          MR. TANASI:  Your Honor, if I could -- I'm

18  essentially getting to it.  The political pressure affected his

19  operation in this case.  And so I'm laying the foundation for

20  that.

21          And additionally, if he doesn't recall the -- the

22  political pressure, I can certainly refresh with his Grand Jury

23  transcript.

24          MR. MYHRE:  I believe we had some motion practice on

25  this, Your Honor.

Rand Stover - Cross

1          MR. TANASI:  We did, Your Honor.  And Your Honor left

2     the door open for to us get into this ground, potentially, if

3     it's relevant to the case.  And it's absolutely relevant, as

4     we've established, to his operation.

5          THE COURT:  Are you referring to the Euclid,

6     California, sheriff that was originally going to be a site that

7     didn't work out?

8          MR. TANASI:  I'm referring in general, Your Honor, to

9     the list of political pressure that he was under, which

10     affected his state of mind and affected his operation in this

11     case.

12          THE COURT:  Well, then you are going to have to lay a

13     foundation that he was affected by some kind of political

14     pressure.  He said there was political pressure.  I don't know

15     that he said he was affected by it.  Just because he's aware of

16     something doesn't make it relevant.

17     BY MR. TANASI:

18     Q.   You testified before the Grand Jury in this case; correct?

19     A.   I did.

20     Q.   And when you testified in front of the Grand Jury, you

21     told -- you were asked --

22          MR. MYHRE:  Objection, Your Honor.

23     BY MR. TANASI:

24     Q.   You talked --

25          MR. MYHRE:  Objection.  This is hearsay, at this

Rand Stover - Cross

1  point, but it's not proper impeachment.  He's not contradicted

2  anything.

3         MR. TANASI:  Well, its effect on the listener.  Its

4  effect on his operation in this case.

5         THE COURT:  All right.  Why don't we take our lunch

6  break now, and go ahead and let the jury have their one-hour

7  lunch break.  It's 12:04, so let's plan to be back here at

8  1:05.

9         I remind you that during this time, you are not to

10 discuss this case with anyone or permit anyone to discuss it

11 with you.  Please let the Court know right away if you hear

12 anything about this case.

13        Do not read or listen to or view anything touching

14 upon this case in any way, and do not attempt to perform any

15 research or any independent investigation about the case.

16        And do not form an opinion until after you've heard

17 all of the evidence presented, heard the closing arguments,

18 been provided with the written jury instructions, and then once

19 you are allowed to begin your deliberation process, then you

20 can discuss the case amongst yourselves and create opinions.

21        But until then, just have lunch and think and talk

22 about other things.

23        All right.  So we will see you back here at 1:05.

24 And after the jury exits, then, Agent Stover, you may also go

25 ahead and stretch and have a lunch break.  We will need you

Rand Stover - Cross

1   back here before 1:05.

2          THE WITNESS:  Thank you, Your Honor.

3       (Jury out.)

4          THE COURT:  All right.  So, the jury has left.  You

5   can go ahead and sit down.  If anybody wants to leave for

6   lunch, you can, but I want to hear from the attorneys, outside

7   the presence of the jury, a proffer of what you are trying to

8   ask and why it's admissible, so that you can hopefully then

9   move along when the jury comes back.

10          MR. TANASI:  Your Honor, is it okay if I stand here

11   and have my notes in front of me?

12          THE COURT:  Sure.  That's fine.

13          MR. TANASI:  So, he testified at of the Grand Jury.

14   He was asked specifically.  He talked about political pressure

15   was the reason -- sorry -- one of the reasons that the cattle

16   weren't transported from the impound area.

17          "Can you give us any information other than that what

18   political pressure and by who?"

19          And he goes through, and he answers, "I could say

20   that our agency, in general, received a lot of political

21   pressure, from both Utah and Nevada Governors, from local

22   representatives, from county commissioners, from sheriffs, from

23   Department of Public Safety employees.  A lot of that -- in my

24   own opinion, a lot of that political pressure was based on poor

25   information that they didn't have the facts and had not seen

Rand Stover - Cross

1  the court orders.  But nonetheless, there was a lot of

2  political pressure."

3          And so I'm proffering it, Your Honor, for the effect

4  on the listener, and the effect on this agent in his

5  investigation, and the effect on this agent in his operation,

6  his impound operation.  And if I could, Your Honor --

7          THE COURT:  What effect did the political pressure

8  have on him?

9          MR. TANASI:  Well, Your Honor, it's the government's

10  position that our clients are the sole effect on the BLM agents

11  in this case.

12          Our clients and their guns, our clients and their

13  rhetoric, our clients and their Facebook, our clients and all

14  these other levels of hearsay is what affected this agent.

15          I'm simply pointing out that political pressure was

16  another effect on this agent.  And what I plan to get into,

17  Your Honor, is the Governor Sandoval statement as well where he

18  outlines his issue with what the BLM was doing.  All of that

19  had an effect on this agent and how he handled things during

20  that impounding operation.

21          THE COURT:  Mr. Myhre.

22          MR. MYHRE:  Your Honor, this is -- if I understand

23  from the proffer here, this was directly addressed in our

24  motion practice; all these statements from Governor Sandoval

25  and other political figures or officeholders.

Rand Stover - Cross

1          This goes to jury nullification.  It doesn't go to

2     the effect on this listener.  The agent has testified that he

3     was aware of political pressure being brought to bear.  But

4     he's not established any bases that it affected him in any way,

5     shape, or form in terms of the operation.

6          I believe his testimony was that they were prepared

7     to continue on with the operation, you know, until -- through

8     the events of the 12th or up to the events of the 12th.

9          So, the statements that are being offered here have

10    no nexus to anything that's relevant in this case with respect

11    to this operation or with respect to this witness and their

12    decision making and their reaction to the events on April 12th.

13         THE COURT:  All right.  The order was No. 1518 on the

14    docket, and the government was seeking to exclude opinions and

15    hearsay statements of public officials or anyone else they

16    think the jury might respect, under Rule 801(c) and the

17    statements of individuals without personal knowledge of the

18    matter under Rule 602.  And that aspect of the government's

19    order was granted.

20         MR. TANASI:  Your Honor, if you will allow me to

21    review the order, my recollection is that there was still some

22    leeway left open by the Court for us to establish how it's

23    relevant and establish, at the time of trial, what it would be

24    offered for.

25         THE COURT:  Go ahead.  You can.

Rand Stover - Cross

1            MR. TANASI:  Thank you.

2            THE COURT:  I have got it up, too.  It's only seven

3     pages.  What I said was, "However to the extent that these

4     beliefs are interlaced with independently admissible evidence,

5     such evidence will not be excluded simply because it references

6     these opinions."

7            MR. TANASI:  Correct.

8            THE COURT:  Is that the portion you are referring to

9     on page 7, line 9 of the order, No. 1518?

10           And the government's argument was that the opinion of

11    a public person not involved in the events in question is

12    irrelevant and likely to confuse the jury.

13           So is that your position, Mr. Myhre?  That they will

14    confuse the jury, because they are statements by individuals

15    who were not involved or not --

16           MR. MYHRE:  Yes, Your Honor.

17           THE COURT:  -- well versed in what was going on?

18           MR. MYHRE:  Yes, Your Honor.  They are not involved.

19    They are just names being thrown out there.

20           But further, there's no relevance to these

21    statements.  The -- it doesn't go to prove or disprove any of

22    the elements of the offenses that are before the Court.

23           The extortion count, which is at issue here with

24    respect to cattle, doesn't matter whether political pressure

25    was brought to bear not to move the cattle or not.  The fact of

Rand Stover – Cross

1  the matter is, is that the cattle were removed from the

2  possession of the BLM.

3          So whether they were moved, or not moved, or couldn't

4  be moved because of political pressure is irrelevant to any of

5  the elements of the offense.

6          THE COURT:  All right.  Well, I think that the

7  defense is entitled to bring up the fact that there was

8  political pressure, and that it may have been either the sole

9  reason or a participating additional reason for -- for the --

10  the impoundment not being completed as originally planned.

11          But as far as getting into the specific statements by

12  people who the jury might respect, and if those statements are

13  in question as to whether or not they are even accurate, which

14  it sounds like they are.  Not based on personal knowledge.

15  They are political statements.  I think that would confuse the

16  jury as to what actually was happening.

17          But as far as it's relevant to the defense's theory

18  that these defendants were not the sole reason why the

19  impoundment did not get completed as planned, I think that it's

20  admissible for that purpose.

21          But not the specifics of what the statements are, but

22  the fact that there was political pressure, and that political

23  pressure may have contributed to or even been the sole reason

24  for, you can explore that aspect of it.  But not -- not

25  bringing up the specific statements made by the politicians.

Rand Stover – Cross

1          MR. TANASI:  Your Honor, if I may just make two more

2     points, and then I'll leave it alone.

3          THE COURT:  Sure.

4          MR. TANASI:  One --

5          THE COURT:  Let me write down my decision before I

6     forget, so when it comes back after lunch, I will remember what

7     I decided.

8          Okay.  So I wrote down political pressure could be

9     sole or contributing reason but no statements.

10         MR. TANASI:  And, Your Honor, I would just point out

11    two things.  One, Your Honor could take judicial notice of the

12    statement itself, which would lend itself to the validity and

13    to the credibility of the statement itself.

14         What I was eventually seeking to get out was the

15    statement which was on Nevada.gov.  And again, I think Your

16    Honor on could take judicial notice of it.

17         And then additionally, it does go to the state of

18    mind for our clients as well, specifically my mine that I can

19    speak to, in that, you know, Governor Sandoval, in this

20    statement, he's basically attacking the way BLM handled the

21    First Amendment Zone; trampling First Amendment rights.

22         And my client's state of mind, in this case, is he's

23    standing up for what he believes in, and he's coming to

24    protest, which the Governor of Nevada also believes is okay as

25    was also mishandled by the BLM in this case.

Rand Stover - Cross

1           So it's wholly relevant for a variety of reasons.
2    And I think the specifics we should be able to get into, but I
3    understand the Court's ruling.
4           THE COURT:  All right.  Well, I can take judicial
5    notice of a statement made on a government website, but that
6    doesn't make it admissible.  But for purposes of a proffer, I
7    think you just lodge it for review.
8           I'm not going to allow to you present it or admit it.
9    It's still overly prejudicial and confusing to the jury.
10          MR. TANASI:  Okay.  Thank you.
11          THE COURT:  Do you want to tell me what exhibit
12   number that was?
13          MR. TANASI:  It hasn't been admitted yet.  I had it
14   premarked though as Defendant's Exhibit 5010-A.
15          THE COURT:  Okay.  So 5001 or 10?
16          MR. TANASI:  10.
17          THE COURT:  5010-A, and that purports to be a copy of
18   a website screen print.
19          MR. TANASI:  It's a screen print of Governor
20   Sandoval's statement.
21          THE COURT:  Okay.  That will not be admitted, but I
22   want you to lodge it, so that it will be part of the appeal.
23          MR. TANASI:  Understood.
24          THE COURT:  Any other questions or areas that you
25   think might cause a problem when we come back from lunch that

Rand Stover - Cross

1    we can address now?

2            MR. TANASI:  Not for the defense, Your Honor.

3            THE COURT:  Okay.  Then we will go ahead and take our

4    lunch break.  Try to be back at by 1:05, if you can.  It's

5    12:16 now.

6        (Recess, 12:15.  Resumed, 1:10 p.m.  Jury out.)

7            THE COURT:  Thank you.  You may be seated.  Call in

8    the jury.

9            COURTROOM ADMINISTRATOR:  Yes, Your Honor.

10       (Jury in.)

11           THE COURT:  Everyone may be seated.  We are joined by

12   the jury also.  All right.  So we are back on the record.

13           We are joined by the jury, returning after lunch, and

14   we also are joined by Special Agent Stover returning as well.

15           When we took a break for lunch, Mr. Tanasi, you were

16   cross-examining Mr. Stover.  Do you want to continue that, sir?

17           MR. TANASI:  Yes, ma'am.  Thank you.

18           THE COURT:  Okay.  Go ahead.

19   BY MR. TANASI:

20   Q.   Good afternoon, Agent Stover.

21   A.   Good afternoon, sir.

22   Q.   Again, did you have an opportunity to have lunch?

23   A.   I did.  Thank you.

24   Q.   Who did you eat with?

25   A.   Just a couple of coworkers downstairs.

Rand Stover - Cross

1    Q.    Coworkers.  Did you have an opportunity to have lunch with

2    the prosecutors in this case?

3    A.    No, sir.

4    Q.    No?  All right.  Prior to the lunch break, I had asked you

5    about political pressure leading up to your threat assessment

6    on the 12th.  Do you recall that?

7    A.    I do.

8    Q.    Okay.  Do you recall giving testimony to the Grand Jury in

9    this case?

10   A.    Yes, I do.

11   Q.    And do you recall telling them that --

12           MR. MYHRE:  Objection, Your Honor.  Foundation.

13           THE COURT:  Sustained.

14   BY MR. TANASI:

15   Q.    Okay.  Let's go back to your threat assessment in this

16   case.  From the threat assessment and let's go forward to the

17   actual operation.  Okay?

18   A.    Okay.

19   Q.    In this case, were you able to carry out your ultimate

20   operation?

21   A.    No, sir.

22   Q.    Okay.  Was part of that reason political pressure?

23   A.    Can you clarify?  Are you asking about the -- the

24   completion of the entire operation?

25   Q.    Correct.  Was part of that reason political pressure?  It

Rand Stover - Cross

1   was; wasn't it?

2   A.   It was.  Yes, it was factor.

3   Q.   Thank you.  All right.  I'm showing you what's been marked

4   for identification as Defendant's Exhibit 5002-E.  Just marked

5   for identification.

6           COURTROOM ADMINISTRATOR:  And counsel, that was

7   5002-E?

8           MR. TANASI:  Yes, sir.

9   Q.   Do you see that in front of you?

10  A.   Yes, I do.

11  Q.   What is it?

12  A.   It's a photo showing several BLM law enforcement officers

13  and two vehicles.

14  Q.   Okay.  Are you familiar with the location?

15  A.   Not from the -- this shot.  I can't tell exactly where

16  they are located at, no.

17  Q.   Does it look like the wash?

18  A.   It could be part -- it could be at the wash.

19  Q.   Okay.  Do you recognize the vehicles?

20  A.   I recognize one as a marked BLM law enforcement vehicle

21  and the other one as a Chevy truck.

22  Q.   Okay.  The one that's marked, does that also have a K9 on

23  it?

24  A.   Yes, it does.

25  Q.   How about the blue truck?  What's that?

Rand Stover - Cross

1   A.   It looks like a blue -- looks like a blue Chevy truck.

2   Q.   Okay.  Do you recognize the agents in this picture?

3   A.   Yes, I recognize a few of the officers in this picture.

4   Q.   Okay.  And do these agents and these officers, they look

5   like folks that were with you on the 12th?

6   A.   Yes.

7   Q.   So would this be a fair and accurate depiction of folks

8   that are with you on the 12th?

9   A.   Yes.  At some point, yes.

10          MR. TANASI:  Okay.  Move to admit Defense

11   Exhibit 5002-E.

12          THE COURT:  Any objection to 5002-E?

13          MR. MYHRE:  Lack of foundation, Your Honor.  I can't

14   determine where, when, exactly this photo -- what it depicts.

15          THE COURT:  He said he couldn't recognize where that

16   was.  Do you want to lay a better foundation?

17          MR. TANASI:  Your Honor, I would point out he did

18   establish that it's a fair and accurate depiction of the folks

19   that were with him at the wash on April 12th.  And I can ask

20   him again.  It's no problem.

21          THE COURT:  Yeah.  Lay a little bit better.  I think

22   you can, but let's get it clear on the record.

23          MR. TANASI:  Understood.

24   Q.   All right.  Agent Stover, in looking at this picture, can

25   you identify the folks that are in this picture; the agents

Rand Stover - Cross

1   that are in this picture?

2   A.   Sir, I can identify some of them but not all of them.

3   Yes.

4   Q.   Okay.  So I just went through.  I counted 12.  How many of

5   those agents can you identify?

6   A.   Give me just a moment, please.

7            THE COURT:  13.

8            THE WITNESS:  Six for sure, sir.

9   BY MR. TANASI:

10  Q.   Okay.  So six of those agents.  Now are those agents that

11  were with you when you were in the wash on the 12th?

12  A.   Of the six that with both rangers and agents, yes, those

13  six, at one point in time, were with me in the wash.

14  Q.   Okay.  And is this a picture, just so we're clear, of the

15  wash on the 12th?

16  A.   It appears to be.

17           MR. TANASI:  Your Honor, I move to admit Defense

18  Exhibit 5002-E.

19           THE COURT:  Mr. Myhre.

20           MR. MYHRE:  No objection, Your Honor.

21           THE COURT:  All right.  So Exhibit 5002-E, as in

22  elephant, will be admitted.

23       (Exhibit 5002-E admitted.)

24           MR. TANASI:  Thank you, Your Honor.

25  Q.   Okay, sir.  We can publish that.  There's a little bit of

Rand Stover - Cross

1   glare there.  Can you see?  I've zoomed in on that picture.

2   A.    Yes, I can.

3   Q.    Great.  All right.  Can you identify those three agents up

4   against the blue truck there?

5   A.    The -- the ones in the foreground, only one for sure, sir.

6   Q.    Which one is that, sir?

7   A.    May I circle?

8   Q.    Sure.  Now, the agent to his right, the one who is

9   smiling, can you identify him?

10  A.    No, sir.  I don't recall his name.

11  Q.    Okay.  Is it somebody you've seen before?  You just don't

12  know his name?

13  A.    Yes, I've seen him before.  I just don't recall his name.

14  Q.    Thank you.  I would like to now show you what's been

15  premarked as Defendant's Exhibit 5002-D.

16        Okay, Agent Stover.  Do you see that picture there?

17  A.    Yes.

18  Q.    What is it?

19  A.    That's a photograph of several law enforcement vehicles

20  and myself and some other law enforcement officers -- a few

21  other law enforcement officers.

22  Q.    Same idea.  It has a little glare on it.  Right?

23  A.    Correct.

24  Q.    Okay.  Thank you, Aaron.

25        All right.  So, in looking at this picture, where is

Rand Stover - Cross

1    it located?

2    A.    This is in the wash or at the post two area.

3    Q.    Okay.  Who are the other agents in this picture?

4    A.    I can positively identify Eric Boik in that picture.

5           MR. TANASI:  Okay.  Your Honor, I'd move to admit

6    Defendant's Exhibit 5002-D.

7           THE COURT:  Any objection to 5002-D as in dog?

8           MR. MYHRE:  Yes, Your Honor.  Just foundation as to

9    when and where.  I understand the wash, but when in the wash.

10          THE COURT:  Mr. Tanasi, do you want to follow up?

11          MR. TANASI:  Understood.

12   Q.    Agent Stover, is this a picture of you in the wash on

13   April 12, 2014?

14   A.    Yes.

15          MR. TANASI:  Move to admit.

16          THE COURT:  Any other objection, Mr. Myhre?

17          MR. MYHRE:  No objection, Your Honor.

18          THE COURT:  All right.  So Exhibit 5002-D as in dog

19   will be admitted.  Would you like to publish it now?

20          MR. TANASI:  Yes, please.

21          THE COURT:  All right.  You may do so.

22        (Exhibit 5002-D admitted.)

23   BY MR. TANASI:

24   Q.    Okay.  So we're looking at Defendant's Exhibit 5002-D as

25   in dog.  Can you identify where you are located?

Rand Stover - Cross

1    A.   Yes.

2    Q.   Can you just circle for us?

3              Thank you, sir.  Okay.  I'm now showing you what's

4    been premarked for identification purposes as Defendant's

5    5002-H.  Okay, sir.  Do you see this?

6    A.   Yes, I do.

7    Q.   Okay.  Do you recognize it?

8    A.   I recognize those two BLM officers -- rangers, I should

9    say.

10   Q.   Who are they, sir?

11   A.   They are -- the one on the -- well, they are Mike

12   Carpenter and Brad Sones.

13   Q.   Now, is this a picture of Mike Carpenter and Mr. Sones on,

14   or in, or near the wash on April 12, 2014?

15   A.   That I don't know.

16   Q.   Okay.  Do you have any idea when this picture was taken?

17   A.   No, sir.

18   Q.   Okay.  In looking at this picture, can you identify where

19   it is?

20   A.   No, sir, not by the picture.

21             MR. TANASI:  Court's indulgence.

22             THE COURT:  Yes.

23        (Pause in the proceedings.)

24             MR. TANASI:  Your Honor, I will pass the witness.

25             THE COURT:  Mr. Marchese, do you want to go next?

Rand Stover - Cross

1          MR. MARCHESE:  Yes, Your Honor.  Thank you.

2                      CROSS-EXAMINATION

3     BY MR. MARCHESE:

4     Q.   Good afternoon.

5     A.   Good afternoon, sir.  How are you?

6     Q.   I'm going to ask that what's previously been entered into

7     evidence, the Dave Bundy arrest video 5008-F as in Frank, if we

8     could publish that, please.

9          COURTROOM ADMINISTRATOR:  Are we on the computer,

10    Mr. Marchese?

11         MR. MARCHESE:  Brian.

12         COURTROOM ADMINISTRATOR:  Okay.

13         MR. MYHRE:  Objection, Your Honor.  This portion is

14    not --

15         THE COURT:  Yes, this is not the correct portion.

16         MR. MYHRE:  -- admitted.

17         MR. MARCHESE:  Can you fast forward it, please?  And

18    I'm sorry, Your Honor.  Up to what number or time frame was it

19    entered?

20         THE COURT:  3:55?  Is that the right number?

21         MS. CREEGAN:  The government has 3:55.

22         MR. MARCHESE:  Brian, can you do up to 3:55 on there,

23    please?  Thank you.

24         (Exhibit 5008-F being played.)

25

Rand Stover - Cross

1          MR. MARCHESE:  Brian, stop it.

2    Q.   Now, in this particular video, Mr. Tanasi asked you some

3    questions, so I'm going to try not to be too redundant.

4          Now, over to the left on the screen, we have

5    Mr. David Bundy; is that correct?

6    A.   Yes, he's on the left of the screen behind the officers

7    there.

8    Q.   And you know that because you have previously seen this

9    video; correct?

10   A.   That's correct.

11   Q.   And it's kind of difficult for you to see, because there's

12   some officers in front of him; correct?

13   A.   Yes, sir.

14   Q.   Okay.  How many officers are depicted in this particular

15   video screenshot?

16   A.   I count eight, sir.

17   Q.   And you see eight on the road; correct?

18   A.   I see eight in the screen there, yes.

19   Q.   Okay.  And you got that little circle up on the screen.

20   Do you see that circle right there?

21   A.   Yes, sir.

22   Q.   And do you see two individuals up there on the hill; is

23   that correct?

24   A.   Yes.

25   Q.   Okay.  And as the supervisor or the assistant supervisor

Rand Stover - Cross

1  in this particular operation, are you aware of who those two

2  individuals are up on the ridge?

3  A.    At the time, I was not aware.  But I am aware now.

4  Q.    Okay.  And what is your understanding of who those two

5  individuals on the ridge were?

6           MR. MYHRE:  Objection, Your Honor.  This was admitted

7  for the -- for the witness's understanding and knowledge in

8  terms of his threat assessment, not what he learned later.

9           THE COURT:  Yeah, what's the relevance, Mr. Marchese?

10          MR. MARCHESE:  Well, it goes to this -- this -- the

11  supervisor, the assistant supervisor, his knowledge of his

12  operation.

13          THE COURT:  Well, he just told you he didn't know at

14  the time but he's learned since.

15  BY MR. MARCHESE:

16  Q.    Okay.  When did you find out who those individuals were?

17  A.    I found out later.  I don't remember if it was later that

18  day or the day after, but it was -- it was within 24 hours of

19  this particular event.

20  Q.    All right.  So it's fair to say it was close in proximity

21  to the event in question; correct?

22  A.    Yes.

23  Q.    Okay.  So based upon that, who were those individuals on

24  that ridge?

25  A.    They are David Russell and Mark Brunk.

Rand Stover – Cross

1    Q.   And to your knowledge, what were Mr. Russell and

2    Mr. Brunk's duties on that particular day?

3    A.   On that particular day, they were assigned to the

4    investigative -- part of the investigative team.

5              MR. MARCHESE:  Brian, can you play a little bit more?

6         (Exhibit 5008-F being played.)

7    Q.   Can you stop it?

8              Now, to your knowledge, do you know who was speaking

9    on that video?

10   A.   Yes, an officer named Jason Cox.

11   Q.   Okay.  And to your knowledge, who is Mr. Cox speaking to?

12   Is he directing his words towards Mr. David Bundy?

13   A.   No, I believe he's directing his words to the driver.

14   Q.   Okay.  And the driver would be Ryan Bundy; correct?

15   A.   That's what I would -- I came to learn, yes.

16   Q.   All right.  And that driver is actually Mr. David Bundy's

17   brother; correct?

18   A.   Yes, sir.

19   Q.   And Mr. Ryan Bundy was expressing concern of what was

20   going on with his brother David; correct?

21   A.   I'm not sure, because I can't hear his voice.

22   Q.   Okay.  But at some point in time, Ryan left; correct?

23   A.   Yes.

24   Q.   Okay.  Driving that white van; correct?

25   A.   Yes, sir.

Rand Stover - Cross

1    Q.   There were no issues with Ryan Bundy; correct?

2    A.   Not that I am aware of.

3    Q.   Okay.  He wasn't arrested; correct?

4    A.   No, he was not arrested.

5    Q.   There was never a warrant for his arrest issued; correct?

6    A.   Correct.

7    Q.   To your knowledge, he did not have a firearm on his person

8    at that time; correct?

9    A.   To my personal knowledge, no.

10   Q.   To your knowledge, there were no firearms in that white

11   van; correct?

12   A.   To my personal knowledge, no.

13   Q.   Okay.  And for the most part, for lack of a better term,

14   he complied with the officers' directives, and he left.  Fair

15   to say?

16   A.   Yes.

17   Q.   Okay.  Now, Mr. David Bundy obviously, that did not

18   happen.  He was arrested; correct?

19   A.   He was arrested, yes.

20   Q.   Okay.  To your knowledge, he did not have a firearm on his

21   person; correct?

22   A.   To my knowledge, that is correct.

23   Q.   The only thing that he had of interest, I guess, for lack

24   of a better term, on his person would have been an iPad;

25   correct?

Rand Stover - Cross

1   A.   He did have an iPad, yes.

2   Q.   And you know that, because that iPad was -- was booked

3   into evidence at some point; correct?

4                MR. MYHRE:  Objection.  Relevance.

5                MR. MARCHESE:  He's already went into this, Your

6   Honor.  If I can get a little bit of latitude, I will flesh it

7   out.

8                THE COURT:  What is the relevance of whether or not

9   the iPad was booked into evidence?

10               MR. MARCHESE:  Well, he's already said that he gave

11  some evidence back.  So it's my good faith belief that he gave

12  the iPad back.  So the government is the one that opened the

13  door with this.  I'm just following it up.

14               THE COURT:  And what is the relevance of whether or

15  not he gave the iPad back?

16               MR. MARCHESE:  Well, the government has already

17  opened the door saying that they had a meeting at the Bundys.

18  Talked about what happened at that particular meeting, and that

19  he was returning some evidence.  I have a good faith belief

20  that that iPad was that evidence that was given back on that

21  day.

22               THE COURT:  All right.  Well, I will allow it.

23  BY MR. MARCHESE:

24  Q.   I will rephrase the question.

25               So it was an iPad that was on Mr. Bundy on that

Rand Stover - Cross

1    particular day; correct?

2    A.    Yes, sir.  He was holding an iPad.

3    Q.    I'm sorry?

4    A.    Yes, sir.  He was holding an iPad.

5    Q.    Okay.  And was there anything else of any particular

6    evidentiary value that was taken on that day to your knowledge

7    from Mr. Bundy?

8    A.    The total -- what I recall, the overall items were three

9    cell phones, some personal identification documents, the

10   iPad, and a portfolio of some kind that contained papers.

11   Q.    Okay.  And what was the date on this incident again?

12   A.    This was April 6th.

13   Q.    Okay.

14   A.    2014.

15   Q.    And when did you go to the Bundy residence, that was

16   referenced in your direct examination with Mr. Myhre, the

17   meeting where you went to return some items?

18   A.    Sir, I never went to the Bundy residence.

19   Q.    Okay.  Where was that meeting then?  I'm sorry.

20   A.    When I returned the property?

21   Q.    Yes.

22   A.    It was at the -- a small gravel turnout at the junction of

23   Highway 170 and Gold Butte Road.

24   Q.    Okay.  So the small gravel turnout meeting, when was that?

25   A.    That was on the morning of April 9th.

Rand Stover - Cross

1   Q.   And David Bundy was there; correct?

2   A.   Yes, sir.

3   Q.   A little bit roughed up; fair to say?  He had some red

4   marks on his face?

5   A.   On that particular morning, he did have an abrasion on his

6   face I remember seeing.

7   Q.   And obviously that you are meeting him at the gravel

8   turnout, he's not still in custody; correct?

9   A.   Correct.

10  Q.   At some point in time, he was released; correct?

11  A.   Yes.

12  Q.   Do you know when to your personal knowledge?

13  A.   I -- I believe he was -- it was either April -- I believe

14  it was April 7th that he was released.

15  Q.   So shortly after the arrest, he was released?

16  A.   Yes, sir.

17  Q.   And you had some items that you wanted to give back to

18  him; is that fair to say?

19  A.   There were some personal property items that I wanted to

20  return, yes.

21  Q.   All right.  And how did you get those items?

22  A.   They were given to me by the arresting officers.

23  Q.   The arresting officers did not book those items into

24  evidence with him?

25           MR. MYHRE:  Objection.  Relevance, Your Honor.

Rand Stover - Cross

1          MR. MARCHESE:  I think it's very relevant.  It's

2    normally the course of action, when someone goes to jail, their

3    property is put in with them.  I'm trying to figure out as to

4    why the non-arresting officer would have it in his possession.

5          THE COURT:  I don't see the relevance of that.

6    Sustained.

7    BY MR. MARCHESE:

8    Q.   I'm going to ask that Defense Exhibit 5006-E, as in

9    Edward, now be published.

10         (Exhibit 5006-E being played.)

11   Q.   Where is the -- I believe that that needs to be fast

12   forwarded as well, Your Honor.  I want to say it was 35 off the

13   top of my head.

14         THE COURT:  55.

15         MR. MARCHESE:  55?

16         THE COURT:  55.

17         MR. MARCHESE:  55, Brian.  Okay.  Play.

18         (Exhibit 5006-E being played.)

19   Q.   Now, do you recognize anyone in this screenshot?

20   A.   Yes.

21   Q.   And who do you recognize?

22   A.   I recognize the three BLM rangers.

23   Q.   And from left to right, can you please tell me who they

24   are?

25   A.   Sure.  The one on the furthest left is Ryan Parr, the one

Rand Stover - Cross

1   in the center is Mike Carpenter, and the one on the right is

2   Mike Rupe.

3   Q.   Okay.  Now, can you please identify either -- I believe

4   there's four BLM agents in the screenshot; correct?

5   A.   I think there are actually five.  There's one standing

6   behind the one in the center.

7   Q.   Okay.  The gentleman in the center who you are referring

8   to, who is that?

9   A.   That is Ron Nelson.

10  Q.   Okay.  And the individual that's behind him, we can only

11  see a very small portion of his head.  Who is that?

12  A.   I believe that's Mike Rupe.  You'd have to let the video

13  play just a little bit more so I can see for sure.

14  Q.   And I'm sorry.  Who did you say you believe it is?

15  A.   Mike Rupe.

16  Q.   And then the three gentlemen behind him?

17  A.   The closest one is -- on the left of the screen, the

18  closest one is Mike Carpenter.

19  Q.   And that's the bearded gentleman with the dog?

20  A.   Yes, sir.

21  Q.   Okay.  And then behind him with no hat in the sunglasses?

22  A.   That is Jason Carey, I believe.

23  Q.   Okay.  And then the other individual who is kind of

24  furthest away with the hat and the sunglasses and his arms at

25  his side?

Rand Stover - Cross

1   A.   That's a female, and I believe that's Angela Stevens.

2   Q.   Okay.  Do you want to play a little bit more?

3        (Exhibit 5006-F being played.)

4   Q.   Does that give you a better understanding as to who that

5   other gentleman was?

6   A.   Yes.  Yes, it does.  Thank you.

7   Q.   Okay.  And who is that?

8   A.   That is Mike Rupe.

9   Q.   Okay.  So you were right.  Now, on that particular date,

10  to your knowledge -- well, you were able to identify Ammon

11  Bundy; correct?

12  A.   Yes.

13  Q.   Okay.  And that was the individual in the plaid shirt;

14  correct?

15  A.   Yes, sir.

16  Q.   The individual that got tasered; correct?

17  A.   Yes, sir.

18  Q.   The individual that had the dogs deployed on him; correct?

19  A.   Define "deploy."

20  Q.   Well, he said -- he pointed, and the dog went at him; is

21  that fair to say?

22  A.   No, sir.  That's not fair to say.

23  Q.   Okay.  So, it's your testimony that in the video, it's not

24  your belief that the Agent Carpenter pointed and the dog went

25  at Mr. Bundy?

Rand Stover - Cross

1    A.    To my knowledge, the dog was never -- when you say

2    deployed, the dog was never released from the handler and the

3    dog was never off leash.  So --

4    Q.    Okay.

5    A.    -- for me that does not mean deploy.

6    Q.    Okay.  Well, for a layman such as myself, I apologize.

7    You would agree that at some point in time, Carpenter put his

8    hand in a forward position and pointed towards Mr. Bundy; you

9    would agree with that; correct?

10   A.    After the -- after the dog was kicked in the head, yes.

11   Q.    Okay.  Can we rewind that back to the beginning?

12         (Exhibit 5006-F being played.)

13   Q.    Sir, it's your testimony that Mr. Bundy kicked the dog in

14   the head prior to the dog going at him.  That's your testimony?

15   A.    Can you rewind it again, please?

16         (Exhibit 5006-F being played.)

17   Q.    Okay.  Bring it back about three seconds, Brian, and play

18   it.

19         (Exhibit 5006-F being played.)

20   Q.    So, is that your testimony?

21   A.    No, sir.

22   Q.    Okay.

23   A.    In viewing it again, it appears that Mr. Carpenter pointed

24   at Ammon Bundy before the kick happened.

25   Q.    Okay.  And before the dog went towards Mr. Bundy, was

Rand Stover - Cross

1  there ever a point in time in which you saw Mr. Bundy grab any

2  of the BLM officers?

3          MR. MYHRE:  Objection, Your Honor.  Relevance.  At

4  this point, we are well beyond what that video was offered for,

5  which was to assess his or examine his threat assessment of

6  that area.

7          THE COURT:  I agree.  I don't know what the relevance

8  is of this.

9  BY MR. MARCHESE:

10 Q.   Okay.  And no one was armed, to your knowledge, in this

11 video; correct?  Other than the BLM agents?

12 A.   As far as -- are you asking about other than the law

13 enforcement officers?

14 Q.   Other than law enforcement.  Correct?

15 A.   To my knowledge, no.  That's correct.

16 Q.   Now, I want to turn your attention to April 11th, 2014, at

17 approximately 18:00 hours.  You had made the statement, on

18 direct examination, and I also believe there's some

19 memorialized reports in reference to this, that you were part

20 of a meeting discussing what the future of this operation would

21 be; the Bundy cattle roundup.  Do you remember that particular

22 meeting?

23 A.   Yes, sir.  If you are referring to the conference call,

24 yes, sir.

25 Q.   Correct.  And on that particular conference call, Dan Love

Rand Stover - Cross

1  had made the decision to basically -- to shut down the

2  operation based on the totality of the circumstances; is that

3  fair to say?

4  A.   Yes.

5  Q.   Okay.  And then later on that night, on the 11th,

6  April 11th of 2014, you had had some testimony about the ICP,

7  and there being an increased security risk at that time.  Do

8  you remember that?

9  A.   Yes.

10 Q.   And that was based on some intelligence that you had

11 received from various sources in the operation; is that fair to

12 say?

13 A.   Yes.

14 Q.   Okay.  And as a result of that, you -- you made the

15 decision to increase security at the ICP; correct?

16 A.   Yes.  In conjunction with the unified command staff, yes.

17 Q.   And as a result, some officers were forced to work some

18 additional hours; correct?

19 A.   Yes.

20 Q.   Working on limited sleep; correct?

21 A.   Yes.

22 Q.   Not their normal course of duty; correct?

23 A.   Not their scheduled hours for that operation.  Some of the

24 officers.

25 Q.   Okay.  Some of the officers weren't getting the normal

Rand Stover - Cross

1    breaks that they would typically get; correct?

2    A.    That's correct.

3    Q.    They didn't have an opportunity to go and sit down and

4    have a meal or anything like that; correct?

5    A.    That's correct.  Some of the officers did not have that

6    opportunity.

7    Q.    Okay.  As a matter of fact, some of the officers, they

8    were lucky only to get a taco truck that at some point in time

9    came and drove up to the area and fed them; correct?

10   A.    That's correct, yes.

11   Q.    All right.  And isn't it true, though, that nothing really

12   happened that night?  There was no attack on the ICP or

13   anything along those lines; correct?

14   A.    There was no attack on the ICP.

15   Q.    So the intelligence that you had received was incorrect,

16   for lack of a better term?

17   A.    I don't know.  What do you mean by "incorrect"?

18   Q.    Well, you increased security; correct?

19   A.    Yes.

20   Q.    And that was based on thoughts that there would be an

21   attack on the -- on the compound; correct?

22   A.    A potential.

23   Q.    Potential.  But there was no attack on the compound;

24   correct?

25   A.    Not that -- no.

Rand Stover - Cross

1    Q.   Okay.  Turning your attention to April 12th, 2014, at

2    approximately 9:00 a.m., it was your testimony that there was

3    some sort of a rally or a speech at the Bundy residence;

4    correct?

5    A.   Not at the Bundy residence.  No, sir.

6    Q.   Okay.  Well, it was in the staging area near the Bundy

7    residence; correct?

8    A.   Off of Highway 170 just north of the bridge.

9    Q.   Correct.  And that's not too far from the Bundy residence;

10   correct?

11   A.   Approximately one and a half -- a little over one and half

12   miles.

13   Q.   And at that particular rally, at that time, Sheriff Doug

14   Gillespie came in; correct?

15   A.   After he was at the rally, yes.

16   Q.   And he came and met with you?

17   A.   He wasn't there to meet with me specifically, but I sat in

18   on the meeting, yes.

19   Q.   Okay.  You were there.  You saw him; correct?

20   A.   For the first part of the meeting, yes.

21   Q.   At some point in time, did it ever come to your knowledge

22   that the sheriff had made the comment that the BLM was ceasing

23   their operations at that rally?  Did that ever come to your

24   knowledge?

25   A.   I don't -- I don't recall that.

Rand Stover - Cross

1   Q.   Okay.  In addition, you also had mentioned a press release

2   in reference to the BLM ceasing their operations.  Do you

3   remember that on direct examination?

4   A.   Yes, there was a press release at some point in time.

5   Yes.

6   Q.   Do you know when that some point in time was?

7   A.   I don't recall, sir.  I'm sorry.

8   Q.   Do you have any idea?  Was it -- let's put it this way.

9   Was it prior to the April 12th, 2014, 9:00 a.m. stage event to

10   your knowledge?

11   A.   I don't believe -- to the best of my knowledge, that press

12   release had not come out at that point.

13          MR. MARCHESE:  Okay.  No further questions.

14          THE COURT:  Mr. Leventhal?  Mr. Engel?  Would you

15   like to cross?

16          MR. LEVENTHAL:  Mr. Engel would, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. ENGEL:

19   Q.   Good afternoon, Agent Stover.

20   A.   Good afternoon, sir.

21   Q.   Appreciate your time.  So, during the course of this

22   operation, you have stated that you were the assistant

23   underneath Dan Love; correct?

24   A.   My job title was the Operations Section Chief, yes.  And

25   so Dan would have been an immediate supervisor.

Rand Stover - Cross

1    Q.   He was your immediate supervisor, so basically everybody

2    else at out there would have been subordinate to you and Dan?

3    A.   No, sir.  Not necessarily.

4    Q.   Not necessarily.  Just the BLM agents?

5    A.   That's a difficult question to answer because of the

6    unified command structure.

7    Q.   Would you say that you were -- had under your authority

8    most of the BLM law enforcement officers?

9    A.   A majority, yes.

10   Q.   Okay.  Thank you.  Let's go to the Ammon Bundy video which

11   is 5006-E, I think.  Yes.  Correct, Brian, please.

12        (Exhibit 5006-E being played.)

13   Q.   We can stop right there.  During this confrontation, were

14   any of your officers injured that you are aware of?

15   A.   Not to my recollection, no.

16   Q.   Do you feel that the tasers were an appropriate use of

17   force?

18   A.   Sir, I can't answer that, because I -- I haven't -- still

19   to this day have not seen all the relevant video and

20   circumstances that were surrounding this particular event.

21   Q.   An appropriate use of force would not have been bringing

22   out any lethal weapons though; would you agree?

23             MR. MYHRE:  Objection.  Relevance, Your Honor.

24             THE COURT:  Mr. Engel, what's the relevance?

25

Rand Stover - Cross

1  BY MR. ENGEL:

2  Q.   To the best of your knowledge, none of the protesters were

3  armed; correct?

4  A.   In this --

5  Q.   In this the particular video.

6  A.   Yes, sir.  That's correct.

7  Q.   Can we play the video up to one minute and 53 seconds,

8  please.

9       (Exhibit 5006-E being played.)

10  Q.   One more second, please.  One more second.

11       (Exhibit 5006-E being played.)

12  Q.   Agent Stover, can you identify what type of weapon that

13  gentleman is carrying?

14  A.   That appears to be one of our agency-issued Colt AR15

15  rifles.

16  Q.   Thank you, sir.  You've stated that there was

17  approximately 134 agents on this operation; is that correct?

18  A.   That sounds about right, yes.

19  Q.   And you also stated that you felt that the threat went up

20  due to the protest at the front of the ICP when the cowboys

21  were riding their horses; correct?

22       MR. MYHRE:  Objection.  Misstates the evidence, Your

23  Honor.  There is no evidence of a protest.

24       THE COURT:  Rephrase your question, please.

25

Rand Stover - Cross

1   BY MR. ENGEL:

2   Q.   Did you feel that the threat went -- the threat rose when

3   the horse -- Cliven and his sons were riding horses in front of

4   the ICP?

5   A.   Are you referring to March 28th?

6   Q.   Correct.

7   A.   Yes.  Yes, I did.

8   Q.   Can we have -- can we have -- let's see.  I apologize.

9          During your threat assessment, would it be safe to

10  say that you did a background check on Cliven and his sons to

11  see if they had any criminal history?

12         MR. MYHRE:  Objection.  Relevance, Your Honor.

13         THE COURT:  What's the relevance, Mr. Engel?

14         MR. ENGEL:  During a threat assessment, if you are

15  going to assess folks, you would think you want to know if they

16  have a violent past.

17         THE COURT:  Sounds like you are getting into

18  inadmissible evidence.

19         MR. ENGEL:  Okay.

20         THE COURT:  Move on.

21  BY MR. ENGEL:

22  Q.   During any of your threat assessments, did you discover

23  that any of the Bundys had a violent past?

24         MR. MYHRE:  Objection, Your Honor.  Relevance.

25         MR. ENGEL:  Same thing?  Okay.

Rand Stover - Cross

1          THE COURT:  Same problem.

2     BY MR. ENGEL:

3     Q.   So, your agents, you stated, wore camouflage during or

4     some of your agents wore camouflage during this operation?

5     A.   Some of them did, yes.

6     Q.   And you stated the reason that you didn't want to affect

7     the cattle in some way?

8     A.   Yes.  In a sense, yes.  So the inner ring of security,

9     those officers wore camouflage clothing.

10    Q.   Okay.  Did the contract cowboys wear camouflaged clothing?

11    A.   Not to my knowledge, no.

12    Q.   Were any of the contracted cowboys injured by any of the

13    cattle to the best of your knowledge?

14    A.   To the best of my knowledge, no.

15    Q.   You also stated that you guys did everything you could to

16    protect the care and well-being of the cattle; is that correct?

17    A.   That was -- that was part of the responsibility of the

18    contractors, yes.  And some civilian BLM employees that were

19    working on the operation.

20    Q.   Were you aware that two bulls were killed during this

21    operation?

22    A.   Yes.

23    Q.   Were you aware that approximately 27 more cows were killed

24    during this operation?

25          MR. MYHRE:  Objection.  Relevance, Your Honor.

Rand Stover - Cross

1          THE COURT:  Relevance, Mr. Engel, or do you want to

2    withdraw the question?

3          MR. ENGEL:  Withdraw the question, please.

4          THE COURT:  All right.

5    BY MR. ENGEL:

6    Q.   Were you aware that any cattle were dying during the

7    course of this operation?

8          MR. MYHRE:  Objection.  Relevance, Your Honor.

9          MR. ENGEL:  Care and well-being, Your Honor.  Were

10   they being cared for and their well-being taken care of during

11   the course of this operation or were they dying?  And I would

12   like to know if the contract cowboys knew it or if the BLM knew

13   it.

14         THE COURT:  What would be the relevance of that?

15         MR. ENGEL:  These cattle were now in the property of

16   BLM, and they are being rounded up and supposedly cared for.

17   And it's relevant in that the protesters had heard that it

18   possibly could be cattle being killed.  Relevant in that some

19   people may have came there because they heard that.

20         THE COURT:  All right.  I will allow it.

21   BY MR. ENGEL:

22   Q.   Agent Stover, were you aware of any cattle dying during

23   the course of this cattle roundup?

24   A.   Yes.

25   Q.   In what way were they dying?

Rand Stover - Cross

1    A.    I was aware of some cattle being euthanized and some

2    cattle being put down by the contractors in the field.

3    Q.    You stated that none of the contractors had been injured

4    by any of the cattle; is that correct?

5    A.    To the best of my knowledge, that's correct.

6    Q.    And none of the BLM agents had been injured by any of the

7    cattle; is that correct?

8    A.    To the best of my knowledge, that's correct.

9    Q.    But you have stated you have now euthanized two of the

10   bulls; isn't that correct?

11            MR. MYHRE:   Objection, Your Honor.   Relevance.

12            THE COURT:   I will allow it, and he may answer the

13   question.

14   BY MR. ENGEL:

15   Q.    So once again, the question remains.   Your agents or those

16   of the contractors euthanized two of the bulls during the

17   course of this impoundment; correct?

18   A.    Two of the -- two bulls were euthanized by the contractors

19   to the best of my knowledge.

20   Q.    To the best of your knowledge, they hadn't injured

21   anybody; is that correct?

22   A.    That's correct.

23   Q.    In what way did you euthanize these two bulls?

24   A.    I did not euthanize them, sir.

25   Q.    In which way -- in what manner did the contract cowboys or

Rand Stover - Cross

1   the BLM euthanize these bulls?

2           MR. MYHRE:  We would ask foundation, Your Honor, if

3   he has first-hand knowledge.

4           THE COURT:  Yeah, it sounds like you are fishing at

5   this point, not that you have a good faith belief that there's

6   some information out there that you are trying to corroborate

7   that someone else knew.

8           MR. ENGEL:  People on the ground, the protesters were

9   under the impression at the time that cattle were being shot.

10          MR. MYHRE:  There is no evidence of that, Your Honor,

11  and he's testifying.

12          THE COURT:  All right.  Just move along.  I gave you

13  some leeway.

14          MR. ENGEL:  Okay.

15  Q.   Let's go to Exhibit No. 257, please, Brian.

16          You stated that your officers were in what's called a

17  stack formation here; correct?

18  A.   Sir, those are not BLM officers.  But, yes, I did say a

19  stack formation.

20  Q.   I'm sorry.  Excuse me.  These Park Service officers were

21  in a stack formation?

22  A.   Yes, sir.

23  Q.   In your law enforcement experience, a stack formation is

24  used for offensive maneuvers; isn't that correct?

25  A.   No, sir, not necessarily.

Rand Stover - Cross

1    Q.   Are they used by law enforcement agencies all over the

2    country?

3    A.   In -- in the law enforcement agencies that I have been

4    employed by, yes.  Both agencies have used this formation.

5    Q.   They use the stack formation just before they go into a

6    residence; isn't that correct?

7    A.   On occasion, yes.

8    Q.   And they use this formation before they clear rooms in a

9    hostage-type situation; isn't that correct?

10   A.   In certain -- yes.

11   Q.   So you would say that this is more of an offensive

12   formation than a defensive formation; is that correct?

13   A.   As I said before, not necessarily.  I wouldn't -- I

14   wouldn't say that it's always an offensive formation.

15   Q.   In what way -- scratch that.

16        So they use this formation prior to going in, in an

17   offensive manner toward -- into a hostile environment; is that

18   correct?

19        MR. MYHRE:  Objection.  Foundation, Your Honor.

20   There's just --

21        THE COURT:  Mr. Engel, foundation?

22   BY MR. ENGEL:

23   Q.   You stated that they use this formation in the execution

24   of a search warrant; isn't that correct?

25   A.   Yes, sometimes.

Rand Stover - Cross

1    Q.   And you also stated when they are entering a building;

2    isn't that correct?

3    A.   Yes, sometimes.

4    Q.   Entering -- entering a building is not a defensive

5    formation --

6            MR. MYHRE:   Objection, Your Honor.   This has been

7    asked and answered and gone over with respect to --

8            MR. ENGEL:   Okay.

9            MR. MYHRE:   -- buildings and search warrants.

10           THE COURT:   All right.   Sustained.

11   BY MR. ENGEL:

12   Q.   Let's move on to Exhibit No. 359 Government.   So this is a

13   picture from your perspective; wouldn't that be fair to say?

14   A.   I -- it's fair to say I am in the picture.   Yes, sir.

15   Q.   So, would it be fair to say that the crowd stayed on their

16   side of the fence for the duration of this protest; isn't that

17   correct?

18           MR. MYHRE:   Objection, Your Honor.   There is no

19   evidence of protest.

20           THE COURT:   Do you want to restate your question?

21           MR. ENGEL:   Yes, ma'am.

22   Q.   During the course of April 12th, the crowd stayed on the

23   opposite side of the fence; isn't that correct?

24   A.   The crowd in general opposed to, yes, except for the

25   individuals I previously mentioned.

Rand Stover - Cross

1    Q.    Okay.  The only time one of the cowboys or any other folks

2    on the other side of the fence came across the fence was when

3    Dan Love asked them to come across the fence; is that correct?

4    A.    Yes.

5    Q.    So at no time anybody attempted to breach or climb your

6    fence prior to Dan Love's request to come across the fence, to

7    the best of your knowledge?

8    A.    To the best of my knowledge.  Correct.

9    Q.    You stated that there was folks up on the bridge above you

10   guys; is that correct?

11   A.    On the interstate overpass, yes, sir.

12   Q.    You stated that they were yelling at you guys; is that

13   correct?

14   A.    Yes, that's correct.

15   Q.    You never stated anywhere that I have been able to find

16   that anybody threw anything at you guys from on top of the

17   bridge; is that correct?

18   A.    No, I have not stated that in my testimony.  No, sir.

19   Q.    To the best of your knowledge, nobody threw anything at

20   your officers; is that correct?

21   A.    Can you define what you mean by "at" our officers?

22   Q.    Did anybody -- have you or any of your officers ever

23   stated in any of your reports that you have available that

24   anything was thrown, a rock, a brick or anything at your

25   officers from that overpass?

Rand Stover - Cross

1    A.   To -- you are referring to reports.  To the reports that

2    I've reviewed, I don't recall that being mentioned in a report.

3    Q.   So to the best of your knowledge, nobody threw anything at

4    your officers from that overpass; is that correct?

5    A.   No, sir.  That -- that's not what I said.  I said in the

6    reports that I have reviewed, it's not mentioned.

7    Q.   Okay.  You stated that Sheriff Roberts arrived on the

8    scene; is that correct?  At the gate at post two?

9    A.   He -- he wasn't the sheriff.  But yeah.  If you are

10   referring to Tom Roberts, yes, sir.

11   Q.   Okay.  Yeah, that's who I'm referring to.  At the time

12   when he arrived, do you recall if the agents at the dark Chevy

13   that were aiming their rifles were aiming their rifles at that

14   time?

15   A.   I don't recall that, sir.

16   Q.   You stated that you heard that Tom Roberts said "You're

17   good.  You can move back."  Is that correct?

18   A.   Yes, sir.  Something to that effect, yes.

19   Q.   Do you recall what time that was?

20   A.   No, sir.  I don't recall exactly.

21   Q.   It's correct that Dan Love went up to the gate about

22   12:16; is that correct?

23   A.   That sounds about right.  Yes, sir.

24   Q.   And the Metro officers arrived approximately 12:22;

25   wouldn't you say?

Rand Stover - Cross

1    A.    I -- I don't recall the exact time, but that --

2    Q.    Okay.  At post one, the sheriff arrived or Tom Roberts

3    arrived approximately 11:20 in the morning; is that correct?

4    A.    Sir, that -- that I do not know.

5    Q.    Okay.  Do you recall Agent Love asking for help from

6    Metro?

7    A.    I recall several officers asking for help from Metro.

8    Q.    Do you recall Agent Love asking for assistance on the

9    evening of the 11th from Las Vegas Metro?

10   A.    I don't recall that specifically, no.

11   Q.    Okay.  So you were never at post one on the morning of the

12   12th; correct?

13   A.    That's correct.  I was not at post one.

14   Q.    You stated that when Tom Roberts arrived, the crowd was

15   not agitated; correct?

16   A.    I believe that's what I -- yeah, that's what I said, I

17   believe.

18   Q.    Would you say it's safe to state that the crowd was only

19   agitated towards your officers and not Metro officers?

20   A.    Yes.

21   Q.    But you have also stated they did not throw anything at

22   your officers from the overpass or never made an attempt to

23   even jump up over the gate; is that correct?

24          MR. MYHRE:  Objection, Your Honor.  Mischaracterizes

25   his testimony.

Rand Stover - Cross

1          THE COURT:  Ask one question at a time, Mr. Engel.

2          MR. ENGEL:  Okay.  Sorry.

3   Q.   After Dave Bundy came over the gate at Agent Love's

4   request, you stated that the crowd calmed down at that point;

5   is that correct?

6   A.   Yes.

7   Q.   You stated also that they were not making aggressive moves

8   at that point; is that correct?

9   A.   Yes.

10  Q.   I've -- you also have not stated that they ever made

11  aggressive moves; is that correct?

12  A.   I'd have to read back the entire testimony.  But yes,

13  that's fairly accurate.  As far as aggressive moves to climb

14  over the -- the fence, if that's what you are asking.

15  Q.   So aggressive moves, they had not thrown anything at you

16  guys from the southbound lanes; correct?

17  A.   Well, sir, you asked me about reports that I had reviewed.

18  Q.   In all of your reports, none of the guys report about

19  anything being thrown from the southbound lane; isn't that

20  correct?

21  A.   Not the written reports that I reviewed, no.

22  Q.   Okay.  So, when you say -- you said nobody is making

23  aggressive moves at that point after Tom Roberts arrives, so

24  aggressive moves meaning nobody is throwing anything at you

25  from the southbound lane, nobody has tried to come over the

Rand Stover - Cross

1   gate; isn't that correct?

2   A.   From the time Tom Roberts arrived --

3   Q.   Uh-huh.

4   A.   -- at the fence line, that's correct.  From that time

5   point forward, that's correct.

6   Q.   From the time that you arrived, did you see anybody making

7   any aggressive moves that were in the wash?

8   A.   What do you mean by "aggressive"?

9   Q.   Did they try to climb the gate?

10  A.   No.

11  Q.   They did not.  So from the time that you arrived until Tom

12  Roberts got there, basically, there was no aggressive moves;

13  isn't that correct?

14  A.   If you're specifically talking about climbing over the

15  gate, you are -- that's correct.

16  Q.   Okay.  Okay.  Let's go to another subject here.  No, let's

17  stick on that one.

18       From the time that you arrived until you went back to

19  the ICP, you did not see anybody point a rifle at you directly;

20  isn't that correct?

21  A.   Correct.  Not -- not directly at me.

22  Q.   Did you see anybody point a weapon directly at one of your

23  officers?

24  A.   No.

25  Q.   You did not.

Rand Stover - Cross

1    A.   Not at that time.

2    Q.   Did you feel that you had enough officers -- scratch that.

3         You stated you had 134 officers on this impoundment;

4    is that correct?

5    A.   Approximately, assigned to the entire operation.

6    Q.   Okay.  I'm going to look for a -- can we go to -- I

7    apologize.  I am not quite that well put together here.

8    Exhibit 347, please.

9         Can you give me a count of how many vehicles are in

10   that circle?  Would you please, officer?

11   A.   Looks to be approximately 37.

12   Q.   37 vehicles, and you have testified that each one of --

13   those aren't all your vehicles, but the majority of them seem

14   to be; wouldn't you say?

15   A.   I can't tell from this screenshot.

16   Q.   Okay.  You stated though in your testimony that each one

17   of your BLM agents carries four weapons; isn't that correct?

18   A.   No, sir.  Not necessarily that they carry that, no.

19   Q.   Well, did you state that most of your law enforcement

20   officers carry an AR15?

21   A.   They -- most of the officers are issued an AR15, yes.

22   Q.   Okay.  So we have 37 vehicles there.  If the majority of

23   them are BLM vehicles, that would put approximately 37 AR15s

24   among those vehicles; is that correct?

25            MR. MYHRE:  Objection, Your Honor.  That

Rand Stover - Cross

1    misstatements the testimony.  I believe his testimony was he

2    didn't know how many vehicles.  He couldn't tell from this view

3    what vehicles were BLM or not BLM.

4              THE COURT:  Restate your question.

5    BY MR. ENGEL:

6    Q.   You stated that most BLM officers carry an AR15; correct?

7    A.   That they are issued an AR15, yes.

8    Q.   And you stated also that you had 134 agents on this

9    impound; correct?

10   A.   Approximately total law enforcement officers.

11   Q.   At -- that would be available at any one time during the

12   12th?

13   A.   Not necessarily.  Some of those officers were -- what time

14   on the 12th?

15   Q.   The morning.  12th, noon.

16   A.   No, sir.  Because not all the officers were there at noon

17   on the 12th.

18   Q.   Okay.  Can you pan up again, please?  So this is at 11:30

19   in the morning on the 12th.  I have done an estimation of

20   vehicles here, and it seems to be about 60 vehicles.  Would

21   that appear to be approximate to you, Agent Stover?

22   A.   I trust that you counted them.  Sure.

23   Q.   Okay.  So here we have 37 law enforcement vehicles.  Here

24   we have another one, two, three, four, five, six, seven, eight,

25   another 12.  So we are at 50 law enforcement vehicles to

Rand Stover - Cross

1    approximately 60 vehicles in the parking area here.  Does that

2    sound about right to you?

3    A.    Yes.  Based on the figures that you have stated, yes.

4    Q.    Okay.  Agent Stover, do you know what time the protesters

5    started to arrive at the parking area?

6    A.    Sir, I'd have to -- I don't know exactly.  I'd have to go

7    back and look at the --

8    Q.    Okay.  On the 11th, is it true that you guys had ended

9    your impoundment operation?

10   A.    At what time on the 11th, sir?

11   Q.    In the evening.

12   A.    At the conclusion of the conference call, the decision was

13   made to conclude the impoundment operation.

14   Q.    Okay.  So, we could say that by dark, it had been

15   concluded?

16   A.    It was concluded in the fact that no more cattle were

17   going to be gathered.

18   Q.    Okay.  And that the impound operation being over with,

19   then the area would once again be opened up for recreational

20   use; would that be correct to say?

21   A.    Not immediately, no.  That would not be correct.

22   Q.    So you -- the operation is over, but almost 600,000 acres

23   are still closed to the public?

24   A.    The closure order had not been rescinded at that point on

25   the evening of the 11th.

Rand Stover - Cross

1    Q.    So the people could not access their desert; is that

2    correct?

3    A.    No, sir.  That's not true.

4    Q.    Okay.  But you just stated that they could not access

5    their desert due to the impoundment hadn't been lifted, but you

6    stated it had been lifted on the evening before?

7    A.    No, sir.  I said the closure order had not been rescinded

8    on that evening.  And if you will recall in my previous

9    testimony, we talked about the overall area of the closure

10   order.  The closure order was going to be enforced and planned

11   to be enforced in the areas that we were operating on any

12   particular day.

13   Q.    Did you guys remove the First Amendment area on the 11th?

14   A.    I don't recall exactly the day and time it was removed.

15   Q.    But you stated it was removed on the 12th; is that

16   correct?

17   A.    It was -- I know it was gone.  They were gone on the 12th.

18   Q.    So the First Amendment area was gone on the 12th, but you

19   are not sure if it was gone on the 11th; is that correct?

20   A.    That's correct.

21   Q.    So by the First Amendment area being gone, then the people

22   would be able to have their First Amendment rights back to

23   utilize their rights once again?

24              MR. MYHRE:  Objection.  Argumentative, Your Honor.

25              THE COURT:  Sustained.

Rand Stover - Cross

1    BY MR. ENGEL:

2    Q.    During the course of this impoundment, the people that

3    were protesting were only allowed to protest inside the First

4    Amendment Zone; correct?

5    A.    No, sir.  That's not true.

6    Q.    When there was -- so the people that were protesting

7    were -- would they be able to come out in the exact location

8    that you were doing your impoundment and protest there?

9    A.    No.

10   Q.    No.  So it's not true that they had to stay in the First

11   Amendment Zone to protest, but they couldn't come out to where

12   you guys were conducting the impoundment; is that correct?

13   A.    That's correct.  The government never -- the BLM, or

14   anybody else that I know from the government, never told the

15   general public that if they wanted to voice their opinions

16   about the operation or to protest, that they had to go to those

17   two areas.

18   Q.    Okay.  So they were then allowed to protest the

19   impoundment operations; is that correct?

20   A.    When you say "they," who and when?

21   Q.    Whoever wanted to protest while you guys were impounding

22   the cattle.

23   A.    If someone wanted to protest, those two areas were offered

24   or they could go to another public domain location.  They could

25   have protested in Las Vegas.  They could have protested in

Rand Stover - Cross

1   Mesquite, in the town of Bunkerville.

2   Q.   But they could have come to the general location where you

3   guys were conducting operations and exercise their First

4   Amendment rights?

5   A.   Correct.  If it was outside the area that was closed, and

6   outside the immediate area that we were operating in, and it

7   was on public land or some other public domain, yes.

8   Q.   So the First Amendment rights were not allowed in direct

9   proximity to where you were?

10  A.   Which rights are you referring to?

11  Q.   The freedom of speech, the freedom of press, the freedom

12  to redress our grievances and the freedom to protest?

13  A.    In the immediate area that we were operating on, in any

14  given day, when that area was closed, no.  That was not an

15  appropriate location to exercise their First Amendment rights.

16  Q.   Sir, did you take a look at the constitution?

17              MR. MYHRE:  Objection, Your Honor.  Argumentative.

18              THE COURT:  Sustained.

19  BY MR. ENGEL:

20  Q.   So the First Amendment area was set up for -- was the

21  First Amendment set up for -- I am struggling here.  I

22  apologize.

23          So the First Amendment area was only set up for

24  basically looks?  We weren't required to go there to protest;

25  is that correct?

Rand Stover - Cross

1   A.   No, sir.  That's not what I said.

2          MR. ENGEL:  Court's indulgence, Your Honor.

3       (Pause in the proceedings.)

4   BY MR. ENGEL:

5   Q.   Officer Stover, I appreciate your time.  Do you recall you

6   and I ever having a conversation on the 12th?

7   A.   No, sir.  I do not.

8          MR. ENGEL:  Thank you, sir.

9          THE WITNESS:  You are welcome.  Thank you.

10         THE COURT:  Mr. Leventhal or Mr. Perez.

11                    CROSS-EXAMINATION

12  BY MR. PEREZ:

13  Q.   Good afternoon, Agent Stover.  My name is Shawn Perez.  I

14  represent Ricky Lovelien.

15  A.   Good afternoon, sir.

16  Q.   I only have a few questions for you.  The closure area, I

17  believe yesterday you testified that that was essentially for

18  safety in moving the cattle; correct?

19  A.   Correct.

20  Q.   And that that's primarily herding, not necessarily driving

21  the trucks?

22  A.   No, sir.  That's not -- that's not accurate.

23  Q.   So it would be both?

24  A.   Yes.

25  Q.   And in addition to that, it was safety of the agents that

Rand Stover - Cross

1    were in the little encampment there?  I believe you called it

2    the command post?

3    A.   Yes, the incident command post.  Yes, that was included in

4    the public closure order.

5    Q.   Okay.  And then so as far as the area, that -- that these

6    safety areas, they did not include, like, I-15?

7    A.   The physical roadbed of Interstate 15?

8    Q.   Right.

9    A.   No, sir.

10   Q.   And they did not include the First Amendment area; the

11   staging area?

12   A.   No, sir.  They did not.

13   Q.   Okay.  And they didn't include the Bundy Ranch?

14   A.   I should clarify what -- your previous question, in the

15   closure order, those two First Amendment areas that were talked

16   about, they -- those locations were included in the closure

17   order.  They were described in the closure order.

18   Q.   But described, but someone could be inside them and

19   wouldn't be in violation of the closure?

20   A.   Yes, sir.  That's correct.

21   Q.   Okay.  And so someone standing on I-15 wouldn't be in

22   violation of the order that -- the closure order, for lack of

23   better description?

24   A.   That's correct.

25   Q.   Okay.  And somebody at the Bundy Ranch certainly wouldn't

Rand Stover - Cross

1    be in violation of the closure order?

2    A.   No, sir.  Not on Mr. Bundy's private property, no, sir.

3    Q.   Okay.  And now with respect to the threat assessment, when

4    you do an assessment, you identify individuals, I'm assuming?

5    A.   Yes, sir.  Sometimes.

6    Q.   Locations?

7    A.   Yes, sometimes.

8    Q.   Terrain?

9    A.   Yes.

10   Q.   Okay.  And based on where certain individuals might be

11   standing, that would change your threat level?

12   A.   If they were engaged in -- depending on where they were,

13   if they were engaged in activity that violated the closure

14   order, per se, in this example.

15   Q.   Well, we've already established the closure order didn't

16   involve the I-15; correct?

17   A.   Correct.  Yes, sir.

18   Q.   Presumably those bridges were part of the I-15?

19   A.   Yes, sir.

20   Q.   Okay.  And there's a southbound bridge and a northbound

21   bridge; correct?

22   A.   That's correct.  Yes, sir.

23   Q.   Now, in your determination, did you make an assessment

24   based on if there were people on the northbound bridge as

25   opposed to southbound bridge?

Rand Stover - Cross

1    A.   Yes, I personally saw people on both the northbound and

2    the southbound overpass.

3    Q.   Which would create the greater threat?

4    A.   For me, it depended on the -- it would depend on the

5    activity or behavior of the particular person.

6    Q.   So, it's not just the location then.  It's the number of

7    people on that -- well, strike that.

8            Let's go back to the bridges.  At various times

9    during the day, there were different numbers of people on each

10   bridge; correct?

11   A.   Yes.  On the -- on the 12th, yes.  That's correct.

12   Q.   On the 12th.  Now, when did you actually make your

13   assessment of which bridge might have created a greater threat?

14   Was that prior to the 12th?

15   A.   No.  It was -- it was on the -- on the 12th.

16   Q.   Okay.  Now, which bridge was closest to the BLM?

17   A.   The bridge closest to the incident command post would have

18   been the southbound Interstate 15 overpass.

19   Q.   Okay.  And did you observe any individuals brandishing

20   weapons on the southbound bridge?

21   A.   To my recollection, not on -- I personally did not witness

22   any on the southbound bridge.

23   Q.   Northbound bridge?

24   A.   I did, at one point, see two individuals on the northbound

25   bridge that had what appeared to be rifles slung over their

Rand Stover - Cross

1    shoulder.

2    Q.   Okay.  And now from a tactical advantage standpoint, which

3    bridge -- well, strike that.

4             If I wanted to be on a bridge, and I wanted a

5    tactical advantage over the BLM, which bridge would I have been

6    on?

7    A.   If you are -- if you are asking me for --

8    Q.   Yeah.  I mean, if I was going to be aggressive to the BLM,

9    would I be on the northbound bridge or would I be on the

10   southbound bridge?

11   A.   In general, you would have preferred to be on the

12   southbound bridge.

13             MR. PEREZ:  Nothing further.

14             THE COURT:  Mr. Jackson?  Mr. Leventhal?

15                    CROSS-EXAMINATION

16             MR. JACKSON:  Just a few questions.

17   Q.   How are you doing, Officer?

18   A.   I am doing okay, sir.  How are you?

19   Q.   I represent Mr. Burleson.  Did you know him before

20   April 12th of 2014?

21   A.   No, sir.

22   Q.   Okay.  There's been some talk about whether or not there

23   was a protest on April 12th of 2014.  Do you believe there was

24   a protest going on out in this area that we've been discussing

25   on April 12th, 2014?

Rand Stover - Cross

1   A.   Are you referring to the wash area and --

2   Q.   Yes.

3   A.   No, sir.  I -- I would not characterize that as a protest.

4   Q.   Have you ever been to a protest?

5   A.   Yes, sir.

6   Q.   When was that?

7   A.   I have experienced many protests in my experience working

8   with the Secret Service and with BLM.

9   Q.   So you have been at previous protests as a BLM agent and

10  on BLM land?

11  A.   On -- specifically on BLM land, no, sir.

12  Q.   Okay.  So, does the BLM have policies in place in general

13  against protests on BLM land?  Is there a general policy manual

14  against protests on BLM land?

15  A.   In general, no, sir.

16  Q.   Do they have a definition of what constitutes a -- what

17  they would characterize as a lawful protest or an unlawful

18  protest?

19  A.   In -- are you asking about a particular regulation?

20  Q.   Yes.

21  A.   No, I don't believe that BLM has a documented definition

22  of a lawful protest in a -- in a regulation.

23  Q.   So, they just kind of wing it on a case-by-case basis?

24  A.   No, sir.  I wouldn't say that.

25  Q.   Well, now, who was in charge that day out at -- in that

Rand Stover - Cross

1    area by the wash?  Was it you or was it Agent Love, the SAC?

2    Who was the main man?  Who was the main boss that day?

3    A.   At that particular post two area, it depended on the time

4    frame.

5    Q.   Who was the main person in charge of that whole area?  Was

6    it you or Agent Love?

7    A.   Of the overall operation, it was Agent Love.

8    Q.   Okay.  And he had superiors back in -- that were giving

9    him orders from either Washington, DC, or higher up; is that

10   correct?

11        Who was giving orders to him?  Who was higher up in

12   the chain of command than Agent Love?

13   A.   Our law enforcement director was on scene.

14   Q.   Okay.  And they had made a decision, on April 11th, that

15   basically you guys should pack up and leave; isn't that

16   correct?

17   A.   No, sir.  I wouldn't say pack up and leave.

18   Q.   Well, basically, that on April 11th, wasn't there a

19   decision made that the cattle were to be released, and that you

20   were not going to maintain your position there?

21   A.   No.  No, sir.

22   Q.   Because of some threat assessment that had been made?

23   A.   No, sir.  That was not the decision made on the 11th.

24   Q.   What was the decision that was made on the 11th?

25   A.   The decision was made to conclude gather -- conclude the

Rand Stover - Cross

1   part of the operation of gathering the cattle from the area.

2   Q.   So you were going to stop the impoundment; right?  And

3   that decision was made to stop the impoundment on April 11th;

4   isn't that correct?

5   A.   Yes, to stop the impounding of the cattle.

6   Q.   So what was the reason for staying there after you decided

7   you weren't going to do the impoundment, aside from maybe

8   gathering up your stuff, gathering up your computers, gathering

9   up your radios, gathering up your tents, gathering up your

10  outhouses, whatever?  Did you have any other reason to stay?

11  A.   Yes.

12  Q.   Aside from providing safety for your officers, what --

13  once you took care of that, was there any other reason to stay?

14  A.   Yes.

15  Q.   What was that?

16  A.   We still had property there that belonged to contractors.

17  Q.   Okay.

18  A.   We still had cattle there that were the property of the

19  United States Government.

20  Q.   I thought the -- there was an agreement that you weren't

21  going to impound the cattle; is that correct?

22  A.   No, sir.  There was a decision that was made to stop

23  gathering any more trespassing cattle from the land.

24  Q.   I'm confused.  I get confused easily at my age.  If you

25  weren't going to impound the cattle, what was the plan for

Rand Stover - Cross

1   gathering up the cattle?

2            I don't quite understand the difference between the

3   two.  How were you -- how were you going to gather up the

4   cattle?  Were you just hoping they would just follow you back

5   to where you came from?  Just follow you down the road, or were

6   they just going to get in the contractors' trucks on their own?

7   What was going to happen.  I don't quite understand how it was

8   going to work.

9   A.   Well, sir, the decision was made to stop gathering

10  additional cattle on the evening of the 11th.

11  Q.   Well, you already had some -- some gathering --

12           MR. MYHRE:  Your Honor, the witness should be allowed

13  to answer.

14           MR. JACKSON:  I am sorry.  I'm sorry, counsel.  I

15  didn't mean to cut off your witness.

16           THE COURT:  Go ahead, Mr. Stover or Special Agent

17  Stover.  You can finish your sentence.

18           THE WITNESS:  Thank you, Your Honor.  There were

19  already probably 377 cattle that had been impounded, and that

20  were located at the incident command post, and that were still

21  there on the 12th.

22  BY MR. JACKSON:

23  Q.   And you wanted to put those in trucks and haul them away,

24  since you already had them penned up; is that correct?  Or the

25  contractors wanted to haul them away so they could get the

Rand Stover – Cross

1   market price for them; is that correct?

2   A.   Personally, I would -- I wanted to continue that part of

3   the operation and to remove those cattle from the incident

4   command post.

5   Q.   So how long did you plan on staying to accomplish this

6   task?

7   A.   There was no deadline set on the evening of the 11th, sir.

8   Q.   Now, you didn't characterize this as a protest.  What is

9   your definition of a protest?  When people are speaking their

10  mind about something that matters to them, you don't consider

11  that a protest?

12  A.   No, sir.  That's not what I said.

13  Q.   Well, what is your definition of a protest?

14  A.   My definition of a protest is a lawful activity that's

15  where an individual or a group of individuals are exercising

16  their First Amendment rights.

17  Q.   Okay.  Now, so the government, in this case, had an order

18  to not allow any protests within 540,000 acres that the BLM had

19  controlled over; is that correct?

20  A.   There was a closure order in place.

21  Q.   There couldn't be any protests in that 540,000 acres; is

22  that your belief?  Except for the maybe half an acre or

23  2/10ths of an acre that was a First Amendment Zone, or the two

24  First Amendment Zones that were designated by the BLM as First

25  Amendment Zones?

Rand Stover - Cross

1    A.   There was a closure order in place, and that closure order

2    provided for an area of public lands that was closed because

3    the operation.  So you are correct.  No protests were to be

4    allowed in that closure -- within that closure area.

5    Q.   Now, in your -- in your training as a BLM agent, did

6    you -- how long has the BLM been in existence?

7    A.   Since 1946.

8    Q.   In the history of the BLM, do you know at any time that

9    the BLM ever had an order prohibiting Martin Luther King from

10   protesting within a 540,000-acre area, and so it was illegal

11   for him to protest in such a large area?

12   A.    I'm not aware of any such order and -- beyond history.

13   Q.   So no such order that you know existed prohibiting freedom

14   of speech in such a large area, that you know of anywhere in

15   the country, do you?  Aside from this area out by the Gold

16   Butte area?

17   A.   Can you ask that again, please?

18        MR. MYHRE:  Objection.

19   BY MR. JACKSON:

20   Q.   Do you know of any such area larger than this 540,000-acre

21   area that they've designated as not being a free speech area?

22        MR. MYHRE:  Objection, Your Honor.  Argumentative.

23        MR. JACKSON:  I'm just asking him if he knows.

24        MR. MYHRE:  Your Honor, it's the manner in which he's

25   asking.  He's asking about whether there's some other place

Rand Stover - Cross

1  that there's a First Amendment prohibition.  I mean, we are

2  arguing about the -- the law, apparently.

3              THE COURT:  Sustained.

4              MR. JACKSON:  I have no further questions.

5              THE COURT:  Mr. Leventhal?

6                        CROSS-EXAMINATION

7  BY MR. LEVENTHAL:

8  Q.   Good afternoon.

9  A.   Good afternoon, sir.

10 Q.   I'm going to be easy.  I've had a rough afternoon.

11          I want to just ask you a few questions about the

12 video that we watched yesterday with the cowboys.  Do you

13 remember that?

14 A.   Are you referring to the one from the March 28th?

15 Q.   I'm referring to the one that went viral, that was played

16 before the jury, regarding the Bundys with the horses, and the

17 music in the background in front of the BLM trucks coming in.

18 A.   Yes, sir.

19 Q.   Okay.  You refer to that as the March 28th video?

20 A.   Yes, that happened on -- that event happened on

21 March 28th.

22 Q.   Very good.  And you indicated that you found that on -- I

23 think you said YouTube; right?

24 A.   That's correct.

25 Q.   And a lot of that stuff in there that was sort of written

Rand Stover - Cross

1   on the screen wasn't true; was it?

2   A.    That's correct.

3   Q.    That's correct.  Okay.  As a matter of fact, did you do a

4   lot of research regarding what was going out there?  I think

5   you indicated that you did in order to continue your threat

6   assessment; correct?

7   A.    I did some, and then we also had a special agent assigned

8   specifically to do a majority of that type of research.

9   Q.    Okay.  And that wasn't the only thing that went out; was

10  it?

11  A.    No, sir.

12  Q.    There were many videos that went out; correct?

13  A.    Yes.

14  Q.    Some true; some not true; correct?

15  A.    I can't speak to all of them.  But in general, I would say

16  yes.

17  Q.    Okay.  And so you would agree with me that a lot of those

18  videos were designed to sort of tear at hearts of the America

19  people; right?

20          MR. MYHRE:  Objection, Your Honor.  Speculation.

21  BY MR. LEVENTHAL:

22  Q.    Well, let me ask you this.  There's the First Amendment

23  sign up; correct?

24  A.    There were signs at the two locations that we've talked

25  about.

Rand Stover - Cross

1   Q.   And you know that that went viral; correct?

2   A.   Yes.

3   Q.   Okay.  And you also know what else went viral was the BLM

4   agent that tossed the woman to the ground.  You remember that;

5   right?

6   A.   I -- like I testified before, I -- at the time, I had not

7   seen that video personally, but later on became aware of it.

8   Q.   Okay.  And you know it went viral; correct?

9   A.   Yes.

10  Q.   Okay.  And so those videos, sort of that -- I guess if you

11  want to call it, for better words, that propaganda that went

12  out, that was sort of inducing people to come to Bunkerville.

13  Would you say that's true?

14  A.   I would say many of those videos, as I -- I previously

15  characterized it was that they created an online narrative.

16  Q.   Okay.  And that online narrative was designed to appeal to

17  many facets, many different people; correct?

18  A.   In general, yes.  I think you could say that.

19  Q.   You indicated that you -- you had a number of people that

20  you were worried about, including the antigovernment -- and I

21  wrote it down.  Correct me if I am wrong -- animal rights

22  activists.  You said that; correct?

23  A.   Yes.

24  Q.   Okay.  So there might have been a video that appeals to

25  them to come down to Bunkerville; correct?

Rand Stover - Cross

1   A.   There could have been, yes.

2   Q.   Okay.  And then you said the Bundys as well as the family;

3   correct?

4   A.   Correct.

5   Q.   Okay.  And then the people -- the freedom people who were

6   sort of shocked at the First Amendment sign; correct?

7   A.   They -- people that could have viewed that, yes.

8   Q.   Okay.  Did you, as a BLM -- did you ever put out any

9   anything?  Did you ever put a video out or anything out that

10  you recall that said, "Hey, we're closed down here."  Anything

11  like that?

12  A.   No, I did not ever put out a video.

13  Q.   All right.  And do you know if BLM put any of their own

14  videos out to sort of counter what was going out through the

15  Bundy message?

16  A.   Not to my knowledge.  The BLM did not put out any video.

17  Q.   Okay.  Now, you indicated that you were also part of the

18  operation -- operational plan; correct?  You actually wrote the

19  plan?

20  A.   Yes, I wrote some of the plan.

21  Q.   Okay.  Was part of that plan -- in addition to gathering

22  cows, was there a part of it where you were gathering

23  intelligence?

24  A.   Yes, that we had individual special agents specifically

25  assigned to that, yes.

Rand Stover - Cross

1   Q.   And that intelligence gathering would have been for

2   people -- as I guess for lack of a better term -- were militia

3   members; correct?

4   A.   At the -- at the start of the operation?

5   Q.   Correct.  Yes.  Sorry.  I didn't mean to talk over you.

6   In the operational plan --

7   A.   Yes.

8   Q.   -- there would have been a provision where you were also

9   not only there to gather cattle, but you were also there to

10  gather information?

11  A.   Yes.

12  Q.   Okay.  And that information was to, as you put it, the --

13  I guess the antigovernment people?

14  A.   I think the word I used were part of the -- some of the

15  concern was -- I think I used the term antigovernment

16  extremist.

17  Q.   Extremist-type groups.

18  A.   Yes.

19  Q.   Okay.  And this intelligence was important to you; right?

20  A.   Absolutely.

21  Q.   I mean, you wanted to know who was coming in; correct?

22  A.   Yes.

23  Q.   And so you would have had those names as well as you would

24  have had pictures of those people; correct?  As best you could?

25  A.   As best I could, yes.

Rand Stover - Cross

1    Q.   Okay.  So, approximately -- and you don't have to give me
2    names.  But approximately how many were on that list?  Do you
3    remember how many people were on that list?
4    A.   Sir, during -- can you narrow the date down for me,
5    please?
6    Q.   I apologize.  It would have been -- foundationally, it
7    would have been during your -- I guess when you wrote the plan
8    itself, how many names did you have on that list?
9    A.   I would have -- I can't recall off the top of my head.
10   Q.   20?
11   A.   Of which -- which group are you talking about?
12   Q.   This antigovernment group, or the militia group, or the
13   ones that you were referring to just now?
14   A.   I -- I don't remember how many names.
15   Q.   You have no idea?
16   A.   I don't.  I'd have to refer back to the documents.
17   Q.   And as you went throughout, and you indicated that this
18   operational plan was fluid; correct?
19   A.   That's correct.
20   Q.   Okay.  So you would have added to it; correct?
21   A.   Yes.
22   Q.   And you would have added names that now you know, because
23   you had sort of undercover agents within those groups; correct?
24   A.   As the event went on, some of our special agents
25   identified certain people, whether on their own or through

Rand Stover - Cross

1   cooperation with other agencies, and those particular names

2   were documented by one of our special agents.

3   Q.   Okay.  And so those names would have been added to your --

4   I guess your list for backup -- again, I don't want to know

5   names, but they would have been added; correct?

6   A.   Correct.  There was a -- I would equate it to like a

7   running log.

8   Q.   A running log?

9   A.   Like a running log or -- that would -- those names would

10  be have been added to that.

11  Q.   Okay.  You were shown -- well, let me go back.  I just --

12  I'm just rather curious about this.

13          Your training and experience, when you were at the

14  Secret Service, you indicated you had 10 weeks of law

15  enforcement at Law Enforcement Center.  And there's an acronym

16  for that.  What was that?

17  A.   Yes, it's referred to as FLETC, sir.

18  Q.   I am sorry?

19  A.   It's referred to as FLETC.  It's an acronym for the

20  Federal Law Enforcement Training Center.

21  Q.   Okay.  And during that 10 weeks, you indicated that you

22  had legal training?

23  A.   Yes.

24  Q.   And you also had arrest training?

25  A.   Yes.

Rand Stover - Cross

1    Q.   Okay.  And you also did search warrant training?

2    A.   Yes.

3    Q.   As well as interviewing?

4    A.   Yes.

5    Q.   Firearms?

6    A.   Yes.

7    Q.   And you also did protection, because it was the Secret

8    Service; correct?

9    A.   No, sir.  Not at that academy.

10   Q.   I apologize?

11   A.   Not at the academy.  At a different training.

12   Q.   Oh, I apologize.  Okay.  How about criminal investigation?

13   A.   Yes.

14   Q.   Okay.  That's the one I want to focus on, the criminal

15   investigation.  You received training in criminal

16   investigation; correct?

17   A.   Correct.

18   Q.   Okay.  Now, you were shown a couple videos here today.

19   One was of -- I guess for lack of a better -- Dave Bundy's

20   arrest.  Did you see that?

21   A.   Yes.

22   Q.   Okay.  And you indicated that you were also investigating.

23   You were the second, I guess, commander there; correct?  Under

24   SAC Love?

25   A.   I didn't indicate that I was investigating, but I was --

Rand Stover - Cross

1   Q.   I apologize.  I understand it's more complicated than

2   that, but you were ASAC, Assistant Special Agent in Command?

3   A.   That was my -- my day-to-day title was Assistant Special

4   Agent in Charge for Utah.

5   Q.   Okay.  So you were high up; correct?

6   A.   Relatively in state of Utah.

7   Q.   Okay.  Now, while you were watching the video, you stopped

8   at three minutes and 55 seconds.  Do you remember that?

9   A.   Yes.

10  Q.   And you indicated that that's when you started your

11  investigation?

12  A.   No, sir.  That's not what I said.

13  Q.   What did you say?

14  A.   I said that from that point forward is when I recall

15  seeing that particular video.

16  Q.   Okay.  You could have seen the whole thing?

17  A.   I -- I didn't recall seeing the whole thing, no.

18  Q.   All right.

19  A.   I recalled seeing it from that point forward.

20  Q.   Would it have been part of your criminal investigation to

21  start at that point as sort of in the middle of a -- of a

22  video?

23  A.   Well, I was not the criminal investigating officer in that

24  particular incident.

25  Q.   You testified here that Mr. Bundy ended up with a few

Rand Stover - Cross

1    tickets that day; correct?

2    A.   He was initially arrested.

3    Q.   Okay.  Just real briefly.  This operational plan you said

4    was fluid.  Were there multiple versions of it?

5    A.   There was a -- a finalized version.

6    Q.   Okay.

7    A.   That was signed before the operation commenced.

8    Q.   Okay.  Now, you indicated that you had met with

9    Metropolitan Police Department; correct?

10   A.   Yes, on numerous occasions.

11   Q.   As well as Nevada Highway Patrol; correct?

12   A.   Yes, sir.

13   Q.   Okay.  They were not at all in your final plan; were they?

14   A.   That's correct.

15   Q.   Okay.  Now, I don't want to beat a dead horse, but let

16   me -- let me ask you about that First Amendment Zone real

17   quick.

18          You indicated that it wasn't -- I wrote it down that

19   it was for viewing cattle?  For viewing what you were doing out

20   there?  Was that one of the reasons for it?

21   A.   No, not necessarily.  That was an area that was offered --

22   two areas that were offered to the general public, if they

23   wanted to be close to the operational area, and potentially

24   view some of the activity that was going on.

25   Q.   Okay.  And they were -- you indicated where one was.  One

Rand Stover - Cross

1   was right there on the I-15?

2   A.   Just off of the I-15 at Exit 112.

3   Q.   Whose -- was it -- whose idea was to name it the First

4   Amendment Zone.  Was it yours?

5   A.   I don't recall.  I don't -- I don't recall.  It was during

6   the planning.

7   Q.   How many times have you testified in court?

8   A.   In this type of --

9   Q.   In a criminal setting.  Correct.

10  A.   In a jury trial?

11  Q.   Yes, sir.

12  A.   This time right here.

13  Q.   This is it.  First time?

14  A.   Yes, sir.

15  Q.   How many times have you been involved in any internal

16  investigations with BLM?

17           MR. MYHRE:  Objection.  Relevance, Your Honor.

18           MR. LEVENTHAL:  I can get into relevance.  This is

19  what we talked about.  I'm asking just very limited specific

20  questions without getting into it.

21           THE COURT:  No, rephrase your question.

22  BY MR. LEVENTHAL:

23  Q.   Okay.  What's your relationship with SAC Love in 2014?

24  A.   In 2014, he was my immediate supervisor.

25  Q.   What about now?

Rand Stover - Cross

1  A.    I haven't spoken with him for a number of months.

2  Q.    2014, he was your -- sort of your direct commander;

3  correct?

4  A.    Yes.  On a day-to-day basis, he was my immediate

5  supervisor.

6  Q.    Okay.  And he was able to give you orders?

7  A.    Yes.

8  Q.    And you followed those orders?

9  A.    If they were lawful, yes.

10 Q.    Well, let me ask you this.  Hypothetically, if you saw him

11 do something illegal, would you complain about it or make a --

12 file a complaint?

13         MR. MYHRE:  Objection, Your Honor.  Hypothetical.

14 Irrelevant.

15         MR. LEVENTHAL:  Well, he just said, Your Honor,

16 that --

17         THE COURT:  I'll allow it.

18 BY MR. LEVENTHAL:

19 Q.    Go ahead.  Do you want me to ask the question again?

20 A.    Yes, please, if you would.

21 Q.    If you saw SAC Love do something illegal, would you

22 complain about it?  Would you file a complaint against him?

23 A.    Illegal, yes.

24 Q.    If you saw SAC Love doing something unethical, would you

25 file a complaint on him?

Rand Stover - Cross

1   A.   Define "unethical" for me.  Are you talking about a

2   violation of agency policy or just general social ethics?

3   Q.   Violation of the agency policy.  Let's start there.

4   A.   I would like to think that I would, yes.

5   Q.   You would like to think that you would?

6   A.   I think that I would.  However, I will say I have been

7   made aware --

8           MR. MYHRE:  Objection, Your Honor.  This is

9   nonresponsive.

10          THE COURT:  Sustained.

11  BY MR. LEVENTHAL:

12  Q.   I think the answer is "I would think that I would."  It's

13  a yes or no question.  Could you give me a yes or no answer?

14          MR. MYHRE:  Your Honor, he's given his answer.

15          THE COURT:  It's a hypothetical.

16          MR. LEVENTHAL:  What's that?

17          THE COURT:  It was a hypothetical.

18          MR. LEVENTHAL:  It was, and so was the answer,

19  hypothetical.

20          MR. MYHRE:  Objection, Your Honor.

21          MR. LEVENTHAL:  Thank you very much.  I have nothing

22  further for you.

23          THE COURT:  All right.  I was going to wait till

24  3:00 for the break, but it looks like -- correct me if I am

25  wrong.  All the defendants have had an opportunity to cross?

1          MR. LEVENTHAL:  Correct, Your Honor.

2          THE COURT:  So let's go ahead then and take our

3    afternoon break.  We will take about a 15-minute break.

4          Remember, during this time, please do not discuss

5    this case with anyone or permit anyone to discuss it with you.

6          Do not read or listen to or review anything that

7    touches upon this case in any way.

8          Do not perform any research or any independent

9    investigation.  Please do not form an opinion.

10          We are back in about 15 minutes.

11       (Jury out.)

12          THE COURT:  All right.  We have a jury note that says

13    "We are supposed to judge each defendant separately, but lawyer

14    is not stating who he is defending.  It would help before he

15    starts asking questions."

16          So, I think you have been doing it for the most part,

17    but not every single time.  I know it's hard to remember to do

18    so, and I will try to be more vigilant about reminding you as

19    well.

20          Let's go ahead and take our bathroom break.

21       (Recess, 2:55 p.m.  Resumed 3:16 p.m.)

22          THE COURT:  May we bring in the jury?  Okay.

23       (Jury in.)

24          THE COURT:  All right.  Everyone may be seated.  We

25    are joined by the jury, and we have Special Agent Stover on the

Rand Stover - Redirect

1    stand.

2              We've concluded with cross-examination.

3              Mr. Myhre, do you have any redirect?

4              MR. MYHRE:  Yes, Your Honor.

5              THE COURT:  All right.  Go ahead, sir.

6                      REDIRECT-EXAMINATION

7    BY MR. MYHRE:

8    Q.   Hello again, Agent Stover.  You were asked on

9    cross-examination, I believe by Mr. Tanasi, Mr. Engel, and

10   Mr. Marchese and others, about the video depicting events of

11   April 9th.  Do you recall that?

12   A.   Yes.

13   Q.   And do you recall in the video seeing in that frame a

14   truck?

15   A.   What kind of truck?

16   Q.   Did you see a large truck in the -- in that video?  Do you

17   recall seeing a truck?

18   A.   Yes.  Yes, the front of what looked like a dump truck.

19   Yes.

20   Q.   And did you have an understanding, based on your viewing

21   of that video, what that truck was doing there?

22   A.   That particular truck was assigned to a team that was in

23   the field looking at removing unauthorized range improvements

24   as part of the Court orders.

25   Q.   So that truck, was that a BLM truck?

Rand Stover - Redirect

1    A.   It was.  I don't know if it was owned by the BLM or -- or

2    by a contractor, but it was a truck that was supporting the

3    operation.

4    Q.   And did you see, in that video frame, something in front

5    of that truck?

6    A.   Yes.

7    Q.   And what was that?

8    A.   It looked like an ATV.

9    Q.   And did you have an understanding of who or who owned that

10   ATV?

11          MR. MARCHESE:  Objection.  Foundation.

12          THE COURT:  Well, the question was whether he has an

13   understanding, so it's a premature objection.  You may answer

14   the question.

15          THE WITNESS:  Thank you.  I did not know who owned

16   the ATV.

17   BY MR. MYHRE:

18   Q.   Do you know who it belonged to?

19   A.   No, I did not know who --

20   Q.   Do you know how it got there?

21          MR. LEVENTHAL:  Your Honor, I apologize.  I object.

22   I believe that came in under the threat assessment, and whether

23   or not that had any bearing on this witness's analysis of

24   threat assessment.

25          And Mr. Myhre actually objected to it, and he

1    indicated that it did.  And I'm not sure what the truck has to

2    do with threat assessment at this point.  So based on that, I

3    object.

4           MR. MYHRE:  Your Honor, they were allowed to ask

5    questions about who people were in the video, and their

6    positions, what they were carrying and so forth.  So, I'm just

7    exploring other aspects of that video that this witness viewed.

8           THE COURT:  All right.

9    BY MR. MYHRE:

10   Q.   Do you have an understanding of how that ATV got there?

11   A.   I learned later that that ATV was ridden by Ammon Bundy.

12   Q.   You were asked a number of questions about April 11th and

13   the plan -- the cessation of impoundment operations.  Do you

14   recall those questions?

15   A.   Yes.

16   Q.   Now, just to clear up a couple of matters, while the

17   impoundment operations were called off on April 11th, that was

18   due to that meeting that you had previous to or in that evening

19   of April 11th; is that correct?

20   A.   The conference call on the evening of the 11th, yes.

21   Q.   But at the time that the decision was made to call off

22   operations, there -- was there a plan devised as to when you

23   were going to leave?

24   A.   On the 11th?  No, there was no plan devised.

25   Q.   Was there a plan on April 12th?

Rand Stover - Redirect

1   A.   Not to my knowledge.  We hadn't gotten that far yet.

2   Q.   Did you have time, on April the 12th, to make a plan?

3   A.   Personally, no, I did not.

4   Q.   And why was that?

5   A.   We were engaged in other things.

6   Q.   What other things were you engaged in?

7   A.   Such as the activities that we have talked about at the

8   post two and post one.

9   Q.   You testified about leaving the area, leaving some

10  equipment behind and so forth.  Was that ever part of a plan

11  for BLM to leave in the manner it did on April the 12th?

12  A.   It was not part of the initial plan, no.

13  Q.   Focusing specifically on the cattle, regardless of whether

14  the activity -- the impoundment was called off or not, was

15  there ever a decision made that the cattle would be left

16  behind?

17  A.   No.  Not to my knowledge, no.

18  Q.   Was there any decision, that you are aware of, about what

19  to do with the cattle?

20  A.   There -- to my knowledge, I was not involved in any final

21  decision on what to do with the cattle.

22  Q.   And to your knowledge, was it ever the plan to release the

23  cattle on April the 12th?

24        MR. LEVENTHAL:  Objection.  He just indicated he had

25  no idea what was happening with the cattle.

Rand Stover - Redirect

1          THE COURT:  Well, the question was as to whether the

2    cattle would be left behind.  That was the prior question.

3          This current question is whether the cattle would be

4    released.  I think it's two different things.  He can answer

5    the question.

6          THE WITNESS:  I -- I -- on the 12th, I was not

7    involved in any meeting about releasing the cattle.

8    BY MR. MYHRE:

9    Q.   Now, I didn't ask you whether you were involved in a

10   meeting.  I asked whether there was a plan, a decision made

11   before the 12th to release the cattle?

12   A.   No.

13   Q.   You were asked a number of questions about the First

14   Amendment Zone and its relationship to the closure order.  Do

15   you recall those questions?

16   A.   Yes.

17   Q.   I believe it was Mr. Jackson who asked the question.  It

18   may have been others, that -- about whether the entire area of

19   500,000 plus acres, as covered by the closure order, meant that

20   there could be no First Amendment activity anywhere within that

21   closure order.  Did that include areas where the BLM was not

22   operating on a particular day?

23   A.   Technically, yes.  It would have included that, but it

24   would not have -- based on the language in the closure order

25   and as we talked about, it would not have been enforced if we

Rand Stover - Redirect

1   weren't operating in a -- in an area that was in close

2   proximity to that location.

3   Q.   So, were any of your officers -- during the impoundment

4   operation, were they ever sent on any sort of operation or

5   mission to arrest people who were protesting in an area where

6   you were not operating directly?

7   A.   Not that I'm aware of.

8   Q.   You never gave that tasking?

9   A.   No.

10   Q.   Was that ever part of the operation plan?

11   A.   No.

12   Q.   Mr. Leventhal asked you some questions about whether BLM

13   had put out an information video or a video that would have

14   countered some of the things that were being put out there in

15   social media and elsewhere.

16        And I believe you said you were unaware of any video

17   to that effect; is that correct?

18   A.   That's correct.

19   Q.   Did -- for the impoundment operation itself though, did

20   the plan include a media plan?

21   A.   It did.

22   Q.   And as part of that media plan, was there a public

23   information officer available?

24   A.   Yes, from the agencies that were participating.  They had

25   all designated public information officers.

Rand Stover - Redirect

1    Q.   So if a member of the public had a question about what was

2    going on, could they come to the impoundment site and ask a

3    question?

4    A.   They -- a member of the public potentially could have come

5    to post one and asked the question.

6    Q.   And would they be then referred to someone?

7    A.   Yes.

8    Q.   In accordance with the media plan?

9    A.   Yes.  If they were a member of the media, yes.

10   Q.   Okay.  If -- if someone just came in and said, "What's

11   going on here?" how would that be handled?

12   A.   It would -- it would depend on the situation.  If it could

13   be handled by an officer that happened to be working at that

14   position and they knew the answer, the officer could have

15   answered it.

16        If it was a question that the officer could not have

17   answered, then he would have had the discretion to get someone

18   else to that location that could answer the question.

19   Q.   And were officers ever instructed to turn people away who

20   had questions?

21   A.   No.  Not if they had general questions about the

22   operation, no.

23   Q.   You were asked by Mr. Engel about the crowd in the wash

24   and breaching or climbing over the gate, I believe was the

25   terminology used, and whether or not you observed any

Rand Stover - Redirect

1 | aggressive moves.  Do you recall those questions?

2 | A.    Yes.

3 | Q.    Now, with respect to your direct testimony, you testified

4 | about your assessment on 1 to 10, that this was a 10 in terms

5 | of potential for violence; is that correct?

6 | A.    That's correct.

7 | Q.    How do you explain the difference between that viewing

8 | aggressive moves and your testimony that this was a very high

9 | level potential for violence?

10 | A.    The question was asked about aggressive moves, climbing

11 | over the gate or over the fence at post two.

12 | Q.    So, in terms of aggressive moves, you defined aggressive

13 | moves in relationship to climbing over the gate?

14 | A.    Well, for Mr. Engel's particular question, he asked about

15 | aggressive moves that I saw for people climbing over the fence

16 | at post two, and that's the question I answered.

17 | Q.    Okay.  But in terms of your overall testimony, is there --

18 | you had indicated that you observed threat indicators; is that

19 | correct?

20 | A.    That's correct.

21 |         MR. MYHRE:  May I have just a moment, Your Honor?

22 |         THE COURT:  Yes.

23 |     (Pause in the proceedings.)

24 |         MR. MYHRE:  Those are all the questions I have, Your

25 | Honor.  Thank you.

1          THE COURT:  Any recross?

2          MR. TANASI:  None from Mr. Stewart, Your Honor.

3          MR. MARCHESE:  None from Mr. Parker.

4          MR. ENGEL:  None from Engel.

5          MR. PEREZ:  None from Lovelien.

6          MR. JACKSON:  No questions, Your Honor.

7          THE COURT:  Mr. Leventhal, any recross?

8          MR. LEVENTHAL:  No, Your Honor.  Thank you.  Not on

9   behalf of Mr. Drexler.

10          THE COURT:  All right.  So, Special Agent, you are

11   free to go.  Thank you for coming in today.  Please be careful

12   on your way down the steps.

13          THE WITNESS:  Thank you.

14          THE COURT:  Do you have another witness to call?

15          MR. MYHRE:  Before we do, may we ask, may Agent

16   Stover be released from subpoena?  I wasn't sure whether

17   defense was planning on doing --

18          THE COURT:  Is he subject to recall?

19          MR. LEVENTHAL:  Yes, Your Honor, he is.

20          THE COURT:  All right.  So he's subject to recall.

21          MR. MYHRE:  Thank you.  Your Honor.

22          MR. DICKINSON:  The government calls Special Agent

23   Michael Johnson.

24          THE COURT:  Good afternoon, Mr. Johnson, Special

25   Agent Johnson.  Come on up here.  You are going to be taking

1  the seat to my right.  Be careful with -- actually, we have all

2  the wires out of the way, but be careful with the steps.

3                    MICHAEL JOHNSON,

4  having been duly sworn, was examined and testified as follows:

5           COURTROOM ADMINISTRATOR:  State your full name and

6  spell it for the record.

7           THE WITNESS:  Michael Johnson, M-I-C-H-A-E-L

8  J-O-H-N-S-O-N.

9                    DIRECT EXAMINATION

10  BY MR. DICKINSON:

11  Q.   Good afternoon, Special Agent Johnson.

12  A.   Good afternoon.

13  Q.   Can you tell the ladies and gentlemen of the jury where

14  you work?

15  A.   I am a special agent -- the Assistant Special Agent In

16  Charge for BLM law enforcement in Utah.

17  Q.   And how long have you been the Assistant Special Agent in

18  Charge in Utah?

19  A.   Almost one year.

20  Q.   And before that, were you just a special agent?

21  A.   Yes, sir.  I was.

22  Q.   And were you a special agent in April 2014?

23  A.   Yes, sir.  I was.

24  Q.   And were you -- did you have any involvement, as a special

25  agent, in the impoundment operation regarding Cliven Bundy's

Michael Johnson - Direct

1  cattle?

2  A.   Yes, I did.

3  Q.   And prior to the impoundment operation starting, did you

4  have some involvement in attempting to reach out to the Bundy

5  family?

6  A.   Yes, I did.

7  Q.   All right.  Sort of the two main things I want to talk

8  about, but your background a little bit.

9         When did you start with the BLM?

10 A.   In October of 2012.

11 Q.   Before October of 2012, did you have any prior law

12 enforcement experience?

13 A.   Yes, I did.  I was a uniformed division Secret Service

14 officer starting in 2001 and became a special agent with the US

15 Secret Service in 2004.

16 Q.   And just briefly, what's the difference between a

17 uniformed secret service officer and a non-uniformed Secret

18 Service officer?

19 A.   As a uniformed Secret Service officer, I was primarily

20 responsible for physical security of the vice president's

21 residence, the White House, and various foreign missions

22 located in the Washington, DC, area.

23        As a special agent with the Secret Service, I was

24 responsible for investigating counterfeit currency, financial

25 crimes, threats against persons that we protect and so forth.

Michael Johnson - Direct

1   Q.   And were you in DC the whole time or elsewhere?

2   A.   I was in Washington, DC, until early 2004.  And then I

3   transferred to Houston, Texas.

4   Q.   And what is your educational background?

5   A.   I have a bachelor's degree in business administration.

6   Q.   And why the move from the Secret Service to the BLM?

7   A.   The BLM is actually the agency that I wanted to work for

8   from the time I was a teenager.  I had hopes of working for

9   them from that time.

10          But due to the limited positions available, and once

11  the positions are full, the difficulty in getting those

12  positions, I needed to go get some experience with another

13  agency so that I would be qualified to work for the BLM.  And

14  so it was kind of a life's goal, really, which became true for

15  me in 2012.

16  Q.   And did you end up in Utah?

17  A.   I did.

18  Q.   So did the move also get you back home?

19  A.   It did.  I applied with the BLM all over the country, and

20  lucked out, and I got my hometown.

21  Q.   And did you do your initial law enforcement training with

22  the Secret Service?

23  A.   I did.

24  Q.   And did that involve some Time at what the jury has now

25  heard of as FLETC?

Michael Johnson - Direct

1    A.    Okay.  Yes, I did two different tours at the Federal Law

2    Enforcement Training Center in Glencoe, Georgia.

3         First was for the uniformed division Secret Service,

4    and second as a special agent with the Secret Service.  Also

5    attended the Secret Services's respective academies in

6    Beltsville, Maryland, for each of those.

7    Q.    And was there any specific training when you started BLM,

8    or was it on-the-job training or --

9    A.    It was on-the-job training.

10   Q.    All right.  Now, in your role as a special agent, how did

11   you became involved -- special agent in Utah, how did you

12   become involved in the impoundment operation in 2014 here in

13   Nevada?

14   A.    My supervisors, which supervised Utah and Nevada, were in

15   charge of planning the -- the cattle gather.  And, therefore,

16   as I worked for them, I became involved with parts of it.

17   Q.    And the supervisors were?

18   A.    Rand Stover and Dan Love.

19   Q.    And before the operation started, in April of 2014, were

20   you tasked with trying to contact the Bundy family?

21   A.    Yes, I was.

22   Q.    And were you the sole agent with that task or was there

23   another agent?

24   A.    Myself and Special Agent Shilaikis from Colorado.

25   Q.    And who tasked you to do that?

Michael Johnson – Direct

1   A.   The Special Agent in Charge Dan Love.

2   Q.   And what was the purpose of trying to reach out to the

3   Bundy family?

4   A.   The purpose of the -- of our trip down to Nevada was to

5   attempt to reach out for the Bundy family -- members of the

6   Bundy family, including Cliven Bundy, Dave Bundy, Ryan Bundy,

7   and discuss with them our intentions to fulfill the Court

8   orders to remove the cattle from the Gold Butte area, and to

9   see if there was anything that we could do, as BLM law

10  enforcement, to mediate any potential problems.

11  Q.   And you mentioned Dave and Ryan Bundy.  To your

12  understanding, what was their relationship with Cliven Bundy?

13  A.   It was my understanding that they were his sons.

14  Q.   And was part of trying to contact the Bundys -- was it to

15  assess any potential threats there might be?

16  A.   Absolutely.  Given the history that I was made aware of

17  from previous attempts to gather the cows there, it was my

18  understanding that there was difficulties there.  And that my

19  role would be to go down and -- and try to talk with them

20  one-on-one, if they would meet with us, and see if there was

21  anything we could do to -- to keep any problems from occurring.

22  Q.   And as the primary day that this occurred, was that

23  March 17, 2014?

24  A.   Yes, it was.

25  Q.   All right.  I want to talk a few minutes and just walk you

1  through that day and the attempts you made to speak with Cliven

2  Bundy, Dave Bundy, and then Ryan Bundy.

3          So where did you start that the day?

4  A.   We started that day in Bunkerville, Nevada, attempting to

5  contact Cliven Bundy at his residence.

6  Q.   And how did you go about that?

7  A.   Myself and Special Agent Shilaikis drove to his home, and

8  knocked on his door, and attempted to talk to him.  And he was

9  not home.

10  Q.   And how were you dressed that day?

11  A.   I was dressed in plain clothes, jeans, cowboy boots, a

12  button-up shirt, cowboy hat.

13  Q.   So made no contact at the residence in Bunkerville?

14  A.   No, sir.

15  Q.   And what did you do next?

16  A.   Next we attempted to call what we believed to be his

17  cellular telephone number.  He did not answer.  I left a voice

18  mail with my name and cellular phone number asking him if he

19  would call me back.

20  Q.   Did you ever get a call back?

21  A.   I never did.

22  Q.   And in total, a call back period?

23  A.   No.

24  Q.   So after that, where did you go?

25  A.   After that, we were already in contact with a BLM

Michael Johnson - Direct

1    uniformed ranger that resided in the area.  And she -- her name
2    was Ranger Sullivan.  She recommended that we go to some areas
3    that were nearby on BLM land that she had recently seen members
4    of the Bundy family gathering cattle.  And that we could
5    potentially run into them and talk to them.
6    Q.   And did you do that?
7    A.   We did.
8    Q.   And what happened?
9    A.   While we were driving out to the area where she believed
10   they could be, we saw a pickup truck coming towards us on the
11   dirt road that we were on.  So we pulled completely off the
12   road, and got out of our -- our truck, and attempted to make
13   contact with them.
14           We didn't impede their progress in any way.  We
15   didn't verbally ask them to stop.  But it's pretty customary,
16   when you are out in the back country in the desert, that if
17   somebody is stopped, that you would talk, stop, and say hello.
18   And so they -- they stopped to talk to us.
19   Q.   Were you in a marked BLM vehicle or --
20   A.   No, it was unmarked.  It was a Ford F150 unmarked truck.
21   Q.   And who did you come in contact with?
22   A.   We came in contact with two individuals, one who
23   identified himself as Duke Clancy Cox.  He goes by Clancy.  And
24   another individual who identified himself as an associative
25   grandson of Cliven Bundy.  Clancy Cox is the son-in-law of

Michael Johnson - Direct

1    Cliven Bundy.

2    Q.   And how long did you talk to those two individuals?

3    A.   It was just a few minutes.  We immediately identified

4    ourselves as BLM law enforcement and told them of our

5    intentions.  That we were attempting to make contact with

6    members of the Bundy family that day to discuss the upcoming

7    cattle gather.  And they knew about it.

8         And we asked if -- we asked Clancy if he would, in

9    fact, attempt to contact Cliven Bundy for us to see if he would

10   meet with us.  And he did.  He did so.  He called Cliven Bundy

11   on his cellular telephone.

12        Mr. Bundy declined to meet with us at that time.  We

13   then asked Clancy if we could have Cliven Bundy's cell phone

14   number.  He did give it to us.  And we asked for Clancy's cell

15   phone number, so that we could contact him back if it was

16   needed, and he did provide it to us as well.

17   Q.   Did you ever call the number that was given to you that

18   you were told was Cliven Bundy's cell phone number?

19   A.   We did.  At the end of the contact, when Clancy was on his

20   way, we got to an area where we had cell phone reception, and

21   we attempted to call Cliven Bundy on the new number that Clancy

22   had given us, and he did not answer.

23        We provided him with our -- I then provided him with

24   my name and cellular phone number to return our call should he

25   choose.

Michael Johnson - Direct

1    Q.   Did you ever receive a call from Cliven Bundy?

2    A.   I did not.

3    Q.   After that, what did you do?

4    A.   After that, we proceeded to go to Mesquite, Nevada, not

5    far away, to attempt to talk to Dave Bundy, one of Cliven

6    Bundy's sons, at an address that we had that we believed to be

7    a potential work address.

8             We arrived at the location and contacted an unknown

9    person there who told us that Dave Bundy had not worked there

10   in several years.

11   Q.   Did you have another lead of where to possibly find Dave

12   Bundy after that?

13   A.   After that, we drove to St. George, Utah, to attempt to

14   contact him at what we believed to be a potential residence for

15   him.  When we arrived at the place, it ended up being a mail

16   parcel store that had, like, P.O. boxes.

17            And we talked to the employee there and asked if we

18   could have the information that belonged to the number, which

19   we originally thought was potentially an apartment number and

20   ended up being a box number.  The employee did provide us with

21   the information on the box number.  It was registered to Dave

22   Bundy, and it was registered to a different address there in

23   St. George, Utah.

24   Q.   And did you go to that address?

25   A.   We did go to that address.

Michael Johnson - Direct

1    Q.   And were you able to make contact with Dave Bundy at that

2    address?

3    A.   Dave Bundy was not at that address.  A person who we later

4    identified as Dave Bundy's wife's sister resided at that

5    address.  Her name was Lora Lee.  When we opened the door, we

6    identified ourselves and asked if she knew if Dave Bundy was at

7    home.

8            And she said, "I -- I don't know anybody named Dave,

9    and I don't know any Bundys," and she shut the door on us.

10   Q.   After that, did you go try and make contact with Ryan

11   Bundy?

12   A.   We did.  We drove from St. George, Utah, to Cedar City,

13   Utah, still again with my partner Agent Shilaikis.  And we

14   drove by the address that we believed to be Ryan Bundy's

15   address.

16           When we drove by his house, we observed there to be

17   several people out in front of the house, several people in the

18   house, several vehicles in the driveway, several vehicles in

19   the street.  And we decided, at that time, that we would not --

20   just the two of us -- attempt to knock on the door and make

21   contact with Ryan Bundy.

22   Q.   So what did you do?

23   A.   So we went to the Cedar City Police Department, and we

24   spoke with an Officer Smith there who was the afternoon

25   supervisor, and identified ourselves as BLM law enforcement and

Michael Johnson - Direct

1    discussed with him the possibility of having his assistance --

2              MR. LEVENTHAL:  Your Honor, I am going to object.

3    There's somewhat of a narrative here, and it's allowing some

4    hearsay statements in.

5              MR. JACKSON:  I will join in that objection.

6              THE COURT:  Mr. Dickinson?

7              MR. DICKINSON:  I will rephrase the question, Your

8    Honor.

9              THE COURT:  All right.  Go ahead.

10   BY MR. DICKINSON:

11   Q.   You made contact with a law enforcement officer.  After

12   having some discussions with -- you say Officer Smith?

13   A.   Yes, sir.

14   Q.   What did you do?

15   A.   We -- after Officer Smith had also run Ryan Bundy's --

16   Q.   Let me just ask you.  What did you do?  Whether you or

17   Officer Smith, did anybody make contact with Ryan Bundy?

18   A.   Yes.  Officer Smith made telephonic contact with Ryan

19   Bundy in our presence.

20   Q.   And what did he tell him?

21   A.   He told them that we --

22              MR. LEVENTHAL:  Objection.  Hearsay.

23              THE COURT:  Mr. Dickinson?

24              MR. DICKINSON:  It's not for the truth of the matter,

25   Your Honor.  It's just for the fact that this officer told Ryan

Michael Johnson - Direct

1    Bundy that the BLM wanted to talk with him and eventually gave

2    them his phone number, and then Ryan Bundy contacts them.

3              THE COURT:  All right.  I will allow it.

4    BY MR. DICKINSON:

5    Q.   What did the officer state in your presence?

6    A.   He stated, in our presence, and we could hear Ryan Bundy's

7    voice on the speaker phone, that there were two BLM law

8    enforcement agents here that would like to meet him to discuss

9    the cattle gather at a neutral location.

10   Q.   And what did Mr. Bundy say?

11   A.   Ryan Bundy responded by saying --

12             MR. LEVENTHAL:  Objection.  Hearsay.

13             MR. JACKSON:  I'd object on the same grounds and

14   confrontation grounds for --

15             THE COURT:  Mr. Dickinson?

16             MR. JACKSON:  -- Mr. Burleson.

17             MR. DICKINSON:  This would be in furtherance of the

18   conspiracy, Your Honor.  This is where Mr. Bundy starts saying

19   it's family, and he will not cooperate in the cattle gathering.

20   And then bring it down to where he calls the agent, and I'm

21   sure we'll get the same objection.  And I can --

22             THE COURT:  All right.  So it's offered as a

23   coconspirator statement?

24             MR. DICKINSON:  Yes, Your Honor.

25             THE COURT:  All right.  Go ahead.

Michael Johnson - Direct

1           MR. DICKINSON:  And there's no confrontation -- just

2      for the record, Your Honor, there's no confrontation issue

3      because, A, it's being offered for -- as the statement of a

4      coconspirator; and, B, it's not testimonial.

5      Q.    Go ahead.  What did Mr. Bundy say?

6      A.    Mr. Bundy stated that we should not show up to the cattle

7      gather, and that when the officer attempted to have Ryan Bundy

8      speak with us, Ryan Bundy terminated that phone call.

9      Q.    And what did you do then?

10     A.    We then spoke with the officer, and the officer told us

11     that if he could make contact with Ryan later in the evening,

12     he would see if Ryan would call us.  And after that, we

13     returned to our hotel for the evening.

14     Q.    And what happened when you returned to your hotel?

15     A.    After we returned to the hotel, I received a phone call on

16     my cellular telephone, of which I recognized the number to be

17     Ryan Bundy's cellular -- cellular phone number.

18     Q.    And did you answer the call?

19     A.    Yes, I did.

20     Q.    And did the person on the other line identify himself?

21     A.    Yes, he did.  He identified himself as Ryan Bundy.

22     Q.    And did you recognize the voice from the police station

23     phone call?

24     A.    I did recognize his voice.

25     Q.    And what did you do then?

Michael Johnson - Direct

1    A.    The phone call lasted approximately 46 minutes, and we

2    spoke on many, many issues.

3    Q.    Let me stop you there.  Did you record the phone call?

4    A.    Yes, I did.

5    Q.    And describe how that happened.  You get the phone call.

6    It's Ryan Bundy.  What do you do?

7    A.    We ran from the hotel room.  The audio recorder that we

8    possessed was out in our vehicle.  So we ran out to the vehicle

9    and turned on the recorder.  The recording began a couple of

10   minutes after the conversation was initiated.

11   Q.    And you say "we."  Was that still Special Agent Shilaikis

12   with you?

13   A.    Yes, sir.  He was with me.

14   Q.    And in general, what was your purpose during the 46-minute

15   telephone call with Ryan Bundy?

16   A.    My purpose circled back to the reason in which I was asked

17   to go down there initially by my Special Agent in Charge, and

18   that was to ascertain the reason or the -- to ascertain what

19   the Bundy family and their associates may do to impede this

20   cattle gather.  And to offer up the -- myself as a contact for

21   them.  That if they had any questions, they should contact me,

22   and we should try and work it out ahead of time.

23   Q.    And next to you is a binder.  One of the binders starts

24   with 1.  I want you to look at Exhibit 13.  It may be on the

25   front is where they are numbered.  I apologize.

Michael Johnson - Direct

1          May I approach, Your Honor?

2          THE COURT:  Yes, you may.  It think it's the front

3     cover of the binder not on the spine.

4     BY MR. DICKINSON:

5     Q.   Government Exhibit 13, that is a disk with an audio file;

6     correct?

7     A.   Yes, sir.

8     Q.   And prior to coming to court, did you have an opportunity

9     to review that audio file, Exhibit 13?

10    A.   Yes, sir.  I have.

11    Q.   And was that the phone call between you and Dave Bundy

12    [sic] on the 17th of March?

13    A.   Yes, it is.

14    Q.   And there are six clips cut down from the 46 minutes;

15    correct?

16    A.   Yes, sir.

17    Q.   And do those six clips accurately reflect the phone

18    conversation you had with Dave Bundy on the 17th?

19    A.   Yes, they do.

20          MR. DICKINSON:  Your Honor, I would offer Government

21    Exhibit 13 into evidence.

22          THE COURT:  Any objection to Exhibit 13?

23          MR. MARCHESE:  No objection Parker.

24          MR. TANASI:  No objection Stewart, Your Honor.

25          MR. ENGEL:  None from Engel.

Michael Johnson - Direct

1            MR. LEVENTHAL:  No objection on behalf of

2   Mr. Drexler.

3            MR. PEREZ:  None for Lovelien.

4            MR. JACKSON:  Just the objection of relevance as to

5   my client.

6            THE COURT:  All right.

7            MR. JACKSON:  Greg Burleson.

8            THE COURT:  So Exhibit 13 will be admitted.  Did you

9   want to publish it?

10           MR. DICKINSON:  Yes, Your Honor.

11          (Exhibit 13 admitted.)

12  BY MR. DICKINSON:

13  Q.   And just starting -- clip one starts at the beginning of

14  your telephone call; correct?

15  A.   Yes, it does.

16  Q.   Strike that.  Clip one starts the beginning of your

17  recording; correct?

18  A.   Yes, sir.

19  Q.   But that was not the beginning of the telephone call?

20  A.   No, sir.

21  Q.   And again, why was that?

22  A.   We were inside the hotel room -- inside the hotel, and the

23  audio recorder was located in our vehicle.  When the call

24  began, we moved from the hotel out to our vehicle to begin the

25  recording.

Michael Johnson - Direct

1          MR. DICKINSON:  We can publish clip A.

2      (Exhibit 13 being played.)

3  BY MR. DICKINSON:

4  Q.   And you pretty much just came straight out and said what

5  your purpose was at the beginning of the clip; correct?

6  A.   Yes, I did.  I wanted to be upfront with Ryan Bundy and

7  tell him what our intentions were.

8          MR. DICKINSON:  If we could play clip B.

9      (Exhibit 13 being played.)

10          MR. DICKINSON:  For the record, Your Honor, the first

11  clip was starting at the beginning of the telephone call to

12  approximately one minute and 15 seconds.  Clip B was on 15

13  minutes and 35 seconds to 17 minutes and 15 seconds in the

14  call.

15  Q.   In the second clip, it appears you weren't getting a

16  direct answer about any potential threats or impedement [sic]

17  one way or the other?

18  A.   No.  I -- throughout the phone call, I was going upon my

19  knowledge, training, and experience as a special agent in

20  having interviewed hundreds, if not a thousand over the years.

21  It's been my experience to let people talk as much as they want

22  to talk.  And then when the opportunity presents itself, to

23  help them circle back to what I was trying to understand from

24  him.

25          MR. DICKINSON:  If we could play clip C, which is at

Michael Johnson - Direct

1   approximately 18 minutes and 10 seconds to 20 minutes and 20

2   seconds.

3       (Exhibit 13 being played.)

4   Q.   If we could go to clip -- publish clip D, which is 21

5   minutes and 35 seconds into the call, to 28 minutes and 35

6   seconds approximately.

7       (Exhibit 13 being played.)

8   Q.   I am going to publish clip E, which is approximately 38

9   minutes to 41 minutes and 10 seconds.

10      (Exhibit 13 being played.)

11  Q.   Let's go over the last clip.  There's been a few

12  references to "our ranch" and "our home," and "if somebody

13  comes to our home."

14          At any time in this conversation, in the 46 minutes,

15  the full version, did you reference the BLM coming to any

16  Bundys home or any -- doing anything at Mr. Bundy's ranch or

17  any private property?

18  A.   No, sir.

19  Q.   All right.  And finally clip F, which is approximately at

20  42 minutes 40 seconds to the end at 46 minutes.

21      (Exhibit 13 being played.)

22  Q.   So, Special Agent Johnson, based on your telephone call

23  with Mr. Bundy, did you feel like you had any answers to the

24  questions you were seeking out that day?

25  A.   Yes, I did.

Michael Johnson - Direct

1    Q.   And what was that?

2    A.   As he stated on multiple occasions, that he and hundreds

3    of others would do whatever it took to stop the gather.

4    Q.   And the phone call speaks for itself, but I have just a

5    couple questions.

6              You asked him several times regarding violence.  And

7    did you ever get a straight answer?

8    A.   No, I did not.

9    Q.   And did you ever hear -- did you ever speak with Mr. Bundy

10   again?

11   A.   No, I did not.  Oh, yes, I did.  Yes, I did.

12   Q.   Did you ever speak -- I am not doing a good job.  Did you

13   ever speak with Ryan Bundy again?

14   A.   Yes, I spoke with him again the next morning.

15   Q.   And was that call recorded?

16   A.   No, it was not.

17   Q.   And about how long, if you recall, was the conversation?

18   A.   It was approximately seven minutes.

19   Q.   And what was the -- what was the nature of that

20   conversation with Ryan Bundy?

21   A.   It was a follow-up conversation which he initiated.  He

22   called me back again.  We were at the same hotel in the

23   morning.  And he wanted to reiterate his points that we should

24   not show up.  That he would do whatever it took to stop the

25   gather.

Michael Johnson – Direct

1          Additionally, he made some rather slanderous comments

2    about other BLM officers who had been in a shooting.  I asked

3    him to seriously consider his role --

4          MR. LEVENTHAL:  Judge, I am going to object again.

5    This is getting into a narrative.

6          THE COURT:  Mr. Dickinson?

7          MR. DICKINSON:  I just asked him to briefly summarize

8    the conversation, Your Honor.

9          THE COURT:  Yeah, it's a seven-minute conversation,

10   so go ahead.

11         THE WITNESS:  My last comment was that I asked him to

12   seriously consider his role in the gather as a husband and as a

13   father, and he terminated the phone call at that time.

14   BY MR. DICKINSON:

15   Q.   Did you ever have any further contact with Ryan Bundy?

16   A.   No, I did not.

17   Q.   Did you ever have any further contact on the 18th with any

18   other members of the Bundy family?

19   A.   Yes, sir.  On the next day, we -- we being myself,

20   Shilaikis -- Agent Shilaikis and Rand Stover, made a telephonic

21   phone call to Duke Clancy Cox who we had previously contacted

22   the day before.

23   Q.   And what was the purpose of that phone call?

24   A.   The purpose of the phone call was to further try to gain

25   any cooperation we could from any of the Bundy family members

1   and try to keep an open dialogue, if there was one to be, to

2   see if we could reach any further resolutions.

3   Q.   And about how long was that phone call?

4   A.   It was just a few minutes.

5   Q.   And at some point, did you give Mr. Cox your phone number?

6   A.   After the phone call was over, I text him my contact

7   number.

8   Q.   You said the next day, was that the 18th, the same morning

9   that you talked to Ryan Bundy the second time?

10  A.   Yes, it is.

11  Q.   Okay.  And did you ever hear from Mr. Cox?

12  A.   Never again.

13  Q.   Did anybody -- whether it be David Bundy, Ryan Bundy,

14  Cliven Bundy, did anybody else ever contact you on the numbers

15  you had given out on the 17th and 18th of March?

16  A.   They never contacted me again.

17  Q.   Was the information that you -- specifically the phone

18  call with Ryan Bundy, was that information conveyed back to

19  your superiors?

20  A.   Yes, sir, it was.

21  Q.   That would Special Agent Stover -- or Assistant Special

22  Agent in Charge Stover at the time and Special Agent in Charge

23  Love?

24  A.   Yes, sir.

25  Q.   Now, did you -- were you working full-time on the

Michael Johnson - Direct

1    impound -- on the cattle impoundment starting then, or was that

2    just a side duty of yours on the 17th and 18th of March?

3    A.   That was a side duty.

4    Q.   When did you become involved full-time in the impoundment?

5    A.   It was approximately the 3rd or 4th of April, a couple

6    weeks after the phone calls.

7    Q.   And the impoundment started -- the actual gathering of the

8    cattle started on the 5th of April; correct?

9    A.   As I recall, yes.

10   Q.   And did you have -- before the impoundment started, when

11   you came to Nevada, did you have a specific role that you were

12   going to be fulfilling in the impoundment?

13   A.   I was assigned to be the investigation's team leader for

14   the duration of cattle impoundment.

15   Q.   And what was your understanding, before the impoundment

16   started, of what the investigation's team leader -- of what

17   your duties were going to be?

18   A.   My primary roles would be to provide countersurveillance

19   for the cattle convoys that would be going to and from the

20   public lands areas where the cows would be gathered, looking

21   for potential threats.  Also to provide protection for those

22   convoys coming in and out of the public lands.

23          And if there were to be any -- any investigations

24   that occurred during the cattle, I would assign team members

25   who were working under me to investigate those things.

Michael Johnson - Direct

1    Q.   Typically, were you on every day from, let's say, the 5th

2    of April to -- we'll go to the 11th of April?

3    A.   Yes, I worked every day.

4    Q.   And what was your shift generally?

5    A.   Generally, we worked approximately 16-hour shifts starting

6    at various times in the morning, depending on when the gather

7    was starting for the day until -- until late evening.

8    Q.   And during that time from the 5th through the 11th, what

9    did you end up doing the most of personally?

10   A.   Personally, myself and my team members were providing

11   countersurveillance for the -- for the convoys of contractors,

12   BLM employees, cowboys that were gathering the cows, and

13   security for their convoys, transporting them back to our

14   incident command post.  That was the majority.

15   Q.   Security for the convoys, just driving along with the

16   convoys?

17   A.   Yes, sir.  There were multiple attempts on multiple days

18   from persons, unknown persons and -- that were attempting to

19   get in between our vehicles, that were attempting to block our

20   vehicles from getting from the public lands onto the highways.

21   Q.   And typically how were the -- were you familiar with how

22   those roads were with the convoys coming off the public lands?

23   I mean, were they improved roads, unimproved roads?

24   A.   They were coming from unimproved dirt roads to improved

25   paved roads.

Michael Johnson - Direct

1   Q.   And did that pose any sort of safety issues?

2   A.   Yes, it did.  The convoys could be very long in nature.

3   They consist of several cars, several trucks, several livestock

4   trailers, which require long distances to stop and start.

5            They were traveling over uneven terrain to even

6   terrain, and, therefore, needed to be able to pass from the one

7   area to the next without being impeded.

8   Q.   And you briefly mentioned that you were engaged in

9   countersurveillance.  Can you just briefly explain to the jury

10  what you mean by that?

11  A.   Countersurveillance is in a -- in a covert role, watching

12  for persons and vehicles that are attempting to disrupt the

13  gather operations.  Identifying that information and then

14  relaying that to the -- those that were involved in the gather

15  to be prepared for that and to come up with ways to mitigate

16  that.

17  Q.   And when you say "covert," do you mean driving around in

18  unmarked cars or --

19  A.   Yes.  Yes, we were in unmarked trucks and SUVs.  And we

20  were operating in plain clothes, like I had said before, jeans,

21  and T-shirts, and ball caps.

22  Q.   You stated you were supervising investigations.  Did you

23  actually conduct any investigations?

24  A.   There were -- there were not many investigations.  There

25  were a couple that I recall, one in which where a threat was

Michael Johnson - Direct

 1   made to one of the head contractors.  I attempted to call the

 2   person who made the threat back, posing as the contractor, to

 3   ascertain as to whether or not the threat was viable.  We

 4   had -- that was my main recollection.

 5   Q.   When you were out there, were you familiar with -- did you

 6   become aware that Dave Bundy was arrested on April 6th?

 7   A.   I was aware of that.

 8   Q.   And did you have any role in investigating that incident?

 9   A.   No, I didn't.

10   Q.   And were you aware of the convoy being blocked on

11   April 10th, where there was a use of force taser deployment to

12   Ammon Bundy?

13   A.   I was aware of that.

14   Q.   Were you aware of that?  Sorry.  I didn't mean to speak

15   over you.

16   A.   I was aware of that but did not investigate that.

17   Q.   So your role wasn't to investigate -- your role didn't

18   include investigating those two incidents?

19   A.   No.  We -- two of my investigative team members did

20   transport Dave Bundy from the ICP to the jail in Las Vegas, but

21   we did not investigate him.

22   Q.   You had no personal involvement?

23   A.   No.  No, sir.

24   Q.   Did you -- but as far as investigations go, did you

25   oversee an undercover operation?

Michael Johnson – Direct

1  A.   Yes, I did.

2  Q.   And in your role, were you acting as an undercover agent?

3  A.   No, I was not.

4  Q.   Did you go observe anything or interact with anybody in an

5  undercover role personally?

6  A.   No, I did not.

7  Q.   Just from your supervisory role, can you just explain what

8  the undercover operation was?

9  A.   The Special Agent in Charge Dan Love, who is also the

10  incident commander, came to me and asked me to pick four team

11  members -- four investigative team members to assume an

12  undercover role to start attending events at the Bundy rally

13  site, a few miles from our incident command post, and to

14  attempt to determine what type of threats, if any, what the

15  temperament was from those that were beginning to gather in the

16  area.

17  Q.   And did, in fact -- did you go through with that?  Did you

18  recruit or assigned four people to do that?

19  A.   Yes, we did.  I assigned two teams of two agents that

20  rented rental cars that became undercover cars.  They purchased

21  undercover clothing from thrift stores to, you know, further

22  help with their -- their covert mission.  And they did attend

23  various rally events and report back to us with their findings.

24  Q.   And how many days, if you recall, did they go up to the

25  rally site?

Michael Johnson - Direct

1    A.   I recall it was two different days.

2    Q.   Do you remember what days?

3    A.   What?

4    Q.   Do you recall which days?

5    A.   I don't recall the days exactly.  I do recall that the

6    second day was the 11th, April 11th .

7    Q.   And when the agents were -- were -- who assumed undercover

8    roles, when they were done for the day, were you the person

9    they came back and reported back to?

10   A.   They did report back to me, and then I reported what they

11   told me to my supervisors.

12   Q.   And that would have been?

13   A.   It was Rand Stover and Dan Love.

14   Q.   So that's how the information flowed that was learned from

15   those undercovers?

16   A.   Yes, sir.

17   Q.   Okay.  Now, you said the last day or the -- you remember

18   the second day, which was the last day you -- the undercovers

19   were operating was April 11th.

20          At some point, when they were operating, were you out

21   in the field with them?

22   A.   Yes, we were.  The remainder of our team was staged as

23   close as we could be to the rally site.  I would approximate

24   that we were approximately a mile away from the rally site.

25          And we -- the only contact that we had with them was

Michael Johnson - Direct

1    via cell phone, and they would periodically check in with us to

2    make sure they were safe.

3    Q.   At some point, did you go back to the ICP on the 11th?

4    A.   I did.  It was much later in the evening.

5    Q.   And were you -- was that the normal time you were going

6    back, or were you summonsed to come back early?

7    A.   We were summoned to come back early.  We had -- the

8    undercover agents had finished their work, and we had escorted

9    them back to where they were staying in St. George, Utah.  And

10   it was at that time that we were informed that the gather had

11   been canceled, and that we were to return to the ICP.

12   Q.   And who was with you, or how many -- whether it be rangers

13   or special agents -- were with you outside of the undercovers

14   that you took back to St. George?

15   A.   The undercovers came back with us as well shortly --

16   shortly after us.  I believe there was 9 or 10 of us.

17   Q.   Including the undercovers?

18   A.   Including the undercovers shortly after us.

19   Q.   So everyone was called back to the ICP?

20   A.   They were.

21   Q.   And what happened when you got back to the ICP?

22   Approximately what time did you get back to the ICP?

23   A.   I don't recall an exact time.  It was in the evening time.

24   It was after dinnertime.  We had eaten dinner in St. George and

25   returned after we ate dinner.

Michael Johnson - Direct

1   Q.   And when you got to the ICP, did you learn why you were

2   called back?

3   A.   We spoke with Rand Stover and with Dan Love, the

4   supervisors for the operation.  They told us that the gather

5   was being suspended at this time, and that there was a

6   potential for persons to come to the ICP to try to do -- that

7   could potentially do us harm, and that were going to

8   potentially try to take the cattle that we were holding there

9   back.  And that our assignment for the evening was to provide

10  very close cover for the ICP, close protection.

11  Q.   Now we're saying "ICP," when you say -- what was your role

12  then?  What did you do after that briefing?

13  A.   After that briefing, I briefed my investigative team on

14  our assignment for the evening, and we assumed positions

15  immediately outside of the ICP in our vehicles and around our

16  vehicles.  And we stayed there for the duration of the night.

17  Q.   And the term ICP has been used here in court throughout

18  the last couple of days.  When you say you were close to the

19  ICP, what specific -- it's sort of been referred to as the

20  whole sort of complex when you go on off the 15 down to where

21  the cattle pens were and the trailers.  Where specifically were

22  you that night?

23  A.   Specifically what I'm referring to in the ICP is the

24  trailers and -- and Conex boxes that were being used to house

25  and -- and provide the office space for gathered personnel.

Michael Johnson - Direct

1          It was the area in the -- in the very center of the
2    ICP and where the most persons -- personnel were gathered.  And
3    so, therefore, we were at that immediate area.
4    Q.   And were there still civilian, non-law enforcement
5    employees on-site throughout the evening of the 11th?
6    A.   Yes, there was.
7    Q.   And the morning of the 12th?
8    A.   Yes, there was.
9    Q.   And any incidents around the ICP, were you aware, on the
10   evening into the morning?  Going through the night of the
11   11th into the morning of the 12th?
12   A.   No, there was not.
13   Q.   And did you get much sleep?
14   A.   Not much.
15   Q.   What -- what did you do on the morning of April 12th?
16   What -- say early morning, 8:00, 9:00 a.m.
17   A.   We awoke and began discussing amongst ourselves what the
18   day's -- the day was going bring.  I checked in with the
19   command staff, and we were just holding until they made
20   decisions on what was going to occur that day.
21   Q.   What were you told was going to -- did you have an
22   assignment?  Were you still just --
23   A.   We were still just providing security at that time.
24          THE COURT:  Mr. Dickinson, is this a good time to
25   stop?  It's 4:30.

Michael Johnson - Direct

1          MR. DICKINSON:  It's actually a perfect time to stop,

2     Your Honor.

3          THE COURT:  All right.  Let's go ahead and let the

4     jury take their overnight break, and we'll ask them to please

5     return at 8:00 a.m. tomorrow morning.

6          Please remember, ladies and gentlemen, that during

7     this break you are not to discuss this case with anyone nor

8     allow anyone to discuss it with you.  You are not to listen to

9     or read to -- read or review anything that touches upon this

10    case in any way.

11         If any friends, relatives, colleagues at work try to

12    talk to you about this case, please tell them "The Judge has

13    told me I cannot talk about this case.  When it's all over,

14    maybe we can talk about it then.  But not while -- not until

15    there's a decision."

16         So please do not talk about the case.  Obviously you

17    can tell your employer, yes, you are still in trial, but you

18    will be off on Friday.

19         Please do not perform any research or make any

20    independent investigation about the case and do not form any

21    opinion until after you have heard all the evidence, closing

22    arguments, been provided with the written jury instructions of

23    law, and then -- then released to begin your deliberation

24    process.  At that time, you can talk to each other about the

25    case, but not until then.

1            So we'll go ahead and stand for the jury.  And then

2    after they've departed, then Special Agent Johnson, you may

3    also take your overnight break.  And we would ask that you be

4    back at 8:00 a.m. tomorrow morning as well.

5            THE WITNESS:  Yes, Your Honor.

6        (Jury out.)

7            THE COURT:  The jury has left the courtroom.

8    Anything that we need to meet about and talk about tomorrow

9    morning or --

10            MR. LEVENTHAL:  No, Your Honor.

11            MR. MARCHESE:  No, Your Honor.

12            THE COURT:  Nothing anticipated?  All right.  We will

13    see you back here at 8:00 a.m. tomorrow morning.

14        (Recess, 4:53 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATIONS

2    For the Plaintiff:

3    Witness Name            Direct  Cross   RD    RX    Voir Dire

4       Rand Stover             7    108    217
                                     155
5                                    171
                                     192
6                                    196
                                     203
7       Michael Johnson      226

8

9                        PLAINTIFF'S EXHIBIT INDEX

10   Exhibit No.                             Marked    Admitted

11   10                                                    31
     11                                                    28
12   13                                                   241
     257                                                   97
13   332                                                   11
     349                                                   71
14   358                                                   72
     359                                                   73
15

16                       DEFENDANT'S EXHIBIT INDEX

17   Exhibit No.                             Marked    Admitted

18   500-B                                               135
     5002-D                                              153
19   5002-E                                              151
     5006-E                                              119
20   5008-F                                              114

21

22

23

24

25

1                              --oOo--

2                  COURT REPORTER'S CERTIFICATE

3

4        I, KATHERINE EISMANN, Official Court Reporter, United

5    States District Court, District of Nevada, Las Vegas, Nevada,

6    certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-entitled matter.

8

9    Date:  March 29, 2017.

10                              /s/ *Katherine Eismann*

11                         Katherine Eismann, CSR CRR RDR

12

13

14

15

16

17

18

19

20

21

22

23

24

25