1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,    )
                                  )    Case No. 2:16-cr-00046-GMN-PAL
4            Plaintiff,           )
                                  )    Las Vegas, Nevada
5        vs.                      )    February 15, 2017
                                  )    8:10 a.m.
6    ERIC J. PARKER (11), O.      )
     SCOTT DREXLER(12), RICHARD   )
7    LOVELIEN (13), STEVEN A.     )
     STEWART (14), TODD C. ENGEL  )
8    (15), and GREGORY P.         )
     BURLESON (16),               )
9                                 )    Day 6
             Defendants.          )
10   _____)

11                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE GLORIA M. NAVARRO
12        UNITED STATES DISTRICT COURT CHIEF JUDGE, AND A JURY

13

14   APPEARANCES:

15   For the Government:

16              STEVEN W. MYHRE, AUSA
                ERIN M. CREEGAN, SAUSA
17              NADIA JANJUA AHMED, AUSA
                NICHOLAS D. DICKINSON, AUSA
18              United States Attorney's Office
                District of Nevada
19              501 Las Vegas Boulevard South, Suite 1100
                Las Vegas, Nevada 89101
20

21   Appearances continued on next page.

22

23   Court Reporter:  Katherine Eismann, CSR, CRR, RDR
                      (702)431-1919 ke@nvd.uscourts.gov
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.

1    APPEARANCES CONTINUED:

2    For the Defendant Eric J. Parker (11):

3             JESS R. MARCHESE, ESQ.
              Law Office of Jess R. Marchese
4             601 South Las Vegas Boulevard
              Las Vegas, NV 89101
5             marcheselaw@msn.com

6    For the Defendant O. SCOTT DREXLER (12):

7             TODD M. LEVENTHAL, ESQ.
              Leventhal and Associates
8             626 South Third Street
              Las Vegas, NV 89101
9             leventhalandassociatescmecf@gmail.com

10   For the Defendant Richard Lovelien (13):

11            SHAWN R. PEREZ, ESQ.
              Law Office of Shawn R. Perez
12            626 South Third Street
              Las Vegas, NV 89101
13            shawn711@msn.com

14   For the Defendant Steven A. Stewart (14):

15            RICHARD E. TANASI, ESQ.
              601 South Seventh Street, 2nd Floor
16            Las Vegas, NV 89101
              rtanasi@tanasilaw.com

17
     For the Defendant Todd C. Engel (15):
18
              TODD C. ENGEL, PRO SE
19            18427-023
              Nevada Southern Detention Center
20            2190 Ease Mesquite Avenue
              Pahrump, NV 89060
21
              JOHN G. GEORGE, ESQ. (Standby Counsel)
22            600 South 8th Street
              Las Vegas, NV 89101
23            johngeorgejr@fastmail.fm

24

25

1    APPEARANCES CONTINUED:

2    For the Defendant Gregory P. Burleson (16):

3            TERRENCE M. JACKSON, ESQ.
             Law Office of Terrence M. Jackson
4            624 South Ninth Street
             Las Vegas, NV 89101
5            Terry.Jackson.Esq@gmail.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Wednesday, February 15, 2017, 8:10 a.m.)

2                          --oOo--

3                  P R O C E E D I N G S

4       (Jury out.)

5          THE COURT:  Thank you.  You may be seated.

6          We are going to call in the jury first and then have

7    you stand up and announce yourself for the record, so that way

8    the jury can see you and hear you explain who it is that you

9    are representing.

10          But first of all, I do want to make some preliminary

11   remarks outside of the presence of the jury just to let

12   everyone know, who may not have been here before, what the

13   expectations are for the manner in which the trial will be

14   conducted.

15          This is not a sporting event.  This is a courtroom.

16   So, it is never appropriate for anyone to make any expression

17   of their opinion, either verbally or through body language, no

18   matter how much you might agree or disagree with what is being

19   said.

20          In addition, the attorneys are not to speak out of

21   turn.  The defendant, Mr. Engel, who is represented -- is

22   representing himself, likewise, is not to speak out of turn.

23   And any person who makes an outburst or displays any

24   distracting or inappropriate body language will have to return

25   to the marshal's holding cell and listen to the remainder of

1   the day through the audio speaker.

2            I do also ask everybody here to make sure that you

3   have no cell phones or any other electronic devices.  Whether

4   or not they are turned off, you are not to have them in the

5   courtroom.  I have instructed the marshals to remove anyone who

6   has a cell phone or any other kind of electronic device.  So

7   please take a moment to check and look and make sure that you

8   don't have one and make arrangements to leave those outside.

9            And this applies to the lawyers as well.  They've

10  also been admonished that they are not to have their cell

11  phones out or any other cameras to record.

12           There is no audio or video recording allowed in the

13  courtroom, in federal court, and lawyers may only use their

14  electronic devices to present evidence for the record and

15  review the evidence so they can prepare.

16           As you can see, there are microphones at the tables.

17  You are always welcome to use those, if it is more convenient

18  for you, as you have lots of documents and books and things

19  spread out there.  Likewise, we have the podium that's been

20  turned to face the witness, so you may also use the podium

21  instead, whichever one you prefer.

22           All right.  So let's go ahead and bring in the jury,

23  and then I will have you go ahead and introduce yourselves for

24  the record.  We do also have nameplates in front of each of the

25  defendants and each of the attorneys as well.

 1        (Jury in.)

 2             THE COURT:  Everyone may be seated.

 3             COURTROOM ADMINISTRATOR:  This is the time set for

 4   Day 6 of jury trial in Case No. 2:16-cr-046-GMN-PAL, United

 5   States of America versus Eric Parker, O. Scott Drexler, Ricky

 6   Lovelien, Steven Stewart, Todd Engel, and Gregory Burleson.

 7             Counsel, please make your appearance for the record.

 8             MR. MYHRE:  Good morning, Your Honor.  Steve Myhre,

 9   Erin Creegan, Nadia Ahmed, and Nick Dickinson on behalf of the

10   United States.

11             THE COURT:  Good morning.

12             MR. TANASI:  Good morning, Your Honor.  Rich Tanasi

13   for Steven Stewart who is present.  Also with us at counsel

14   table is Gwen Wilson and Brian Glynn.

15             THE COURT:  Good morning.

16             MR. MARCHESE:  Good morning, Your Honor.  Jess

17   Marchese on behalf of Eric Parker.

18             THE COURT:  Good morning.

19             MR. LEVENTHAL:  Good morning, Your Honor.  Todd

20   Leventhal on behalf of Mr. Drexler.  He's present.

21             MR. ENGEL:  Good morning, Your Honor.  Todd Engel

22   representing myself.

23             THE COURT:  Good morning.

24             MR. PEREZ:  Good morning, Your Honor.  Shawn Perez on

25   behalf of Mr. Ricky Lovelien.

Michael Johnson – Direct

1          THE COURT:  Good morning.

2          MR. JACKSON:  Good morning, Your Honor.  Terrence

3   Jackson on behalf of Greg Burleson.  Also with me at counsel

4   table is Christine Abbott, who is Mr. Burleson's sight

5   translator and my investigator.

6          THE COURT:  All right.  Thank you.  Good morning.

7          All right.  Now, we do have Special Agent Johnson

8   back on the witness stand.  Thank you for coming in on time,

9   sir.

10          And then we have Mr. Dickinson on behalf of the

11   government.  You may continue with your direct examination of

12   Special Agent Johnson.

13          MR. DICKINSON:  Thank you, Your Honor.

14                      MICHAEL JOHNSON,

15   having been previously sworn, was examined and testified as

16   follows:

17                    DIRECT EXAMINATION

18   BY MR. DICKINSON:

19   Q.   Good morning, Special Agent Johnson.

20   A.   Good morning, sir.

21   Q.   I believe when we broke yesterday, we were discussing the

22   morning of April 12th, 2014.

23   A.   Yes, sir.

24   Q.   And the previous night, you had worked in sort of a

25   security position right down in the heart of the ICP right by

Michael Johnson - Direct

1  the main buildings; correct?

2  A.   Yes, sir.

3  Q.   And then we'll start back off on that morning.  At some

4  point, did you learn you were going to be -- were you told to

5  go somewhere else?

6  A.   Yes.  Approximately 11:15 in the morning, we were told

7  that there were a large group of people approaching post one,

8  and that we were to move from our location close to the ICP

9  towards post one.

10  Q.   And did you do that?

11  A.   Yes.  Yes, I did.

12  Q.   How did you do that?

13  A.   In a vehicle.  The entire investigative team that was in

14  the area relocated just behind post one.

15  Q.   And specifically, where did you go?

16  A.   I was right behind an old broken down tractor that was

17  just behind post one.

18  Q.   And that was approximately 11:15-ish.

19  A.   Approximately.

20         MR. DICKINSON:  Can we bring up Government's

21  Exhibit 347 on the monitor?

22         COURTROOM ADMINISTRATOR:  347?

23  BY MR. DICKINSON:

24  Q.   Yes.  Special Agent Johnson, this is a screenshot

25  approximately 11:30.  From this aerial view, can you see where

Michael Johnson - Direct

1   you would have been at post one?

2   A.   Yes, I can.

3   Q.   Can you circle it on the screen?

4        At approximately -- were you with anybody or next to

5   any specific person?

6   A.   I rode up in the vehicle with Special Agent Shilaikis, and

7   when we all arrived there, I was there with the -- the rest of

8   the investigative team and others.

9   Q.   And about how long were you at this specific spot?

10  A.   I'd say approximately 15 minutes.

11  Q.   And before you left that spot at 15 minutes, did Special

12  Shilaikis do anything?

13  A.   Special Agent Shilaikis was recording the events that were

14  occurring with a video camera.

15  Q.   So at some point when you were there for that brief period

16  of time, he started recording?

17  A.   Yes, he did.

18  Q.   And when you were at this spot for, as you say,

19  approximately 15 minutes, what did you observe?

20  A.   When we arrived at the area, we began to see large groups

21  of vehicles driving on the freeway coming in our direction.

22  Q.   Is that what we are seeing over here?

23  A.   Yes.

24  Q.   Did you see anything specifically, at this time, in those

25  first 15 minutes, that gave you any concern?

Michael Johnson - Direct

1    A.   Yes, definitely.  And I was narrating on the video which

2    Agent Shilaikis was recording, calling out some of the things

3    that I was seeing.  We began to see persons with all types of

4    weapons, wearing all types of military fatigues and so forth.

5    Q.   And when you say "all types of weapons," what do you mean?

6    What did you see?

7    A.   We were seeing assault-style rifles, bolt-action-style

8    rifles, handguns, extra magazines for handguns and assault

9    rifles.  Military-style fatigues.  Persons wearing body armor,

10   persons wearing elbow pads, knee pads, protective helmets.

11   Q.   And why was this of concern to you?

12   A.   It was of great concern to me.  It was unlike anything I

13   had ever seen before in my law enforcement career.

14   Q.   And you said you were there about 15-ish minutes.  Where

15   did you go then?

16   A.   There was one of the command staff that was located with

17   us there.  He was a special agent in charge of another region

18   named Loren Good.  He began to make assignments to move

19   investigative team members to additional areas to bolster the

20   support.

21   Q.   And how was that communicated to you?  Was that over

22   radio?  Were you wearing a radio?

23   A.   I was wearing a radio, but we were in voice communication.

24   We were close enough to just speak to each other.

25   Q.   And the radio you were wearing, was that called -- sort of

Michael Johnson - Direct

1    like a walkie-talkie type style with an earpiece?

2    A.    I had a shoulder mike.  I didn't have an earpiece.

3    Q.    So you were hearing it audibly?

4    A.    I could hear it audibly out loud.

5    Q.    And that would have been any radio traffic off that

6    frequency you were on?

7    A.    Yes.

8    Q.    And while we are on it, what were you wearing?

9    A.    I was wearing jeans and a T-shirt.  I put on my body armor

10   at that time and a ball cap.

11   Q.    And were you carrying any weapons?

12   A.    Yes, I was.  I was carrying my government-issued sidearm

13   pistol with a couple extra magazines.  I was also carrying my

14   government-issued AR15.

15   Q.    And where -- when you left here, where did Agent Good tell

16   you to go?

17   A.    He directed myself and Ranger David Russell to move over

18   to an area between post one and post two down in the wash.

19   Q.    Thank you.  Can you see that area in this picture?

20   A.    Yes, I can.

21   Q.    Is that specifically where you were?

22   A.    I believe so.  If there was another view from the other

23   side, I could confirm that, but I believe that is where we

24   were.

25   Q.    Was that any sort of a structure?

Michael Johnson - Direct

1   A.   That is a generator with a light tower attached to it.

2   Q.   Will you pull up Government -- can we publish Government

3   Exhibit 132, clip C, and go to approximately 19:26:40.   I

4   think -- if you could look on your screen, I think there's a

5   clear button.

6   A.   I got it.

7        (Exhibit 132 being played.)

8   Q.   You can pause it right there.   This is the opposite view.

9   Can you see here where you were?

10  A.   Yes, I can.

11  Q.   All right.   And approximately how long were you at that

12  position?

13  A.   I was there until we were told that the gather was

14  concluding, and we returned to the ICP to gather our belongings

15  and leave.   It was approximately an hour to two hours.

16  Q.   So if you got up to post one at 11:15 and were there about

17  15 minutes, you would have gotten here 11:30, 11:30-ish, 11:45

18  fair to say?

19  A.   Fair to say.

20  Q.   Now, just in general, what were you doing standing there

21  until you were told to leave that post?

22  A.   Well, specifically, we were using the generator as cover

23  due to the large numbers of persons that we were seeing with

24  weapons.   And we were there to provide cover for those that

25  were down inside the wash.

Michael Johnson – Direct

1           So we were doing two things.  We were protecting

2    ourselves by being there and protecting the others that were

3    down below us.

4    Q.   Now, I will try to have you give the jury the view of what

5    you could -- what you could actually view, because you couldn't

6    view everything; correct?

7    A.   Correct.

8    Q.   The sort -- could you view the north and southbound lanes

9    as they were over the wash?  So, essentially, what we're

10   referring to as the bridges?

11   A.   Yes, I could see those.

12   Q.   How far could you see -- could you see into the wash in

13   between the bridges from where you were standing?

14   A.   No, I couldn't.

15   Q.   So, if the bridge -- and I am holding my hands

16   apart about -- I don't know -- a foot.  If this is a bridge,

17   you could you see all the way to the ground or at some point

18   did your view stop?

19   A.   In between the bridges, no, we couldn't see in.  On the

20   north side of the bridge down where our people were, we could

21   see down into the bottom.

22   Q.   If we could go just up to 19:27.

23           (Exhibit 132 being played.)

24   Q.   Just keep going a little bit more, please.  Please, we can

25   stop it there.

Michael Johnson - Direct

1          (Exhibit 132 being played.)

2    Q.   So you could -- you couldn't see down here then?

3    A.   No, sir.

4    Q.   But you could see right there?

5    A.   Yes.

6    Q.   Okay.  Then -- so you couldn't see in the middle here?

7    A.   No, sir.

8    Q.   All right.  So during your time by the light generator,

9    were you using any sort of -- do you have binoculars?

10   A.   I did have binoculars.

11   Q.   And were you using those binoculars?

12   A.   I was.

13   Q.   And what were you using those for?

14   A.   I was using them to view persons and places that were, I

15   mean, close in, far away.  Using them to view everything I

16   could.

17   Q.   So were you scanning up and down both sides of the I-15?

18   A.   Yes, I was.

19   Q.   And what were you seeing?  What were you seeing that gave

20   you concern, if anything?

21   A.   Well, we were -- we continued to watch the crowds and the

22   vehicles gather on both sides of the I-15 as time went on.  One

23   of the most specific things, that I recall that I will never

24   forget, was something that I recognized very clearly to be a

25   sniper and a spotter.

Michael Johnson - Direct

1          I know this, because I am very active in the

2    outdoors.  I am a regular hunter and outdoorsman and use

3    binoculars and range finders on a regular basis.  And I

4    recognized very quickly an individual that -- there were two

5    individuals.  One individual that was carrying an assault-style

6    rifle, and he lowered himself below the concrete barricades,

7    and I didn't see him again.

8    Q.   Let me stop you right there.

9    A.   Okay.

10   Q.   Which concrete barricades?  I'm not saying it took place

11   at this time, but will this picture right here help you

12   describe?

13   A.   Yes, it would have been on the -- on the far side of I-15

14   in this area over here.

15   Q.   Okay.  Do you recall the specific area sitting here today?

16   A.   I can't tell you exactly where he was.  He was -- the

17   crowd was very large and extensive when we were looking at it,

18   and they were in there.  And I wasn't solely focusing on those

19   persons.  I was scanning all kinds of areas.

20   Q.   Okay.  So you saw two people that gave you concern in this

21   incident?

22   A.   I did.

23   Q.   One had a rifle?

24   A.   One had an assault-style rifle, and he -- I saw him,

25   through my binoculars, lay down behind the concrete barricade.

Michael Johnson - Direct

1    And I did not see him stand up again.  He was with a second

2    individual who had binoculars and a range finder.

3              MR. MARCHESE:  Objection.  Foundation.  I want to

4    know how he knows that he's with this individual.

5    BY MR. DICKINSON:

6    Q.   Where was the second individual --

7    A.   They were immediately --

8    Q.   Sorry.  Let me ask -- I don't want to talk over you, so

9    let me ask the question.

10             Where was the second individual in relation to first

11   individual?

12   A.   Standing right next to him.

13   Q.   Like -- say this is the first individual.  I'm the second

14   individual.  How close?

15   A.   Right -- all the way right next to him.

16   Q.   Like a foot?

17   A.   Standing together.

18   Q.   So you see the first individual was standing up, and do

19   you recall how they were holding the rifle?

20   A.   He had it slung with a sling over his -- over his

21   shoulder.

22   Q.   And then person dropped down behind --

23   A.   The person dropped behind the concrete barrier.

24   Q.   -- concrete barrier.  So you couldn't see him at all.

25   A.   Couldn't see him at all.

Michael Johnson - Direct

1          THE COURT REPORTER:  Please do not talk over one

2   another.

3          MR. DICKINSON:  I apologize.

4          MR. TANASI:  Your Honor, I am going to object to the

5   line of questioning as well.  Just from foundational purposes,

6   we don't know what time we're talking about here.

7          THE COURT:  Do you want to set a time?

8   BY MR. DICKINSON:

9   Q.   To the best of your ability, you got down -- you testified

10  down here about between 11:30 and 11:45.  Do you recall today

11  specifically what time you saw that?

12  A.   My best estimation would be sometime between 12:00, 12:30.

13         MR. TANASI:  Your Honor, same objection.  Sounds like

14  a guess to me.  Sounds like he's speculating.

15         THE COURT:  Overruled.

16  BY MR. DICKINSON:

17  Q.   So first -- you are talking -- you first person you saw.

18  What did you see the second person do that gave you -- if --

19  that caused you concern?

20  A.   The second person dropped down shortly after the first

21  person dropped down.  And then periodically, I would see him

22  pop back up over the concrete barricade.  And at times he was

23  using binoculars to look, and at other times, what gave me the

24  most concern, is what I recognized to be in his hand is a

25  handheld range finder.  A range finder is --

Michael Johnson - Direct

1    Q.   What -- what is a range finder?

2    A.   A range finder is something that is used to determine

3    distances between the person and a given object.

4    Q.   And how did you recognize that as a range finder?

5    A.   I recognized this, because I own one personally.  I -- I

6    have a government-issued range finder.  I have used them for

7    many years.

8            And I distinctly remember this individual holding the

9    range finder in his right hand.  They are a singular ocular

10   device which has one lens.  He brought it up to his right eye

11   with his right hand.  And I saw him do that a number of times

12   pointing it at different individuals, and, in fact, pointing it

13   at me.

14   Q.   And did that give you concern?

15   A.   It gave me great concern.

16   Q.   Why?

17   A.   I have never seen anybody in any situation ever use a

18   range finder to look at me or my fellow officers.  Nor could I

19   envision them doing that for any reason other than to cause me

20   harm.

21   Q.   And how were you feeling at that time?

22   A.   At that time, I began to be even more concerned than I

23   already was.

24   Q.   What were you concerned for?

25   A.   I was concerned that he was providing distances to the

Michael Johnson – Direct

1   person that I saw drop below the barricades first to

2   potentially engage us in gunfire.

3   Q.   So did you feel threatened?

4   A.   Absolutely.

5   Q.   Were you concerned for the safety of your fellow officers?

6   A.   Absolutely.

7   Q.   And at some point, did your view or attention get drawn

8   away from -- from those individuals?

9   A.   Yes, it did.

10  Q.   And what were you continuing to see?

11  A.   We were continuing to see all manner of persons, men,

12  women, children, both armed and unarmed, move about.  And, I

13  mean, in every direction we could see.

14  Q.   And you mean every direction.  Do you mean -- because

15  you've said you couldn't see in between the bridges, so would

16  it be around?

17  A.   Anywhere we could see, we could -- there were people in

18  front of us.

19  Q.   Now, I specifically want to draw your attention -- again,

20  I'm not specifically this time at 12:27.  But on the northbound

21  bridge, so over here, which I have circled with red, at some

22  point did you notice what appeared to you to be other law

23  enforcement officers?

24  A.   Yes, I did.

25  Q.   Were you aware what agency they were with?

Michael Johnson - Direct

1   A.   I believed them to be Nevada Highway Patrol based on their

2   uniform.

3   Q.   And what did you see?  Were they in or out of their

4   vehicles?

5   A.   They were out of their vehicles.

6   Q.   And what did you see them doing?

7   A.   I just saw them walking around amongst the people on the

8   overpass and in the area of the overpass.

9   Q.   And based on what you were observing, did that cause --

10  did that cause you any concern about what actions or nonactions

11  you may need to take?

12  A.   I remember being extremely confused as to why they were

13  just walking around in the area.  And I'm still confused to

14  this day.  I don't -- I don't know exactly what they were

15  doing.

16  Q.   Now, you a second ago said that you saw also types of

17  people.  So first you saw people armed.  You mentioned rifles.

18  Handguns as well?

19  A.   Yes, sir.

20  Q.   You saw unarmed individuals; correct?

21  A.   Yes, sir.

22  Q.   Men, women, people that appeared underage?

23  A.   Yes, sir.

24  Q.   Did the totality of that -- of those different types of

25  people intermingling pose a concern to you?

Michael Johnson - Direct

1    A.   It was a great concern.

2    Q.   And why is that?

3    A.   Well, our -- I was contemplating the difficult situation,

4    the difficult option of if I was forced to use deadly force, it

5    would be extremely difficult to do so given the other persons

6    that were intermingled with those that were -- that were armed.

7    Q.   Now, when you were -- when you were down at the light --

8    the light post, when you were observing things, did you observe

9    Special Agent -- were you able to see or did you see Special

10   Agent Love walk to the -- to the gate?

11   A.   I saw him walking in the area, but we couldn't see clear

12   to the bottom.  I couldn't see him when he -- he became out of

13   view at one point.

14   Q.   Okay.  And at some point thereafter, did you see him come

15   back?

16   A.   Yes, I did.

17   Q.   And was he with anybody?

18   A.   I don't recall.

19   Q.   At some point after Special Agent Love came back, were you

20   given further direction which caused you to leave where you

21   were?

22   A.   Yes.  We were given direction via the -- via radio traffic

23   and in person that we should return to the ICP, gather our

24   belongings, and prepare to leave.

25   Q.   And were you given a time period?  How long you had?

Michael Johnson - Direct

1    A.    It was as soon as possible.

2    Q.    Were you told why?

3    A.    I was not told why.

4    Q.    So did you, in fact, gather your belongings?

5    A.    Yes, we did.  The -- the -- all the law enforcement

6    officers returned to the ICP and began loading up their trucks,

7    hooking on trailers as fast as we could.

8    Q.    And how did -- did you leave?

9    A.    Yes, we did.

10   Q.    And how did you leave?

11   A.    We left in our vehicles.

12   Q.    All together?

13   A.    All together.

14   Q.    Will you pull back up Government Exhibit 347.

15         Did you leave out of the entrance at post one?

16   A.    Yes, we did.

17   Q.    So you would have come like this onto the 15?

18   A.    Yes, and then --

19   Q.    You can do it.

20         So you just drew -- you came through the median and

21   then onto the northbound bridge up to -- towards Mesquite?

22   A.    Yes, we returned to our hotel in Mesquite.

23   Q.    And what -- what happened when you got to your hotels in

24   Mesquite?

25   A.    Well, we -- when we left and we crossed the median, we --

Michael Johnson - Direct

1    there was a large group of people that were gathered in the

2    area.  And I had my --

3    Q.   Let me stop you.

4    A.   Oh.

5    Q.   Let me ask that question.  When you left, were there

6    people that were watching here?

7    A.   Yes, there were lots of people and --

8    Q.   And where were --

9    A.   -- lots of vehicles.

10   Q.   -- where were the people primarily gathered?

11   A.   (Indicating.)

12   Q.   And so as you pulled out through here and went down,

13   drawing back the direction you had, what was -- were you able

14   to observe the mood of the crowd?

15   A.   Yes, I was.  I had the windows cracked in my vehicle, so I

16   could hear what they were saying.  And as I drove past, there

17   were people yelling and screaming obscenities at us and -- as I

18   drove past, and then we returned to Mesquite.

19   Q.   So you get to your hotel at Mesquite, and what did you do

20   there?

21   A.   We packed our belongings in our hotel rooms and got in our

22   vehicles to prepare to depart for Las Vegas.

23   Q.   So you didn't stay in Mesquite that night?

24   A.   No, we didn't.  In fact, while we were packing up our

25   rooms, Las Vegas Metropolitan SWAT team was standing guard at

1   the hotel so we could pack our belongings and leave in safety.

2   Q.   Based on your training and experience, is that unusual to

3   have another agency providing another agency protection?

4   A.   Very unusual.

5   Q.   You talked about the -- that you felt threatened or in

6   fear on the 12th.  At what point did you stop feeling concern

7   for your safety?

8   A.   It would have been later that evening after we arrived in

9   Las Vegas at a new hotel and -- and we were amongst -- I was

10  amongst my peers.  It was just later that evening.

11  Q.   Now, yesterday you testified about your -- starting back

12  in March, your original involvement in the impoundment, which

13  was just reaching out to the Bundy family, and you had a

14  conversation with Ryan Bundy.

15          Did that conversation ever cross your mind when you

16  were in the wash on the 12th?

17  A.   I began to reflect upon it more that evening after --

18  after we were in Las Vegas.  And it was ringing in my --

19  ringing true to me that what he had said he would do, he did.

20  That he would stop the gather, and that he would have hundreds

21  of supporters to help him do it.

22  Q.   And how, if at all, has the experience of

23  April 12th affected you?

24  A.   It has been -- I have thought about it many, many times in

25  the last few years.  There is a distinct point to me that is

Michael Johnson - Cross

1  something that is different than anything else I've ever

2  experienced in my law enforcement career.

3          Normally, when potential use of force situations

4  occur, it would be something such as myself and another team

5  members serving an arrest warrant or a search warrant.  And we

6  would know that we were going into a potential situation, a

7  harmful situation.

8          In this case, I felt like the day of the 12th, we

9  were sitting at the ICP and minding our own business, if you

10  will.  And these persons came at us, which was a very

11  distinguishing factor for me.

12          MR. DICKINSON:  One second, Your Honor.  May I have

13  one minute?

14          THE COURT:  Yes.

15      (Pause in the proceedings.)

16          MR. DICKINSON:  Thank you, Your Honor.  I will pass

17  the witness.

18          THE COURT:  Cross-examination.

19          MR. TANASI:  Yes, Your Honor, briefly.

20          THE COURT:  All right, Mr. Tanasi.

21          MR. TANASI:  Thank you.

22                      CROSS-EXAMINATION

23          MR. TANASI:

24  Q.  Good morning, Agent Johnson.  How are you?

25  A.  Good morning, sir.  Well.  Thank you.

Michael Johnson - Cross

1   Q.   Good.  My name is Richard Tanasi.  I represent Steven

2   Stewart.  I've got just a couple questions for you on cross.

3   Okay?

4   A.   Okay.

5   Q.   Yesterday we heard a kind of audio snippet version of your

6   phone call with Ryan Bundy prior to April 12, 2014.  Do you

7   remember that?

8   A.   I do.

9   Q.   We heard a few of them; right?

10  A.   Yes, sir.

11  Q.   All right.  And just for the record, stating the obvious,

12  that conversation was not with my client, Steven Stewart;

13  correct?

14  A.   No, it was not.

15  Q.   In fact, you have never spoken to my client, Steven

16  Stewart, before in the past; correct?

17  A.   Never.

18  Q.   Okay.  Now, you indicated on the 12th that on that

19  northbound bridge where you saw what you've called are snipers

20  and spotters, you also saw NHP and Metro just walking around;

21  right?

22  A.   I recall --

23  Q.   Yes or no, sir.

24  A.   Yes.  Not both.  I recall one.

25  Q.   Okay.  Did you see NHP just walking around?

Michael Johnson - Cross

1    A.   Yes, I did.

2    Q.   Thank you.  And on the 12th, Agent Love -- he is your

3    boss; correct?

4    A.   Not now.  On the 12th.  Excuse me.  Yes, he was.

5    Q.   He is no longer your boss.  Why is that?

6              MR. DICKINSON:  Objection.  Relevance.

7              THE COURT:  Sustained.

8    BY MR. TANASI:

9    Q.   Sir, on the 12th, Agent Love, he was your boss; correct?

10   A.   Yes.

11   Q.   And so he was in charge; fair to say?

12   A.   Yes.

13   Q.   Okay.  He was an important part of the day's events on the

14   12th; fair to say?

15   A.   Yes.

16   Q.   Very important part.  Probably the most important part;

17   correct?

18   A.   I agree.

19   Q.   Thank you, sir.  In this case, you prepared a report;

20   fair?

21   A.   Yes.

22   Q.   Prepared several reports; right?

23   A.   Yes.

24   Q.   In fact, you prepared a report related to your events on

25   the 12th; correct?

Michael Johnson – Cross

1    A.    Yes.

2    Q.    But you prepared that report on the 14th, two days later;

3    correct?

4    A.    Yes.

5    Q.    All right.  Prior to preparing that report, you probably

6    talked to Agent Love; isn't that fair?

7    A.    Yes.

8            MR. TANASI:  Thank you.  Nothing further.

9            THE COURT:  Anyone else want to cross-examine Special

10   Agent Johnson?

11           Mr. Marchese.

12           MR. ENGEL:  Yes, Your Honor.

13           MR. MARCHESE:  I believe Mr. Engel is going to go.

14   I'll wait until after him.

15           THE COURT:  All right.  Mr. Engel.

16                        CROSS-EXAMINATION

17   BY MR. ENGEL:

18   Q.    Good morning.

19   A.    Good morning.

20   Q.    You stated that you were at post one approximately 11:15;

21   is that correct?

22   A.    Yes.

23   Q.    At 11:15, you begin to see vehicles pulling up on the

24   opposite side of both lanes of the highway; correct?

25   A.    Yes.

Michael Johnson - Cross

1  Q.   At 11:15 to 11:25, there were no law enforcement vehicles

2  parked in the median between the northbound lane and the

3  southbound lane; correct?

4  A.   I don't recall.

5  Q.   Can we go to that exhibit, please.  132.  Exhibit 132 at

6  what would be 18:50 or 18:20?

7           MR. MARCHESE:  18:20.

8       (Exhibit 132 being played.)

9  BY MR. ENGEL:

10  Q.   Brian, go until you see post one and the freeway, please.

11  Right there, please.

12           So, at 18:00, which would be 11:20 in the morning,

13  there is just two vehicles in the median; is that correct?

14  A.   I see those.

15  Q.   Okay.  Go a little bit further, please, to -- I think it's

16  18:22, 18:25.  Right there.  A little bit further, please,

17  Brian.  Right there.  Back up a little bit.  Back up just a

18  touch, please.  Right there.

19       (Exhibit 132 being played.)

20  Q.   It seems to be that the vehicles are no longer there; is

21  that correct?

22  A.   You are talking about the police vehicles?

23  Q.   The vehicles that were previously -- right there.  Stop,

24  please.

25  A.   I don't see them in the frame.

Michael Johnson - Cross

1    Q.   So, would it be fair to assume that the people that were

2    parking across both lanes of freeway had direct access to come

3    towards post one?

4    A.   Because it was unblocked.

5    Q.   Unimpeded.  There is no law enforcement standing between

6    post one and where the people are parking?

7    A.   I don't see any barricades.

8    Q.   So they -- once again, they had direct access to make a

9    left and come directly towards post one?

10   A.   I am unaware if there were additional police officers that

11   were telling them to stay back.  I -- I don't know.

12   Q.   Okay.  When you were at post one, you stated that you

13   observed people with weapons; is that correct?

14   A.   Yes.

15   Q.   At that time, did you begin to level your weapon and aim

16   it at those folks?

17   A.   No, I did not.

18   Q.   Did you not aim it at them because you didn't feel

19   threatened?

20   A.   At that time, they were not aiming them at me.

21   Q.   Okay.  So you didn't feel that you needed to aim them

22   back; correct?

23   A.   Correct.

24   Q.   Okay.  On the radio, you guys were calling out the

25   protests were moving down to the wash; is that correct?

Michael Johnson - Cross

1   A.   I heard some traffic to that.

2   Q.   And that would be approximately 11:35?

3   A.   I -- I couldn't say exactly when it was.

4   Q.   Okay.  And at approximately 11:35, 11:40, everybody was

5   talking about protesters under the bridge; correct?

6   A.   There was so much radio traffic, I can't recall an exact

7   time or exactly what was being said.  There was nonstop radio

8   traffic.

9   Q.   Did you hear over the radio when Agent Stover sent

10  officers into the wash?

11  A.   I don't recall that.

12  Q.   Okay.  At 11:20, do you recall when the sheriff's deputy

13  arrived to post one and told you BLM officers to put away your

14  rifles?

15  A.   No.

16          MR. DICKINSON:  Objection.  Hearsay or calls for

17  hearsay.

18          THE COURT:  Do you want to rephrase that, Mr. Engel?

19  BY MR. ENGEL:

20  Q.   Did you ever hear Sheriff Roberts tell you guys at the

21  post -- at post one to put away your rifles?

22  A.   No, I did not.

23  Q.   Do you recall, at 11:27 in the morning, a call coming over

24  the radio stating -- by your dispatch -- "Get your long guns

25  out of sight.  They have enough."

Michael Johnson - Cross

1    A.    No, I do not.

2    Q.    From your position, were you able to see -- when you guys

3    moved over to -- when you moved out of post one and moved over

4    to the light tower, were you able to view the officers down in

5    the wash?

6    A.    Yes.

7    Q.    Were you able to view all the vehicles behind the officers

8    that were right up against the gate?  The ones directly as they

9    were stacked up back there behind them?

10   A.    I could see the vehicles.

11   Q.    Okay.  Do you recall Agent Love or Agent Stover ever

12   giving the order to escalate the situation?

13   A.    No.

14   Q.    Did Agent Love or Agent Stover ever give the order to aim

15   their weapons at the people in the wash?

16   A.    I didn't hear that.

17   Q.    At this time, were you ever given the authority to aim

18   your weapons at people under the wash by anybody?

19   A.    No.

20   Q.    Were you aware that the people in the wash heard over the

21   loudspeaker that you guys were going to shoot them?

22            MR. DICKINSON:  Objection.  Speculation.

23            THE COURT:  The question was phrased properly.  "Did

24   you ever hear," so I will allow it.

25            THE WITNESS:  No, I did not.

Michael Johnson - Cross

1   BY MR. ENGEL:

2   Q.   Was that you on the loudspeaker shouting that you would

3   shoot the protesters if they came forward?

4   A.   No.

5   Q.   Do you know who it was?

6   A.   No, I do not.

7   Q.   From your perspective, you could see post one -- post one

8   and behind post two; correct?

9   A.   Yes.

10  Q.   But you could not see in between the bridges?

11  A.   No.

12  Q.   Is that correct?  Could not.  So you could film everybody

13  on the northbound bridge; correct?

14  A.   I was not filming.

15  Q.   Agent Shilaikis standing next to you, was he filming?

16  A.   He was filming back when we arrived the tractor.  He was

17  not with me --

18  Q.   Okay.

19  A.   -- when I got to the generator light tower.

20  Q.   Okay.  Thank you.  Did you -- at 11:53, did you see the

21  lady that left the wash, and went back to the parking area, and

22  yelled to the people in the parking area "The BLM is aiming

23  rifles at the people under the bridge"?

24  A.   No, I did not.

25  Q.   Go to 11- -- or 18:42, please.  It may be on the next one,

Michael Johnson - Cross

1  Brian.  18:42.  Right at the end.  Right there where you have a

2  view of the northbound lane, please.  There you go.

3      (Exhibit 132 being played.)

4  Q.  So here at 18:42, there is nobody on the bridge; is that

5  correct?

6  A.  I see one person.

7  Q.  Okay.  One person and one vehicle.  So it would be safe to

8  stay there were no protesters on the bridge at that time?

9  A.  I don't see a large group, no.

10 Q.  And you can see the folks underneath the bridge; correct?

11 A.  I can see them.

12 Q.  Were you aware that at 11:41, your fellow officers at post

13 one -- at post two began aiming their weapons at the folks

14 under the bridge?

15 A.  I did see my fellow officers aim their weapons towards

16 that area, as I also saw persons under the bridge --

17 Q.  Excuse me, Officer.  Just answer the question, please.

18 A.  Okay.

19 Q.  So at 11:41, you did -- you state that you did see your

20 officers -- your fellow officers aiming their weapons into the

21 wash area; correct?

22 A.  I couldn't give a specific time.  It was in that -- in

23 that time frame.

24 Q.  Now, you also stated you didn't level your weapon at the

25 people pulling up across the road even though that they -- you

Michael Johnson - Cross

1  observed them having weapons; is that correct?

2  A.    I did not point my weapon at anybody.

3  Q.    So once again, you state you did not see the lady run down

4  the freeway at 11:53, and yell to everybody standing in the

5  parking area that the BLM is pointing rifles?

6            MR. DICKINSON:  Objection, asked and answered.

7            MR. ENGEL:  Okay.  Sorry.

8            THE COURT:  Sustained.

9  BY MR. ENGEL:

10 Q.    So as we see here at 11:42, there's nobody on the bridge.

11 Can you fast forward to 11:54, please, Brian?  I don't think

12 you are going to find it on this one.  11:54, please.

13            MR. GLYNN:  18:54?

14    (Exhibit 132 being played.)

15 BY MR. ENGEL:

16 Q.    Yeah.  I'm sorry.  Try to go to where you see the bridge

17 or -- right there.

18 Q.    Okay.  It's difficult to see, Officer Johnson, but there

19 on the bridge, right in front of the semi-truck, do you -- can

20 you see where there's a large group of protesters standing?

21 A.    Yeah.  Right there?

22 Q.    Yeah.  Right there.  Yes, sir.

23 A.    I see those in the picture.

24 Q.    So it would be safe to say that after the lady came down

25 to the parking area and yelled "The BLM is pointing rifles at

1   the people under the bridge" --

2              THE COURT:  Mr. Engel, he's already stated --

3              MR. ENGEL:  Sorry, Your Honor.

4              THE COURT:  You're assuming facts that aren't in

5   evidence.  There's been no evidence of that.  He said he didn't

6   hear it, so you can't keep saying it as if it actually is a

7   fact.

8              MR. ENGEL:  Yes, ma'am.  Sorry.

9              THE COURT:  Please rephrase.

10  BY MR. ENGEL:

11  Q.   So at this time at 11:54, now there are people at the

12  bridge; correct?  On the top of the bridge?

13  A.   I see them.

14  Q.   Okay.  Can you fast forward, please, to 11:57?  And let it

15  play a little bit, please, Brian.

16       (Exhibit 132 being played.)

17  Q.   And ready to stop it right -- right there.  Right there.

18  FBI Agent McEwen testified --

19              MR. DICKINSON:  Objection to what somebody else

20  testified to, Your Honor.

21              THE COURT:  Sustained.

22  BY MR. ENGEL:

23  Q.   Agent Johnson, would you attempt to identify that vehicle

24  for us, please?

25  A.   The white one or the --

Michael Johnson - Cross

1    Q.    Yeah, the white one on the top side of the two vehicles.

2    A.    It appears to be some sort of a police vehicle.

3    Q.    So it would be safe to say that a police -- police

4    officers were amongst the people on the northbound bridge;

5    correct?

6    A.    Yes.

7    Q.    At approximately 12:00 p.m., the horses came down and went

8    underneath the northbound bridge.  Is that -- would that be

9    safe to say?

10   A.    I saw them when they were on the horizon, and then I lost

11   view of them when they went underneath.

12   Q.    Okay.  At this time, were you able to still see the agents

13   down at post one aiming their rifles in towards the wash area?

14   A.    Are you talking about post two?

15   Q.    Post two.  Excuse me.  I'm sorry.

16   A.    I -- I saw them on a few different occasions.  I can't say

17   exactly when it was.

18   Q.    Okay.

19   A.    As I was -- as I have stated earlier, I was scanning the

20   entire area for a long period of time.

21   Q.    Thank you.  At this time, do you recall seeing National

22   Park Service agents come around the side of their vehicle and

23   do what you gentlemen call a stack formation?

24   A.    I -- I did see them down there in a group.  I'm unaware of

25   their exact tactics.

Michael Johnson - Cross

1    Q.    Okay.  Can you go to Exhibit 257, please.

2              Would you recognize those gentlemen as being National

3    Park Service police that were on the side of their vehicle that

4    day?

5    A.    I do recognize them as such.

6    Q.    At approximately 12:00 p.m.?

7    A.    I do not know the time.

8    Q.    Okay.  Thank you.  Can you recall how long they held this

9    position?

10             MR. DICKINSON:  Objection, Your Honor.  He's

11   testified that he didn't see them in this position.

12             MR. ENGEL:  Oh, sorry.

13   Q.    Can you go to Exhibit 258, please, Brian.

14             From your position, Officer Johnson, could you see

15   these gentlemen?

16   A.    I could see them from the side, not from -- not from this

17   position that this picture depicts.

18   Q.    Okay.  And you don't recall if you saw them take up this

19   position at 11:41 in the morning?

20   A.    Not exactly.

21   Q.    Let's move on from 12:00 p.m. to 12:16 p.m.

22             At 12:26, Special Agent in Charge Love approached the

23   gate; correct?

24   A.    I'm not aware of the exact time.

25   Q.    It's approximately.

1    A.    Approximately.

2    Q.    Okay.  Thank you.  Agent Stover at this time testified

3    that up to this point --

4            MR. DICKINSON:  Objection about what another witness

5    testified about.

6            THE COURT:  Sustained.

7    BY MR. ENGEL:

8    Q.    At this time, were you able to observe Agent Love at the

9    gate?

10   A.    I could not see him at the gate.  I saw him approach the

11   area, but I couldn't see that far down in.

12   Q.    Okay.  So let's go to 12:24, please.

13            At this time, you see Tom Roberts and another deputy

14   arrive and start walking towards the gate?

15   A.    I don't know Tom Roberts.

16   Q.    The sheriff deputy for Las Vegas Metro?

17   A.    I saw individuals approach the gate at varied times

18   throughout the entire afternoon.

19   Q.    Okay.  And at this time, were you still observing this

20   vehicle parked in this current position?

21   A.    I don't -- I don't recall that from this view.  I was in a

22   completely different view.

23   Q.    So you couldn't see that vehicle?

24   A.    I could see the vehicle.  It was not from this

25   perspective.  But I could see this vehicle, and I could see

1    these people.

2    Q.   And you would state that it was still parked there at

3    12:24 when the sheriff deputies arrived; correct?

4    A.   I am unaware of an exact time, but I did see that vehicle

5    in that area at that time.

6    Q.   Okay.  At approximately 12:27, Dave Bundy, Dan Love, and

7    Dennis Michael Lynch, a reporter, started -- had crossed over

8    the gate and started to walk towards post one; is that correct?

9    A.   I didn't see them.

10   Q.   All right.  Let's back up a little to 12:18.

11            At approximately 12:18, you had -- still had a visual

12   of the northbound lanes; correct?

13   A.   Yes.

14   Q.   At approximately 12:18, did you see two Nevada Highway

15   Patrol trooper vehicles arrived on the northbound bridge?

16   A.   I saw Nevada Highway Patrolmen in the area during the --

17   most of the time.

18   Q.   Did you see them park amongst the protesters at

19   approximately 12:18?

20   A.   I couldn't be that specific.  I saw them in the area

21   during that time.

22   Q.   And you stated that they got out of their vehicles -- out

23   of their vehicles and walked amongst the people?

24   A.   I saw that.

25   Q.   At this time, did you observe me seeking help from the

Michael Johnson - Cross

1    officers?

2    A.   You yourself?

3    Q.   Yes, sir.

4    A.   I don't recall seeing you.

5    Q.   So you don't recall seeing me on the bridge?

6              MR. DICKINSON:  Objection.  Asked and answered.

7              MR. ENGEL:  Sorry, Your Honor.  Sorry.

8    Q.   Did you begin -- did you see them begin to assist the

9    protesters on the bridge?

10             MR. DICKINSON:  Objection.  By who?

11   BY MR. ENGEL:

12   Q.   By highway patrol.

13   A.   I couldn't see exactly what they were doing.

14   Q.   But you stated that you saw them amongst us?

15   A.   I saw them there, and I saw them walking around.

16   Q.   So now we've seen Metro PD amongst the protesters up on

17   the bridge, and now we are seeing, about 20 minutes later,

18   highway patrol among the people on the bridge?

19             MR. DICKINSON:  Objection, Your Honor.  He said he

20   didn't see Metro PD on the bridge.

21             THE COURT:  Sustained.

22   BY MR. ENGEL:

23   Q.   You saw law enforcement vehicles amongst the people on the

24   bridge; correct?

25   A.   I did.

Michael Johnson - Cross

1    Q.   And now you have seen highway patrol park on the bridge,

2    get out of their vehicles, and walk amongst the people?

3    A.   I saw Nevada Highway Patrol.  I saw their vehicles.  I saw

4    them amongst the people.

5    Q.   Are you aware that the law enforcement officers that you

6    saw at 11:57 and at approximately 12:18 made no arrests that

7    day?

8    A.   I am unaware.

9    Q.   Are you aware that that vehicle was parked there with

10   those men aiming rifles at the people under the wash until

11   12:56?

12         MR. DICKINSON:  Your Honor, these questions are

13   assuming facts not in evidence.

14         THE COURT:  Sustained.  You could just rephrase the

15   question.  Instead of saying "Are you aware that they did

16   something?" you can say, "Did you ever see them doing

17   something?"

18   BY MR. ENGEL:

19   Q.   Did you see this vehicle parked there until 12:56?

20   A.   I can't specify a time, but I did see the vehicle in the

21   area during this event.

22   Q.   Okay.  Thank you.  So at this time, you have stated that

23   you did not level your weapon at anybody at post one or post

24   two; correct?

25         MR. DICKINSON:  Objection.  Asked and answered.

Michael Johnson - Cross

1          THE COURT:  Sustained.

2     BY MR. ENGEL:

3     Q.   Officer Johnson, were you injured in any way on this day

4     physically?

5     A.   No.

6          MR. ENGEL:  Thank you, Your Honor.  I have no more

7     questions.

8          THE COURT:  Thank you, Mr. Engel.

9          Mr. Marchese?

10         MR. MARCHESE:  Thank you, Your Honor.

11                    CROSS-EXAMINATION

12    BY MR. MARCHESE:

13    Q.   Good morning, sir.  My name is Jess Marchese.  I represent

14    Eric Parker, the gentleman in the blue shirt right there.

15    A.   Good morning, sir.

16    Q.   I am going to ask that --

17         Brian, can you get 132 up, please?  This is an

18    exhibit that's been previously entered into evidence, and I

19    just want to use it to familiarize you with the area and where

20    you were on that day.

21         And while he gets there, I am going to ask you a

22    couple preliminary questions, sir.

23         So, on the 11th, you are working.  April 11th, that

24    is 2014.  You are working in an undercover capacity; fair to

25    say?

Michael Johnson - Cross

1    A.   Me personally?

2    Q.   Yes.

3    A.   Yes, I was in plain clothes.

4    Q.   Okay.  An investigative unit, I believe, is the way you

5    had described it?

6    A.   Yes.

7    Q.   And was it you and four other officers or three other

8    officers?

9    A.   I was the investigative team leader.

10   Q.   Okay.

11   A.   And there were -- are you referencing the four undercover

12   officers that went to the rally area?

13   Q.   I have -- my notes indicate that there were four

14   undercover officers, and you had gone back to the ICP compound;

15   is that correct?

16   A.   At what time?

17   Q.   On April 11th, 2014.  You went out to the hotel, and then

18   you came back; is that correct?

19   A.   I'm not sure exactly what time of day you are referring

20   to.

21   Q.   Okay.  Did you make it to the ICP compound on the 11th?

22   A.   Yes.

23   Q.   Okay.  What time did you go back?

24   A.   In the evening time.

25   Q.   Okay.  Had you gone in any other time on that day?

Michael Johnson – Cross

1   A.   I was there in the morning, I believe.

2   Q.   Okay.  So you were there or you weren't there in the

3   morning?

4   A.   I believe I was.  I can't say for sure.  I don't know.  I

5   don't remember where we started that day.

6   Q.   All right.  Long day.  Correct?

7   A.   Long day.

8   Q.   I believe you had even said something to the effect of you

9   didn't sleep much?

10  A.   The night of the 11th into the 12th, no, I did not.

11  Q.   Okay.  How about previous to that?  Did you sleep?

12  A.   I did.

13  Q.   Okay.  How much did you sleep on the 11th and the 12th?

14  A.   I would say, at most, a couple hours.

15  Q.   So it's a long day?

16  A.   Very long day.

17  Q.   So you were running on fumes?

18  A.   I was tired, but I was doing well.

19  Q.   Sure.  You were awake, but you were tired.  You like to

20  get a good night's sleep in a good bed; fair to say?

21  A.   Fair to say.

22  Q.   All right.  So, you get back.  And at some point in time,

23  I believe your testimony was about 11:30-ish, you get up to

24  post one; is that correct?

25  A.   Approximately 11:15.

Michael Johnson - Cross

1    Q.    11:15.  And then you were there for about 15 minutes, give

2    or take?

3    A.    Give or take.

4    Q.    And, of course, while this whole ordeal is going on,

5    you're not looking at your watch; right?

6    A.    No, I am not.

7    Q.    You are not taking notes, pulling out your cell phone,

8    checking the time.  This is a guestimate; right?

9    A.    Yes.

10   Q.    Your mind was in other places, obviously?

11   A.    Yes, it was.

12   Q.    Now, I want to turn your attention to the screen here.

13   And Mr. Dickinson showed you some angles from here.  You

14   recognize this area; correct?

15   A.    I do.

16   Q.    All right.  So, you said at about 11:15, you got to a

17   particular area.  Please put a one on the screen in the area

18   where you originally got to.

19   A.    Is there any way to zoom in a little bit?

20   Q.    Unfortunately, no.  And this was the best overhead,

21   because I wanted to get the entire area.

22          Okay.  So that's where you started out, and that's

23   when you were with Special Agent Shilaikis, I believe?

24   A.    Yes, sir.

25   Q.    Who else were you with at that time?

Michael Johnson – Cross

1    A.   There were several other of the investigative team

2    members.

3    Q.   Okay.  Now, the invest -- who were the other investigative

4    team members that you were with?  Was it all the people under

5    you that you were supervising?

6    A.   Yes.

7    Q.   And who were they again?  I apologize.

8    A.   They were -- I don't exactly remember when they came up,

9    if they came up exactly with me, a minute after, a minute

10   before.

11   Q.   Sure.

12   A.   But there were -- there was a Forest Service officer,

13   there was BLM Ranger David Russell.  There was another Special

14   Agent in Charge Loren Good who had come up.  There was -- there

15   was a number of us.

16   Q.   Okay.  And once again, this is not something that you are

17   writing down as you are going on.

18   A.   No.

19   Q.   You don't exactly know what's about to transpire, so you

20   are just kind of focusing on the situation at hand; fair to

21   say?

22   A.   Fair to say.

23   Q.   At some point in time, you and David Russell go back

24   towards post one and two in the wash; is that correct?

25   A.   In between?

Michael Johnson - Cross

1   Q.   Yes.

2   A.   At the generator.

3   Q.   Right.  And can you put an X on the screen as to where you

4   would be at that point?

5   A.   This -- I can approximate.  This is so zoomed out that I

6   can't see exactly where it is.

7   Q.   Okay.  Please approximate.

8         Now, this particular terrain, would you -- you would

9   agree with me that from the freeway and down into the wash,

10  it's down at an angle.  Is that fair to say?

11  A.   Yes.

12  Q.   Okay.  Now, you prepared a memorandum -- a memorandum --

13  excuse me -- of activity in reference to this event and other

14  events that you perceived as a result of your investigation; is

15  that correct?

16  A.   Are you referring to the one on the 14th?

17  Q.   I was about to lay some more foundation to that, and there

18  was one specifically on April 14, 2014, that you prepared;

19  correct?

20  A.   I recall it, yes.

21  Q.   Okay.  Now, this particular event occurred on April 12th

22  of 2014; correct?

23  A.   Yes, it did.

24  Q.   So, it was prepared two days after the event in question.

25  You would agree with me on that statement; correct?

Michael Johnson - Cross

1    A.    I agree.

2    Q.    Did you prepare any notes in which you used to prepare

3    your April 14th, 2014, memorandum of activity?

4    A.    I did not.

5    Q.    Okay.  So basically, what you did is you went off your

6    memory?

7    A.    Yes, I did.

8    Q.    Okay.  And as you have previously testified before, on

9    direct examination, this was a memorable event.  You would

10   agree with me on that?

11   A.    Yes.

12   Q.    So, one of the things that I have here is that from your

13   perspective -- now, I'm talking about the second position by

14   the generator when you are with Mr. Russell.

15          From your perspective, it was difficult to see all

16   the areas of the wash; fair to say?

17   A.    Fair to say.

18   Q.    Okay.  You could see where the law enforcement was,

19   because that was kind of, I guess, on your side of the road,

20   for lack of a better term?

21   A.    Fair to say.

22   Q.    Okay.  And then in between the south and the northbound

23   bridges, that was a little more difficult.  You couldn't see

24   everything in there due to the terrain, for lack of a better

25   term?

Michael Johnson - Cross

1   A.   Correct.

2   Q.   Okay.  Now, as to the southbound bridge, could you see the

3   southbound bridge from where you were located?

4   A.   I could see both.

5   Q.   Okay.  You could see both bridges.  You would agree with

6   me though, that the area that you were in is actually at a --

7   somewhat of a lower elevation than the bridges; is that fair to

8   say?

9   A.   I would say it's fairly even.

10  Q.   It's even.  Did you take any pictures that day from that

11  location?

12  A.   I did not.

13  Q.   Okay.  And you were using binoculars; correct?

14  A.   Yes, I was.

15  Q.   You were with Special Agent Russell.  Were you with anyone

16  else at that specific location?

17  A.   No.

18  Q.   Okay.  So it was just the two you of in that immediate

19  area?

20  A.   Yes.  I was aware that people were working at a distance

21  behind me from time to time, but we were the only two there.

22  Q.   You were the only two in that fixed position; correct?

23  A.   Yes.

24  Q.   People were coming and going.  But for the most part,

25  that's your area, you and Mr. Russell?

Michael Johnson - Cross

1  A.   Yes, it is.

2  Q.   Okay.  Now, you have -- you are obviously aware of your

3  memorandum of activity from that day, because you were the one

4  who told me about it?

5  A.   Yes, I am.

6  Q.   And I would also -- is it fair to say that you knew you

7  were coming to court today; correct?

8  A.   Yes.

9  Q.   So you have probably reviewed it just to freshen up.  It's

10  almost three years after the incident; correct?

11  A.   I have.

12  Q.   And you've probably met with Mr. Dickinson just to kind of

13  go over the expectations of what he might ask you and things

14  like that in this proceeding here today; fair to say?

15  A.   Fair to say.

16  Q.   All right.  Isn't it true that in your memorandum of

17  activity, that you said that due to the distance between my

18  position and the persons and vehicles I was observing, I was

19  unable to identify individual persons; is that correct?

20  A.   Specifically, yes.

21  Q.   Okay.  And specifically, you also write in that memorandum

22  of activity that you couldn't identify any clothing patches on

23  these persons; is that fair to say?

24  A.   Fair to say.

25  Q.   Okay.  You also testified, on direct examination, that

1    there were numerous people in that area wearing all types of

2    military fatigues; is that correct?

3    A.    Correct.

4    Q.    But there were also a lot of people wearing all sorts of

5    casual clothing as well; correct?

6    A.    Yes, there was.

7    Q.    Now, there was some testimony in reference to what you

8    classified as a sniper and a spotter; correct?

9    A.    Yes.

10   Q.    Okay.  And it was your belief that they were a sniper and

11   a spotter were based upon several things.  One was that you saw

12   one of the individuals with an assault-style rifle; correct?

13   A.    Correct.

14   Q.    Did the other individual have an assault-style rifle?

15   A.    No.

16   Q.    Okay.  It was your testimony that you believed that they

17   were working in concert together; correct?

18   A.    Yes.

19   Q.    Okay.  You have no personal knowledge of who those

20   individuals are; is that correct?

21   A.    That is correct.

22   Q.    Okay.  You don't know if those individuals know each

23   other; isn't that correct?

24   A.    I do not know.

25   Q.    To your personal knowledge, you don't know -- strike that.

Michael Johnson - Cross

1          There were also -- if you look at this northbound
2     bridge, you would agree with me, from looking at the exhibit
3     and from what you personally perceived on the date in question,
4     that there were several people on the northbound bridge; is
5     that correct?
6     A.   Correct.
7     Q.   Which side of the bridge was -- were the two located --
8     the two individuals located on?  And what I mean by that is
9     where was the sniper in referenced to alleged spotter?
10    A.   Well, they were -- they were right next to each other.
11    Q.   Okay.  Who was on which side?
12    A.   The -- from my perspective, the spotter was on the left
13    and the sniper was on the right.
14    Q.   Okay.  And in your memorandum of activity, you have given
15    no description whatsoever of their clothing; correct?
16    A.   Correct.
17    Q.   You also indicated that the alleged sniper laid down on
18    the road; is that correct?
19    A.   I saw him drop below the concrete barricade.
20    Q.   Okay.  But you have no idea what he was actually doing
21    behind the concrete barrier; correct?
22    A.   I could not see him.
23    Q.   I mean, I'm sure you are very good at your job, but you
24    can't see through concrete; fair to say?
25    A.   Fair to say.

Michael Johnson - Cross

1    Q.   Okay.  You also indicated, on direct examination, that at

2    some point in time, the alleged sniper pointed his weapon at

3    you; is that correct?

4    A.   I did not specifically say that sniper pointed his weapon

5    at me.

6    Q.   Okay.  Someone did?

7    A.   I did not say that I saw anybody pointing a weapon at me.

8    Q.   No one pointed his weapon at you on that day?

9    A.   I saw weapons pointed at my fellow officers, but I did not

10   see someone point a weapon at me.

11   Q.   Okay.

12   A.   I saw the spotter point his range finder at me.

13   Q.   Would you agree that that was probably the most memorable

14   portion of that day was when the weapons were pointed at your

15   fellow officers?

16   A.   I would say it was one of the top ones.

17   Q.   Okay.  And isn't it true that in your memorandum of

18   activity, you made no mention of a sniper pointing a weapon at

19   your fellow officers?

20   A.   I did not.

21            MR. MARCHESE:  Pass the witness, Your Honor.

22            THE COURT:  Mr. Jackson?

23                          CROSS-EXAMINATION

24   BY MR. JACKSON:

25   Q.   Thank you.  Good morning, Officer.

Michael Johnson - Cross

1   A.   Good morning.

2   Q.   My name is Terrence Jackson.  I represent Gregory

3   Burleson.

4           Had you had any contact with Mr. Burleson prior to

5   April 12 of 2014?

6   A.   None.

7   Q.   Okay.  You were at the scene, you stated, on April 12th,

8   2014.  Was it a very noisy, chaotic scene?

9   A.   It was.

10  Q.   Could you hear anything that the various civilian

11  protesters were saying while you were at the scene?

12  A.   I could not.

13  Q.   How far away were you from the civilian protesters that

14  were there?  Was it 50 yards, a hundred yards, 75 yards?  How

15  far?

16  A.   It was a couple hundred yards.

17  Q.   So you were -- you were far enough away you couldn't

18  identify anyone.  You could only see through your binoculars

19  that there were people, but you weren't close enough to

20  recognize any actual physical characteristics of them; is that

21  correct?

22  A.   I could see them, yes.  But I did not recognize any of the

23  people specifically.

24  Q.   All right.  So you could see they were people.  Could you

25  tell whether it was a man or a woman?  Were you close enough to

Michael Johnson - Cross

1    see that?

2    A.    Yes.

3    Q.    You were -- you could hear there was a lot of noise coming

4    from the -- from the area where the -- where the people were;

5    is that correct?

6    A.    Which area?

7    Q.    What?

8    A.    Which area?

9    Q.    Could you hear -- could you hear noise from the people

10   yelling and screaming?  Anything like that?

11   A.    It -- I -- I don't recall hearing loud screaming, no.

12   Q.    Okay.  Could you hear a bullhorn?  Could you hear noise

13   from a bullhorn set off by the -- from the BLM or from any of

14   your agencies?

15   A.    No, I couldn't hear it.

16   Q.    Okay.  Now, you were never told to get closer to this

17   scene because of -- it degenerated so much that there was

18   enough danger that they needed you closer to provide greater

19   protection to the agents that were closer to the scene; is that

20   correct?

21   A.    I was given my assignment to go to the area that I went

22   to.

23   Q.    You were never told to advance closer than 200 yards to

24   the scene; is that correct?

25   A.    I was told to go to the area that I went to.  There were

Michael Johnson - Cross

1    others that were -- that got orders to go down into the wash.

2    Q.   Now, the question is, you were never told, during that

3    time period, go closer than 200 yards to the wash; is that

4    correct?

5    A.   I -- after I got there, no.

6    Q.   Okay.  And you were there for approximately two hours

7    before you were told to pack up and leave?

8    A.   All approximate times, yes.

9    Q.   All right.  Your putative supervisor during that time was

10   Mr. Love.  He was the agent in charge?

11   A.   He was.

12   Q.   Did you have direct contact with him while you were at the

13   scene?

14   A.   No, I did not.

15   Q.   Now, you said you saw highway patrol officers at the

16   scene.  How many highway patrol officers did you see

17   approximately?

18   A.   It was a few.  I don't -- I don't recall a number.

19   Q.   Okay.  And you -- it seemed to you that the highway patrol

20   officers were wandering around close to the protesters, going

21   in and out among them; is that correct?

22   A.   It is.  They were intermingled.

23   Q.   And that disturbed you in some way?

24   A.   It confused me.

25   Q.   They seemed to be not afraid at all of the protesters?

Michael Johnson - Cross

1    A.    I couldn't tell what they were thinking.

2    Q.    Now, did you see any metropolitan police officers on the

3    scene?

4    A.    I saw them immediately at post one, but I don't recall

5    them out on the -- on I-15.

6    Q.    Do you know what the uniform of the metropolitan police

7    officers looks like?

8    A.    I do.

9    Q.    You weren't aware of metropolitan police officers at the

10   scene anywhere in your line of vision?

11   A.    They -- they were at post one.  I knew that.  But I was --

12   I saw them when I was at post one, and then I didn't see them

13   after I was at the generator.  I don't recall seeing them.

14   Q.    You didn't see any of them among the crowd of people down

15   in the wash, or you couldn't actually see down in the wash; is

16   that correct?

17   A.    I could see down into the wash, and I did see uniformed

18   officers that were not BLM or park police that were down there.

19   But I don't know exactly who they were.

20   Q.    Okay.  And you don't -- and you don't know if you saw

21   metropolitan police officers down there?

22   A.    I -- no, not for sure.  I believe there was a couple of

23   them that had approached the -- the wash area, yes.  But I -- I

24   do not know any metropolitan police officers.

25   Q.    Did you have any -- any communication at all with any park

Michael Johnson - Cross

1   police?

2   A.    I did not.

3   Q.    And I assume you didn't have any communication then with

4   any metropolitan police officers either; is that correct?

5   A.    I did not.

6   Q.    So, you were pretty much covering the rear of this

7   operation, way back -- the rear of this whole operation that

8   was going on, was that your function?

9   A.    Unclear.  The rear of the operation?

10  Q.    Well, you were -- you were the far end of this whole area;

11  wouldn't that be fair to say?  You weren't in the middle of

12  this operation that was going on here in the wash; is that

13  correct?

14          MR. DICKINSON:  Objection to operation.  Is he --

15  BY MR. JACKSON:

16  Q.   All right.  I will rephrase the question.  I will withdraw

17  the question.

18          From the distance of 200 feet -- or, excuse me --

19  200 yards, you felt great fear?

20  A.    I did.

21  Q.    And the people that were closer -- the law enforcement

22  officers from the highway patrol and the metropolitan police,

23  did any of them pull out their guns and point them at the

24  civilians, either with or without guns?

25  A.    You are talking about the Nevada Highway Patrol?

Michael Johnson – Cross

1    Q.   Yes.

2    A.   I didn't see them do that.

3    Q.   Or the metropolitan police department officers?

4    A.   I didn't see that.

5    Q.   Based on that, did you conclude that they were in great

6    fear as well even though they were closer than you?

7    A.   I --

8           MR. DICKINSON:  Objection.  Speculation and the

9    witness has already testified he didn't know what other

10   officers thought.

11          MR. JACKSON:  Okay.  I will withdraw the question.  I

12   have no further questions.

13          THE COURT:  Thank you, Mr. Jackson.

14          Mr. Leventhal?

15          MR. LEVENTHAL:  Thank you, Judge.

16                    CROSS-EXAMINATION

17   BY MR. LEVENTHAL:

18   Q.   Good morning.  My name is Todd Leventhal, and I represent

19   Mr. Drexler.

20          I'm going to take you back to yesterday in your

21   testimony with the government.  You -- you indicated that you

22   were assigned to -- first to go meet up with Cliven Bundy on --

23   I believe you said March 17th; correct?

24   A.   Correct.

25   Q.   And you did so at the direction of Special Agent Love?

Michael Johnson - Cross

1    A.    Yes, I did.

2    Q.    Your commander?

3    A.    Yes, I did.

4    Q.    And you indicated that the Bundys had issues or problems

5    in the past with the cows.  Could you tell me what specific

6    issues that they had that caused you to go see Mr. Bundy on

7    March 17th?

8    A.    I had been told by Mr. Love that there had been previous

9    attempts to gather the cattle that were unsuccessful.

10   Q.    Did he indicate to you why they were unsuccessful?

11   A.    They were -- it was my understanding that there were

12   conflicts between the Bundy family, the courts, and the BLM.

13   Q.    Okay.  Did you ever know that prior to -- was there ever a

14   protest of any sort out there prior to when the BLM began to

15   gather his cattle?

16   A.    I'm unaware of them.

17   Q.    I apologize?

18   A.    I am unaware if there was.

19   Q.    Okay.  So, let me take you to March 17th.  Now, you

20   indicated that you and Special Agent Shilaikis; correct?

21   A.    Shilaikis.

22   Q.    Now, he's from Colorado?

23   A.    He is.

24   Q.    And you are from Utah?

25   A.    I am.

Michael Johnson - Cross

1   Q.   And Special Agent Shilaikis and yourself, you guys came

2   out to Nevada; correct?

3   A.   We did.

4   Q.   And you indicated the purpose was to mediate and to keep

5   problems from occurring.  That is what I wrote.  Is that still

6   correct?  Is that still your testimony?

7   A.   That's correct.

8   Q.   Okay.  So you started out in Bunkerville and you went over

9   to the Bundy's home; correct?

10  A.   We did.

11  Q.   And you indicated nobody was home?

12  A.   No one.

13  Q.   So then you went and you called the cellular; correct?

14  A.   We did.

15  Q.   You didn't get an answer; did you?

16  A.   No answer.

17  Q.   But you left a message; correct?

18  A.   We did.

19  Q.   So you then went to go see Ranger Sullivan?

20  A.   We did.

21  Q.   You found Ranger Sullivan?

22  A.   Yes, she was already in the area.

23  Q.   Okay.  And she led you to Duke, Duke Clancy, I believe you

24  indicated; correct?

25  A.   Duke Clancy Cox.

Michael Johnson - Cross

1    Q.   Okay.  And so you went out to meet up with Duke Clancy

2    Cox.  You were looking for the Bundys, but he was what you

3    found; correct?

4    A.   It was a chance encounter, yes.

5    Q.   Okay.  You indicated to him to have one of the Bundys call

6    you; correct?

7    A.   We first asked him if he would call Cliven Bundy.

8    Q.   Okay.

9    A.   Which he did.  And Mr. Bundy declined to meet with us.

10   Q.   Okay.  But you got a message to him that you were looking

11   for Cliven Bundy; correct?

12   A.   We did.

13   Q.   Okay.  So still you haven't found Mr. Bundy or the Bundys,

14   so then you went to Mesquite; correct?

15   A.   We did.

16   Q.   Okay.  And in Mesquite, you were looking for Dave?

17   A.   We were.

18   Q.   Okay.  Couldn't find Dave; could you?

19   A.   No.

20   Q.   So you went over to St. George, Utah, that day; correct?

21   A.   Correct.

22   Q.   And you indicated you went to a P.O. box; correct?

23   A.   It was a mail parcel store --

24   Q.   Okay.

25   A.   -- that had P.O. boxes.

Michael Johnson - Cross

1   Q.   And the employee there, I assume, provided the information

2   on Dave's residence; correct?

3   A.   He did.  She did.

4   Q.   She did.

5   A.   I think it was a she.  Yes.

6   Q.   Now, how -- is that public information or did you have to

7   flash your badge or something to get that?

8   A.   We identified ourselves as BLM law enforcement and asked

9   for it.

10  Q.   Okay.  You didn't have a warrant of any sort; did you?

11  A.   We didn't.

12  Q.   No court order; did you?

13  A.   We did not.

14  Q.   Okay.  And she freely provided you an address; right?

15  A.   She did.

16  Q.   That address turned out to be Dave Bundy's wife's sister's

17  house Lora Lee; correct?

18  A.   Correct.

19  Q.   And she indicated she didn't know anything?

20  A.   She didn't know any --

21  Q.   Didn't know anybody?  Didn't know the Bundys?  Didn't know

22  anything; right?

23  A.   Didn't know Dave, didn't know the Bundys, and she shut the

24  door on us.

25  Q.   Okay.  So now tracking Dave Bundy down was futile, so now

Michael Johnson - Cross

1   you are looking for Ryan; correct?

2   A.   We made one additional attempt to contact Ryan via the

3   phone number.

4   Q.   Okay.  And so you went from St. George, and you drove up

5   to Cedar City?

6   A.   We did.

7   Q.   And you went to his house; correct?

8   A.   We drove by his house.

9   Q.   And you indicated there were too many cars out there, so

10  you didn't want to go up there; did you?

11  A.   Cars and persons.

12  Q.   Okay.  So you indicated that you met up with the Cedar

13  City Police Department Officer Smith?

14  A.   Yes, sir.

15  Q.   He contacted Ryan?

16  A.   Yes, he did.

17  Q.   You heard that conversation?

18  A.   It was on speaker phone.

19  Q.   You went back to your hotel that night?

20  A.   We did.

21  Q.   And then you got a call from Ryan; correct?

22  A.   That's correct.

23  Q.   Okay.  Seems like a long itinerary.  Did you feel like you

24  were you stalking them at some point?

25  A.   No.

Michael Johnson - Cross

1   Q.   You must have had a very urgent message to get to them.

2   That's quite a bit to get to them; don't you think?

3   A.   We were going from person to person.

4   Q.   Okay.

5   A.   When we couldn't contact one, we would go to the next.

6   Q.   And all this was to mediate; correct?

7   A.   Was to discuss the impending gather and offer any help or

8   any mediation that we could provide.

9   Q.   Okay.  Now, we heard your conversation with Mr. Bundy

10  yesterday.  Do you remember that conversation?

11  A.   I do.

12  Q.   And we heard over and over, at least I think I counted,

13  eight times where you indicated that we are coming.  Did you

14  hear that?

15  A.   Yes.

16  Q.   Did you hear that you indicated that I'm telling you, we

17  will show up.  Did you indicate that?  Did you hear that?

18  A.   Yes.

19  Q.   And then over and over "We are coming"; correct?

20  A.   I don't recall a number.  But, yes, I did say that.

21  Q.   Okay.  Now, you were hired on, you indicated, as

22  countersurveillance; right?

23  A.   Hired on --

24  Q.   Or you were brought on to this mission as

25  countersurveillance; correct?

Michael Johnson - Cross

1   A.   That was one of our assignments.

2   Q.   Okay.  And so -- and I agree there was multiple sort of

3   assignments within that.  There's the cows; correct?

4   A.   Correct.

5   Q.   And then there's the intel or the countersurveillance;

6   correct?

7   A.   Correct.

8   Q.   Okay.  And so you were out there to do the intel, if you

9   will, or the countersurveillance.  And Agent Stover

10  indicated -- and if you disagree with this, let me know --

11  that --

12          MR. DICKINSON:  Objection about what another witness

13  testified.

14          MR. LEVENTHAL:  Your Honor, there is nothing wrong

15  with what another witness testified to under oath here in

16  court.  That's why we have the exclusionary rule.  And if I'm

17  wrong, this jury will know what they said.

18          MR. DICKINSON:  It absolutely is incorrect.

19          MR. LEVENTHAL:  Absolutely not.

20          THE COURT:  It is.  Sustained.  Rephrase your

21  question.

22  BY MR. LEVENTHAL:

23  Q.   Okay.  If Agent Stover came in here and indicated that

24  there was two parts --

25          MR. DICKINSON:  Objection.  Same objection, Your

Michael Johnson - Cross

1    Honor.

2              MR. LEVENTHAL:  I am asking --

3              MR. DICKINSON:  Improper.

4              THE COURT:  You have to change the form of the

5    question.

6    BY MR. LEVENTHAL:

7    Q.   Okay.  If there were two -- do you agree that there were

8    two parts of this or three parts; one intel and one cows;

9    correct?

10   A.   Of what?

11   Q.   Of this mission.

12   A.   My mission?

13   Q.   The mission, the whole mission.

14   A.   I couldn't divide it up into -- into parts of the mission.

15   Q.   Okay.  Did you -- before you went through this, you had a

16   list of people or threat assessments.  Did you -- were you

17   aware of those threat assessments?

18   A.   For -- I'm unclear what you are asking.

19   Q.   Okay.  When you started this assignment prior -- after

20   March, after you saw the Cliven Bundys and you announced you

21   were coming, did you have a list of people with you that you

22   were looking for or that you were getting ready to find or

23   pictures of certain people?  Threats, if you will?

24   A.   I don't recall that.

25   Q.   You don't?  You don't recall?

Michael Johnson - Cross

1   A.    Me personally?

2   Q.    You personally, yeah.  You were in charge of the

3   countersurveillance; correct?

4   A.    Correct.  I don't recall that.  I don't recall having

5   pictures of persons we were looking for.

6   Q.    No?  A list of names?

7   A.    We -- I knew a list of names, because I had been in

8   contact -- attempted to contact several of the Bundy family

9   members.

10  Q.    Were there other people other than the Bundy family

11  members that you had a list of?

12  A.    I don't recall that.

13  Q.    You don't recall?  So there was nobody other than the

14  Bundys that you would have identified to be some sort of a

15  threat?

16  A.    I recall that as the gather progressed, there were

17  individuals that were being identified by -- I mean, several

18  groups of -- I mean, different groups of BLM officers and

19  agents, yes.

20  Q.    Okay.  So, you were identifying people through the

21  arrests; is that what you are indicating?

22  A.    Not just that.  Just through license plate numbers.

23  Q.    Okay.

24  A.    And persons that were contacting us at post one.

25  Q.    Okay.  But there was no list, to your knowledge, that was

Michael Johnson - Cross

1   there prior to the actual impound?  The start of the impound?

2   A.   I don't recall that.

3   Q.   You don't recall that?

4   A.   No.

5   Q.   Okay.  You've had special training in -- you indicated

6   that you had special training when you were with the Secret

7   Service; correct?

8   A.   Yes.

9   Q.   10 weeks of training?

10  A.   Much more than that.

11  Q.   Much more than that.  Now, you indicated at BLM, you

12  haven't had any training.  It's on the job; right?

13  A.   We attend an annual 40-hour training every year.

14  Q.   Okay.

15  A.   And we're admitted or allowed to attend other training

16  courses as needed.

17  Q.   And you indicated that you have served search warrants;

18  correct?

19  A.   I have.

20  Q.   Okay.  Now, how often in your search warrants prior, do

21  you alert people that you're coming?  Have you ever done that

22  before?

23  A.   You don't alert them.

24  Q.   You don't; do you?

25  A.   No.

Michael Johnson - Cross

1    Q.   You don't alert people that you are coming?

2    A.   It's not custom --

3    Q.   I'm sorry.  There's no -- it's not normal; right?

4    A.   No.

5    Q.   Okay.  But you were told to do it in this instance?

6    A.   What's that?

7    Q.   To alert the Bundys you were coming?

8    A.   Yes.

9         MR. LEVENTHAL:  Okay.  I have nothing further.  Thank

10   you.

11        THE COURT:  Mr. Perez?

12                      CROSS-EXAMINATION

13   BY MR. PEREZ:

14   Q.   Good afternoon, Agent.

15   A.   Good morning.

16   Q.   My name is Shawn Perez, and I represent Ricky Lovelien.

17        Are you familiar with Mr. Lovelien?

18   A.   I am not.

19   Q.   I was looking at your report, and you were using Swarovski

20   8x56 binoculars?

21   A.   Yes.

22   Q.   And you understand how binoculars work?

23   A.   Yes, I believe so.

24   Q.   Okay.  Now, as far as that number eight --

25   A.   That's the --

Michael Johnson - Cross

1   Q.   -- what does that represent when you are talking about

2   8x56?

3   A.   Eight is the number of optical magnifications to the naked

4   eye.  Eight times --

5   Q.   And so --

6   A.   -- what the naked eye could see.

7   Q.   So, whatever I can see with the naked eye, that will help

8   me see it eight times clearer, bigger?

9   A.   Eight times closer.

10  Q.   Closer.  Okay.  And from your vantage point, when you said

11  that you observed someone with their range finder, what was the

12  distance that you were at?

13  A.   It was several hundred yards.

14  Q.   Okay.  And you said that you've used range finders and --

15  for hunting or in your line of work.  How big is a range

16  finder?

17  A.   It's approximately that big.

18  Q.   Okay.  So indicating a size of what?  Like 4 inches by --

19  A.   Probably 4 to 5 inches.

20  Q.   So, you saw -- obviously, you couldn't see any markings on

21  the side of the range finder?

22  A.   No, I couldn't see any markings.

23  Q.   Okay.  You said you also couldn't detect what people were

24  wearing?

25  A.   I think I said --

Michael Johnson - Cross

1    Q.   Like clothing?

2    A.   -- specific patches.

3    Q.   Okay.

4    A.   Specific identifiers that would identify a person with a

5    group.

6    Q.   You couldn't identify any faces?

7    A.   No.

8    Q.   Okay.  Now, do you have a video camera?

9    A.   Do I personally have one?

10   Q.   Yeah.  Have you ever seen a video camera?

11   A.   Yes.

12   Q.   Okay.  Aren't they about this size as well?

13   A.   Yes.

14   Q.   Okay.  I am -- that's approximately what?  4 by 6?  I

15   guess if you had a GoPro, it would be a little smaller than

16   that?

17   A.   Uh-huh.

18   Q.   Correct?

19   A.   It's possible.

20   Q.   Right.  So, at a range of 200 yards or -- plus or minus;

21   right?  Maybe more?

22   A.   A few hundred yards.

23   Q.   Okay.  Well, do you know the approximate distance between

24   the bridges?

25   A.   I don't.

Michael Johnson - Cross

1   Q.   Would it be fair to say that it's less than a hundred

2   yards?

3   A.   I do not know.

4   Q.   Okay.  Well, at that distance at 200 yards --

5   A.   200 yards was the distance that they asked me what was my

6   closest proximity to persons.

7   Q.   Okay.

8   A.   These persons that I'm referring to were beyond 200 yards.

9   A few hundred yards.

10  Q.   So they were farther away than 200 yards?

11  A.   Yes.

12  Q.   And so you could detect something approximately

13  4-by-6 inches to be a range finder as opposed to being maybe a

14  cell phone?

15  A.   With my binoculars and given my experience in utilizing a

16  range finder, I recognized the motion and the -- in which that

17  person was using to be very specific to someone using a range

18  finder.

19  Q.   Can you demonstrate for me what the motion?

20         Okay.  That would be similar to a video camera;

21  correct?

22  A.   I haven't seen people use video cameras up that close to

23  their face.

24  Q.   Well, at 200 plus yards, even through your 8x56 Swarovski

25  binoculars -- which are very good binoculars --

Michael Johnson - Redirect

1  A.   Yes, they are.

2  Q.   -- you couldn't tell how close that was to his face; could

3  you?

4  A.   I could see it right up to his face.

5  Q.   Well, do you know what the distance it was between the --

6  I mean, does he use, like, an eye piece?

7  A.   It has a small eye piece.  Most of them have a small eye

8  piece.

9  Q.   Some video cameras have a small eye piece, too; do they

10  not?

11  A.   They do.

12  Q.   So, is it fair to say that it's possible it was a video

13  camera?

14  A.   It's possible.

15       MR. PEREZ:  Okay.  I have nothing further.

16       THE COURT:  I think everyone has had an opportunity

17  to cross-examine; right?

18       Okay.  Any redirect, Mr. Dickinson?

19       MR. DICKINSON:  Yes, Your Honor.

20                      REDIRECT-EXAMINATION

21  BY MR. DICKINSON:

22  Q.   Special Agent Johnson, Mr. Engel asked you some questions.

23  He went over a lot of times with you.

24       You generally testified that you were up again at

25  post one at about 11:15; correct?

Michael Johnson - Redirect

1    A.    Yes, sir.

2    Q.    Were there for 15 minutes, and then went to where you were

3    for the remainder until you were told to report back, and then

4    everybody left?

5    A.    That is correct.

6    Q.    To be clear, were you watching -- were you recording

7    things --

8    A.    No.

9    Q.    -- time-wise?

10   A.    No.

11   Q.    So you weren't keeping track of time?

12   A.    No.

13   Q.    So any specific things that were shown to you, do you have

14   any idea if the times were accurate?

15   A.    I do not.

16   Q.    So, for example, could we pull up Government Exhibit 258?

17         Do you have any idea when this was captured?

18   A.    I --

19   Q.    Time-wise?

20   A.    No, I do not.

21   Q.    All right.  You can take it down.

22         You had some questions about -- Mr. Engel asked you

23   some questions about raising or pointing your weapon.  When you

24   got -- how did -- where was your sidearm?  How was your sidearm

25   on you?

Michael Johnson - Redirect

1    A.    It's on my belt.

2    Q.    The whole time?

3    A.    The whole time.

4    Q.    And your long gun, where was that when you were at post

5    one?

6    A.    It was over my shoulder on a sling.

7    Q.    And when you moved to the light post where you were the

8    remainder of the time, where was your weapon?

9    A.    It started on a sling over my shoulder, and then as time

10   went on, I laid it down on the ground.

11   Q.    And Mr. Engel asked you a lot of questions about the

12   officers that you could see when you were scanning the crowd.

13          During that two-hour period, hour and a half,

14   two-hour period, where was your primary focus of what you were

15   looking at either with your normal vision or your binoculars?

16   A.    It was between the bridges and down in the wash.

17   Q.    So you weren't just focused on what your fellow officers

18   were doing in the wash?

19   A.    No.

20   Q.    You were asked, again by Mr. Engel, several questions

21   about your fellow officers and whether you saw them pointing

22   weapons and when.  You don't know when; correct?

23   A.    I do not.

24   Q.    But you did see weapons being, what you would say, pointed

25   by your fellow officers?

Michael Johnson - Redirect

1   A.   I did.

2   Q.   You testified that based on your view -- correct me if I'm

3   wrong -- you couldn't see anything in the wash itself in

4   between the two bridges?

5   A.   No, I cannot.

6          MR. MARCHESE:   Objection.  Leading.

7   BY MR. DICKINSON:

8   Q.   Could you see anything in the wash between the two

9   bridges?

10  A.   No.

11  Q.   So did you have a view of what those officers in the wash

12  were seeing when they were looking towards --

13         MR. MARCHESE:   Objection.  Speculation.

14         THE COURT:   The question was "could he see."  I will

15  allow it.  Overruled.

16         THE WITNESS:   Could you say it again, please?

17  BY MR. DICKINSON:

18  Q.   Could you -- could you see what the officers in the wash

19  were seeing when they were looking between the bridges?

20  A.   No, I could not.

21  Q.   So you have no idea what they were -- what they observed,

22  threats, no threats, or anything that they observed?

23  A.   I could not see that.

24  Q.   Of why they possibly would have raised their weapons?

25  A.   Correct.

Michael Johnson - Redirect

1   Q.   You were asked some questions about the NHP first that you

2   saw walking around, and your answer was you were confused?

3   A.   Yes.

4   Q.   And you stated that you didn't see anybody get arrested?

5   A.   I did not.

6   Q.   Based upon what you observed, your observation, your

7   training and experience, do you feel like the officers you saw

8   on that bridge could have effectuated an arrest safely?

9           MR. LEVENTHAL:  Objection.  It calls for speculation.

10          MR. MARCHESE:  Join.

11          MR. TANASI:  Join.

12          MR. DICKINSON:  It's the officer's observation of

13   what he was seeing, Your Honor.

14          THE COURT:  All right.  I will allow it in a limited

15   way.  Go ahead.

16          THE WITNESS:  They could have effected arrests should

17   they have chosen to.

18   BY MR. DICKINSON:

19   Q.   Do you have an idea -- did you ever talk to them?  Do you

20   have any idea of what they were doing?

21   A.   I have never spoken to them.

22   Q.   Or why they acted one way or the other?

23   A.   I do not.  No.

24   Q.   Mr. Leventhal asked you some questions about a search --

25   search warrants and officers don't usually announce when they

Michael Johnson – Redirect

1    are giving search warrants; correct?

2    A.    Correct.

3    Q.    When you went out to talk to the Bundys, was it clear that

4    they knew that the cattle impoundment was coming?

5           MR. LEVENTHAL:  Objection.  Calls for speculation.

6           THE COURT:  Overruled.  He can answer the question.

7    BY MR. DICKINSON:

8    Q.    Were you aware that the Court orders had issued when you

9    went to talk to the Bundys?

10   A.    I was aware they had been issued.

11   Q.    And based on what you knew, were aware that that was

12   public information?

13   A.    Yes.  I believed I was clear in my intentions to Ryan

14   Bundy.

15   Q.    And those intentions again were?

16   A.    That we were going to come gather the cattle, and that we

17   did not want any problems.  And if there was anything we could

18   do to mediate that, I would -- I would have liked to talk about

19   it.

20   Q.    You were asked several questions about your perception.  I

21   think you were pretty clear, but you could identify

22   individuals; correct?

23           Could you identify individuals on the bridge?

24   A.    By --

25   Q.    Both the north and southbound bridge?

Michael Johnson - Redirect

1   A.   I could see -- I could identify people, yes.

2   Q.   And could you identify, based on your training and

3   experience, what you believed were weapons?

4   A.   Yes.

5   Q.   And could you identify sex of individuals?

6   A.   Yes.

7   Q.   But you couldn't -- could you identify patches on their

8   clothing?

9   A.   No.

10  Q.   And could you identify people well enough to, say, a few

11  days later pick them out of a photo lineup?

12            MR. TANASI:  Objection, Your Honor.  Leading.

13            MR. MARCHESE:  Parker join.

14            THE COURT:  Asked and answered.  Overruled.

15  BY MR. DICKINSON:

16  Q.   You were asked by -- Mr. Engel and Mr. Jackson several

17  times referenced or used the term "protesters."

18            Based on your training and experience, have you been

19  around -- well, before I ask that, based on your work with the

20  Secret Service, have you observed protests?

21  A.   Yes.

22  Q.   Approximately how many?

23  A.   Dozens.

24  Q.   And how about with the BLM?

25  A.   A few.

Michael Johnson - Redirect

1  Q.   And based upon what you observed that day, did you observe

2  any protesters?

3  A.   I -- that was not a protest to me.

4  Q.   And why is that?

5  A.   Because they were -- they were carrying weapons.  They

6  were pointing weapons.  They were using the tactics I described

7  as a spotter and the shooter, and that's it.

8            MR. DICKINSON:  One second, Your Honor.

9            THE COURT:  Actually, we are going to go ahead and

10 take a break here.  Let everyone use the restroom and stretch.

11           I do remind the jury during this time not to discuss

12 this case with anyone nor permit anyone to discuss it with you.

13 As always, please let the Court know right away if you

14 inadvertently hear anything about the case.

15           And please do not read or listen to or view anything

16 touching upon the case.  Do not attempt to perform any research

17 or any independent investigation about the case, and do not

18 form any opinion about the case until after you have heard all

19 of the evidence, the closing arguments, been provided with the

20 written jury instructions of law, and then been released to

21 begin your deliberation process.

22           We will go ahead and take about -- what do we need to

23 do, Aaron, 20 minutes?

24           COURTROOM ADMINISTRATOR:  About 20 minutes, Your

25 Honor.

Michael Johnson – Redirect

1          THE COURT:  All right.  We will take a 20-minute

2    break and be back here about 10:20.  Please stand for the jury.

3          And after they have exited, then, Special Agent

4    Johnson, you can take your restroom break here as well.

5          Please be back here at 10:20.

6          THE WITNESS:  Thank you, Your Honor.

7       (Jury out.)

8          THE COURT:  All right.  The jury has left.  The door

9    is closed.

10          Miss Dickinson, are you here to escort Mr. Leventhal?

11          MS. DICKINSON:  Yes, Your Honor.

12          THE COURT:  All right.  We will be back here at

13    10:20.

14          COURTROOM ADMINISTRATOR:  Off the record.

15       (Recess 10:01 a.m.  Resumed 10:27 a.m.  Jury out.)

16          THE COURT:  You can go ahead and sit down until he

17    comes back through the door, and he'll say all stand.

18       (Jury in.)

19          THE COURT:  All right.  Everyone be seated.

20          We have all the jurors returning from the break.  We

21    have Special Agent Johnson back on the witness stand.

22          Mr. Dickinson, do you want to continue with your

23    redirect?

24          MR. DICKINSON:  The government has no further

25    redirect Your Honor.

Michael Johnson - RX

1          THE COURT:  All right.  Any defendant wish to perform

2   recross?

3          MR. TANASI:  Yes, please, Your Honor.

4          THE COURT:  All right.  Go ahead, Mr. Tanasi.

5                    RECROSS-EXAMINATION

6   BY MR. TANASI:

7   Q.   Good morning again, Agent Johnson.  How are you?

8   A.   Good morning.  Well.  Thank you.

9   Q.   Good.  Prior to our break, you indicated that this was not

10  a protest in your opinion; correct?  Your words.

11  A.   It did not appear to be a protest.

12  Q.   As you sit here today, you are saying it's not.  And that

13  event on the 12th was not a protest; correct?  That's your

14  words.

15  A.   It appeared to be much more than that.

16  Q.   Okay.  But again, prior to the break, you said it was not

17  a protest; is that fair?

18  A.   I don't recall my exact words.  I don't recall it to be --

19  I don't believe it to be just a protest.

20  Q.   Would you like the court reporter to read your words back

21  for you, sir?

22          THE COURT:  That's not available.  We don't do read

23  backs.

24  BY MR. TANASI:

25  Q.   Understood.  Again, as you sit here today, is it your

1    testimony that the events on the 12th was not a protest?

2    A.    No.

3    Q.    No, it wasn't a protest; or no, it's not your --

4    A.    No, it's not a protest.

5    Q.    Okay.  So, prior to today's testimony, do you recall

6    meeting with Agent Willis on January 15, 2015?

7    A.    Agent Willis from the FBI?

8    Q.    Yes, sir.

9    A.    I recall.

10   Q.    Okay.  And in that meeting with Agent Willis, you

11   discussed all of your prior reports and interviews in this

12   case; correct?

13   A.    Correct.

14   Q.    And nothing changed when you met with him on January 15th?

15   A.    Right.

16   Q.    January 15th, 2015; correct?

17   A.    No.

18   Q.    So your reports were true and accurate, and your

19   interviews were true and accurate as well; correct?

20   A.    Yes.

21   Q.    All right.  Do you recall, on May 22nd, 2014,

22   approximately 1:00 p.m., you were interviewed by Kent Kleman?

23   A.    Okay.

24   Q.    Do you recall that?

25   A.    I recall.

Michael Johnson - RX

1   Q.   Okay.  And in that interview, you went over the events, as

2   you recalled them, on April 12th, 2014; correct?

3   A.   Correct.

4   Q.   Do you recall doing that?

5   A.   I do.

6   Q.   Okay.  Do you recall telling Kent Kleman that you believed

7   the Bundys felt empowered by the militia protest -- I'm

8   sorry -- militia presence at the protest?

9   A.   I believe we were using protest as -- protesters as a

10   matter of a word to use.

11   Q.   You used the word "protest."  You called it a protest --

12   fair enough -- on May 22, 2014?  Yes or no, sir?

13   A.   Okay.  Yes.

14              MR. TANASI:  Thank you.  Nothing further?

15              THE WITNESS:  Okay.

16              THE COURT:  Anyone else?

17              MR. MARCHESE:  No recross from Parker.

18              MR. ENGEL:  Yes, Your Honor.

19              THE COURT:  Mr. Engel?

20                          RECROSS-EXAMINATION

21   BY MR. ENGEL:

22   Q.   Thank you, Agent Johnson, for your patience with me.  Is

23   it true that these folks in the parking area near post one were

24   carrying flags?

25   A.   Where exactly?

Michael Johnson - RX

1    Q.   On the opposite side of the freeway where they were

2    parking and all along the freeway.

3    A.   I don't recall exactly.

4    Q.   Do you recall if these folks were yelling while they were

5    on the other side of the freeway?

6    A.   I couldn't hear them.

7    Q.   Would carrying flags and yelling be consistent with

8    freedom of speech enshrined in the First Amendment of the

9    Constitution?

10            MR. DICKINSON:  Objection.  Calls for a legal

11   conclusion.

12            THE COURT:  Sustained.

13   BY MR. ENGEL:

14   Q.   You stated that you saw people in the parking area bearing

15   arms; is that correct?

16   A.   What parking area?

17   Q.   Near post one where they were all parking near the

18   northbound lane.

19   A.   Yes.

20   Q.   You also stated that you saw people bearing arms on the

21   freeway above the wash; correct?

22   A.   Yes.

23   Q.   Isn't it true that bearing arms is enshrined in the Second

24   Amendment of the US Constitution?

25            MR. DICKINSON:  Objection.  Calls for a legal

Michael Johnson - RX

1   conclusion.

2            THE COURT:  Sustained.

3   BY MR. ENGEL:

4   Q.   How far away from you was Agent Shilaikis when he was

5   videotaping the events?

6   A.   He was right next to me.

7   Q.   So, it would stand to reason that he would have captured

8   the alleged weapons pointing; correct?

9   A.   There -- I didn't see any weapons pointed in the direction

10  he was videoing.

11  Q.   You stated that you saw personally weapons pointed at your

12  fellow officers; correct?

13  A.   I did.

14  Q.   So would it stand to reason that Agent Shilaikis, while

15  standing next to you videotaping the event, would have captured

16  protesters pointing weapons at your fellow officers; correct?

17  A.   No, he was videoing in a different area.  I saw them when

18  I was with Agent Russell.

19  Q.   So he was -- excuse me.

20            So you were visually seeing people pointing weapons,

21  and you never said Agent Shilaikis videotape that?

22  A.   I wasn't with him when I saw it.

23  Q.   You just -- oh, sorry.  Have you seen Agent Shilaikis's

24  video?

25  A.   Yes.

Michael Johnson - RX

1    Q.   On that video, from his perspective and your perspective,

2    have you ever seen any video evidence of people pointing

3    weapons at your fellow officers?

4              MR. DICKINSON:  Objection, Your Honor.  He stated he

5    wasn't with Agent Shilaikis the majority of that time in that

6    video, so it couldn't have been from his perspective.

7    BY MR. ENGEL:

8    Q.   Have you seen the video since April 12?

9    A.   Yes.

10   Q.   Since -- now that you've seen the video since April 12th,

11   have you seen anybody on that video pointing weapons at your

12   fellow officers?

13   A.   Specifically on Agent Shilaikis's video?

14   Q.   Specifically on Agent Shilaikis's video.

15   A.   No.

16   Q.   Thank you.  You stated that you did see people pointing

17   weapons at your fellow officers.  Did you have an access to a

18   radio that day?

19   A.   I did.

20   Q.   Would it be unreasonable to say -- strike that question.

21             Did you report over the radio, to any of your fellow

22   officers, that protesters were pointing weapons at your fellow

23   officers?

24   A.   I did attempt to do so, yes.

25   Q.   You attempted to do so.  Did you do that, sir?

Michael Johnson - RX

1    A.    There was so much radio traffic, that I am unaware if my

2    traffic transmitted through or not.

3    Q.    It would be a fairly important thing to see, if protesters

4    were pointing rifles at your fellow officers; is that correct?

5    A.    Yes, and I did hear others relaying the same information.

6    Q.    I didn't ask you that, sir.

7    A.    Okay.

8    Q.    It's a fairly -- you've stated it's fairly important.  It

9    could be dangerous if people were pointing weapons at your

10   fellow officers.  But you did not broadcast over the radio that

11   people were pointing weapons at your fellow officers?

12            MR. DICKINSON:  Objection, Your Honor.

13            THE COURT:  He said he attempted to broadcast it over

14   the radio.

15   BY MR. ENGEL:

16   Q.    How many times did you attempt to do that, sir?

17   A.    One time.

18   Q.    One time.  Can you pull up 258, please.

19            Sir, is it a reasonable response for people to take

20   cover when weapons are being aimed at them?

21   A.    Yes.

22   Q.    That would explain why the protesters -- in this picture

23   would explain why the protesters were taking cover behind the

24   concrete barrier; correct?

25            MR. DICKINSON:  Objection, Your Honor.  Assuming

Michael Johnson – RX

1    facts not in evidence.  He's essentially testifying.

2              THE COURT:  Sustained.  You've asked him about this

3    photograph, and he stated he doesn't know when it was taken,

4    and he didn't see anything from this perspective of the

5    photograph.

6              MR. ENGEL:  No more questions, Your Honor.  Thank

7    you.

8              THE COURT:  Anyone else?  Mr. Perez?  Mr. Jackson?

9    Mr. Leventhal?

10             MR. JACKSON:  Just one question.

11             THE COURT:  All right.  Go ahead.  Mr. Jackson.

12                          RECROSS-EXAMINATION

13   BY MR. JACKSON:

14   Q.   Did you yourself take cover at any time to avoid being

15   shot by anyone?

16   A.   That's why I was behind the generator.

17   Q.   You were hiding under a generator?

18   A.   I was using it as cover.

19   Q.   Were you down on the ground?

20   A.   I was kneeling.

21   Q.   How long were you down on the ground underneath the

22   generator?

23   A.   For the duration of the time I was there.

24   Q.   Two hours?

25   A.   It was one to two hours.

Michael Johnson - RX

1    Q.   You were hugging the ground for two hours?

2    A.   I was kneeling, squatting.  I don't recall exactly my

3    position the entire time.

4    Q.   How were you doing your job to watch what was going on if

5    you were down hugging the ground?

6    A.   I was watching over the top and to the side of the

7    generator with my binoculars and with my eyes.

8    Q.   Oh, so you were down like this underneath, or were you up

9    looking around?

10   A.   Kneeling, squatting.  I mean, looking all around.

11   Q.   Well, what do you define as taking cover?

12   A.   Cover is defined as something that would stop a bullet.

13   Q.   Okay.  So if you are up looking through your binoculars,

14   was your head or your body or your chest exposed to anyone that

15   had a rifle or a gun or some weapon --

16   A.   Yes, it was.

17   Q.   -- at any time?

18   A.   Yes, it was.

19   Q.   So you weren't taking cover during at least part of that

20   time; is that right?

21   A.   I did have parts of my body that were exposed at times,

22   yes.

23   Q.   Okay.  So, part of the time -- part of the two hours, you

24   weren't just hugging the ground, you know, afraid for your

25   life; is that right?

Michael Johnson - RX

1    A.   There were times when I was exposed, yes.

2    Q.   Okay.  And there were other officers there that were

3    walking around like they were not afraid at all during part of

4    that time; is that correct?

5    A.   Walking --

6    Q.   Walking around the area.  BLM agents, HPD agents, Metro

7    agents; is that correct?

8    A.   I would be speculating to say exactly what they were

9    doing.  I was focused on what I was looking at.

10   Q.   You could see the other officers though; right?

11   A.   I could see them down below me, yes.

12   Q.   You were watching them?

13   A.   Right.

14   Q.   Watching them to see they were safe?

15   A.   Yes.

16   Q.   You were also watching the other people in the gully;

17   right?

18   A.   Yes.

19   Q.   But you said you couldn't see what was down in the gully

20   very well?

21   A.   I'm unclear as to exactly what you are --

22   Q.   Okay.  Down in the wash, you couldn't see what was down in

23   the wash very well?

24   A.   Are you talking in between the --

25   Q.   Right.  In between the --

Michael Johnson - RX

1  A.   In between, I couldn't see, no.

2  Q.   Okay.  You were asked by Mr. Engel, I think, whether you

3  could see any flags.  And you seemed to not be able to see any

4  flags.  You couldn't see any flags with your binocular out?

5  A.   I don't recall specifically seeing flags.

6  Q.   You know what a flag looks like?

7           MR. DICKINSON:  Objection.  Argumentative.

8           THE COURT:  Sustained.

9           MR. JACKSON:  I have no further questions.

10          MR. PEREZ:  Nothing from Mr. Lovelien, Your Honor.

11          MR. LEVENTHAL:  Nothing on behalf of Mr. Drexler.

12  Thank you.

13          MR. ENGEL:  Nothing from Engel.

14          THE COURT:  Any redirect?

15          MR. DICKINSON:  No, Your Honor.

16          THE COURT:  All right.  Thank you, Agent Johnson.

17          THE WITNESS:  Thank you.  Your Honor.  Thank you,

18  ladies and gentlemen of the jury.

19          THE COURT:  And please be careful on your way down

20  the steps.

21          The government may call its next witness.

22          MR. TANASI:  Your Honor, the United States calls

23  Special Agent Adam Sully.

24          THE COURT:  Good morning, Special Agent Sully.  Come

25  on up.  You are going to be seated next me in the witness

Adam Sully - Direct

 1   chair, but watch your step on the way up.  There's a couple of
 2   steps there.
 3                          ADAM SULLY,
 4   having been duly sworn, was examined and testified as follows:
 5              COURTROOM ADMINISTRATOR:  State your full name and
 6   spell it for the record.
 7              THE WITNESS:  Adam Sully, A-D-A-M S-U-L-L-Y.
 8                      DIRECT EXAMINATION
 9   BY MS. CREEGAN:
10   Q.   Good morning, sir.
11   A.   Good morning.
12   Q.   Could you please tell us your current job?
13   A.   I am a Special Agent with the United States Department of
14   Interior, Bureau of Land Management.
15   Q.   How long have you had that job?
16   A.   Since 2009.
17   Q.   And before that, what were you doing?
18   A.   I was a law enforcement ranger with the Bureau of Land
19   Management.
20   Q.   Could you explain what the difference is between a ranger
21   and a special agent?
22   A.   A ranger for the Bureau of Land Management is the
23   uniformed patrol function, so it would be the same as your
24   typical police department having their patrol and their
25   detectives.  And the special agents are responsible for the

Adam Sully – Direct

1    long-term investigations.

2    Q.   So all together, you have been with the BLM as a law

3    enforcement officer since 1999?

4    A.   Correct.

5    Q.   And when you entered on to duty with the BLM, did you have

6    to do any special training?

7    A.   Yes.

8    Q.   Could you describe that training, please?

9    A.   So, when I became a BLM ranger, part of the training was

10   attending the Federal Law Enforcement Training Center, which is

11   in Glencoe, Georgia.  That was a 13-week -- at that time, it

12   was called the Land Management Police Training Program.

13   Q.   Okay.  And what generally did you cover there?

14   A.   It was a variety of police training related to patrol

15   tactics, report writing, firearms training, defensive tactics.

16   Q.   Where are you currently stationed?

17   A.   In Oregon.

18   Q.   Where have you been stationed since 1999?

19   A.   In Eugene and in Salem, Oregon.

20   Q.   Both in Oregon.  And did you become involved with the

21   BLM's impoundment operation in the Bunkerville, Nevada, area in

22   April of 2014?

23   A.   Yes.

24   Q.   And how did you become involved considering that you are

25   not from the Nevada area?

Adam Sully - Direct

1    A.   At some point, there was an email or a call that requested

2    assistance with the operation in Nevada.

3    Q.   And was it seeking volunteers or telling people that they

4    were assigned?

5    A.   It was a volunteer operation.

6    Q.   Were you a volunteer?

7    A.   Yes.

8    Q.   And why did you volunteer?

9    A.   It's common just -- the BLM doesn't have a lot of law

10   enforcement, so it's common for people to assist in other areas

11   where there's not enough law enforcement presence in that area

12   to conduct an operation.

13            So, it was an opportunity to work in an area that --

14   that I normally am not from and with something that typically

15   in my area I don't deal with.

16   Q.   You don't usually do cattle impoundments in Salem or

17   Eugene?

18   A.   I don't.

19   Q.   And about when did you arrive in the Bunkerville, Nevada,

20   area?

21   A.   I know briefing was on April 4th, so on or about

22   April 3rd, 2014.

23   Q.   Did you have an understanding or had you have been briefed

24   by the time you arrived earlier what your general

25   responsibilities would be?

Adam Sully - Direct

1    A.    Yes.

2    Q.    And what were your general responsibilities?

3    A.    I was assigned as a member -- it was the investigative

4    team.  And, really, our duties going in were going to be, to be

5    open to duties as assigned.  So, it was going to be a variety

6    of things that came up during the operation.

7    Q.    Who was on the investigative team?

8    A.    Well, my supervisor, the team leader was Special Agent --

9    let's see -- Michael Johnson.  And then I worked directly with

10   another agent named Mike Hauck.  And there was a couple other

11   agents on the team, Lance Maniscalco and Bryn Elton.

12   Q.    And Agent Mike Hauck was your partner essentially?

13   A.    Yes.

14   Q.    And from the time that you arrived about 2nd, 3rd, 4th,

15   and up to April 6th, what were the general duties that you were

16   performing?

17   A.    It was a variety of duties.  We had -- we had contract

18   pilots, so we would meet them at the airport and give them law

19   enforcement escort back to the lodging they were in.  If -- the

20   BLM civilian employees would have law enforcement with them in

21   the convoy, so if they needed extra people for protection, then

22   we would provide that.

23   Q.    You mentioned that you would be escorting pilots.  What

24   were the pilots piloting?

25   A.    Helicopters.

Adam Sully - Direct

1   Q.   And what were the helicopters used for?

2   A.   My understanding is they were used to herd the cattle

3   during the impoundment where they wanted cattle to go.

4   Q.   And you mentioned that you were providing an escort for

5   convoys.  Who was in those convoys?

6   A.   There was BLM employees -- civilian BLM employees.  There

7   was contractors that were hired to assist with the operation.

8   Q.   Were you briefed as to what you should anticipate?  Would

9   there be a need for a law enforcement officer on the convoy?

10  A.   Going into the operation, it was made known that Cliven

11  Bundy had stated that he would do, you know, whatever is

12  necessary to stop the -- the impound from taking please.

13  Q.   So you were anticipating some possible interference?

14  A.   Yes.

15  Q.   Did your duties change in any way as of April 7th?

16  A.   Yes.

17  Q.   And how did they change?

18  A.   As a result of -- on April 6th, Dave Bundy was arrested

19  for failing to leave a closed area.  And then after that event,

20  there was posting on -- on one of the Bundy's blogspots.

21  Something to the effect of "They have my cattle, they have my

22  son, and the range war starts tomorrow."

23       And there was a rally that was planned for the 7th

24  that the Bundys were inviting supporters to come attend.

25  Q.   And what was your assignment with regard to the rally that

Adam Sully – Direct

1    you just mentioned?

2    A.   So we were asked to go to the rally in plain clothes, just

3    to report back an assessment of the crowd that was there, kind

4    of what things were being said, and just provide our assessment

5    of what the level of risk was with the operation.

6    Q.   So you mentioned that you were asked to go in plain

7    clothes.  Was this an undercover assignment?

8    A.   Yes.

9    Q.   And what did you do to sort of prepare your cover?

10   A.   So as I said, I was working with Mike Hauck, another

11   special agent.  So it was really just coming up with a quick

12   back story, if -- if we were approached just with conversation,

13   as far as where we were from or other details.

14   Q.   Were you intending to identify yourself as BLM law

15   enforcement at the rally?

16   A.   No.

17   Q.   And why not?

18   A.   I don't feel we would get an accurate reflection of what

19   was going on at the rally if they knew that there was BLM law

20   enforcement there.

21   Q.   So you were prepared to tell them a back story that you

22   were not law enforcement if anyone asked?

23   A.   That's correct.

24   Q.   Did you, in fact, attend the rally on the 7th?

25   A.   Yes.

Adam Sully - Direct

1    Q.   And about what time did you get there?

2    A.   On or about 9:00, 9:30.

3    Q.   Okay.  And where was it located?

4    A.   So, off of State Route 170, which is close to where the --

5    the Bundy Ranch is, there was a -- kind of a pullout that went

6    down just adjacent to the right-of-way of the highway there.

7    And it was down in that area.

8              MS. CREEGAN:  Okay.  Your Honor, can we publish

9    Government's previously admitted Exhibit 330, please?

10             THE COURT:  Yes, you may.

11   BY MS. CREEGAN:

12   Q.   And Special Agent Sully, do you recognize this map?

13   A.   Yes.

14   Q.   Can you generally identify the major roadways that you see

15   on this map by putting a line on them as you explain them?  You

16   can touch the screen --

17   A.   Okay.

18   Q.   -- and make a line so the jury can see.

19   A.   So this would be the interstate.

20   Q.   And that's the --

21   A.   15.

22   Q.   That's the I-15 running across the east/west version of

23   the top of the map?

24   A.   Correct.

25   Q.   Okay.  What other major roadways do you recognize?

Adam Sully - Direct

1   A.   This is the one that I referred to as State Route 170.

2   Q.   And this is a road that dips down from the top of the map

3   to the center; is that correct?

4   A.   Correct.

5   Q.   Are there any other roadways that you recognize?

6   A.   Sorry.  Could you repeat that?

7   Q.   I'm sorry.  I have been told I talk very quietly.

8        Are there any other roadways that you recognize?

9   A.   No.

10  Q.   Okay.  Those are the major roads in the area?

11  A.   Yes.

12  Q.   And could you, with a circle, please indicate where the

13  rally site was?

14  A.   Generally in that area.

15  Q.   And about how close was that to the Bundy family's private

16  residence?

17  A.   I'm not sure exactly the scale.  I believe the private

18  residence is down there where the -- in this area -- in this

19  area there.

20  Q.   That's the purple dots in the bottom left?

21  A.   Correct.

22  Q.   And where on this map is the impound site or the ICP where

23  the BLM was located if it is there?

24       And that is --

25  A.   In that general area.

Adam Sully - Direct

1    Q.    I'm sorry.  I don't mean to talk over you.  That's in the
2    top right corner of the map?
3    A.    Yes.
4    Q.    Okay.  So you attend this rally on the 7th, and you
5    mention that you got there around 9:30.  About how long were
6    you there?
7    A.    Till -- probably three hours.
8    Q.    About three hours?
9    A.    Yeah.
10   Q.    When you arrived, did you see that there were any other
11   people there?
12   A.    Yes.
13   Q.    About how many other people?
14   A.    I would estimate like 50 to 75 when we got there.
15   Q.    Over the course of the time that you were there, about how
16   many people did you observe?
17   A.    I would estimate about 100 people.
18   Q.    And can you describe generally how people were attired?
19   A.    I would describe it as kind of a typical western or
20   range-type dress.  What I would expect to see kind of in that
21   area.
22   Q.    So, what are some items of clothing people would be
23   wearing?
24   A.    Just blue jeans, button-up or T-shirts.  Some of them had
25   cowboy hats, some ball caps.

Adam Sully - Direct

1    Q.   Did you observe that there were any cars parked by the

2    rally site?

3    A.   Yes.

4    Q.   And were you able to observe what states the license

5    plates were from?

6    A.   Yes, some of them.

7    Q.   What were the license plates that you saw?

8    A.   For most part, it was Nevada, Utah.  Maybe a couple

9    Arizona.  Generally areas that are close within driving

10   distance of the rally site.

11   Q.   Did you observe whether anyone was carrying any firearms?

12   A.   On the 7th, I don't recall any standing out.

13   Q.   People may have been carrying firearms, but it wasn't

14   conspicuous to you?

15   A.   Correct.

16   Q.   Can you generally describe the -- the mood of the rally?

17   A.   I guess I would -- it was kind of the typical speeches.

18   They had a couple speakers there.  And it was generally the --

19   kind of anti-federal government and the -- that the federal

20   government couldn't own federal land, so there -- there was no

21   BLM authority there to enforce this -- the grazing, the court

22   order.

23   Q.   And did you hear anything that suggested to you a plan to

24   interfere with the BLM at that time?

25               MR. LEVENTHAL:  Objection.  Hearsay.

Adam Sully – Direct

1          THE COURT:  I'm sorry.  I didn't hear the question.
2    Could you repeat it?
3          MS. CREEGAN:  Did he hear anything regarding a plan
4    to interfere with the BLM at that time?
5          THE COURT:  What was the objection?
6          MR. LEVENTHAL:  Relevance and hearsay.
7          MS. CREEGAN:  One of the charged counts is
8    interfering.  And if anybody did make a statement about the
9    plan, it would be in furtherance of the conspiracy.
10          THE COURT:  Overruled.  He may answer the question.
11    BY MS. CREEGAN:
12    Q.   Did you hear anything to that effect?
13    A.   On the 7th, I don't recall anything.
14    Q.   And did you, or Agent Hauck, or people that you directed
15    to do so in the crowd take any pictures at the time you were
16    there at the rally site on the 7th?
17    A.   Yes.
18    Q.   And could I ask you to please turn in your government
19    exhibit book to look at Exhibits 15, 16, and 18 through 22.
20    A.   I am sorry.  Could you repeat those numbers again?
21    Q.   Of course.  15 and 16.
22    A.   15 and 16.
23    Q.   There are multiple books.
24    A.   Mine start at 276.
25    Q.   Look for the one that has a 1 on the cover.

Adam Sully - Direct

1   A.   And I apologize.  I will start with number --

2   Q.   Look at 15 and 16, please.  Just let me know if you

3   recognize them.

4   A.   Exhibit 15, yes, I recognize that.

5   Q.   Okay.  Can you look at Exhibit 16, please?

6   A.   Yes, I recognize Exhibit 16.

7   Q.   And may I ask you to also review Exhibits 18 through 22?

8           COURTROOM ADMINISTRATOR:  Counsel, that was 18

9   through 22?

10          THE WITNESS:  I recognize Exhibit 18.

11   BY MS. CREEGAN:

12   Q.   Okay.

13   A.   Exhibit 19 I recognize.  Exhibit 20 I recognize.

14   Exhibit 21 I recognize.  And Exhibit 22 I recognize.

15   Q.   And generally speaking, what are these?

16   A.   So generally after where the rally was initially, where

17   they had a couple people do speeches, then they moved up right

18   adjacent to the State Route 170.  And people assisted with

19   erecting a couple posts with the banner that was in one of

20   those -- one of those photographs, one of those exhibits.

21   Q.   So these pictures depict activities that occurred at the

22   rally site while you were there on the 7th?

23   A.   That's correct.

24   Q.   Do these pictures fairly and accurately represent what you

25   saw on the 7th?

Adam Sully - Direct

1    A.   On the 7th, yes.

2            MS. CREEGAN:  Your Honor, the government moves to

3    admit 15, 16, and 18 through 22.

4            MR. MARCHESE:  No objection Parker.

5            MR. TANASI:  No objection Stewart.

6            MR. LEVENTHAL:  No objection on behalf of

7    Mr. Drexler.

8            MR. ENGEL:  No objection from Engel.

9            MR. PEREZ:  No objection Lovelien.

10           MR. JACKSON:  No objection from Mr. Burleson.

11           THE COURT:  All right.  So Exhibits 15, 16, 18, 19,

12   20, 21 and 22 will be admitted.

13       (Exhibit 15, 16, 18, 19, 20, 21 and 22 admitted.)

14           MS. CREEGAN:  Thank you.  Permission to publish 15?

15           THE COURT:  You may.

16   BY MS. CREEGAN:

17   Q.   And Agent Sully, can you please describe what's going on

18   in this picture?

19   A.   That's where we had moved up next to the State Route 170.

20   And I recognize that's Special Agent Hauck holding up a sign as

21   we are just standing behind that -- the banner that I was

22   talking about that's eventually put up between the two white

23   posts.

24   Q.   Okay.  Exhibit 16, please.  And do you recognize this

25   picture?

Adam Sully - Direct

1    A.    Yes.

2    Q.    Can you describe what's going on here?

3    A.    That's me holding up the sign as we were getting ready to

4    help put it up.

5    Q.    And Exhibit 18, please?  Can you describe what's depicted

6    in this picture?

7    A.    This is an overview of initially where we gathered.  Down

8    in that area is -- they used -- the back of the pickup truck

9    was a stage for speeches for a couple people to talk.  And then

10   we moved up from that location to the area where the -- what

11   would become their staging area that was next to the

12   interstate.

13   Q.    And so these are the sorts of people that you were

14   observing depicted in this picture and the license plates that

15   you were observing depicted here?

16   A.    That's correct.

17   Q.    And Exhibit 20, please.  And can you describe what's

18   happening in this picture?

19   A.    Again, that's another overview.  And that's after we had

20   moved up.  On what would be the left side of that picture, you

21   can see one of the white posts that's described that gets put

22   up, and then the banner goes between them.  So it's that --

23   it's that group again moving up to the staging area.

24   Q.    And let me just ask you for a little information.  So you

25   had mentioned that you heard some speeches in the back of

Adam Sully - Direct

1  pickup trucks, and then the group went to start to work on

2  something.

3  A.    (Nods head.)

4  Q.    And -- sorry.  Could you answer in a verbal response?

5  They have to --

6  A.    Yes, that is correct.

7  Q.    Thank you.  And so what is it that they set to work on?

8  A.    I don't recall exactly kind of what they had talked about.

9  But while we were up there, they kind of made a point of

10 everybody getting involved with putting up the -- the posts and

11 that big sign up there at that staging area.

12 Q.    So first there were some people speaking, and then there

13 was the assembly of this speaking area with the two posts?

14 A.    Correct.

15 Q.    Okay.  And can I ask for Exhibit 21, please?

16        And what's depicted in this picture?

17 A.    Again, these are the two white posts that eventually

18 are -- had the sign.  They are put out and the sign is placed

19 between them.

20 Q.    And Exhibit 22, please?  What's depicted here?

21 A.    So this is where they requested everybody to get a hand on

22 the post and help -- help put it up to hang up their banner.

23 Q.    Thank you very much.  So, did there come a time where you

24 left the rally?

25 A.    Yes.

Adam Sully - Direct

1    Q.    And after that, what did you do?

2    A.    After that, we briefed our -- Special Agent Mike Johnson,

3    our team lead, of what our opinion was of the rally.  What we

4    saw.  What we had heard.

5    Q.    And what was your general assessment of the rally?

6    A.    At that time, it was kind of what we expected as far as

7    people that were coming in to support Bundy.  In my opinion,

8    there wasn't really -- I didn't see a threat to stop the

9    operation.  I didn't hear any direct plans or anything at that

10   time.

11   Q.    So from that point until sometime on April 10th, what

12   duties are you performing?

13   A.    Again, more of the escorting-type duties as assigned to

14   help out with -- with other teams or things that came up.

15   Q.    Did that change somewhere between April 10th and

16   April 11th?

17   A.    Yes.

18   Q.    And how do your duties change?

19   A.    So as a result -- on April 9th, there was an altercation

20   during -- there was a -- some BLM employees, who their mission

21   for that day was to remove structures that were on BLM that

22   weren't permitted.  And as they -- so again, these -- these BLM

23   employees are escorted by law enforcement.

24          As the BLM employees are coming out, the ones driving

25   the dump truck pulling the trailer, where they are coming out,

Adam Sully – Direct

1   it's visible from where that staging area was that was in the

2   photographs.

3              And during that, there was an individual by the name

4   of Pete Santilli.  He had put his vehicle in front of the first

5   law enforcement vehicle coming out to stop the convoy.  And --

6              MR. MARCHESE:  Objection.  Foundation.  Lack of

7   personal knowledge.

8   BY MS. CREEGAN:

9   Q.   Just very generally, what was your understanding of what

10  happened on the 9th?

11  A.   As a result of BLM law enforcement trying to get those

12  employees out of that conflict to a safe area, Ammon Bundy was

13  tased during that event which was posted on social media.

14  Q.   And how did that change the duties that you had?

15  A.   We had intel analysts and, you know, even ourselves kind

16  of watching social media.  And as result of that, there was a

17  lot more responses from either self-described or known militia

18  members that said they were coming into the area, bringing guns

19  and ammo to -- to support the Bundys and stop the BLM.

20             MR. MARCHESE:  Objection.  Hearsay.

21  BY MS. CREEGAN:

22  Q.   Did you receive a general threat assessment that the

23  threat had increased?

24  A.   Yes.

25  Q.   And so as a result of that, what new assignments, if any,

Adam Sully - Direct

1    did you receive?

2    A.    So then on April 10th, our team leader, Special Agent Mike

3    Johnson, instructed Mike -- Special Agent Mike Hauck and I that

4    we were to do additional undercover operation.

5             And for the next five day, we were going to be

6    assigned to attempt to spend as much time as we could at the

7    Bundy's staging area just to continually assess what was going

8    on, what the -- what type of threats, if any, they were making.

9    And a general feel for what the crowd was.

10   Q.    And in furtherance of that mission, did you take any steps

11   to adopt a new cover identity, improve your old one, prepare

12   for an undercover role?

13   A.    Yes.  Part of that mission was to go to Las Vegas and rent

14   a couple cars that weren't government vehicles in attempt just

15   to -- where they wouldn't be able to identify us as BLM.

16            We then went and got a hotel in St. George, Utah, so

17   that we wouldn't be traveling in and out of the known BLM

18   incident command post off of Interstate 15.

19   Q.    And did there come a time when you attended another rally

20   at the same site that you had been at before?

21   A.    Yes.

22   Q.    And when was that?

23   A.    On April 11th, 2014.

24   Q.    And about what time did you get there?

25   A.    We got there around 10:30 in the morning.

Adam Sully - Direct

1   Q.   And about how long were you there?

2   A.   Till around 3:30 that afternoon.

3   Q.   I am going to ask you some similar questions to the ones I

4   asked you about the 7th.  So the first one is, generally how

5   were people attired?

6   A.   Excuse me?

7   Q.   What types of clothing were they wearing?

8   A.   You had some that were in -- like I described on the 7th,

9   the typical Western ranch wear, blue jeans, cowboy hats.  But

10  also mixed in was a lot of people that were in military-type

11  clothing, camouflage.  What I would describe as more

12  military-type dress.

13  Q.   And did you also have an opportunity to observe some of

14  the license plates of the cars that were parked near the rally

15  site?

16  A.   Yes, I did some of them.

17  Q.   And what states were those license plates from?

18  A.   Again, there was kind of the local -- the driving area,

19  the Nevada, Utah, Arizona.  But in addition to that, there was

20  more of the California, Idaho, Montana.  A further drive.

21  Q.   And did you observe anybody with a firearm at the rally?

22  A.   Yes.

23  Q.   About how many people did you observe with firearms?

24  A.   Without --

25  Q.   With firearms.

Adam Sully - Direct

1    A.    Probably around 20 people with firearms.

2    Q.    And what types of firearms were these?

3    A.    Some were holstered sidearms, and then I would estimate

4    around four of they were rifles, long guns.

5    Q.    And before you attended this rally, were you given any

6    pictures of people to look for?

7    A.    Yes.

8    Q.    And did one of the -- the people that you were given a

9    picture to look for, were you given the name Ricky Ray

10   Lovelien?

11   A.    Yes.

12   Q.    And did you, in fact, see that individual at that rally?

13   A.    Yes.

14   Q.    Did you speak to that individual?

15   A.    Briefly.  It was a greeting.

16   Q.    And if you need to stand up, please do.  But do you see

17   that individual here in the courtroom today?

18   A.    Yes.

19   Q.    And can you please indicate, by just generally describing

20   where he is seated, if he's seated, and what he is wearing?

21   A.    At the back table on the right with the blue shirt and

22   glasses on his forehead.

23         MS. CREEGAN:  And Your Honor, we'd ask that the

24   record reflect that he's identified the defendant Ricky Ray

25   Lovelien.

Adam Sully - Direct

1          THE COURT:  Yes, the record will so reflect.

2     BY MS. CREEGAN:

3     Q.   And Agent Sully, you mentioned you just exchanged a few

4     words with him.  Anything more than an introduction?

5     A.   No.

6     Q.   Did you observe other people that you had been given

7     pictures for?

8     A.   Yes.

9     Q.   Who did you observe?

10    A.   Mel Bundy, Ryan Payne, Jim Lardy.

11    Q.   Did you speak with Ryan Payne?

12    A.   No.

13    Q.   Did you hear him speaking?

14    A.   Yes.

15    Q.   And what were the circumstances under which you heard him

16    speaking?

17    A.   I had overheard a conversation when he was talking with

18    Mel Bundy, and I overheard -- he was -- Ryan Payne was telling

19    Mel that there were some of the militia aren't going to come

20    until a certain event took place.  I couldn't overhear exactly

21    what that event was.

22    Q.   So he said some words to the effect the militia won't come

23    until --

24          MR. MARCHESE:  Objection.  Leading.

25

Adam Sully - Direct

1   BY MS. CREEGAN:

2   Q.   Sorry.  I was trying summarize.  Would you say in your own

3   words as close as you can remember what it is what he said?

4   A.   He said -- he told --

5           MR. JACKSON:  I am going to object on the grounds of

6   hearsay and on the grounds of confrontation as well.

7           MS. CREEGAN:  Your Honor, this would be a

8   coconspirator Ryan Payne in a statement in furtherance of the

9   conspiracy coordinating militia arrival.  And further, there is

10  no confrontation issue as these statements are not testimonial.

11          MR. JACKSON:  I am renewing my objection that they

12  haven't established a conspiracy as to Mr. Burleson.

13          THE COURT:  All right.  The objection is noted.

14          You may answer the question.  You might need to

15  restate it.

16  BY MS. CREEGAN:

17  Q.   Sure.  As close as you can remember, what were Ryan

18  Payne's words to Mel Bundy?

19  A.   So Ryan Payne told Bundy -- Mel Bundy that some of the

20  militia aren't going to come until a certain event takes place.

21  And I did not hear what he said -- described that event as

22  being.

23  Q.   Did you have any opportunity to speak to Mel Bundy?

24  A.   No.

25  Q.   Did you hear him speaking?

Adam Sully - Direct

1    A.    Yes.

2    Q.    And what did you hear him speaking about?

3    A.    There was a Bundy supporter who arrived at the incident

4    command post, and I overheard -- Mel Bundy asked if he was

5    associated with a militia.  And the gentleman said he wasn't.

6    And Mel Bundy --

7              MR. MARCHESE:  Objection.  Hearsay.

8              MS. CREEGAN:  Your Honor, this is also coordination

9    of the militia's arrival in furtherance of this conspiracy.

10             THE COURT:  Overruled.

11             MR. MARCHESE:  Well, Your Honor, I understand the

12   objection when it comes to Mel Bundy or Ryan Bundy -- or excuse

13   me -- or Ryan Payne as they are charged here.  But an unknown

14   individual, who is not charged, I would argue is not part of

15   the conspiracy and that would be hearsay.

16             MR. TANASI:  Mr. Stewart joins.

17             MR. JACKSON:  Well, there's a conclusion that he's a

18   Bundy supporter.  We object to that.  We don't have any

19   evidence that he's Bundy supporter or another person unknown.

20             We don't even know who this person is, so that's

21   certainly beyond any kind of logical.  He's just somebody that

22   was there.  We don't know whether it's a Bundy supporter or

23   some passerby.

24             THE COURT:  Ms. Creegan.

25             MS. CREEGAN:  Your Honor, we would submit it's a fair

Adam Sully - Direct

1   characterization given that the person is at this rally

2   speaking with Mel Bundy attempting to coordinate with him.

3           As to the objection as to what this person is saying,

4   this person is asking a question.  The question can't assert

5   information.  He's asking where to go and whether he identifies

6   as a militia or not.

7           You know, we are not trying to offer that for the

8   truth of the matter.  We don't know whether that individual is

9   a member of the militia or not.  The point is that Mel Bundy is

10  able to coordinate people that are arriving and direct some

11  people to stay at the militia camp.

12          THE COURT:  All right.  The objection is overruled.

13  You might need to ask the question again.

14  BY MS. CREEGAN:

15  Q.   I'm sorry.  Could you please just repeat what you remember

16  of that conversation between that person and Mel Bundy.

17  A.   So, during that conversation, he was asking Mel Bundy

18  about where he could stay.  And Mel Bundy asked if he was

19  associated with the militia.  And the gentleman said he wasn't.

20          And Mel Bundy had pointed out that there was a

21  militia camp that was further down the road across the river,

22  and that the people who came that weren't associated with the

23  militia, he pointed out a different area that was adjacent to

24  the staging area where they were camped.

25  Q.   Did you see where Mel Bundy indicated that these camps

Adam Sully - Direct

1    were located?

2    A.   At that time, no.

3    Q.   Did you see that there was a camp that was relatively near

4    the supporter camp?

5    A.   Yes.

6    Q.   And were you able to see where there was another camp

7    across the river as he had indicated?

8    A.   Yes.

9    Q.   Can I pull up Government's Exhibit 330, please.

10          And this is our map that we've previously looked at.

11   Would you please again circle where the rally site was?  And

12   can you indicate with an X where the militia camp was located?

13   A.   I believe it was generally in that area across that

14   bridge.

15   Q.   And just for the record, you've indicated an area just

16   south of the rally site across the Virgin River.

17   A.   Yes.

18   Q.   Can you indicate with another X where the non-militia

19   camping site was?

20   A.   In general, he pointed down towards kind of a -- I'm

21   sorry.  That's not a very good X -- but right in that area.

22   Q.   So just north of the rally site?

23   A.   Generally.

24   Q.   And did you have any other memorable conversations while

25   you were at that rally?

Adam Sully - Direct

1    A.    Yes.

2    Q.    And what was that?

3    A.    I remember speaking with one individual there.  He

4    identified himself as JT, wearing camouflage.  And during our

5    conversation --

6              MR. MARCHESE:  Objection.  Hearsay.

7              MR. TANASI:  Mr. Stewart joins.

8              THE COURT:  Ms. Creegan.

9              MS. CREEGAN:  Your Honor, we would submit that these

10   were also in furtherance of the conspiracy.

11             THE COURT:  So also coconspirator statements.

12             MS. CREEGAN:  Yes, Your Honor.

13             THE COURT:  Overruled.  You may answer the question.

14   BY MS. CREEGAN:

15   Q.    I'm sorry.  What did this individual JT say to you?

16   A.    So he was describing to me -- one, he said that he chooses

17   to camp in the militia area camp, because that's where the

18   important decisions are made.  And he described the -- the

19   other Bundy supporters that weren't militia as drum-beating

20   hippies.

21             And then he described the -- he said he had better

22   guns than the BLM.  And he didn't describe how much, but

23   indicated a large amount of ammunition with him as well.

24   Q.    And did there come a time when you saw that Mr. Cliven

25   Bundy was present at this rally?

Adam Sully - Direct

1    A.    Yes.

2    Q.    And how did Mr. Bundy arrive at the rally?

3    A.    So, at -- it was around 1:00, because it was a media-type

4    event.  He came in with -- it was -- I believe it was five

5    armed escorts with him to the stage.

6    Q.    And when you say that they were armed, how were they

7    armed?

8    A.    Sidearms.

9    Q.    Is there anything else that makes you think that they were

10   escorting him?

11   A.    So there was two of them that walked up on the stage with

12   him.  And then I remember three of them that stood in front of

13   the stage where he was speaking, and they weren't -- they

14   weren't facing towards him like they were listening to his

15   presentation.  They were facing the crowd in more of a

16   security-type stance or posture.

17   Q.    Did any of them have radios or earpieces or other types of

18   communication equipment?

19   A.    Yes.  I did observe one of them with an earpiece and

20   another one had a radio with him.

21   Q.    Did you observe anyone else that appeared to be guarding

22   Mr. Bundy?

23   A.    I'm sorry.  Could you repeat?

24   Q.    Did you observe anyone else that appeared to be guarding

25   Mr. Bundy?

Adam Sully - Direct

1    A.    As far as directly with him walking up to stage?

2    Q.    Anywhere in the rally.

3    A.    While he was speaking, across -- sorry -- across the road,

4    I can kind of point it out on the map, if you want me to.

5    Q.    Certainly.

6    A.    So, where that circle is is generally where the staging

7    area was where the rally was taking place.  There is a steep

8    hill on that -- on that side.  And there was -- I think I saw

9    four people that had long guns up on -- it was higher ground.

10   Looked like, again, providing security for the -- for the rally

11   while he was there.

12   Q.    And did Mr. Bundy -- you said he was walking up onto the

13   stage.  Did he make a speech on the stage?

14   A.    Yes.

15   Q.    Did you stay for the entirety of that speech?

16   A.    Yes.

17   Q.    And did you or anyone else that was with you take a video

18   of that speech?

19   A.    I did not.  I don't know if anybody else did.

20   Q.    Did you later see a video on social media --

21   A.    Yes.

22   Q.    -- of that speech?  And did you review that video?

23   A.    Yes.

24   Q.    And did you determine whether it fairly and accurately

25   depicted what you saw on April 11?

Adam Sully - Direct

1    A.   Yes, it did.

2    Q.   And I'm going to ask you to turn to Exhibit 49 in the

3    government's exhibit book.  And what do you see there?

4    A.   There's a disc.

5    Q.   And have you previously reviewed the contents of that

6    disc?

7    A.   Yes.

8    Q.   And is that the video that you mentioned of Cliven Bundy

9    speaking on the 11th?

10   A.   Yes.

11   Q.   It fairly and accurately represents what you saw?

12   A.   Correct.

13          MS. CREEGAN:  Your Honor, the government would move

14   to admit Exhibit 49.

15          THE COURT:  Any objection to Exhibit 49?

16          MR. TANASI:  No objection Stewart.

17          MR. MARCHESE:  None from Parker.

18          MR. LEVENTHAL:  None, Your Honor.  Not on behalf of

19   Mr. Drexler.

20          MR. ENGEL:  None from Engel.

21          MR. PEREZ:  None from Lovelien.

22          MR. JACKSON:  No objection from Mr. Burleson.

23          THE COURT:  All right.  Exhibit 49 is admitted.  Did

24   you want to publish it now?

25          MS. CREEGAN:  Yes, Your Honor.

Adam Sully - Direct

1          THE COURT:  All right.  Go ahead.

2          (Exhibit 49 admitted.)

3    BY MS. CREEGAN:

4    Q.   Could you clear your screen, the markings?  There's a

5    little clear button.

6          (Exhibit 49 being played.)

7    Q.   And who is that individual standing up on the stage behind

8    that table?

9    A.   Cliven Bundy.

10   Q.   And are you able to observe any persons that you

11   previously described as his security detail in this picture?

12   This screenshot?

13   A.   So, there's the person on the stage with him back towards

14   the left appears to be clapping his hands there.  The one

15   directly in front of him that has the black T-shirt on, the

16   sunglasses, and the ball cap that's facing away from him.  And

17   then the other one that's on the far right side that's taking a

18   drink of water.

19   Q.   Would you play, please?

20         (Exhibit 49 being played.)

21   Q.   Nicole, can we stop that?

22         Okay.  After you observed that speech, did there come

23   a time when you left that rally?

24   A.   Yes.

25   Q.   And what did you do after that?

Adam Sully - Direct

1  A.   We -- myself and Agent Mike Hauck went back to St. George

2  and briefed our team lead, Special Agent Mike Johnson, on what

3  we had seen, some of the conversations we had with people

4  there, and just our general feel of the crowd.

5  Q.   What was your general assessment of this rally?

6  A.   Based on the conversations we've had and just the change

7  in -- in makeup of the crowd as far as -- when we were there on

8  the 7th, we didn't see any people carrying sidearms.  There

9  wasn't the -- the talk of them having more powerful weapons

10 than the BLM, a lot of the just very

11 anti-federal-government-type rhetoric.

12          And our -- our assessment was that it was getting too

13 dangerous.  We really needed to assess if it was worth the

14 safety of the BLM employees, law enforcement, and the

15 contractors we had to continue with the operation.

16 Q.   And what did you do after you briefed Special Agent

17 Johnson?

18 A.   So, that information, my understanding is it went up the

19 chain of command.  And that combined with other information, a

20 short time later on the evening of the 11th, we heard that the

21 operation was being canceled due to safety concerns, like I

22 mentioned, for the contractors, the BLM employees, and law

23 enforcement.

24 Q.   And what duties did you have from the 11th and going into

25 the 12th?

Adam Sully - Direct

1   A.   So, sometime on the evening of the 11th, we had heard that

2   there was a bomb threat or some kind of threat at the hotel

3   where we were staying at Mesquite.  So we were instructed to go

4   back to the hotel, and we provided security at the parking lot.

5   We didn't know if there was anybody staying in the hotel after

6   that.  We had heard that --

7          MR. JACKSON:  Your Honor, I would like to make an

8   objection at this time, and I would like to have a conference

9   at this time with the Court.

10          THE COURT:  Regarding?

11          MR. JACKSON:  Regarding the last statement of this

12   witness.

13          THE COURT:  All right.  Do counsel want to waive the

14   presence of their clients at sidebar?  Mr. Engel, obviously, is

15   entitled to attend sidebar.

16          MR. MARCHESE:  Yes, Your Honor.  Parker will.

17          MR. LEVENTHAL:  On behalf of Mr. Drexler, yes.

18          THE COURT:  Mr. Perez, does Mr. Lovelien waive?

19          MR. PEREZ:  Yes.

20      (Sidebar.)

21          THE COURT:  All right.  So just to remind you as

22   before, because this is a short wall, whoever is speaking needs

23   to move towards this wall so nobody can read your lips or hear

24   your voice.

25          MR. JACKSON:  I will try to be real succinct.  I am

Adam Sully - Direct

1   objecting to the statement that came in --

2           THE REPORTER:  You need to speak up.

3           THE COURT:  He's trying to make it easier for you and

4   not be heard by the jury.  Go ahead.

5           MR. JACKSON:  I am objecting to the statement that --

6   the evidence that came in about a bomb threat on 4/11 at the

7   hotel.  And I don't think it has any relevance to this case, to

8   my client.

9           I think it's highly prejudicial.  And under the

10  Federal Rules of Evidence, prejudicial effect is greater than

11  any probative effect.

12          I don't think that there was any way -- I don't think

13  there is any way they can link it to my client or to any

14  general conspiracy.  Just a vague saying that there was a bomb

15  threat, I think, is highly prejudicial, and that should not

16  have come before the jury.  And I ask that be stricken.

17          THE COURT:  Ms. Creegan.

18          MS. CREEGAN:  Your Honor, we submit that it's highly

19  probative in this instance.  We have a large number of

20  continued threats and interference with the BLM contractors by

21  a large group of individuals, one of which called in this

22  threat to evacuate this hotel.

23          I think the reasonable inference the jury can draw is

24  that one of the Bundy supporters is the person who called in

25  this threat for the purpose of trying to get the BLM to leave

Adam Sully - Direct

1  exactly as Mr. Bundy was instructing the crowed he wanted them

2  to do.

3          MR. JACKSON:  Who called it in?

4          MR. MARCHESE:  Well, Mr. Parker -- Jess Marchese

5  here.  We would join in that.

6          In addition, we don't think the proper foundation has

7  been laid given the fact we don't know who made the statement.

8  It's also -- I don't know if it's a double, a triple or

9  whatever hearsay statement.  So, there's also couple levels of

10  hearsay here that are problematic not to mention the

11  foundation.

12          MR. TANASI:  This is Richard Tanasi for Steven

13  Stewart.  I join as well.

14          MR. PEREZ:  Shawn Perez on behalf of Rick Lovelien.

15  I joined.

16          MR. JACKSON:  Object to --

17          THE COURT:  Let Mr. Leventhal and Mr. Engel speak.

18          MR. JACKSON:  I'm sorry.

19          MR. ENGEL:  Todd Engel, I join as well.

20          MR. LEVENTHAL:  Todd Leventhal on behalf of

21  Mr. Drexler.  I join as well.

22          THE COURT:  I'm sorry I cut you off.

23          MR. JACKSON:  Okay.  We can't confront or

24  cross-examine the person who made the treat.  Whether it was

25  made -- it could have been made by a law enforcement agent for

Adam Sully - Direct

 1    all we know.  It could have been made by -- it could have been

 2    made by Cliven Bundy, but not by anybody in this group of five

 3    people.  We don't know.

 4         I am objecting to it.  I think it's highly

 5    prejudicial to my client.  The prejudicial effect greatly

 6    outweighs any probative value.  Sure.  There's bomb threats

 7    made every day everywhere in the country.

 8         It could have been a long-distance phone call for all

 9    we know.  It could have been made from somebody in Oregon, or

10    in Kansas, or New York, you know, that saw it on the Internet

11    and decided they were going to, you know, mess with things and

12    didn't like the BLM or whatever.  We don't know who did it.

13         THE COURT:  Ms. Creegan, do you have more evidence

14    other than just the witness saying that there was a bomb threat

15    and he had to go out there and help out?

16         MS. CREEGAN:  Not that we intend to introduce.

17         THE COURT:  Okay.  I'm going to strike it at this

18    point.  If there's more information later that gives more

19    light --

20         MR. MARCHESE:  Your Honor, I want to make one more --

21         THE COURT:  -- then we can make --

22         MR. MARCHESE:  Oh, go ahead.

23         THE COURT:  -- the objection and reassess it.

24         DEFENDANT ENGEL:  Yes, Todd Engel here.  Your Honor,

25    we also have evidence from BLM documents that they performed a

Adam Sully - Direct

1   "misinformation campaign."

2            THE COURT:  All right.  Well, you will be able to

3   present that during the defense or if you elicit it during

4   cross.

5            MR. LEVENTHAL:  Just real quick, Your Honor.  I want

6   to make a -- just a general objection to the admittance of the

7   coconspirator.

8            Under the *Anderson* case, the United States Supreme

9   Court enunciated the rules that it must be in the course and in

10  furtherance of the conspiracy, but there needs to be some

11  independent evidence and some connection that these defendants

12  had something to do with it.

13           If we just allow coconspirator statements or just

14  label them, the next is unindicted coconspirators which

15  implodes the entire hearsay rule.

16           Now, they are trying to attach labels.  Mr. Drexler's

17  name has not come up once except for me.  I am the only one

18  that has said his name so far.  He has not been identified.

19  He's not -- there has been no -- nothing linking a conspiracy

20  at this point.

21           And I understand that they have to prove the

22  conspiracy, and I think they are putting the cart before the

23  horse when it comes to coconspirator statements not to -- to

24  prove up the conspiracy itself.

25           I understand that, you know, they have to build it up

Adam Sully - Direct

1   and then at the end, they can -- but in order to prove or get

2   statements in, because of the -- the untrustworthiness of all

3   these statements and people just hearing things, I am going to

4   object to all of this as a -- all the coconspirator statements.

5          THE COURT:  Ms. Creegan, do you have any response to

6   that?  I know there's been other statements, too, not just the

7   ones elicited by Ms. Creegan.

8          MR. LEVENTHAL:  Correct.

9          MS. CREEGAN:  Your Honor, the state of the law is

10  that when a defendant joins a conspiracy, he is part of the

11  conspiracy, and that all of those statements that were made by

12  his coconspirators before he joined can be used as evidence

13  against him.

14         Even if it's Mr. Drexler's argument that he didn't

15  join at the time these statements were made, we can show that

16  there was a conspiracy existed, and that there were -- if

17  stated in furtherance of a conspiracy, then that is sufficient

18  for them to be put before the jury.

19         If the jury wants to reject and say that we are not

20  able to find that Mr. Drexler joined this conspiracy and that

21  this isn't something that he should be on the hook for, that's

22  something that I am sure could be demonstrated over the course

23  evidence.

24         But as of today, we are on day two of probably 30 or

25  35 of evidence.  And I believe that we will be able to show

Adam Sully - Direct

1    that we can connect Mr. Drexler to this conspiracy.

2              THE COURT:  Mr. Myhre, did you want to add anything?

3              MR. MYHRE:  No, Your Honor.

4              THE COURT:  I don't see Mr. Dickinson in here.  I

5    want to give everybody a chance to speak if you need to.

6              MR. MARCHESE:  I have lodged the objection, so I

7    think I made a record.  But I want to expand a little bit on

8    what Mr. Leventhal said, although I think he articulated his

9    position very well.

10             I am also particularly concerned in reference to

11   these uncharged coconspirators such as the statement was just

12   elicited from this JT individual.  Very little foundation.  I

13   don't know who this man is.  I don't know what he looks like.

14             So, the fact that we are now bringing in these

15   statements of people who I don't believe are going to be

16   testifying, who I don't believe -- well, I know they are not

17   charged is very problematic to me, and we object to any of

18   those statements.

19             MR. TANASI:  And I -- Rich Tanasi.  I join for Steven

20   Stewart.  I would just add on the foundational component of the

21   conspiracy.  I understand potentially what the Court's ruling

22   is, but just I would just ask for more foundation.  Otherwise,

23   I think we will continue to object on the same grounds.

24             THE COURT:  Well, the coconspirator statements are

25   not testimonial, so there is no confrontational clause on this

Adam Sully – Direct

1    issue.  And as conspirator statements, they may be introduced.

2    They are not hearsay.

3           As far as the timing of the evidence, it's difficult

4    to even imagine how they could introduce evidence of the

5    joining of the conspiracy before events of the conspiracy,

6    considering these folks came in from other states to Nevada

7    after the conspiracy allegedly started.

8           So I don't think there's any procedural issue there

9    that's unduly prejudicial either.  But I am striking the

10   testimony about the bomb threat being called into the Mesquite

11   hotel, since there's no other evidence to indicate who did

12   that.

13          MR. JACKSON:  It's hard for us to have a continuing

14   objection.  I hate to keep jumping up and objecting, but that's

15   basically what my position is as well as other counsel have

16   stated.

17          THE COURT:  I understand.  That's fine.  I think it's

18   appropriate.  All right.  Thank you.

19        (End of sidebar.)

20          THE COURT:  All right.  So, ladies and gentlemen of

21   the jury, I am going to ask you to disregard that last

22   statement regarding a bomb threat being made at the Mesquite

23   hotel.  That's not evidence in this case.

24   BY MS. CREEGAN:

25   Q.   Agent Sully, you mentioned that you were on guard duty at

1    the hotel.  What did you do after that?

2    A.    So, we were there throughout the night.  And then the next

3    morning, on the 12th, we were instructed to go back to the BLM

4    incident command post and start taking it down and getting

5    prepared to leave the area.

6    Q.    And about what time did you -- did you arrive at the

7    impound site?

8    A.    About 10:30 that morning.

9    Q.    And where were you originally?

10   A.    Down kind of around where our offices and other trailers

11   were inside down at the command post.

12   Q.    Did there come a time when that changed?

13   A.    Yes.

14   Q.    What happened?

15   A.    Around 11:15, Special Agent in Charge Loren Good told us

16   that there was a group that was gathering up at the front gate,

17   which they referred to as post one, and that they were

18   requesting additional law enforcement up there at the -- up

19   there at post one.

20   Q.    And what did you do in response to that?

21   A.    Myself and Special Agent Mike Hauck drove up to post one.

22   Q.    And what did you observe when you arrived at post one?

23   A.    When we got there, there was a crowd gathering at post

24   one.  There was marked BLM law enforcement ranger vehicles in

25   front of us, and there was a crowd gathering on the Interstate.

Adam Sully - Direct

1    And shortly after we arrived, there was a Las Vegas

2  Metro SWAT vehicle that showed up and a number of marked

3  local -- I believe it was Metro law enforcement vehicles as

4  well.

5  Q.   Were you able to observe members of the crowd?

6  A.   Yes.

7  Q.   Can you generally describe what you saw?

8  A.   It was a mix similar to what we saw on -- at the rally on

9  the 11th.  Some people in just general dress, western wear,

10 jeans, T-shirts, and then also some of the camouflage

11 military-type clothing.

12 Q.   What did you observe people in this crowd doing?

13 A.   Yelling at the people in front.  Starting to impede

14 traffic up on the Interstate.

15 Q.   How long were you at post one?

16 A.   It was only about probably 10 minutes.

17 Q.   And what happened that you were only there 10 minutes?

18 A.   We were -- if I remember correctly, it was Special Agent

19 Mike Johnson heard that they were requesting assistance.  What

20 they referred to as post two, which is underneath the -- the

21 I-15 overpass, there was a wash.

22    And there was another area that accessed the command

23 post.  And they had put up some cattle gates.  And they asked

24 us to going down to post two because of a growing crowd that

25 was gathering at that location.

Adam Sully - Direct

1   Q.   And did you, in fact, go to post two?

2   A.   We did.

3   Q.   And about when did you arrive there?

4   A.   It was shortly after that, so probably around 11:25,

5   11:30.

6   Q.   And within post two, there's that cattle gate, and then

7   there's the wash leading up to the impound site.

8   A.   Uh-huh.

9   Q.   Where were you located?

10  A.   So when we got down there, there was a line of marked law

11  enforcement vehicles that was fairly close to that gate.  And I

12  believe there was another one a few yards behind them.  We were

13  probably about 100 yards directly behind that front line of law

14  enforcement.

15  Q.   So how many cars did you see in that front line?

16  A.   I believe I saw three, if I recall correctly, and it

17  seemed like there was one, at least, directly behind that one.

18  Q.   So there were three cars out front, and you were about

19  100 yards back from them?

20  A.   Yes.

21  Q.   About how far were those three cars from the cattle gate?

22  A.   Initially, they were fairly close.  I'm estimating, you

23  know, 10 to 20 yards from that front gate.

24  Q.   To your knowledge?

25  A.   Yes.

Adam Sully - Direct

1   Q.   Were you able to observe any people on the other side of

2   that cattle gate?

3   A.   Yes.

4   Q.   What did you observe?

5   A.   The crowd was slowly -- well, pretty rapidly getting

6   larger and approaching the gate yelling and starting to press

7   up towards that gate.  And I could see people up on the --

8   gathering up on the overpasses, on both sides, both the

9   north -- northbound and southbound, and then gradually

10  increasing.

11         Underneath the overpass, there's kind of a steep bank

12  that goes up both sides, and there's some cement, kind of like

13  pillars, I guess, holding up as supports.  And they were

14  gathering in amongst on that hill.

15  Q.   Can you describe the general makeup of the types of people

16  that were present in the crowd?  For example, men, women,

17  children, different -- were those all present?  Only one?

18  A.   We saw a number of men, and there was also women in there.

19  I distinctly remember a woman sitting with what looked like a

20  child, maybe 10 or 11 years old, underneath the overpass area.

21         And so it was a real mix of, you know, women --

22  mostly adult males, but there was women in -- I know I saw at

23  least one child mixed in amongst that group.

24  Q.   And did you observe any people with firearms?

25  A.   Yes.

Adam Sully - Direct

1    Q.   About how many people did you observed?

2    A.   There was -- estimating about 20 with just sidearms, and I

3    distinctly remember seeing six people with long guns.  As I was

4    there behind my vehicle, I had binoculars.  There was another

5    special agent next to me, and I was just trying to identify the

6    threats to him that I could see with the binocular, so I

7    remember calling those out.

8    Q.   And how many did you call out?

9    A.   I remember around six of them.

10   Q.   And do you remember where you saw anybody with a long gun

11   positioned?  You had mentioned that you saw people in the wash.

12   People on bridges.

13   A.   I know I saw one.  And some of them had slung.  And the

14   more concerning ones were when the barrel would come up towards

15   the law enforcement in the front.  I know I saw one, with

16   binoculars on.

17          It would have been the overpass farther away from us,

18   the north -- it's the northbound, even though it doesn't run,

19   but the overpass further away from us.  And then I distinctly

20   remember one.  He was -- as I'm looking at that -- where I was

21   talking about that hill with the barriers, and he had a rifle.

22   He was leaning up against one of those barriers to my left.

23          I guess we were on the north side, so that would be

24   east.  And it appeared to me he kind of steadied himself and

25   then looked through the scope on the rifle toward the people in

Adam Sully - Direct

1    the front there.

2    Q.   And did you remember seeing anybody else specifically that

3    you saw with a long gun?

4    A.   I remember people having them slung amongst the crowd but

5    that's all that comes to mind.

6    Q.   Did you see any individuals that were on the bridges that

7    had long guns?

8    A.   The one that I mentioned that was on the northbound, the

9    overpass that was further away from me.

10   Q.   And do you remember the gender of the individual that had

11   the long gun on the bridge?

12   A.   I remember see facial hair on him -- I am assuming it was

13   a male -- when he didn't have the rifle raised up.

14   Q.   And did you observe what color that facial hair was?

15   A.   It was darker color.

16   Q.   Was the individual wearing any clothing that you can

17   remember?  You can describe?

18   A.   I don't remember.

19   Q.   Was the individual wearing anything on their head?

20   A.   I don't recall.  I just remember the rifle.

21   Q.   And did this individual ever point a firearm toward the

22   BLM?

23   A.   Yes.  He briefly raised it up from that position, and it

24   appeared to be looking toward down where we were at, and then

25   lowered it.  And I don't know if I continued scanning after

Adam Sully – Direct

1    that point or if he moved out of my view.

2    Q.   And did the individual that you mentioned that was up on

3    the embankment, did that individual ever point the gun directly

4    at the BLM?

5    A.   Yes.

6    Q.   Did you observe that there were armed people behind

7    unarmed people?

8    A.   Yeah.  I had mentioned there was a woman and what appeared

9    to be, like, a younger minor that were on that embankment

10   underneath there.  And that one individual, he kind of moved

11   around, but he was always either leaning up against that pillar

12   or kind of went behind where that woman and child were sitting

13   on that steep embankment.

14   Q.   Did you ever hear any announcements come over the BLM's

15   public announcement system?

16   A.   Yes.

17   Q.   What did you hear?

18   A.   I heard -- I can't remember the exact words, but that it

19   was a closed area.  That they needed to get back.

20   Q.   And how far away were you located from where the PA system

21   was?

22   A.   About 100 yards.  It was -- I believe it was coming from

23   those front vehicles right there.

24   Q.   Could you hear what the person was saying clearly or

25   unclearly?

Adam Sully - Direct

1    A.    I could definitely hear that they needed to move back away

2    from the gate.  There was a lot of noise coming from the crowd,

3    and I was kind of constantly trying to talk to the -- the other

4    special agent that was with me.  But I could clearly hear them

5    saying to the people that were approaching the gate that they

6    had to move back.

7    Q.    Did you ever hear the individual using the PA system say

8    that they would shoot?

9    A.    No.

10   Q.    And you could hear this at a distance of about 100 yards?

11   A.    Yes.

12   Q.    Did you observe any of the law enforcement officers,

13   whether they be BLM or park service, pointing a firearm toward

14   the crowd?

15   A.    No.

16   Q.    You could not observe any of them?

17   A.    I could not.

18   Q.    Did you learn of any requests to use force?

19   A.    Yes.

20   Q.    What was that?

21   A.    I heard over one of the radios the people in front as the

22   crowd was -- was growing and pushing up against that gate, they

23   had requested to use pepper ball, less lethal force.

24   Q.    And what thoughts did you have about that?

25   A.    I clearly remember, at that time, you know, through my 18

Adam Sully - Direct

1  years of law enforcement experience, that's the most scared I

2  was of either being shot or watching fellow officers be shot.

3  Q.   Why was that?

4  A.   As this is -- in processing the information we heard the

5  last couple days leading into that event and then with the --

6  the people that were coming, you know, them clearly saying that

7  they were there to -- to stop the government, and then even

8  some of the statements, like, Pete Santilli saying that BLM law

9  enforcement's going to be arrested.

10         And that it felt like it was growing to that -- that

11  flashpoint.  As soon as one thing happens, whether it's just

12  someone accidentally, you know, shooting their gun or

13  something, that it was just -- it was going to be mass

14  casualties on both sides.

15         MR. JACKSON:  Object to that as a conclusion.

16         THE COURT:  Overruled.  It's perception.

17  BY MS. CREEGAN:

18  Q.   And Ranger, why did the pepper ball make you concerned

19  specifically?

20  A.   For me it was -- it would have been that flashpoint that

21  there was a mix at that time of horses, women, children,

22  people.  And I didn't think that the people on -- that I saw on

23  the northbound side would know exactly what was going on when

24  they heard the chaos ensue as soon as that happened.

25         And I was afraid they would start shooting live

Adam Sully - Direct

1   ammunition down at the -- our law enforcement in that front

2   line.

3   Q.   You thought if the pepper ball was deployed, there would

4   be an exchange of gunfire?

5   A.   Yes.

6   Q.   Agent Sully, you have mentioned that you were very

7   concerned when you were in the wash; is that correct?

8   A.   That's correct.

9   Q.   And I think you even mentioned that that was as concerned

10  as you had ever been?

11  A.   Correct.

12  Q.   Did you describe why you felt that way?

13  A.   Yeah.  I think as law enforcement officers, we're --

14            MR. TANASI:  Objection.  Asked and answered.

15            THE COURT:  Overruled.  You may explain.

16            THE WITNESS:  As a law enforcement officer, you know,

17  we focus on kind of just reverting back to our training, and

18  you need to in those situations.  You try to just get your mind

19  off it.

20            But that was so volatile, I think, on -- on hearing

21  those people talk about their willingness to shoot law

22  enforcement.  And so you can't help but, you know, as you are

23  standing down there, thinking about, you know, your kids and --

24  and I know just from reading, you know, other law enforcement,

25  when there's an officer that dies or something, you understand

Adam Sully - Direct

1  that that officer went in to that profession knowing that it's

2  dangerous.  But I think you read about -- you know, they leave

3  behind a son and daughter.  You know, that's --

4              MR. MARCHESE:  Objection.  Self-serving.

5              THE COURT:  Overruled.

6  BY MS. CREEGAN:

7  Q.   I'm sorry to interrupt you.  Please go ahead.

8  A.   So, those things, it's etched with the level that it had

9  risen to and how I felt that it was to that point of as soon as

10  that first -- whether it was just something accidental, it was

11  these people had come, in some of their words, as a revolution.

12              I felt like we were just at a complete disadvantage

13  down in that wash where we were at.  And so I hope I explained

14  that well enough.

15  Q.   In your capacity as a BLM law enforcement officer, had you

16  previously observed protests?

17  A.   Yes.

18  Q.   What types of protests had you seen?

19  A.   We have protests related to timber sales.  There's people

20  that don't agree with some of the -- what trees are cut or any.

21  We've had protests associated with our wild horse and burro

22  program and other ones related to mining laws.

23  Q.   Was what you observed on the 12th the same or different

24  than those other protests?

25  A.   Different.

Adam Sully - Cross

1   Q.   How was it different?

2   A.   On the -- on the 11th, we had been told, and they knew

3   that the operation was -- was done.  We were -- we were packing

4   up to go home.  And yet then on the morning of the 12th, they

5   are -- they are coming to our location, you know, where we have

6   our safe spot set up.

7        And it -- they -- they had done what they wanted as

8   far as stopping the cattle impound.  So it was -- the way they

9   were bringing -- they were bringing the guns, pointing weapons,

10  and trying to come into the area where we had civilian BLM

11  employees, contractors, and a clearly defined barrier, it was

12  no longer a protest in my mind.  It was more of an assault on

13  our location.

14       MS. CREEGAN:  Okay.  Court's indulgence for a moment?

15       THE COURT:  Yes.

16     (Pause in the proceedings.)

17       MS. CREEGAN:  Thank you, Agent Sully.  I have no

18  further questions.

19       THE COURT:  All right.  Any cross?

20       MR. TANASI:  Yes, Your Honor.

21       THE COURT:  Go ahead, Mr. Tanasi.

22                    CROSS-EXAMINATION

23  BY MR. TANASI:

24  Q.   Good almost afternoon, Agent Sully.  How are you?

25  A.   Thank you.  Good.

Adam Sully - Cross

1   Q.   Good.  I represent Steven Stewart.  I have a few questions

2   for you on cross.  Okay?

3   A.   Okay.

4   Q.   All right.  I just want to be clear on how you categorize

5   the 12th.  Was it a protest or was it not a protest?

6   A.   In my mind, it was not a protest.

7   Q.   Okay.  You had an opportunity, on January 29th, 2015, to

8   meet with FBI Special Agent Joel Willis; correct?

9   A.   That's correct.

10  Q.   You see him in the courtroom now; right?

11  A.   Yes, I do.

12  Q.   Okay.  At that meeting, US Attorney Steve Myhre, he was

13  there; correct?

14  A.   Yes.

15  Q.   Okay.  US Attorney Nadia Ahmed was there; correct?

16  A.   Yes.

17  Q.   And also US Attorney Roger Yang was there; correct?

18  A.   I believe so.

19  Q.   And in that meeting, you discussed prior interviews and

20  prior reports that you had authored, you know, related to the

21  events of the 12th; correct?

22  A.   Correct.

23  Q.   And, in fact, there were no changes other than your

24  undercover capacity that were noted to those reports; fair?

25  A.   I believe so.

Adam Sully - Cross

1   Q.   Okay.  So let's go back to the 15th.  You authored a

2   memorandum of activity on April 15th, 2014.  Do you recall

3   that?

4   A.   Yes.

5   Q.   Okay.  And in that report, you wrote down how you recalled

6   events that took place on April 12th, 2014; right?

7   A.   Correct.

8   Q.   Okay.  And those events were, I guess, three days before;

9   correct?

10  A.   Yes.

11  Q.   So you didn't take the time on the 12th to write down all

12  these events.  You waited three days; correct?

13  A.   Yes, that's correct.

14  Q.   Prior to preparing this report, you had an opportunity to

15  discuss what you were going to put in that report with other

16  agents?

17  A.   Prior to the 15th?

18  Q.   Correct.

19  A.   Yes.

20  Q.   You discussed probably with Agent Love what you were going

21  put into this report; correct?

22  A.   No.  I don't recall that.

23  Q.   You don't recall that.  Agent Love, at the time, he was

24  your supervisor; correct?

25  A.   No.

Adam Sully - Cross

1    Q.   He was Agent Johnson's supervisor; correct?

2    A.   I don't believe so.

3    Q.   Okay.  Agent Johnson, he was your boss; correct?

4    A.   He was the team lead for -- for our assignment during

5    that -- during the operation.

6    Q.   Okay.  So, if Agent Johnson -- if you report to Agent

7    Johnson and Agent Johnson reports to Agent Love, wouldn't that

8    make Agent Love your boss?

9    A.   Well, my supervisor isn't Agent Love, so I would have to

10   say no.

11   Q.   Okay.  He has no supervisor authority over you; is that

12   your testimony?

13   A.   That's correct.

14   Q.   Okay.  All right.  So, let's go back to the April 15,

15   2014, report.  You've testified here today that it's -- that

16   what occurred on the 12th was not a protest; right?

17   A.   As far as underneath the -- where I was located underneath

18   the wash?

19   Q.   You've called it not a protest; correct?

20   A.   In my opinion, no.

21   Q.   Okay.  All right.  In that report, you indicate that there

22   was a crowd of protesters gathering just off Interstate 15 at

23   post one; correct?

24   A.   Correct.

25   Q.   Called them protesters; right?

Adam Sully - Cross

1  A.  Correct.

2  Q.  Okay.  You also indicated that there was a crowd of

3  protesters steadily growing to over 200 people; correct?

4  A.  On the 12th?

5  Q.  Correct.

6  A.  Yes.

7  Q.  Protesters; right?

8  A.  I think that's in the report, yes.

9  Q.  That's the word you used.  It's in your report; correct?

10  A.  Correct.

11  Q.  Okay.  You also indicated that after a few minutes, after

12  we moved back, I saw SAC Love -- SAC Dan Love walking in the

13  direction of the protest group and go out of my sight as he

14  talked with individuals in front of the protest group; correct?

15  A.  Yes.

16  Q.  That's in your report; correct?

17  A.  Correct.

18  Q.  Your words; correct?

19  A.  Yes.

20  Q.  And you are referencing SAC Love; correct?

21  A.  That's correct.

22  Q.  Your boss; correct?

23  A.  No.

24  Q.  You also indicate in the report that you saw over 20

25  protesters who were wearing holsters and sidearms; correct?

Adam Sully - Cross

1    A.    Repeat on which date.

2    Q.    On the 12th.

3    A.    Yes.

4    Q.    You saw protesters carrying guns; correct?

5    A.    In the report, yes.  That's what I put.

6    Q.    On that day, sir, you saw protesters carrying guns; fair?

7    A.    Correct.

8              MR. TANASI:  Thank you.  Nothing further.

9              THE COURT:  All right.  It's 12:00, so let's go ahead

10   and take our lunch break.  We are going to take a little bit of

11   a longer lunch break today.  What time, Aaron?

12             COURTROOM ADMINISTRATOR:  1:15, Your Honor.

13             THE COURT:  Till 1:15.

14             During this lunch break, I do remind all the jurors

15   that you are not to discuss this case with anyone nor to permit

16   anyone to discuss it with you.  You may speak to your fellow

17   jurors about other things, but not about this case.

18             If you do go outside to stretch, or I think we did

19   have a smoker, please remember to keep the button on, so

20   whether you have a jacket on or take the jacket off, keep your

21   juror button on.  And please let me know if anybody

22   inadvertently says anything to you in elevator or elsewhere

23   about the case.

24             Also, do not read or listen to or view anything that

25   touching upon the case.  Please do not perform any research or

Adam Sully - Cross

1  any independent investigation about the case and do not form

2  any opinion about the case until after we have provided you

3  with all the testimony, the evidence, you've heard closing

4  arguments, and you are provided with the jury instructions of

5  the law that will guide you during the deliberation process.

6          So, we will stand now for the jury so they can take

7  their lunch break.  We'll have them back here at 1:15.

8          Likewise, Special Agent Sully, after the jury exits

9  the courtroom, then you may as well go have your lunch break --

10         THE WITNESS:  Thank you.

11         THE COURT:  -- and stretch, and we'll ask you to

12  please be back here by 1:15.

13     (Jury out.)

14         THE COURT:  All right.  So, the jury has left the

15  courtroom.

16         And Mr. Leventhal, I just wanted to give you a couple

17  citations here.  *United States v. Everett*, E-V-E-R-E-T-T, Ninth

18  Circuit case, an individual need not be indicted to be

19  considered a coconspirator for the purposes of Rule

20  801(d)(2)(E), likewise, *United States v. Williams*, also a Ninth

21  Circuit case more recent.

22         MR. LEVENTHAL:  And I apologize, Your Honor.  Can you

23  repeat that citation?

24         THE COURT:  Yes.  So it's United *States v. Everett*,

25  E-V-E-R-E-T-T, 692 F.2nd 596 is the first Ninth Circuit case.

Adam Sully - Cross

1   And then the later more recent Ninth Circuit case is *United*

2   *States v. Williams*, 989 F.2nd 1061.

3           MR. LEVENTHAL:  Thank you.

4           THE COURT:  All right.  So we're going to go ahead

5   and take a break.  Do we need to come back here before 1:15?

6   We're just giving one juror some extra time, because they need

7   to make an important phone call with an employer.

8           So, if there was an issue that we needed to talk

9   about outside the presence of the jury, it would be a good time

10  to do so, so we don't waste their time.

11          MR. MARCHESE:  Not as of right now.  I can't think of

12  anything.

13          THE COURT:  All right.  So we'll just be back here at

14  1:15 ready to start.

15          MR. MARCHESE:  Thank you.

16          COURTROOM ADMINISTRATOR:  Off record.

17      (Recess, 12:02 p.m.  Resumed 1:19 p.m.  Jury out.)

18          THE COURT:  Thank you.  You may be seated.

19          Aaron, if you could bring in the jury.

20          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

21          THE COURT:  And we will be taking our next break at

22  2:55.

23          MR. LEVENTHAL:  Thank you.

24      (Jury in.)

25          THE COURT:  Everyone may be seated.  We are joined by

Adam Sully - Cross

1   the jury, and we have Special Agent Sully back on the witness

2   stand.

3          Mr. Tanasi, did he finish -- did you finish with your

4   cross-examination?

5          MR. TANASI:  I am all done.  Thank you, Your Honor.

6          THE COURT:  Okay.  Mr. Marchese?

7          MR. MARCHESE:  Thank you, Your Honor.

8          THE COURT:  Go ahead.

9                    CROSS-EXAMINATION

10  BY MR. MARCHESE:

11  Q.   Good afternoon, Special Agent Sully.  My name is Jess

12  Marchese.  I represent Eric Parker.

13  A.   Good afternoon.

14  Q.   All right.  So, I'm just going to mainly focus on

15  April 14th of 2014 and what you perceived in your role on that

16  day.

17         So, at what point did you get to Toquop Wash

18  approximately time-wise?

19  A.   Could you repeat the date for me?

20  Q.   April 14th, 2014.

21  A.   I was not there on April --

22  Q.   I'm sorry.  April 12th.  I apologize.  I am reading

23  something else.  April 12th.

24  A.   Okay.  Approximately what time -- I'm sorry.  You threw me

25  off with the date.  Repeat the question one more time for me.

Adam Sully - Cross

1    Q.   On April 12th --

2    A.   Uh-huh.

3    Q.   -- 2014, what time did you get to the Toquop Wash?

4    A.   Let's see.  Estimate around 11:25, 11:30.

5    Q.   Okay.  And then at some point in time, you went down into

6    the wash.  Is that fair to say?

7    A.   Yes.

8    Q.   Okay.  And that was behind the BLM gate that was erected;

9    correct?

10   A.   Correct.

11   Q.   And that gate was erected under the southbound freeway of

12   the I-15; correct?

13   A.   Correct.

14   Q.   Okay.  And I'm going to publish what's already been marked

15   and brought into evidence as Exhibit 132 for a moment.

16            Brian.

17            COURTROOM ADMINISTRATOR:  What number, Mr. Marchese?

18            MR. MARCHESE:  It's 132, Aaron.  Thank you.

19            COURTROOM ADMINISTRATOR:  Thank you, sir.

20        (Exhibit 132 being played.)

21   BY MR. MARCHESE:

22   Q.   Stop it there, Brian.

23            And for the record, this is approximately -- in the

24   upper corner of this is UTC time 19:22:32.

25            Do you see the area where you were at depicted on

Adam Sully - Cross

1    this particular screenshot?

2    A.   Yes.

3    Q.   Okay.  And can you just maybe do a dot or an X or

4    something that you are comfortable with just to show the jury

5    where you were.

6              So, is that a pickup truck?

7    A.   It's a Ford Expedition, an SUV.

8    Q.   Okay.  So were there -- next to it, is that a pickup truck

9    or --

10   A.   I don't recall.

11   Q.   All right.  You had mentioned on direct examination that

12   you were standing next to an agent.  Who was that agent that

13   you were standing next to?

14   A.   Special Agent Jason Curry.

15   Q.   Okay.  Was anyone else next to you?

16   A.   I know at some point Special Agent Michael Hauck was as

17   well.

18   Q.   Okay.  So, it was the three of you at that particular SUV?

19   A.   Yes.

20   Q.   Okay.  What was directly in front of you to your

21   recollection?

22   A.   Let's see.  In front of me, I know I saw the -- the marked

23   law enforcement vehicles that were just -- well, you can see

24   the three there that are closest to that gate, and then that

25   one vehicle.  I don't recall anything else in front of me.

Adam Sully - Cross

1   Q.   Okay.  And Brian, I am going to ask you to go back to

2   29:07, please.

3            Now, is this a better depiction of where you were

4   located at that time on that day on the April 12th incident?

5   A.   Yes, I can still see that vehicle.

6   Q.   It's closer up of where you would have been; correct?

7   A.   Correct.

8   Q.   All right.  And please indicate that on the -- on the

9   screen for the jury.  Thank you.

10            Now, it was your testimony that you didn't see anyone

11   pointing a firearm from the BLM at the crowd; is that correct?

12   A.   That's correct.

13   Q.   Now, I want to turn your attention to a memorandum of

14   activity that you authored on April 15th of 2014.  Do you

15   remember authoring that?

16   A.   Yes.

17   Q.   Okay.  And in that particular memorandum of activity, you

18   delineated what you remember that day as a part of your

19   investigation.  Fair to say?

20   A.   Correct.

21   Q.   Okay.  And that would have been a fair and accurate

22   depiction of what you remember; correct?

23   A.   Yes.

24   Q.   You wouldn't have left anything out important on that

25   particular memorandum; correct?

Adam Sully - Cross

1    A.    That's correct.  I would not have.

2    Q.    Okay.  Because that's something that might be used at a

3    later time for you to go back and review or maybe even testify

4    in court based upon.  Fair to say?

5    A.    Correct.

6    Q.    Okay.  On direct examination, you made reference to an

7    individual on the northbound bridge.  Do you remember the

8    government asked you some questions about an individual on the

9    northbound bridge with a rifle?

10   A.    Yes, I recall that.

11   Q.    Okay.  And it was your testimony that that individual had

12   dark facial hair; correct?

13   A.    That's correct.

14   Q.    Okay.  Yet you couldn't remember his clothing; correct?

15   A.    I do not.

16   Q.    You could remember his gender which was male; correct?

17   A.    Correct.

18   Q.    And couldn't remember if the individual had anything on

19   his head; correct?

20   A.    I could not remember.

21   Q.    And it was your testimony that this individual briefly

22   raised the weapon and pointed it in the direction of the BLM

23   officers; is that a correct statement?

24   A.    That's what I saw, yes.

25   Q.    Okay.  However, in your memorandum of activity, authored

1   on April 15th of 2015, isn't it true that you made no mention

2   of an individual on the northbound bridge with facial hair that

3   was male that you could not indicate whether -- what he was

4   wearing, raising his rifle and pointing it in the direction

5   briefly of the BLM?

6   A.   In that report, I don't specifically mention that.  I

7   think I grouped that in with the six individuals I saw with

8   rifles.

9   Q.   Okay.  But in that particular report, you didn't

10  specifically reference an individual on the northbound bridge

11  that was male with dark facial hair briefly raising his weapon

12  and pointing it at the BLM; is that correct?

13  A.   That's correct.

14  Q.   Now, you've also met with the government and the FBI on

15  numerous occasions, but I want to point you --

16          MS. CREEGAN:  Your Honor, assumes facts not in

17  evidence.

18  BY MR. MARCHESE:

19  Q.   Have you met with the FBI previously before coming to

20  court today?

21  A.   Yes.

22  Q.   Okay.  And have you met with the government before coming

23  to court today?

24  A.   Yes.

25  Q.   How many times did you meet with the FBI?

Adam Sully - Cross

1  A.   Twice.

2  Q.   How many times did you meet with the government?

3  A.   Three times?

4  Q.   Okay.  I want to turn your attention to February 24th of

5  2015.  If I was to tell you that you met with the FBI on that

6  day, in this particular courthouse, would that -- would you

7  disagree with that statement?

8  A.   I don't recall the exact date.

9  Q.   Okay.  But in that general time frame, you met with the

10  FBI and several individuals from the United States Attorney's

11  Office on that particular day.  Do you remember that?

12  A.   Yes.

13  Q.   And on that particular day, that was just kind of a

14  summary of everything that you had seen and memorialized based

15  upon your investigation from this alleged incident; is that

16  correct?

17  A.   That's correct.

18  Q.   They asked you a bunch of questions about what you

19  remembered; correct?

20  A.   Yes.

21  Q.   Okay.  And they also gave you copies of previous documents

22  that you had authored; correct?

23  A.   Yes.

24  Q.   And they gave you an opportunity to change those documents

25  if there was any clarifications that you wanted to make;

Adam Sully – Cross

1    correct?

2    A.    Yes.

3    Q.    And isn't it true on that particular day, that you were

4    given the opportunity to make changes, and the only change that

5    you wanted to make was one particular change.  Does that sound

6    correct?

7    A.    I don't recall, honestly, because I know there was a

8    photograph as well.  And I can't remember if it was at that

9    meeting, so I don't recall exactly what changes were made.

10   Q.    Okay.  Well, if I was to tell you that the one change that

11   you wanted to make was just in reference to your

12   responsibilities that you were working in an undercover

13   capacity during the BLM operation in April of 2014.  Would that

14   sound correct?

15   A.    Yes, I believe so.  I know that was one correction.

16   Q.    Okay.  Would it also sound correct that you did not bring

17   up an individual on the northbound bridge with dark facial

18   hair, that you couldn't tell what he was wearing, briefly

19   raising his weapon towards the BLM and pointing it at them?

20   A.    At that date, I don't recall, no.

21   Q.    Okay.  Now, I also have down -- and correct me if I am

22   wrong.  I apologize if I am, because taking notes and doing a

23   million things at once here.

24         You testified on direct examination that Dan Love was

25   not your supervising agent on April 12th, 2014, was that your

Adam Sully - Cross

1    testimony?

2    A.    Yes.

3    Q.    Okay.  Dan Love -- you agree with me -- did work for the

4    BLM to your knowledge April 12th of 2014; correct?

5    A.    Yes.

6    Q.    And his title, on April 12th of 2014, was that he was the

7    Special Agent in Charge; is that correct?

8    A.    That's correct.

9              MR. MARCHESE:  No further questions.

10              THE COURT:  Mr. Perez?

11                        CROSS-EXAMINATION

12    BY MR. PEREZ:

13    Q.    Good afternoon, Agent Sully.  My name is Shawn Perez.  I

14    represent Ricky Lovelien.

15    A.    Good afternoon.

16    Q.    Now, you had mentioned that you did identify Mr. Lovelien

17    as being at -- I guess it was the protest area?

18    A.    No, this would have been the staging area off of State

19    Route 170.

20    Q.    Okay.  And you also mentioned something about the militia

21    camp.  So this was not the militia camp?

22    A.    That's correct.

23    Q.    Okay.  And how was Mr. Lovelien dressed at the time?  Do

24    you recall?

25    A.    I recall, like, a short sleeve -- it was either a green or

1    camouflage shirt.

2    Q.   He wasn't wearing fatigues or anything like that?

3    A.   I don't recall.

4    Q.   And then also in your report of April 15th, you did not

5    know his first name, Mr. Lovelien's first name; correct?

6    A.   That's correct.

7    Q.   Okay.  When did you learn his first name?

8    A.   When I was shown the -- from our intel analysts, when I

9    got the report of who to look for, at that time.  And then when

10   I was writing the report, I didn't have that from them with me.

11   And so then afterwards, I knew -- I went back and looked at

12   that what we're given as far as people that were known to them,

13   and then put the two together.

14   Q.   So you knew -- you knew his name before then?  You just

15   didn't have the paper that would refresh your recollection of

16   who he was?

17   A.   Yeah.  I didn't bring that paper with me on the 11th to

18   that rally.

19   Q.   What exactly was that document?

20   A.   I don't recall.

21   Q.   I mean -- well, obviously, you said they gave you a

22   picture of Mr. Lovelien?

23   A.   Correct.  This was people who they knew were either

24   affiliated or self-described militia that were coming into the

25   area.  And I'm not sure if it was a DM -- Department of Motor

Adam Sully - Cross

1  Vehicle photograph.  It was just a photograph that we were

2  given.

3  Q.   Okay.  Was there any other information given about

4  Mr. Lovelien?

5  A.   Not that I recall.

6  Q.   Okay.  And do you know what militia Mr. Lovelien is

7  associated with, if any?

8  A.   If it was -- from Montana.  I don't remember if there was

9  a specific name.

10  Q.   Are you aware that Montana has several different militia?

11  A.   I was not aware of that.

12  Q.   Does the name Montana -- Montana State Defense Force come

13  to mind as far as Mr. Lovelien?

14  A.   No, it doesn't.

15  Q.   Okay.  And now, on the date of April 12th in the wash, did

16  you see Mr. Lovelien in the wash?

17  A.   I did not.

18  Q.   Did you see him anywhere on April 12th that you recall?

19  A.   Not that I recall, no.

20          MR. PEREZ:  Okay.  I have nothing further.  Thank

21  you.

22          THE COURT:  Mr. Engel.

23          MR. ENGEL:  Yes, ma'am.

24                  CROSS-EXAMINATION

25

Adam Sully - Cross

1    BY MR. ENGEL:

2    Q.   Thank you, Agent Sully, for being here today.

3    A.   Thank you.

4    Q.   My name is Todd Engel.  I'm representing myself.

5         To the best of your knowledge, were there

6    approximately 134 law enforcement agents involved in this

7    operation?

8    A.   I don't know that number.

9    Q.   Would you agree that -- that the desert, this area that

10   you guys were performing this impoundment would be considered

11   to Cliven Bundy his place of employment?  His place of work

12   where he herds cattle, does his daily operations, feeds them?

13   A.   Yes.

14   Q.   Has Cliven Bundy ever come to a location where you work to

15   protest with armed people?

16            MS. CREEGAN:  Objection, Your Honor.  Argumentative.

17            THE COURT:  Sustained.

18   BY MR. ENGEL:

19   Q.   Has Cliven Bundy ever come to a BLM facility that you are

20   aware of to protest?

21   A.   Not that I'm aware of.

22   Q.   It looks like you began your undercover assignment on 4/7.

23   Does that sound about right?

24   A.   Yes.

25   Q.   On 4/7, did you see any illegal activity?

Adam Sully - Cross

1   A.   No.

2   Q.   Did you see me on 4/7?

3   A.   I don't recall.

4   Q.   On 4/8, there is no reports of any illegal activity; is

5   that correct?

6   A.   Not that I made, no.

7   Q.   On 4/9, I have no reports of illegal activity anywhere in

8   any of my discovery.  Is that a fair statement to say no

9   illegal activity occurred on 4/9?

10          MS. CREEGAN:  Your Honor, objection.  Personal

11  knowledge.  Is Mr. Engel's question to the witness's knowledge?

12          THE COURT:  Sustained.  Do you want to rephrase that?

13  BY MR. ENGEL:

14  Q.   On 4/9, did you file any reports stating there was illegal

15  activity that occurred on that date?

16  A.   I don't recall any -- yeah, myself filing any reports.

17  Q.   Did you see me anywhere on 4/9?

18  A.   Can you repeat that?

19  Q.   Did you see me anywhere on April 9th?

20  A.   I did not.

21  Q.   On 4/10, did you observe any illegal activity?

22  A.   Not that I recall.

23  Q.   On 4/11, you stated that you went to a rally; is that

24  correct?

25  A.   That's correct.

Adam Sully - Cross

1    Q.   Between the hours of 10:00 and 3:00; correct?

2    A.   Around about 10:30 to 3:30.

3    Q.   You stated that you saw men with western clothing;

4    correct?

5    A.   Correct.

6    Q.   You saw folks with military-type clothing; correct?

7    A.   Yes.

8    Q.   Was there anything illegal about their military-type

9    clothing?

10   A.   No.

11   Q.   You also said you saw firearms at that rally; is that

12   correct?

13   A.   That's correct.

14   Q.   You saw holstered sidearms; correct?

15   A.   Yes.

16   Q.   Did you see anything illegal about the holstered sidearms?

17   A.   No.

18   Q.   You stated you saw rifles also?

19   A.   Yes.

20   Q.   Anything illegal about the rifles on that date?

21   A.   No.

22   Q.   On that date, you also stated that you saw four people on

23   top of a hill with guns; is that correct?

24   A.   That's correct.

25   Q.   To the best of your knowledge, they were doing nothing

Adam Sully - Cross

1    illegal; is that correct?

2    A.   That's correct.

3    Q.   On that date, Cliven Bundy was discussing issues

4    concerning, say, the revolution; is that correct?

5    A.   Yes.

6    Q.   Is discussions concerning the revolution illegal?

7    A.   No.

8    Q.   Was I at the rally on 4/11 to the best of your knowledge?

9    A.   I don't know that -- the answer to that.

10   Q.   You stated that you arrived on 4/12, the day of the

11   incident in question, at approximately 11:25 to 11:30; is that

12   correct?  At post two.  Sorry.

13   A.   That's correct.

14   Q.   Okay.  And you stated that you were 100 -- approximately

15   100 yards behind other law enforcement vehicles?

16   A.   Yeah, that was my estimate.  Yes.

17   Q.   Brian, can you pull up Exhibit 132 at 19:22:32, please.

18   Right there.

19        (Exhibit 132 being played.)

20   Q.   You've stated for the record that this was your vehicle;

21   is that correct?

22   A.   That was the vehicle I was behind.

23   Q.   That you were behind.  Excuse me.

24   A.   Yes.

25   Q.   Would it be safe to say that you -- under this situation,

Adam Sully - Cross

1   you would be evaluating everything around you?

2   A.   Yes.

3   Q.   You would be looking for threats in all directions; would

4   that be safe to say?

5   A.   Primarily at that point, my area was focused to the front

6   where those people were.

7   Q.   Would it be safe to say that you were communicating

8   visually with the other officers who would have been off to

9   your right?  Off to this direction here?

10  A.   No, I didn't have communication with them.

11  Q.   Visual, would you be looking over there to see what they

12  are doing?  Just kind of looking around?

13  A.   Yes.

14  Q.   Do you recollect this vehicle right here which would be

15  approximately, what?  30 yards from you?

16  A.   I don't recall.

17  Q.   You don't recall distance or if you were -- if you looked

18  that direction or --

19  A.   Yeah.  I mean, it was -- from the photo, it was there.  I

20  don't recall, you know, as far as memory what the vehicle was

21  or anything.

22  Q.   Okay.  Brian, could you go to Exhibit 258, please?  I

23  don't know how to get rid of those.

24          Do you recall seeing the gentlemen -- this vehicle

25  and the gentlemen standing around this vehicle?

Adam Sully - Cross

1   A.   I don't recall that.

2   Q.   Sir, may I ask you, did you aim your rifle at any of the

3   protesters that day?

4   A.   I did not.

5   Q.   You stated that you felt that you had the disadvantage in

6   the wash due to the elevation of the terrain; is that correct?

7   A.   That's correct.

8   Q.   Did you know that approximately a quarter to a half a mile

9   away, there was BLM agents up on the mesa who had a very -- a

10  much higher elevation than where the wash was?

11  A.   I'm not aware of that.

12  Q.   Were you aware that there was an FBI plane in the air?

13  A.   No, I was not.

14  Q.   Were you aware that there was a National Park Service

15  plane in the air?

16  A.   No, I was not.

17  Q.   Were you aware that there was a Metro helicopter in the

18  air?

19  A.   No.

20  Q.   You stated that it seems that people protest timber,

21  mining, and some -- and different things against the BLM.  Is

22  that fair that you run into these protesters fairly regularly?

23  A.   Not regularly, but, yes.  It's fair to say that does

24  happen.

25  Q.   So it would be a fair statement to say that Cliven Bundy

1    isn't alone in his protests against the BLM?

2              MS. CREEGAN:  Objection.  Relevance.

3              THE COURT:  Sustained.

4    BY MR. ENGEL:

5    Q.   Were you familiar with the arrest of David Bundy on the

6    6th?

7    A.   Yes.

8    Q.   Were you aware that he received some abrasions to the side

9    of his face during that arrest?

10   A.   I think I was made aware of that after that, yes.

11   Q.   Were you aware of the tasing of Ammon Bundy on the 9th?

12   A.   Yes.

13   Q.   Would you agree that when people are tased, it puts holes

14   in their body and it uses an electrical shock?

15             MS. CREEGAN:  Objection.  Relevance.

16   BY MR. ENGEL:

17   Q.   Would you agree that when a person is tased, that it can

18   be --

19             MS. CREEGAN:  Objection.  Relevance.

20             THE COURT:  What's the relevance, Mr. Engel?

21   BY MR. ENGEL:

22   Q.   Would you agree that somebody that has been tased can

23   receive minor injuries?

24             MS. CREEGAN:  Objection.  Relevance.

25             THE COURT:  Mr. Engel, what is the relevance of this

Adam Sully - Cross

1    question?

2              MR. ENGEL:  I'm sorry, Your Honor.

3    Q.   Mr. Sully, to the best of your knowledge, did you receive

4    any injuries that day on April 12th?

5    A.   No, I did not.

6    Q.   Did any of your fellow officers, that you are aware of

7    that were standing around you, receive any injuries caused by

8    the protesters that day, physical injuries?

9    A.   Physical injuries?

10   Q.   Physical injuries.

11   A.   No, not that I am aware of.

12   Q.   So would it be safe to say that the only thing that was

13   hurt out there on that day would be the BLM agents' feelings?

14             MS. CREEGAN:  Objection.  Argumentative.

15             THE COURT:  Sustained.

16             MR. ENGEL:  No further questions, Your Honor.

17             THE COURT:  Mr. Leventhal?  Or Mr. Jackson, do you

18   want to go next?

19             MR. JACKSON:  I have just got a couple of questions.

20             THE COURT:  Sure.

21                         CROSS-EXAMINATION

22   BY MR. JACKSON:

23   Q.   Good afternoon, Mr. Sully.  My name is Terrence Jackson.

24   I represent Gregory Burleson.

25             Did you see Mr. Burleson at the rally on April 11th,

Adam Sully - Cross

1    2014?

2    A.   I'm sorry?  Could you point him out to me?

3    Q.   He's the gentleman sitting near the end of the table

4    there.  He's got a little bit of a beard and a mustache.

5    A.   Your Honor, can I stand just to -- I can't see behind that

6    screen.

7            THE COURT:  You can go ahead and stand up.

8            THE WITNESS:  No, sir.  I don't recognize him.

9    BY MR. JACKSON:

10   Q.   Okay.  Now, you mentioned some talk about militias.  Is it

11   illegal, per se, to belong to a militia?

12           MS. CREEGAN:  Objection.  Calls for legal conclusion.

13   BY MR. JACKSON:

14   Q.   All right.  Well, let me rephrase it.

15           Have you ever arrested anybody for merely being in a

16   militia?

17   A.   No, I have not.

18   Q.   And you said there were many people that the government

19   checked out who were in a militia that you believed were coming

20   to this Bundy demonstration?  Rather than call it a protest,

21   this Bundy demonstration?

22   A.   Yes, that's information that we were given.

23   Q.   And they weren't -- they weren't arrested simply because

24   they were in a militia; is that correct?

25   A.   Can you repeat the question, please?

Adam Sully - Cross

1  Q.   They weren't taken into custody simply because they

2  were -- had been members or had been associated with a militia,

3  just because of that; is that right?

4  A.   That's correct.

5  Q.   In other words, they had to do some overt act or violate

6  some federal law before they could be taken into custody or

7  arrested for violation of a federal law; isn't that correct?

8  A.   That's correct.

9  Q.   Just being involved in a militia isn't a crime in this

10 country; is that right?

11 A.   That's correct.  It's not.

12          MR. JACKSON:  Thank you.  No further questions.

13          THE COURT:  Mr. Leventhal.

14          MR. LEVENTHAL:  Yes, thank you.

15                    CROSS-EXAMINATION

16 BY MR. LEVENTHAL:

17 Q.   Good afternoon.

18 A.   Good afternoon.

19 Q.   My name is Todd Leventhal, and I represent Mr. Drexler

20 right there.

21          Special Agent Sully, you were asked on direct

22 examination how you felt.  Do you remember a number of those

23 questions?  How you felt?

24 A.   Yes.

25 Q.   One of your answers, amongst many, was you could not

Adam Sully - Cross

1    imagine how much anger was directed at law enforcement.  Do you

2    remember giving that answer?

3    A.    Yes.

4    Q.    Okay.  So, you were out there.  And when you arrived on

5    April 12th, I believe you said you arrived at 10:30 in the

6    morning from Mesquite; correct?

7    A.    That's correct.

8    Q.    And you saw Metropolitan Police Department out there;

9    correct?

10   A.    At point one, yes.

11   Q.    And their law enforcement agency; correct?

12   A.    Yes.

13   Q.    Did you see any of them upholstering their pistols or

14   having weapons with them or on their person or out?

15   A.    On their person but not out.

16   Q.    Not out.  Okay.  Did you see anybody come up or point any

17   weapons at any Metropolitan police officers?

18   A.    I did not.

19   Q.    Okay.  Did you see the Nevada Highway Patrol?  Were they

20   out there?

21   A.    Yes.

22   Q.    And they are a law enforcement agency; correct?

23   A.    That's correct.

24   Q.    Same question.  Did you see any of them have their long

25   guns out or guns put on anybody at that time?

Adam Sully - Cross

1   A.   I don't recall that, no.

2   Q.   Okay.  You indicated that after a while, you saw many

3   different license plates come in from different states.  Do you

4   remember giving that testimony?

5   A.   On the 11th?

6   Q.   Yes.

7   A.   Yes.

8   Q.   Okay.  And so you -- you were curious, but your job title

9   changed from -- on April 6 or April 7th; correct?

10  A.   No.

11  Q.   Well, you indicated that on April 6th, there was Dave

12  Bundy's arrest; correct?

13  A.   Correct.

14  Q.   And at that time, you were transporting pilots, I believe

15  you said?

16  A.   Before that time?

17  Q.   Yes.

18  A.   That was one of the duties was escorting.

19  Q.   Escorting.

20  A.   Yes, the pilots.

21  Q.   And when I say your responsibilities changed, I am merely

22  suggesting that you now went undercover; correct?

23  A.   Yes.

24  Q.   Okay.  And that would have been on the 7th you went

25  undercover; correct?

Adam Sully - Cross

1    A.    For a short time on the 7th, yes.

2    Q.    Okay.  And you did so because of, you indicated, David

3    Bundy's arrest; correct?

4    A.    We did so because of the rally that was going to be held

5    on the 7th.

6    Q.    Okay.  So, it had nothing to do with Dave Bundy's arrest

7    going viral?

8    A.    That's what we -- we responded to the report on the -- it

9    was the Bundy Blogspot about, "Yeah, they have my son.  They

10   have my cattle.  A range war starts tomorrow."

11   Q.    Whatever it said, whether it was true or false, it went

12   viral; correct?

13   A.    Correct.

14   Q.    Okay.  And that was where David Bundy was standing next to

15   his car.  We've seen it; correct?  In front of his car?

16   A.    Yes.

17   Q.    And you saw it.  He was holding an iPad; correct?

18   A.    I have seen the video.  I was not present during that --

19   Q.    I understand, but you saw the video; correct?

20   A.    That's correct.

21   Q.    Okay.  And that's what sort of was another decision or

22   another element in the process of your decision making to go

23   undercover; correct?

24   A.    From seeing that video?

25   Q.    Not from seeing it, from it happening.  From it going

Adam Sully - Cross

1  viral.

2  A.   It was the -- the response from Cliven Bundy on that

3  website --

4  Q.   Okay.

5  A.   -- about declaring "The range war starts tomorrow," is

6  what -- why we wanted to see what the response was.

7  Q.   Okay.  And whether it was true or false, the video that

8  you saw, it appeared that he was just standing there doing

9  nothing.  Whether or not he was in a closed area, a non-closed

10 area, that was the message that went out; correct?

11 A.   That was the message that went out.

12 Q.   That's the message that went out.  So that's what people

13 saw, the public saw; correct?

14 A.   I don't know what they -- what videos they saw, but --

15 Q.   It would have been one of them.  You indicated it was on a

16 blogspot or something; correct?

17       MS. CREEGAN:  Objection, Your Honor.  This misstates

18 his testimony.  He saw the post about range war I believe was

19 his direct testimony.

20 BY MR. LEVENTHAL:

21 Q.   Did you see the video?

22 A.   Yes, I've seen the video.

23 Q.   Okay.  And you saw in that video that David was taken down

24 by a few different BLM agents; correct?

25 A.   I don't recall the whole video though.

Adam Sully - Cross

1    Q.   Okay.  Do you recall the dogs barking?  German Shepherds

2    barking while he was being taken down?

3    A.   I don't.

4    Q.   Okay.  Do you recall seeing what was looked at as snipers

5    up on a ridge?  Do you recall that?

6    A.   From that video, no, I don't.

7    Q.   You don't?  Okay.  Now, on April 9th, you saw when

8    Margaret Houston, a 58-year-old woman, was taken down?

9    A.   On April 9th?

10   Q.   Yes.

11   A.   I was not there, no.

12   Q.   Okay.  Were you in an undercover capacity still on

13   April 9th?

14   A.   No, I was not.

15   Q.   Okay.  So you have not seen that video?

16   A.   I have seen that video, yes.

17   Q.   Okay.  And so -- and you know that that video also went

18   viral; correct?

19   A.   That's correct.

20   Q.   Okay.  And that's where she was -- they call it

21   clotheslined, where she was picked up from behind; correct?

22              MS. CREEGAN:  Objection, Your Honor.  Argumentative.

23              THE COURT:  Ask him a question about --

24   BY MR. LEVENTHAL:

25   Q.   Yes.  And this all goes back to you indicated that you

Adam Sully - Cross

1   could not imagine how much anger was directed at law

2   enforcement.

3            MS. CREEGAN:  Relevance.

4            MR. LEVENTHAL:  It's relevant.  That was his answer.

5   That's how he felt.  And he's also indicated that he's seen

6   these videos.  I mean, I can move on.  It's just --

7            THE COURT:  It's overruled.  You can keep going.

8   BY MR. LEVENTHAL:

9   Q.   Did you see that -- you saw that video?

10  A.   Yes.

11  Q.   Okay.  And you saw how she was taken down; correct?

12  A.   Correct.

13  Q.   And she was thrown to the ground.  You saw that; right?

14           MS. CREEGAN:  Objection.  Argumentative.

15           THE COURT:  Well, it's asked and answered.  He said

16  he saw the video.

17  BY MR. LEVENTHAL:

18  Q.   On April 9th, you saw the tasing of Ammon Bundy; correct?

19  A.   That's correct.

20  Q.   Okay.  And again, we've seen that.  You saw that BLM put

21  up a First Amendment zone; correct?

22  A.   I didn't see them put it up.  But, yes.  I saw them in the

23  area.

24  Q.   And that went viral; correct?

25  A.   Yes.

Adam Sully - Cross

1    Q.   And when I say "viral," I mean it went out on the public

2    airwaves; right?

3    A.   I understand.  Yes.

4    Q.   Okay.  And one of your jobs was escorting pilots, you

5    indicated, amongst others; correct?

6    A.   That's correct.

7    Q.   Okay.  And so you knew that the BLM was also shooting

8    cows; correct?

9    A.   No, that was not what they were doing.

10   Q.   Okay.  And do you know whether or not information went

11   out -- again, truthful, not truthful -- about whether or not

12   BLM was stealing cattle?

13   A.   Yes.

14   Q.   Okay.  And so there was -- there was some news that BLM

15   was stealing cattle; correct?

16   A.   Correct.

17   Q.   Again, truth, not truth, it went out; correct?

18   A.   That's correct.

19   Q.   Okay.  So you went undercover.  And on April 7th, you

20   indicated and you told us that you attended the rally; correct?

21   A.   Yes.

22   Q.   Okay.  And at that rally, you indicated that you had --

23   and I am going to have to clarify this.  You either had

24   pictures of identifying different people in known or

25   self-described militia groups?  Did you have those on you?

1    A.    I didn't have them on me.  I don't think we had those on

2    the 7th.

3    Q.    No?  Were you taking pictures of different people at the

4    rally?

5    A.    No, I was not.

6    Q.    You were not.  So it was on the 11th then that you had

7    pictures of this so-called self-described known militia people?

8    A.    That's correct.

9    Q.    Okay.  And were you ever briefed, or did you have any

10   meetings regarding these self-described known militia people?

11   A.    We would have been briefed of their identity.

12   Q.    Okay.  And how would that happen?

13   A.    We had intel analysts that were there at the command post

14   working.

15   Q.    Okay.  And so you would have had them on your phone or

16   some other mechanism to see who was there?

17   A.    No.

18   Q.    No.  How would you recognize somebody then?  Did you look

19   at them and then go to the rally?

20   A.    Yeah, I was, prior to the rally, looking at the

21   photographs.

22   Q.    Okay.  So you spent -- you indicated you spent

23   approximately three hours at the April 11th rally; correct?

24   A.    I -- it was a little longer than that on the

25   April 11th rally.  We were probably there closer to five hours.

Adam Sully – Cross

1    Q.    Five hours.  Okay.  And on the April 7th rally, you were

2    there for -- how much -- how long were you there?

3    A.    About three hours.

4    Q.    Three hours?  Okay.  Now, in your undercover capacity,

5    knowing that there was a lot of misinformation that went out,

6    did you do anything to dispel any of the rumors?

7    A.    That was not our role there.

8    Q.    Okay.  Did you do anything to further any of the rumors?

9    A.    No.

10   Q.    So, you are in an undercover capacity.  Are you talking to

11   people while you are out there?

12   A.    Yes.

13   Q.    And I would assume you are not talking about the weather.

14   Are you talking about what's happening with the Bundys?

15   A.    There was a variety of different topics.  They were more

16   than willing to share their views.

17   Q.    Would it be fair to say that people were there for

18   different reasons?

19   A.    I guess I would have to have you clarify that.

20   Q.    Okay.

21   A.    I don't know what -- what you are asking.

22   Q.    Okay.  Were there people there because they cared about

23   cows?

24   A.    I would assume so.

25             MS. CREEGAN:  Objection, Your Honor.  Lack of

Adam Sully - Cross

1  personal knowledge.

2          MR. LEVENTHAL:  He was there.  I am asking him if he

3  knows.

4          THE COURT:  If he knows.

5          THE WITNESS:  I don't recall having a conversation

6  with someone saying they cared about cows.

7  BY MR. LEVENTHAL:

8  Q.   There weren't a lot of people that would drive for hours

9  because of cows; correct?  Or you don't know that?

10 A.   I don't know that.

11 Q.   And you were there for seven house on one rally, and you

12 intermingled with people; correct?

13         MS. CREEGAN:  Objection.  Misstates testimony.  He

14 said five and three.

15         THE COURT:  He said five and three.  Go ahead and

16 restate the questions.

17 BY MR. LEVENTHAL:

18 Q.   I apologize.  Five hours on April 11 you were there, and

19 you mingled and spoke to people; correct?

20 A.   That's correct.

21 Q.   And you did so in an undercover capacity; correct?

22 A.   That's correct.

23 Q.   So you had to assume the role as, I guess, the protesters;

24 correct?  That's what you do; right?

25 A.   Yes.

Adam Sully - Cross

1    Q.   And as you assume the role, you are then speaking to them

2    about the different reasons why they were there.  Why were you

3    there?  What was your -- what was your -- sort of your identity

4    as being there?

5    A.   We were just there because we heard it on the radio and

6    wanted to come see what was going on.

7    Q.   Okay.  So you didn't get involved in any sort of the

8    politics of all of it?

9    A.   No.

10   Q.   Okay.  And you didn't have any discussions with anybody, I

11   guess, about the politics of all of it, whether BLM was right

12   or wrong; correct?

13   A.   No, I don't recall that.

14   Q.   No?

15   A.   No.

16   Q.   Now, I noticed, at the second rally, the

17   April 11th rally -- and we saw it earlier.  I don't need to

18   play it for you again.  But there were a lot of camera crews in

19   the front there.  Did you see that?

20   A.   That was on April 11?

21   Q.   Correct.

22   A.   Correct.

23   Q.   And those camera crews were from major news organizations;

24   correct?

25   A.   Yes.

Adam Sully - Cross

1    Q.   Okay.  FOX News was there.  ABC was there.  CNN was there.

2    Do you remember seeing those?

3    A.   I do know FOX News was there.  I can't say for sure which

4    other ones were there.

5    Q.   Okay.  But there were major news organizations?

6    A.   Yes.

7    Q.   And there were a number of them; correct?

8    A.   Correct.

9    Q.   And on the video, we also saw people you identified to be

10   Cliven Bundy's security team; correct?

11   A.   Yes.

12   Q.   Okay.  And I notice that they had somewhat of a

13   sophisticated way of communicating.  They had earpieces.  Did

14   you recognize that?

15   A.   Yes.

16   Q.   Okay.  Now, on direct examination, you indicated that on

17   April 11th -- are you with me?  On the evening?  April 11th?

18   A.   On the evening of April 11th?

19   Q.   Yes.

20   A.   Okay.

21   Q.   You were in Mesquite; correct?

22   A.   I was -- excuse me?

23   Q.   Were you in Mesquite?

24   A.   Yes.

25   Q.   Okay.  And you had a meeting with SAC Love and ASAC

Adam Sully - Cross

1    Stover?

2    A.    No, I did not.

3    Q.    You weren't involved in that?

4    A.    No.

5    Q.    Were you aware that on the April 11th, that the BLM was

6    going to close down operations?

7    A.    Yes.

8    Q.    Okay.  You were.  Okay.  And so you stayed in Mesquite

9    that night; correct?

10   A.    Yes.

11   Q.    And you didn't get back to Bunkerville until the morning

12   of April 12th; correct?

13   A.    That's correct.

14   Q.    And you were aware that it was going to close down

15   April 11th?  You were aware that BLM was closing operations;

16   correct?

17   A.    That's what I was told, yes.

18   Q.    Okay.  So that information, you would assume, would get

19   out to the public; correct?  Maybe?

20   A.    That would have been, yeah, a different level than -- than

21   I was at --

22   Q.    Okay.

23   A.    -- so I'm not sure who was responsible for that.

24   Q.    And so if that information got out to the public and the

25   public thought that BLM was closed, closing down operations,

Adam Sully - Cross

1  because that's what you knew it to be on the 11th, they

2  probably wouldn't have expected BLM to be there on the 12th; is

3  that safe to assume?

4  A.   No.

5  Q.   Okay.  So, when something gets closed down, your testimony

6  is, is that it doesn't have to always all be closed down?

7  A.   There was a variety of trailers and structures.  It would

8  have been unreasonable for all that to get taken out of there

9  the evening of the 11th.

10  Q.   And I understand that.  I understand your point of view,

11  and I guess I'm asking you to speculate, so I don't want to do

12  that.

13         Now, at 10:30 in the morning, you were at post one;

14  correct?

15  A.   At 10:30, I would have been down at the incident command

16  post.

17  Q.   Okay.  And then now when you arrived at post two -- I

18  apologize.  What time was that at approximately again?

19  A.   At post two, estimated around 11:25, 11:30.

20  Q.   And when you got there, you were told that there were more

21  people coming; correct?

22  A.   That's correct.

23  Q.   And that's why you went down there, because you heard more

24  people were coming down in that area; correct?

25  A.   That's correct.

Adam Sully - Cross

1    Q.   And when you got there, what was your first -- what was
2    the first thing you saw in terms of the protesters?  Were they
3    under the bridge at that point?
4    A.   There was two overpasses, and I recall some underneath
5    both of those, yes.
6    Q.   Protesters underneath both of them?
7    A.   There was people underneath both of those overpasses that
8    were there.
9    Q.   And just for clarification, you have never seen
10   Mr. Drexler; have you?  I can have him stand up for you.
11   A.   No, I have not.
12   Q.   He wasn't at any of your rallies that you were at;
13   correct?
14   A.   I don't recall seeing him.
15           MR. LEVENTHAL:  Thank you very much.
16           THE COURT:  Mr. Jackson?
17           MR. JACKSON:  I have already had my chance, Your
18   Honor.
19           THE COURT:  I am losing track.  Did we have all six?
20           Okay.  Any redirect, Ms. Creegan?
21           MS. CREEGAN:  May we have a moment, Your Honor?
22           THE COURT:  Yes.
23        (Pause in the proceedings.)
24           MS. CREEGAN:  No redirect, Your Honor.
25           THE COURT:  All right.  Thank you, Special Agent

Alex Ellis - Direct

1   Sully --

2               THE WITNESS:  Thank you.

3               THE COURT:  -- for coming in today.  Please be

4   careful on your way out with the steps on your way down.

5               THE WITNESS:  Thank you, Your Honor.

6               THE COURT:  Government may call its next witness.

7               MR. MYHRE:  Thank you, Your Honor.  We call Alex

8   Ellis.

9                          ALEX ELLIS,

10  having been duly sworn, was examined and testified as follows:

11              COURTROOM ADMINISTRATOR:  State your full name and

12  spell it for the record.

13              THE COURT:  Good afternoon, Mr. Ellis.  You are going

14  to come up and take a seat right here to my right.  Watch your

15  step.  A couple steps up there.

16      (Witness sworn.)

17              THE WITNESS:  My name is Alex Ellis A-L-E-X

18  E-L-L-I-S.

19              MR. MYHRE:  Thank you, Your Honor.

20                      DIRECT EXAMINATION

21  BY MR. MYHRE:

22  Q.   Good afternoon, Mr. Ellis.  How are you?

23  A.   Good.  And you?

24  Q.   Good.  Thank you.  What's your current occupation?

25  A.   I work in the IT field currently.

Alex Ellis - Direct

1    Q.   And back in April of 2014, what was your occupation?

2    A.   I would have been working as a busboy at the Red Mountain

3    Spa Restaurant.

4    Q.   Now, were you also attending school?

5    A.   Yes, I was a senior in high school.

6    Q.   How old were you at the time?

7    A.   I was 17.

8    Q.   Now, in -- around the 11th of April of 2014, did you have

9    occasion to travel to Bunkerville, Nevada?

10   A.   I did.

11   Q.   Okay.  And did you go with anybody?

12   A.   I went with my friend Michael Flynn at the time.

13   Q.   And what -- what caused you to travel to Bunkerville?

14   A.   After reading some local news articles and seeing what was

15   going on there, I just honestly was curious.  I wanted to see

16   it for myself.

17   Q.   And who is Mr. Flynn?

18   A.   He was a friend of mine.  He was working as a reporter at

19   the time for the St. George Independent News.

20   Q.   And you've said you were going to travel down to -- to

21   Bunkerville just to -- out of curiosity, basically?

22   A.   Right.  I was.  And the way Michael got involved, I

23   stopped for a drink at at local coffee shop before leaving, and

24   saw him, and asked if he'd like to leave with me.  And he said

25   "Yes."

Alex Ellis - Direct

1  Q.   And around what time did you get down to Bunkerville?

2  A.   It was a little later in the evening.  Probably close to

3  5:00 p.m.

4  Q.   And do you remember the route that you took once you got

5  down there?

6  A.   I do.

7        MR. MYHRE:  Your Honor, may we recall up Exhibit 330,

8  please?

9        THE COURT:  Yes.

10  BY MR. MYHRE:

11  Q.   To your right is a monitor.  And does that appear to be a

12  map of the Bunkerville area?

13  A.   Yes.

14  Q.   And are you familiar with State Route 170?

15  A.   Yes.

16  Q.   Okay.  And can you just -- if you click on the right side

17  of your screen, you will see a little crayon there.  If you

18  could just trace the route for us that you came into the

19  Bunkerville area.

20  A.   Great.

21  Q.   So, now how did you know where to be going for -- to --

22  for this particular area?  Did you have a map or something or

23  did you just --

24  A.   Well, we knew it was close to Mesquite, so we took the

25  I-15 to Mesquite and then pulled up a map off of Google from

Alex Ellis - Direct

1    there.

2    Q.   And what were you looking for?

3    A.   The ranch, the protest site.

4    Q.   So when you pulled up into that general area where you

5    have your line, did you find a protest site?

6    A.   We did.  We parked a little bit south of it, around there,

7    south of the bridge, and found the protest site further north

8    there.

9    Q.   Okay.  You have drawn two circles, one just south of the

10   bridge and then north of the bridge.

11        When you pulled up south to the bridge, did you --

12   did you observe anything on that road that was off to the left

13   from there?

14   A.   Yes, we did.

15   Q.   Okay.  Did you try to drive up that road?

16   A.   No, we did not.

17   Q.   And was there a reason you didn't?

18   A.   As we walked past it, we saw several men -- several men in

19   camouflage holding rifles, and so that discouraged us from

20   going down that way.

21   Q.   If I could ask you to refer to those exhibit books there,

22   and if you would turn to Exhibit 327, please.

23        Do you have that, Mr. Ellis?

24   A.   Yes.

25   Q.   And does -- what is Exhibit 327?

Alex Ellis – Direct

1  A.   Looks to be a close-up of the map which is south of the

2  bridge.

3  Q.   Is that a fair and accurate depiction of the area as you

4  observed it on April 11th, 2014?

5  A.   It is.

6          MR. MYHRE:  Your Honor, may we offer Exhibit 327?

7          THE COURT:  Any objection to 327?

8          MR. MARCHESE:  None from Parker.

9          MR. TANASI:  None from Stewart.

10          MR. LEVENTHAL:  None from Drexler.

11          MR. ENGEL:  None from Engel.

12          MR. PEREZ:  None from Lovelien.

13          MR. JACKSON:  No objection from Burleson.

14          THE COURT:  All right.  Exhibit 327 will be admitted.

15          Did you wish to publish it now?

16          MR. MYHRE:  Yes, Your Honor, please.

17          THE COURT:  Go ahead.

18       (Exhibit 327 admitted.)

19  BY MR. MYHRE:

20  Q.   Now, Mr. Ellis, it should be on your screen there, so if

21  you could mark on this map where you saw people with the guns.

22          And do you recall approximately how many were there?

23  A.   Several, maybe five, six.

24  Q.   And what -- I'm sorry.  Go ahead.

25  A.   We didn't stay too long.

Alex Ellis - Direct

1   Q.   Did you observe what they were doing?

2   A.   Looked like they were just standing guard.

3   Q.   Now, you followed this road then north of the bridge; is

4   that correct?

5   A.   Yes, this one.

6   Q.   And when you got there, did you see a stage?

7   A.   North of the bridge.

8   Q.   Yes.  Did you see a stage there?

9   A.   Yes.

10  Q.   And did you see any people around in that area?

11  A.   Yeah.  Not very many.  It was later in the evening, so it

12  seemed by then many of them had either gone back home or to

13  their cars.

14  Q.   So what did you do?

15  A.   We walked the site up north past the stage a bit and back

16  down.  Talked to several people.

17  Q.   And what did you talk to them about?

18  A.   Asked them why they were there, and what they thought of

19  the whole situation.

20  Q.   And so was this in connection with Mr. Flynn's job of

21  reporting?

22  A.   Yes.

23  Q.   Approximately how many people do you think were in that

24  area when you were there?

25  A.   By the time we got there?  Not very many.  Maybe 60, 70.

Alex Ellis - Direct

1    Q.   Did you observe any people wearing firearms at all?

2    A.   Several, yes.

3    Q.   And what type of firearms?

4    A.   Mostly handguns.

5    Q.   And how were they -- were they carrying them and holstered

6    or otherwise?

7    A.   On their sides, yes, in holsters.

8    Q.   Are you familiar with firearms?

9    A.   Yes.

10   Q.   Do you own firearms yourself?

11   A.   Yes.

12   Q.   Was -- in terms of just speaking with people there, how

13   would you -- did you form an assessment generally of what the

14   mood of the people was?

15   A.   On the 11th, at that time, relaxed mostly.

16   Q.   Did you see any speakers or presenters on the stage or in

17   and around the stage?

18   A.   Not on the 11th.

19   Q.   Did you notice any signage or posters or anything of that

20   nature?

21   A.   Yes.

22   Q.   Did you read them, or do you recall what they said?

23   A.   Mostly anti-BLM slogans, statements of support for the

24   Bundys.  "We're here till the cattle come home."  Things to

25   that effect.

Alex Ellis - Direct

1    Q.   And the people that you did see though, just -- were they

2    just standing around, or were they just talking among

3    themselves?  What did you observe them doing?

4    A.   Not much activity.  Standing, talking.

5    Q.   So did you decide to go back then home that evening?

6    A.   Yeah.  We figured that we weren't going to get much

7    information that day.

8    Q.   Were you planning to go down the next day?

9    A.   Yes.  Michael suggested we come back the next day earlier

10   to catch more people.

11   Q.   Did you have, at that time, any information that there

12   were any events planned for the next day?

13   A.   No.

14   Q.   So the next day arrives.  Do you return?

15   A.   Sorry?

16   Q.   The next day arrives.  Do you return to Bunkerville?

17   A.   Yes.

18   Q.   Okay.  And when you drove there this time, approximately

19   what time of day was it?

20   A.   We got there much earlier, around 7:00, maybe 7:30 a.m.

21   Q.   Did you drive in the same route that you did previously?

22   A.   Yes.

23   Q.   And this time, when you drove in there, did you notice a

24   change from the previous day?

25   A.   There were many more people.  A little more activity.

Alex Ellis - Direct

1  Q.   When you say more people, were there -- did you see more

2  vehicles or just more bodies walking around?  How would you --

3  A.   Both.

4  Q.   How did you make that assessment?

5  A.   Both.  It was more difficult to find a parking spot, and

6  there was many more bodies, much more activity.

7  Q.   Now, when you came around that bend, as you are coming

8  around SR-170, did you look off to the left again where you had

9  seen those men the previous day?

10 A.   Uh-huh.  And they were there again.

11 Q.   Okay.  Did you notice anything else in that area,

12 trailers, trucks, cars parked?  Anything of that nature?

13 A.   A little south to the road in a little dirt lot, there

14 were some horsemen and a handful of horse trailers.

15 Q.   Did you -- do you recall how many horses were there?

16 A.   Two dozen maybe.

17 Q.   Do you have any -- did you get out and speak to anybody

18 about what the horses were doing there or anything of nature?

19 A.   We did.

20 Q.   You did -- what did you -- what were people saying about

21 the horses?

22 A.   A few of them identified themselves as local ranchers who

23 were there in support of Cliven.

24 Q.   So, this time did you go north again toward the staging

25 area?

Alex Ellis - Direct

1    A.    Yes.

2    Q.    Okay.  Did you find a place to park?

3    A.    Yes.  South of the bridge again.

4    Q.    So you parked south of the bridge?

5    A.    Yes, and walked north across it.

6    Q.    Now, when you got to the stage area, did -- how large was

7    the crowd when you first got there?

8    A.    Several hundred.  Between 2- and 300, I'd say.

9    Q.    Now, Mr. Flynn, did he have with him a recording device of

10   sort some?

11   A.    He did.  He had a camera.

12   Q.    What was his purpose for being there that day?

13           MR. LEVENTHAL:  Objection.  Calls for speculation and

14   no foundation.

15   BY MR. MYHRE:

16   Q.    Well, do you know what he was going to be doing with the

17   camera that day?

18   A.    Yes.

19   Q.    And what was that?

20   A.    He was there to gather interviews for his job at the news

21   agency.

22   Q.    And during the course of April 12th, did you attend most

23   of the events of that day at the staging area and subsequently

24   down at the wash?

25   A.    Yes, I was with him for almost the whole day.

Alex Ellis - Direct

1    Q.   And during that time, was he recording images as they were

2    occurring that day?

3    A.   Yes.

4    Q.   Did you also assist him in recording images?

5    A.   I did.

6    Q.   Now, since that date, Mr. Flynn has passed; is that

7    correct?

8    A.   It is.

9    Q.   You have reviewed, have you not, the videos that were

10   recorded that day; is that correct?

11   A.   I have.

12   Q.   And you reviewed those at the US Attorney's Office here in

13   this District of Nevada?

14   A.   Yes.

15   Q.   What I'd like to do now is go through some of those with

16   you.

17          Now, Mr. Ellis, we have a number of exhibits.  And

18   these recordings were broken up into several different files;

19   is that right?

20   A.   Yes.

21   Q.   And just for record purposes, we have marked those files

22   separately on the exhibit list.  So I'd like you just to, if

23   you could, pull the binder beginning with Exhibit 51, please.

24          MR. LEVENTHAL:  Your Honor, before we begin, may we

25   have a quick sidebar?

Alex Ellis - Direct

1              THE COURT:  No.

2              MR. LEVENTHAL:  Well, there's an issue.  I didn't

3    know that Mr. Flynn passed away.  And so there's an

4    authenticity.

5              I mean, is Mr. Ellis going to authenticate, I guess,

6    because he saw?  Because we wanted to bring in video ourselves,

7    and this is news for me that Mr. Flynn passed away.

8              THE COURT:  I don't hear an objection.  We'll see if

9    Mr. Ellis can authenticate these videos or not, and then I will

10   ask you if you want to lodge an objection.

11             MR. LEVENTHAL:  Very good.

12   BY MR. MYHRE:

13   Q.   And Your Honor, Court's indulgence.  Because there are so

14   many, I'd like to take them in groups.

15             Beginning with Exhibits 51, 52 and 53, and you have

16   there in -- in your book various disks; is that correct?

17   A.   Yes.

18   Q.   And you have reviewed the files that are on those disks;

19   is that correct?

20   A.   Yes.

21   Q.   And they are fair and accurate depictions of the events as

22   you witnessed them on April the 12th of 2014; is that correct?

23   A.   Yes.

24             MR. MYHRE:  Your Honor, we offer Exhibits 51, 52, and

25   53.

Alex Ellis - Direct

1          THE COURT:  Any objection to Exhibits 51, 52 and 53?

2          MR. TANASI:  Your Honor, I think we lodge the same

3     authenticity objection as well and foundation.

4          MR. MARCHESE:  Parker joins and adds chain of

5     custody.

6          MR. LEVENTHAL:  Mr. Drexler joins.

7          MR. ENGEL:  Engel joins.

8          MR. PEREZ:  Lovelien joins.

9          MR. JACKSON:  I'd just like to ask a few questions on

10    voir dire, and I may or may not have an objection until certain

11    questions are asked about foundation.

12         THE COURT:  Mr. Myhre, do you want to set a

13    foundation?  He said he was there.  He said he helped Mr. Flynn

14    to take the videos.  He has reviewed them.  He says they are

15    fair and accurate.

16         I don't know what other foundation you are looking

17    for.

18         MR. JACKSON:  Well, chain of custody is one thing.

19    That's the main thing.  Whether the videos have been -- you

20    know, when was the last time he saw them?  Whether they could

21    have been altered?  There's a number of questions that I would

22    like to ask.

23         MR. MYHRE:  That's fair game for cross-examination,

24    Your Honor.

25         MR. JACKSON:  All right.  Then I -- I don't have any

Alex Ellis - Direct

1    objection if I can ask adequate questions on cross.

2              THE COURT:  You can ask him on cross-examination.

3              All right.  So Exhibit 51, 52, and 53 will be

4    admitted.  He said it was a fair and accurate representation of

5    what he and Mr. Flynn videotaped on April 12.

6              MR. MYHRE:  Thank you, Your Honor.

7         (Exhibit 51, 52 and 53 admitted.)

8    BY MR. MYHRE:

9    Q.   Now, Mr. Ellis, during the course -- did there come a time

10   Mr. Bundy spoke to the group that was assembled there?

11   A.   Which Bundy?

12   Q.   Mr. Cliven Bundy.

13   A.   Yes.

14   Q.   And before he spoke, did Mr. Ellis, you know, pan the

15   crowd or take photos -- or, excuse me -- record images of the

16   area surrounding the stage and so forth?

17   A.   You mean did Mr. Flynn?

18   Q.   Mr. Flynn.  I'm sorry.  What did I say?

19   A.   Mr. Ellis.

20   Q.   Oh, I'm sorry.  I apologize.  Mr. Flynn.

21   A.   Yes, he did.

22             MR. MYHRE:  May we publish 51, Your Honor?

23             THE COURT:  Yes, you may.

24        (Exhibit 51 being played.)

25   BY MR. MYHRE:

Alex Ellis - Direct

1   Q.   Thank you.  So in that segment there, Mr. Ellis, what --
2   what did we observe?
3   A.   A few of the protesters standing while they sang the
4   National Anthem.
5   Q.   Was that -- were there things like that we've seen
6   depicted in this video here?  Were people singing songs and
7   doing the sort of things that would be described as
8   patriotic-type of things?
9   A.   Yes.
10  Q.   Nicole, can we back that up to just right in the
11  beginning.  That's fine right there.
12          I had this at the very beginning segment.  Do you
13  see, in the foreground there, a person -- circling right here.
14  Do you see this person?
15  A.   Yes.
16  Q.   And was this the only time you saw this person this day?
17  A.   No.
18  Q.   Did you see him later in the day as well?
19  A.   Yes.
20          MR. MYHRE:  If we could move to Exhibit 52, please,
21  and may we publish, Your Honor?
22          THE COURT:  Yes, 52.
23  BY MR. MYHRE:
24  Q.   I am sorry.  So on this particular image here, Mr. Ellis,
25  you see some numbers along the bottom portion of the image?  Do

Alex Ellis - Direct

1   you see that?

2   A.   Yes.

3   Q.   And what do you know those to be?

4   A.   That is the time stamp of the video.

5   Q.   Now, the 2014-04-12, that's the date.  And the numbers

6   after that 10 underscore 39 underscore 49, would that be the

7   time that was local to Nevada or local to Utah?

8   A.   That was Utah local time.

9        MR. MARCHESE:  I am going to object as to foundation.

10  BY MR. MYHRE:

11  Q.   Do you know whether this particular time stamp here is

12  local to Nevada or local to Utah?

13  A.   Local to Utah, meaning it would be an hour ahead of Nevada

14  time.

15       MR. MARCHESE:  I would like some more foundation as

16  to his personal knowledge as to how he knows this, when he saw

17  this, whether this was in his possession, all these sorts of

18  things which have not been laid at this point.

19       MR. MYHRE:  Your Honor, we have laid the foundation

20  for the --

21       THE COURT:  Yeah, you can ask on cross-examination.

22  It goes to the weight.

23  BY MR. MYHRE:

24  Q.   Okay, Nicole.  If you could advance that, please.

25       (Exhibit 52 being played.)

Alex Ellis - Direct

1   Q.   Stop, Nicole, please.

2              Now, Mr. Ellis, the individual who was just speaking,

3   did you recognize that individual?

4   A.   I do.

5   Q.   And who is that?

6   A.   That is Ammon Bundy.

7   Q.   And do you know his relationship to Cliven Bundy?

8   A.   I believe he's his son.

9   Q.   Now, the individual holding the microphone, do you know

10  who that individual was?

11  A.   I do.

12  Q.   And who is that?

13  A.   That is Sheriff Gillespie.

14  Q.   Now, drawing your attention to an individual right here,

15  do you recognize that individual?

16  A.   I do.

17  Q.   And do you know that individual's name?

18  A.   I do not.

19  Q.   Okay.  Did you have occasion to observe him throughout the

20  day that day?

21  A.   I did.

22  Q.   And was that -- and where did you observe him?  At this

23  stage area?

24  A.   Yes.

25  Q.   Did you notice whether he had any interaction with other

Alex Ellis - Direct

1   people on that stage or below the stage?

2   A.   He did.

3   Q.   And what type of interaction did you observe?

4   A.   He was speaking with several of them including Ammon

5   Bundy.

6   Q.   When you say several of them, you mean several people on

7   the stage or elsewhere?

8   A.   Yes, on stage.

9   Q.   Now, at this time, before the sheriff begins to speak,

10  what was your general -- did you assess the -- the mood of the

11  crowd before this speech we are about to see occurred?

12  A.   They seemed happy.

13  Q.   How large was the crowd about this point in time?

14  A.   Almost 300.

15  Q.   And within the crowd, did you see any people with

16  firearms?

17  A.   I did.

18  Q.   And what type of firearms did you see?

19  A.   Both handguns and long guns.

20  Q.   And when you say long guns, what are you referring to?

21  A.   Rifles.

22  Q.   And how -- when you saw people with long guns, how were

23  they being carried?

24  A.   Down across the front of their bodies.

25  Q.   If you could continue the film, please.

Alex Ellis - Direct

1        (Exhibit 52 being played.)

2    Q.   Nicole, stop that, please.   Thank you.

3            Now, we just heard the recording.   What I wanted to

4    ask you, Mr. Ellis, was were you aware that the meeting was

5    going to be taking place before Sheriff Gillespie got there?

6    A.   Not until after arriving.

7    Q.   After you arrived there?

8    A.   Uh-huh.

9    Q.   And was this a matter that was generally discussed among

10   people in the crowd?

11   A.   Yes.   That's where I found out about it from.

12   Q.   When you -- before the sheriff arrived, did you have a

13   sense of what -- from your discussion, was that -- what the

14   speech was going to be about or the appearance of the sheriff,

15   what that was going to be about?

16   A.   They spoke of a press release where they had decided the

17   cattle would be released from the BLM.

18   Q.   Well, that's what the sheriff just said.   Was that

19   discussed before the sheriff even got there, or was there some

20   anticipation as to what the sheriff was going to say?

21   A.   Yes, that is when we first heard about it was before the

22   sheriff had spoken.

23   Q.   Now, just drawing your attention to another individual,

24   the person I have just drawn an arrow to, did you happen to see

25   him that day on the stage?

Alex Ellis - Direct

1    A.   I did.

2    Q.   Did you observe his actions?

3    A.   He was also speaking with others up on the stage.

4    Q.   And do you know that individual's name?

5    A.   I do not.

6    Q.   Okay.  Nicole, if you could continue, please.

7         (Exhibit 52 being played.)

8    Q.   And the record should reflect that the segment has ended.

9         Now, Mr. Ellis, the individual speaking, do you

10   recognize who that was?

11   A.   I do.

12   Q.   And who was that?

13   A.   That was Cliven Bundy.

14   Q.   Now, we just heard what he said, but I wanted to explore

15   what you, as -- when you were there, what you were perceiving

16   or what you were understanding as to what he was saying.  What

17   was your understanding from what he said?

18   A.   He was asking for the sheriff to disarm the National Park

19   Service as well as to tear down the tollbooths to entry to

20   those parks.

21   Q.   Now, when we heard the reaction of the crowd to that, what

22   was your reaction to that?

23   A.   My reaction to the crowds' reaction?

24   Q.   No, your reaction to what Mr. Bundy had said.

25   A.   I thought it was unreasonable.

Alex Ellis - Direct

1    MR. MARCHESE:  Objection.  Relevance.

2    MR. TANASI:  Stewart joins.

3    MR. MYHRE:  It's completely relevant, Your Honor.

4  He's a listener to the speech at the time.  It's his

5  impression.

6    THE COURT:  All right.  I will allow it.  Overruled.

7  BY MR. MYHRE:

8  Q.   Now, in terms of your overall sense of the rest of the

9  crowd, what was -- what was your impression as to how they

10  received it?

11    MR. TANASI:  Objection, Your Honor.  Speculation.

12  BY MR. MYHRE:

13  Q.   Just what your impression was at the time.  Did you have

14  an impression?

15  A.   They were expecting unreasonable goals.

16  Q.   Now, following this speech, did you see -- it appears that

17  the sheriff left.  Did you observe the sheriff leave and his

18  staff?

19  A.   Yes.

20  Q.   If we could play Exhibit 53, please.

21    (Exhibit 53 being played.)

22  Q.   And the record should reflect we've played to the end of

23  segment 53.

24    In that particular segment, we saw some horses in --

25  go up some high ground; is that correct?

Alex Ellis - Direct

1   A.   Yes.

2   Q.   Now, where was that high ground in relationship to the

3   stage?

4   A.   Directly across from it.

5   Q.   Was it directly across from the other side of the road?

6   A.   Yes.  Yes, across the stage to the other side of the road.

7   Q.   Did you see where the horses came from?

8   A.   They seemed to be coming from the north.

9   Q.   And how did the crowd react to the horses?

10  A.   Happily.

11  Q.   Now, I'd like you to turn to Exhibits 57, 58 and 59,

12  please.  Do you have those?

13  A.   Yes.

14  Q.   Yes, and have you reviewed those exhibits as well before

15  coming in to court?

16  A.   I have.

17  Q.   And are they also fair and accurate depictions of the

18  events as you witnessed them on April 12th, 2014?

19  A.   They are.

20       MR. MYHRE:  Thank you.  May we offer, Your Honor,

21  Exhibits 57, 58 and 59?

22       THE COURT:  Any objection to 57, 58 and 59?

23       MR. MARCHESE:  Parker objects to all the exhibits on

24  the grounds of authentication and chain of custody.

25       MR. TANASI:  Stewart joins, Your Honor.

Alex Ellis - Direct

1          MR. LEVENTHAL:  Drexler joins, Your Honor.

2          MR. ENGEL:  Engel joins, Your Honor.

3          MR. PEREZ:  Lovelien joins.

4          MR. JACKSON:  I have reserved my right to object

5     pending cross-examination.

6          THE COURT:  All right.  Thank you.  Exhibits 57, 58

7     and 59 will be admitted.

8          The witness has stated they are a fair and accurate

9     representations of the videos that -- of the events that he saw

10    on April 12th.

11         (Exhibit 57, 58 and 59 admitted.)

12         MR. MYHRE:  May we publish, Your Honor?

13         THE COURT:  Yes.

14         MR. MYHRE:  Thank you.

15    Q.   Now, before we play 57, Mr. Ellis, after the sheriff left

16    and after the horses went up onto the high ground, did there --

17    Mr. Bundy had stated that they had an hour.  What happened

18    during that intervening hour?

19    A.   During the hour, several people came up on stage.  They

20    sang the National Anthem a few times, recited poetry, told

21    stories.

22    Q.   And during the hour, how would you describe -- did you

23    have an impression of just the general mood of the crowd?

24    A.   They seemed happy.  They seemed like they believed they

25    were getting what they wanted.

Alex Ellis - Direct

1    Q.   If we could play Exhibit 57, please.

2         (Exhibit 57 being played.)

3    Q.   Now, Mr. Flynn -- or, excuse me, Mr. Ellis, we saw at the

4    very beginning of this a time stamp of about 11:49; would that

5    be correct?

6    A.   Yes.

7    Q.   So would that be about 10:49 local Nevada time?

8    A.   Yes.

9    Q.   Now, focus your attention, please, to right here in front.

10   I'm drawing an arrow toward an individual.  Do you know who

11   that individual is?

12   A.   I do not.

13   Q.   And but does he appear to be wearing some sort of uniform?

14   A.   Yeah.

15         MR. MARCHESE:  Objection.  Leading.

16         MR. TANASI:  And best evidence, Your Honor.

17   BY MR. MYHRE:

18   Q.   Do you see what he's wearing?

19   A.   I do.

20   Q.   What is he wearing?

21   A.   It's wearing camouflage.

22   Q.   Now, were there a number of people like that?

23   A.   There were.

24   Q.   And were any of them located in and around Mr. Bundy?

25   A.   Yes.

Alex Ellis - Direct

1   Q.   And where were they located?

2   A.   In front of the stage and several on the stage.

3   Q.   Did you observe what they were doing?

4   A.   They also seemed to be providing security for Mr. Bundy.

5   Q.   Did you notice any patches or any identifying marks about

6   their uniforms?

7   A.   I did.

8   Q.   And what did you?  What did you observe?

9   A.   Many of them had patches on their arms identifying them as

10  Oath Keepers.

11  Q.   Did you have an understanding of what Oath Keepers were at

12  that time?

13  A.   I did.  I read they were a local militia.

14  Q.   Now, in the very first part of this video clip, we heard a

15  voice and about taking -- taking the video itself.  Was that

16  Mr. Flynn's voice?

17  A.   Yes.

18  Q.   Continue, please.

19       (Exhibit 57 being played.)

20  Q.   And the record should reflect that was the end of the clip

21  of the Exhibit 57.

22           During this time period, Mr. Ellis, what's is your --

23  what's going on here?  Do you recall?

24  A.   Cliven Bundy had returned after just under an hour and was

25  asking his supporters how much longer they should wait for the

Alex Ellis - Direct

1   sheriff to meet his demands.

2   Q.   So essentially, they are waiting for the hour to end?

3   A.   (Nods head.)

4          MR. MYHRE:  And if we could publish Exhibit 58,

5   please?  Court's permission?

6          THE COURT:  Yes.

7      (Exhibit 58 being played.)

8   BY MR. MYHRE:

9   Q.   Okay.  Mr. Ellis, at the beginning of the clip, I think we

10  saw a time stamp of 11:53; is that correct?

11  A.   Yes.

12  Q.   Which would be 10:53 local; is that right?

13  A.   Excuse me.  Sorry?

14  Q.   That would be 10:53 local; is that right?

15  A.   Yes.

16  Q.   We also saw some what appeared to be police vehicles enter

17  the area; is that correct?

18  A.   Yes.

19  Q.   Did you observe that?

20  A.   I did.

21  Q.   And what were those vehicles?

22  A.   They appeared to be Las Vegas Metro.

23  Q.   We saw a shot there of a road.  What road was that?

24  A.   That would be the highway that drove past the stage site.

25  Q.   And you saw a number of vehicles parked along there as

Alex Ellis - Direct

1  well; correct?

2  A.    Yes.

3  Q.    Was it difficult to find parking in and around that area?

4  A.    It was.

5  Q.    And why was that?

6  A.    Because there were so many people there.

7              MR. MYHRE:  Court's indulgence to publish Exhibit 59.

8              THE COURT:  It's 2:55, and so why don't we go ahead

9  and take a break here.

10             MR. MYHRE:  Very well, Your Honor.

11             THE COURT:  And during this break -- how long do we

12  need, Aaron?

13             COURTROOM ADMINISTRATOR:  About 20 minutes, Your

14  Honor.

15             THE COURT:  We'll take a 20-minute break.  And I

16  remind the jury that you are not to discuss this case with

17  anyone, not permit anyone to discuss the case with you, do not

18  read or listen to or view anything that touches upon this case

19  in any way.  Do not perform any research or investigation, and

20  do not form any opinion.

21             It's 2:55, so we should plan to be back here at 3:15.

22  Go ahead and stand for the jury.

23             And Mr. Ellis, after the jury has exited, then you

24  may go ahead and exit as well and stretch, use the bathroom,

25  whatever you need to do.  Please be back here by 3:15 p.m.

Alex Ellis - Direct

1      (Jury out.)

2           COURTROOM ADMINISTRATOR:  Off record.

3      (Recess 2:55 p.m.  Resumed 3:33 p.m.  Jury out.)

4           THE COURT:  Thank you.  You may be seated.

5           Let's go ahead and call in the jury.

6      (Jury in.)

7           THE COURT:  Everyone may be seated.  We are joined by

8   the jury.  And we have the witness.  Mr. Alex Ellis is back on

9   the stand.  Thank you, sir, for being back on time.

10          Mr. Myhre, you may go ahead and continue with your

11  direct examination.

12          MR. MYHRE:  Thank you, Your Honor.  May we publish

13  Exhibit 59 at this point?

14          THE COURT:  Yes.

15     (Exhibit 59 being played.)

16  BY MR. MYHRE:

17  Q.   Stop right there for me, please.

18          Mr. Ellis, we just stopped the segment 59.  And did

19  you see an individual -- you see his arm here in this frame

20  holding what appears to be some sort of device.  Do you

21  recognize that individual?

22  A.   Yes.

23  Q.   And did you see him out there that day?

24  A.   I did.

25  Q.   And again, in this angle, we also see several individuals

Alex Ellis - Direct

1    in front of the stage; is that correct?

2    A.    Yes.

3    Q.    And who do you recognize those individuals to be?

4    A.    The same men in camouflage who were providing security it

5    seemed.

6    Q.    Please continue.

7          (Exhibit 59 being played.)

8    Q.    Mr. Ellis, we just watched the end of segment 59.  A

9    couple of things.

10          First all, did you hear mention of the Powerline Road

11    and the Toquop Wash?

12   A.    Which road?

13   Q.    Powerline Road and Toquop Wash.  Did you hear those

14   references in this segment?

15   A.    I heard Toquop Wash but not Powerline Road.

16   Q.    Did you have any idea where Toquop Wash was?

17   A.    No.

18   Q.    Now, after -- so you were there, and Mr. Bundy was

19   speaking in that segment; is that correct?

20   A.    Yes.

21   Q.    Did you observe how the crowd reacted to that?

22   A.    Yes.  They were excited about it.

23   Q.    And did the crowd do anything in response to what he had

24   said?

25   A.    They started to gather in their vehicles and head down to

Alex Ellis - Direct

1   the I-15.

2   Q.   In which direction did they head?

3   A.   To the north.

4   Q.   What did you do and Mr. Flynn do?

5   A.   We did the same.  We got in our car and headed up north to

6   I-15.

7   Q.   Now, did you notice whether -- again, you talked about the

8   crowd previously.  Did you notice whether any people with guns

9   left that area as well?

10  A.   Yes.

11  Q.   Did you notice where they happened to be headed?

12  A.   To their cars up north to I-15.

13  Q.   When you left that area then, did you -- you drive

14  apparently?

15  A.   Yes.

16  Q.   And who was with you?

17  A.   Michael Flynn.

18  Q.   And did you have any sense or any impression as to the

19  potential for any harm to come to you if you were to move with

20  the rest of the group?

21  A.   Yes.  We discussed that, Michael and I, that it may be

22  dangerous.

23          MR. MARCHESE:  Objection.  Hearsay.

24          MR. MYHRE:  Just asking for what his impression was,

25  Your Honor.

Alex Ellis - Direct

1          THE COURT:  All right.  Without telling us what

2   Mr. Flynn said, just tell us your impression.

3          THE WITNESS:  I felt it would be dangerous.

4   BY MR. MYHRE:

5   Q.   And why was that?

6   A.   Because I knew many of the supporters as well as the BLM

7   were armed.

8   Q.   And how did you know that?

9   A.   Because I had seen them.

10  Q.   And had you -- had you received any information that

11  anybody had disarmed the BLM?

12  A.   No.  That's part of the reason why they left, because they

13  didn't meet those -- those demands.

14  Q.   Now, we'll move forward.  And if I could have you look in

15  your exhibit book at Exhibits 64 and 70, 71 and 72.  And you

16  have reviewed those?

17  A.   Yes.

18  Q.   And again, those are true and accurate depictions of

19  images that were captured on or about April 12, 2014; is that

20  correct?

21  A.   They are.

22  Q.   And you have reviewed each of those outside the courtroom

23  today?

24  A.   I have.

25  Q.   And those were the -- they accurately depict the events as

Alex Ellis - Direct

1    you witnessed them on the 12th of April?

2    A.   They are.

3              MR. MYHRE:  Your Honor, we offer Exhibits 64, 70, 71

4    and 72.

5              THE COURT:  Any objection?

6              MR. MARCHESE:  Same objection to Parker,

7    authentication and chain of custody.  And we'd ask for a

8    continuing objection.

9              MR. TANASI:  Stewart joins.

10             MR. LEVENTHAL:  Drexler joins.

11             MR. ENGEL:  Engel joins.

12             MR. PEREZ:  Lovelien joins.

13             MR. JACKSON:  I will just reserve my objection until

14   cross-examination.

15             THE COURT:  All right.  Thank you.

16             The witness said that they are what they purport to

17   be and they fairly and accurately depict the scene where he was

18   on April 12, 2014.

19             Lack of foundation doesn't seem to be an issue, and

20   I'm going to let you ask questions about chain of custody, but

21   that doesn't go to admissibility.

22             So it will be admitted.  Did you want to go ahead and

23   start publishing?

24             MR. MYHRE:  Please, Your Honor, 64.

25             THE COURT:  64.  All right.

Alex Ellis - Direct

1          MR. MYHRE:  Thank you.

2          (Exhibits 64, 70, 71 and 72 admitted.)

3          (Exhibit 64 being played.)

4     BY MR. MYHRE:

5     Q.   Mr. Ellis, we have stopped this clip.  And again, the time

6     stamp below reads what?

7     A.   Reads 12:18:28.

8     Q.   And local time would be?

9     A.   That would be 11:18:28.

10    Q.   And in this image, what are we viewing?

11    A.   Las Vegas Metro police as well as civilian vehicles headed

12    east down the northbound I-15.

13    Q.   So looking at the northbound 15?

14    A.   Yes.

15    Q.   And you are headed?

16    A.   Headed east.

17    Q.   Not northbound, but it's headed east there?

18    A.   Correct.

19    Q.   Please proceed.

20         (Exhibit 64 being played.)

21    Q.   During that segment, Mr. Ellis, what did we observe?

22    A.   Las Vegas Metro police continuing to drive east on the

23    northbound I-15 towards the site where the protesters had moved

24    to.

25    Q.   And we heard the words "You see that?"  Who spoke those

Alex Ellis - Direct

1   words?

2   A.   I did.

3   Q.   And the other voice that we heard on this segment, was

4   that of Mr. Flynn?

5   A.   Yes.

6   Q.   And when you say "You see that," to what were you

7   referring?

8   A.   Where the protesters had gathered.

9            MR. MARCHESE:  May we publish Exhibit 70, Your Honor?

10           THE COURT:  Yes.

11       (Exhibit 70 being played.)

12   BY MR. MYHRE:

13   Q.   Stop it, Nicole.

14           We hear someone talking again in this segment of the

15   video.  That is Mr. Flynn speaking?

16   A.   Yes.

17   Q.   What is the discussion there?

18   A.   At the time, I was only 17 years old, so he was asking me

19   to leave so I wouldn't be a liability to the news company.

20   Q.   And we saw also an image of someone with a gun; is that

21   correct?

22   A.   Yes.

23   Q.   And did you -- do you recall seeing that on the 12th?

24   A.   Not during what we saw on the camera here.

25   Q.   And that's because?

Alex Ellis - Direct

1   A.   I was not with Michael during this scene that was

2   recorded.

3   Q.   Where were you at that time?

4   A.   I was back near the car.

5   Q.   And why were you back there?

6   A.   Because he was asking me to leave.

7             MR. JACKSON:  Your Honor, may we approach the bench

8   at this time?

9             THE COURT:  All right.

10             (Sidebar.)

11             MR. LEVENTHAL:  Just for the record, Mr. Drexler

12   waives the sidebar.

13             MR. MARCHESE:  Parker as well.

14             MR. PEREZ:  Lovelien as well.

15             MR. JACKSON:  My client would waive being here

16   present.

17             I'm going to join in the objection with other counsel

18   as far as at least the video from here on, because it's clear

19   that this witness can't say that he can vouch for the accuracy

20   of it, because he says from this point on, he wasn't there.

21             And so whatever is on it from this point on, he can't

22   vouch for the accuracy of it.  So from this point on, I think

23   we need to shut it off.

24             THE COURT:  That seems to be the case, Mr. Myhre.

25             MR. MYHRE:  Well, two things, Your Honor.  First is

Alex Ellis - Direct

1   that the witness, for authentication, all that is required is
2   that the image is what it purports to be.  He does not have to
3   be present for every frame taken.

4            He has already testified that this witness was there
5   and was recording during the events.  And as to the sequence of
6   events, during this particular segment, he had moved down the
7   road a bit, but he comes back and later joins with Flynn
8   throughout the remainder of the video.

9            They are not together every minute of every second or
10  every second of every minute on this video, but that's not
11  required under the law.  He testified that it is what it
12  purports to be.

13           There's sufficient foundation as to why he's there,
14  what he's doing there, and what Mr. Flynn is doing, so --
15           THE COURT:  Okay.  I will let you --
16           MR. JACKSON:  Can I respond?
17           THE COURT:  -- ask the witness if he can see -- if he
18  was there and could see the remainder of what is on the
19  videotape.  He's already previously seen the videotape, so he
20  is familiar with it.
21           MR. MYHRE:  Yes, Your Honor.
22           THE COURT:  So if he tells us that he did actually
23  see himself what's on the videotape, and it's fair and
24  accurate, I don't have a problem with that.
25           But I agree with Mr. Jackson.  It sounds like, at

Alex Ellis - Direct

1   this point, he returns to the car.  And maybe you are right.

2   At some later point he rejoins Flynn, and from there forward he

3   can testify as to the remainder of that tape.

4           So I will let you ask the question.

5           MR. JACKSON:  Can I respond to one thing?  The most

6   famous case in history is Richard Nixon for the 18-minute gap.

7   And we got a 19-minute gap.  He can't vouch for the accuracy of

8   anything.  And if they've got a -- if they've got a five-minute

9   or a six-minute gap --

10          THE COURT:  Mr. Jackson, I just agreed with you that

11  from this point on, if this witness was not with Mr. Flynn or

12  saw what Mr. Flynn was videotaping, then it shouldn't be shown

13  to the jury.  That portion of it would not be admissible.

14          The remainder of it, at some point, this witness

15  rejoined Mr. Flynn, can see what's viewed, what's being shown,

16  displayed on the video and can say that it's fairly and

17  accurately, then obviously that section would be.

18          MR. JACKSON:  I think --

19          THE COURT:  But we don't know that yet until

20  Mr. Myhre asks him those questions.

21          MR. MYHRE:  Your Honor, may I just add one thing for

22  the record?

23          THE COURT:  Sure.

24          MR. MYHRE:  If the ultimate ruling by Court is that

25  somehow this wouldn't come in, we would ask the opportunity to

Alex Ellis - Direct

1    brief it.  Because there is case law that says that the

2    proponent of the evidence does not have to be present for every

3    portion of the video.  He doesn't even have to be present

4    necessarily for the recording of the video as long as they can

5    testify --

6              THE COURT:  That it fairly and accurately depicts.

7    But if he's not there, how can he say what it fairly and

8    accurately depicts?  We don't know, because all he said is he

9    went back to the car.

10             So in my mind, the vision I'm seeing is him returning

11   to the car --

12             MR. MYHRE:  I see.

13             THE COURT:  -- closing the door, and he doesn't have

14   a view of anything other than what he can see from the windows

15   of the car.  I don't know where this video going.

16             If the video stays in same area where he's seated and

17   he can actually see it, just from a different vantage point,

18   then I don't have a problem with that.

19             We don't know that is the problem, so you need to

20   establish that with your questions.

21             MR. MYHRE:  Thank you.

22             MR. TANASI:  If I can just join for Stewart.  I came

23   here late.

24             THE COURT:  Sure.

25          (End of sidebar.)

Alex Ellis - Direct

1          THE COURT:  All right.  Mr. Myhre, you may continue.

2          MR. MYHRE:  Thank you.

3   Q.   Mr. Ellis, you testified that you -- at this point, you

4   went back to the car.  Where was the car?

5   A.   Probably 30 or 40 feet south of where Michael was standing

6   in that clip.

7   Q.   So, that -- while you may not have been standing next to

8   him at the time that that was taken, were you -- did you see

9   that area where this video was taken?

10  A.   Yes.  We were parked in the area that the protesters had

11  moved to.

12  Q.   So was this area visible from where you were?

13  A.   Yes, you can see it in the clip.

14  Q.   And does that -- what -- this area as depicted on this

15  video, does that fairly and accurately depict what you were

16  able to observe?

17  A.   Yes.

18          THE COURT:  Just to be clear, so you could see from

19  the vehicle everything that's shown on this video?

20          THE WITNESS:  Yes, I could see the freeway and the

21  people approaching.

22          THE COURT:  All right.  So you have already seen this

23  video before today; right?

24          THE WITNESS:  Yes.

25          THE COURT:  And everything you see in the video, you

Alex Ellis - Direct

1   also had a vantage point from the car that you could see.

2                   THE WITNESS:  Yes.  You can see where we were parked

3   in the video.

4                   THE COURT:  So at no point did Mr. Flynn, with his

5   video, walk over into another area where now, for whatever

6   reason, it's blocked and you can't see what he's taping?

7                   THE WITNESS:  No.

8                   THE COURT:  All right.  You may go ahead and

9   continue.

10                  MR. MYHRE:  If we could continue the video, please.

11       (Exhibit 70 being played.)

12  Q.   Now, Mr. Ellis, at the end of this particular clip, we saw

13  a number of cars.  What was that area where we saw the cars?

14  A.   That was the area where the protesters had started to

15  convene after Cliven's speech and also where we had parked.

16  Q.   Now, after you parked, did you later rejoin Mr. Flynn?

17  A.   Yes.  I believe I'm with him in the next clip.

18                  MR. MYHRE:  May we publish Exhibit 71, Your Honor?

19                  THE COURT:  Yes, you may.

20       (Exhibit 71 being played.)

21  Q.   And what did we just observe in that clip, Mr. Ellis?

22  A.   That was me asking Michael if I could upload pictures of

23  what we were seeing to the Internet.

24  Q.   And what were you seeing?

25  A.   A lot of police standing between the northbound and

Alex Ellis - Direct

1    southbound I-15.

2            MR. MYHRE:  And may we publish Exhibit 72, Your

3    Honor?

4            THE COURT:  All right.  You may publish 72.

5        (Exhibit 72 being played.)

6    BY MR. MYHRE:

7    Q.   And in Exhibit 72, is that -- are you still in that

8    parking area?

9    A.   Across the interstate from it.

10   Q.   Across?

11   A.   It's on the other side of the northbound.

12   Q.   Okay.

13   A.   In the median area.

14   Q.   And we saw -- we saw a number of flags in that particular

15   segment; did we not?

16   A.   Yes.

17   Q.   Did you observe flags?

18   A.   Yes.

19   Q.   Now I will move on to Exhibits 74, 76, and 77.  And same

20   as before, if you would look at 74?

21   A.   Yes.

22   Q.   76?

23   A.   Yes.

24   Q.   And 77?

25   A.   Yes.

Alex Ellis - Direct

1   Q.   And are those clips that you have reviewed outside the
2   courtroom today?
3   A.   Yes.
4   Q.   And do they fairly and accurately depict the events as you
5   witnessed them on the 12th April -- excuse me -- 12th of
6   April 2014?
7   A.   Yes.
8              MR. MYHRE:  Your Honor, we offer Exhibits 74, 76 and
9   77.
10             THE COURT:  Any objection?
11             MR. MARCHESE:  Parker, same objections.
12             MR. TANASI:  Stewart joins, Your Honor.
13             MR. LEVENTHAL:  Drexler joins, Your Honor.
14             MR. ENGEL:  Engel joins, Your Honor.
15             MR. PEREZ:  Lovelien joins.
16             MR. JACKSON:  I will just reserve my right to object
17  after cross.
18             THE COURT:  All right.  Thank you.
19             Exhibits 74, 76 and 77 will be admitted.
20         (Exhibit 74, 76 and 77 admitted.)
21             MR. MYHRE:  May we publish 74, Your Honor?
22             THE COURT:  Yes.
23         (Exhibit 74 being played.)
24             MR. MYHRE:  And 76, Your Honor?
25             THE COURT:  Yes.  Yes.

1          (Exhibit 76 being played.)

2     BY MR. MYHRE:

3     Q.   Now, in Exhibit 72, if you recall seeing that, where were

4     you located then?  Where was that taken?

5     A.   Further west on the I-15 northbound.

6     Q.   Now, on Exhibit 74, we saw -- at the start of that, where

7     were you located then at the beginning of 74?

8     A.   We had moved east up the I-15 northbound to the wash.

9     Q.   And was there anything in particular that drew your

10    attention to the wash area?

11    A.   The reason we went over there is because we were in the

12    original spot where the protesters had went, and a lady had

13    came up and started yelling at everybody saying that the BLM

14    was down further on the highway supposedly pointing guns at

15    civilians she said.

16    Q.   And how did you react to that?

17    A.   As reporters, we thought that that was something we should

18    cover, so we ran down there.

19    Q.   Okay.  So you and -- was Mr. Flynn with you?

20    A.   Yes.

21    Q.   Now, at the scene that we saw at the opening of this, what

22    was that?

23    A.   Some of the protesters shouting at the BLM from the top of

24    the I-15.

25    Q.   Now, in terms of the actual geographic area, was that a

Alex Ellis - Direct

1    shot of the wash?

2    A.   Yes.

3    Q.   During that segment, did you hear any references to court

4    orders?

5    A.   Yes, I believe I did.

6    Q.   And did you hear anything about court orders while you

7    were in the wash?

8    A.   Some of the protesters were shouting things such as your

9    court order does not apply here.  Things to that effect.

10   Q.   Now, we saw a shot of what appeared to be vehicles on the

11   southbound bridge or just north of the southbound bridge; is

12   that correct?

13   A.   Yes.

14   Q.   And do you have an understanding of what those were?

15   A.   We believed those were BLM and federal agents as well as

16   Las Vegas Metro police.

17            MR. MYHRE:  Your Honor, may we publish Exhibit 77?

18            THE COURT:  Yes.

19       (Exhibit 77 being played.)

20   BY MR. MYHRE:

21   Q.   Mr. Ellis, during that segment, first of all, where --

22   from what vantage point is this scene being shot?

23   A.   Still on top of the northbound I-15.

24   Q.   And just generally, what did we view in this latest

25   segment?

Alex Ellis - Direct

1   A.   The horsemen from earlier in the day had arrived in the

2   wash and the protesters seemed to rally behind them and start

3   to approach the BLM position.

4   Q.   And that segment, we had a time stamp on that at around

5   12:56; was that correct?

6   A.   Yes.

7   Q.   Which would be 11:56?

8   A.   Yes.

9   Q.   So we will proceed on.  We will move to Exhibits 78, 79

10  and 80.

11          And same as before.  If you could look at 78, please

12  and then 79 and 80.  And outside of the presence of the jury,

13  you have reviewed these video clips previously; correct?

14  A.   I have.

15  Q.   And they fairly and accurately depict the events as you

16  witnessed them on April 12, 2014; correct?

17  A.   They do.

18          MR. MYHRE:  Your Honor, we offer Exhibits 78, 79 and

19  80.

20          THE COURT:  Any objection?

21          MR. MARCHESE:  Parker, same objection.

22          MR. TANASI:  Stewart joins.

23          MR. LEVENTHAL:  Drexler joins.

24          MR. ENGEL:  Engel joins.

25          MR. PEREZ:  Lovelien joins.

Alex Ellis - Direct

1          MR. JACKSON:  I am going to object on a couple of

2    grounds.

3          One, I think there's some prejudicial material in the

4    one that violates Federal Rule of Evidence 40 -- 401 and 403.

5    It's more prejudicial than probative.

6          Particularly, it also violates the confrontation

7    clause.  The comments from Mr. Flynn -- and I'm going to ask to

8    make a motion that parts of it be stricken.

9          The comments of Mr. Flynn about that the police were

10   afraid, that's a conclusion which he made, but he's not subject

11   to cross-examination.  It's also highly prejudicial, and the

12   government brought it in by bringing this video, which was good

13   tactics by them, but I think it's also --

14         MR. MYHRE:  Well, Your Honor, we object to the

15   speaking objections, quite frankly.

16         MR. JACKSON:  I simply object to it, because I have

17   reserved my objections up till now.  I am now making an

18   objection.

19         THE COURT:  Thank you, Mr. Jackson.

20         Mr. Myhre?

21         MR. MYHRE:  Yes, Your Honor.  The -- with respect to

22   the comments by Mr. Flynn, there is no confrontation clause

23   issue, since these are non-testimonial statements.  They are

24   excited utterances, and they are present sense impressions.

25   He's recording as he's viewing what is occurring before him.

Alex Ellis - Direct

1      So therefore, to the extent they are hearsay, they --
2  they are clearly an exception to the rule against hearsay.
3      MR. MARCHESE:  Your Honor, I'm going to join his
4  objection.  And I would disagree respectfully with Mr. Myhre,
5  who I have the utmost respect for.
6      But I'm going to disagree that they are a present
7  sense impression, because we cannot lay or he cannot lay any
8  foundation as to an excited utterance of these particular
9  statements, because the individual, Mr. Flynn, who was making
10  these statements, is not here.
11      And it's irrelevant what his state of mind --
12  Mr. Flynn's state of mind is, talking about what the officers
13  were allegedly feeling or thinking at the time.
14      So, I think Mr. Jackson is absolutely correct, and I
15  join his motion.
16      MR. JACKSON:  The other thing, Your Honor, he was a
17  reporter doing this for pay.  So I don't think it was an
18  excited utterance.  He made this video hoping to sell it, I
19  believe, or at least as part of his job.  So I don't think it's
20  an excited utterance.
21      MR. TANASI:  Your Honor, Mr. Stewart joins.
22      MR. LEVENTHAL:  Mr. Drexler joins.
23      MR. ENGEL:  Engel joins.
24      MR. PEREZ:  Lovelien joins.
25      THE COURT:  All right.  Well, the Court disagrees.

Alex Ellis - Direct

1   There is no confrontation clause issue.  It's not testimonial.

2   It does appear to be a present sense impression.

3           So Exhibits 78, 79, and 80 will be admitted.

4       (Exhibit 78, 79, and 80 admitted.  79 and 80 later

5   withdrawn.)

6           MR. MYHRE:  Thank you, Your Honor.  And may we

7   publish 78, Your Honor?

8           THE COURT:  Yes, you may.

9       (Exhibit 78 being played.)

10  BY MR. MYHRE:

11  Q.   If you could back up just a bit, Nicole.  Right there.

12  Thank you.  Thank you.

13          Now, Mr. Ellis, we've heard -- we heard Mr. Flynn

14  asking you to do something; correct?

15  A.   Yes.

16  Q.   And what was he asking you to do?

17  A.   He was asking me to take note of what the BLM was saying

18  to the protesters.

19  Q.   Now, at the time that this segment of the video was shot,

20  were you still in the same area as you described before?

21  A.   Yes, on top of the I-15.

22  Q.   Could you hear what was being said by the people on the

23  other side of that gate?

24  A.   Yes.  It was difficult though.

25  Q.   Okay.  And what did you understand them to be saying?

Alex Ellis - Direct

1    A.    I understood them to be saying -- asking the protesters to

2    please disburse, and that they are authorized to use up to

3    lethal force.

4    Q.    Now, did you later move from that area further up the

5    wash?

6    A.    Later on, yes.

7    Q.    And as you got closer to the area up the wash, could you

8    hear clearer than where you were at the time this video was

9    shot?

10   A.    By the time I moved up, they had stopped saying it.

11   Q.    So if we could continue, please, with 78.

12         (Exhibit 78 being played.)

13   Q.    And I think I neglected one thing.  I apologize, Your

14   Honor.  If we could back up 78 just again, please.  Right

15   there.

16         Now, I'm circling an individual here in this

17   particular segment.  Do you recognize that person?

18   A.    I do.

19   Q.    And who is that?

20   A.    That is Ammon Bundy.

21   Q.    And where had you seen him previously?

22   A.    Previously speaking on the stage.

23   Q.    And may we publish Exhibit 79, Your Honor?

24         THE COURT:  Yes, you may.

25         (Exhibit 79 being played.)

Alex Ellis - Direct

1    BY MR. MYHRE:

2    Q.   Stop there, please.  Back up just a bit.  Right there.

3    Thank you.

4           Now, Mr. Ellis, did there come a time then -- do you

5    recognize the vantage point from where this video is being

6    shot?

7    A.   Yes.

8    Q.   And where was it being shot from?

9    A.   From down in the wash.

10   Q.   And do you know what side of the wash?

11   A.   From the northbound I-15 looking towards the southbound.

12   Q.   Now, drawing your attention to two individuals on the top

13   of the frame here and circling that, do you recognize anyone in

14   that circle?

15   A.   I do.

16   Q.   And who do you recognize?

17   A.   I recognize Ammon Bundy as well as a protester with a

18   rifle I had seen earlier at the stage.

19   Q.   Okay.  And which one is Ammon Bundy?

20   A.   Ammon Bundy is the one on the right taking his hat off.

21   Q.   And the other -- does the other individual -- do you

22   notice whether he's carrying a firearm or not?

23   A.   I do.

24   Q.   And how is he -- what type of firearm is he carrying if

25   you can tell?

Alex Ellis - Direct

1    A.   A long gun.

2    Q.   And how is he carrying it?

3    A.   Down across the front of his body.

4    Q.   Now, during the time that videos in the wash were being

5    shot, you and Mr. Flynn were not always together at the same

6    time; is that correct?

7    A.   That is correct.

8    Q.   Are you able, however, to see him when he's filming?

9    A.   Yes.  I'm still on top of the northbound I-15 able to see

10   everything that's happening.

11   Q.   So everything that's depicted in these videos, you are

12   able to see your vantage point as well; is that correct?

13   A.   Yes.

14   Q.   Thank you.  Please proceed.

15        (Exhibit 79 being played.)

16   Q.   That last segment we were able to see a line of people; is

17   that correct?

18   A.   Yes.

19   Q.   And the vantage point from where that scene was shot or

20   that image was captured rather?

21   A.   That would be down in the wash.

22        MR. MYHRE:  And may we publish Exhibit 80, Your

23   Honor?

24        THE COURT:  Yes.

25        (Exhibit 80 being played.)

Alex Ellis - Direct

1          MR. MYHRE:  My apologies, Your Honor.  My apologies,

2    Your Honor, 79 had several clips within it, and my notes did

3    not reflect that.  So if I may go back and republish 79, clip

4    B.

5          THE COURT:  All right.

6      (Exhibit 79, clip B, being played.)

7    Q.   And clip C, please.

8      (Exhibit 79, clip C, being played.)

9    Q.   Okay.  Mr. Ellis, the first clip we saw is clip B, which

10   appeared to be under the southbound bridge; is that correct?

11   A.   Yes.

12   Q.   Could you tell from what vantage point that video was

13   captured?

14   A.   Under the southbound bridge on the west side.

15   Q.   Was it above or below the wash?

16   A.   Above the wash.

17   Q.   Was it -- whereabouts was it -- with proximation to the

18   bridge, was it on that skirt area?

19   A.   On the slope area just under the bridge.

20   Q.   Now, the next clip we saw, clip C, from which vantage

21   point where was that taken?

22   A.   Directly under the bridge in the wash.

23   Q.   In relationship to the gate, where was it?

24   A.   Directly in front of it.

25   Q.   And the individual that we saw in clip C was who?

Alex Ellis – Direct

1   A.    Ammon Bundy.

2              MR. MYHRE:  Court's indulgence.

3              THE COURT:  Sure.

4              MR. MYHRE:  And may we publish Exhibit 80, Your

5   Honor?

6              THE COURT:  Yes.  Is this going to be the last one?

7   Because it's already past 4:30, or do you want to do Exhibit 80

8   tomorrow?

9              MR. MYHRE:  Yes, Your Honor.  That would be fine.

10             THE COURT:  All right.  Then we'll go ahead and break

11  for the evening.  We will be back here at 8:00 a.m.

12             I do remind the jury, please do not discuss this case

13  with anyone or allow anyone to discuss it with you.  If you do

14  hear anything about the case, please let me know right away.

15             Also, do not listen to or read or view anything that

16  touches upon this case in any way.  Do not attempt to perform

17  any research or make any independent investigation concerning

18  the case.

19             And do not form any opinion regarding the issues in

20  this case until after you have heard all the evidence, all the

21  testimony, seen everything, the closing arguments.  I will

22  provide with you the written jury instructions, and then I will

23  instruct you that you can begin your deliberation process and

24  speak to each other about the case, but not until then.

25             So, we'll go ahead and stand so that you can go ahead

1    and go home for the night.  We'll see you back here at

2    8:00 a.m.

3            Mr. Ellis, after the jury exits, then you as well may

4    go home for the night, and we will see you back here at

5    8:00 a.m., please.

6        (Jury out.)

7            THE COURT:  All right.  Off record.

8            COURTROOM ADMINISTRATOR:  Off record.

9        (Recess, 4:35 p.m.)

1                          INDEX OF EXAMINATIONS

2    For the Plaintiff:

3    Witness Name              Direct   Cross    RD     RX     Voir Dire

4         Michael Johnson          7      25     75     84
                                           28            86
5                                          43            91
                                           54
6                                          60
                                           71
7         Adam Sully              95      145
                                          153
8                                         161
                                          163
9                                         171
                                          173
10        Alex Ellis             189

11

12                         PLAINTIFF'S EXHIBIT INDEX

13   Exhibit No.                                     Marked    Admitted

14   15, 16, 18, 19, 20, 21 and 22                              107
     49                                                         124
15   51, 52 and 53                                              202
     57, 58 and 59                                              211
16   64, 70, 71 and 72                                          221
     74, 76 and 77                                              230
17   78, 79, and 80                                             236
     327                                                        193
18

19

20

21

22

23

24

25

1                                  --oOo--

2                      COURT REPORTER'S CERTIFICATE

3

4          I, KATHERINE EISMANN, Official Court Reporter, United

5     States District Court, District of Nevada, Las Vegas, Nevada,

6     certify that the foregoing is a correct transcript from the

7     record of proceedings in the above-entitled matter.

8

9     Date:  March 29, 2017.

10                              /s/ *Katherine Eismann*
                                ─────────────────────────

11                              Katherine Eismann, CSR CRR RDR

12

13

14

15

16

17

18

19

20

21

22

23

24

25